# EXHIBIT 14

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GREY FOX, LLC a California ) Case No.
limited liability company; MAZ ) 2:16-cv-03157-PSG-
PROPERTIES, INC., a California ) JEM
Corporation; BEAN BLOSSOM, LLC, )
a California limited liability )
company; WINTER HAWK, LLC, a )
California limited liability )
company, individually and on )
behalf of others similarly )
situated, )
                            )
            Plaintiffs, )
                            )
vs. )
                            )
PLAINS ALL AMERICAN PIPELINE, )
L.P., a Delaware limited )
partnership; PLAINS PIPELINE, )
L.P., a Texas limited )
partnership, and JOHN DOES 1 )
through 10, )
                            )
            Defendants. )
_____)


VIDEO-RECORDED DEPOSITION OF RICHARD J. RODDEWIG

Los Angeles, California

Thursday, September 28, 2023

Volume I

Reported by:

ROCHELLE HOLMES

CSR No. 9482

Job No. 6107468

PAGES 1 - 203


Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GREY FOX, LLC a California      )   Case No.
limited liability company; MAZ )   2:16-cv-03157-PSG-
PROPERTIES, INC., a California  )   JEM
Corporation; BEAN BLOSSOM, LLC, )
a California limited liability  )
company; WINTER HAWK, LLC, a    )
California limited liability    )
company, individually and on    )
behalf of others similarly      )
situated,                       )
                                )
         Plaintiffs,            )
                                )
vs.                             )
                                )
PLAINS ALL AMERICAN PIPELINE,   )
L.P., a Delaware limited        )
partnership; PLAINS PIPELINE,   )
L.P., a Texas limited           )
partnership, and JOHN DOES 1    )
through 10,                     )
                                )
         Defendants.            )
_____)

Deposition of RICHARD J. RODDEWIG, taken on behalf of Plaintiff, at 350 S. Grand Avenue, 50th Floor, Los Angeles, California, beginning at 9:06 a.m. and ending at 3:08 p.m. on Thursday, September 28, 2023, before ROCHELLE HOLMES, Certified Shorthand Reporter No. 9482, Certified Realtime Reporter No. 0123.

Page 2

APPEARANCES:


For Plaintiffs:


     CAPPELLO & NOEL

     BY:   LAWRENCE CONLAN, ATTORNEY

     831 State Street

     Santa Barbara, California 93101-3227

     (805) 564-2444

     Lconlan@cappellonoel.com


For Defendants:


     MUNGER, TOLLES & OLSON LLP

     BY:   JORDAN SEGALL, ATTORNEY

     350 South Grand Avenue, 50th Floor

     Los Angeles, California 90071-1560

     (213) 683-9207

     Jordan.segall@mto.com


ALSO PRESENT:   MICHAEL TACHOVSKY


VIDEOGRAPHER:   BRADEN BATES, TELEGENICS


Page 3

                              INDEX

      WITNESS              EXAMINATION BY                PAGE

    RICHARD J. RODDEWIG

    Volume I

                            MR. CONLAN                      6




                            EXHIBITS

      NUMBER              DESCRIPTION                     PAGE

    Exhibit 23        Declaration of Richard J.      8

                      Roddewig in Support of

                      Rebuttal Expert Witness

                      Disclosure

    Exhibit 24        Expert Report                    13

    Exhibit 25        "Off the Rails"                  98

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Los Angeles, California, Thursday, September 28, 2023

9:06 a.m. - 3:08 p.m.

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 9:06 a.m. on September 28th, 2023.  This is Media Unit 1 of the video-recorded deposition of Richard J. Roddewig in the matter of Grey Fox, LLC, et al., versus Plains All American Pipeline, et al., filed in the United States District Court, Central District of California.

The location of the deposition is 350 South Grand Avenue, Los Angeles, California 90071.

My name is Braden Bates representing Telegenics and I'm the videographer.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. CONLAN:  Larry Conlan for the plaintiffs.

MR. SEGALL:  Jordan Segall, Munger Tolles & Olson for the defense.

MR. CONLAN:  I also have Michael Tachovsky with me today from Landmark Research.

THE VIDEOGRAPHER:  Thank you, Counsel.

And will the court reporter please swear in

Page 5

the witness.

RICHARD J. RODDEWIG,

having been duly administered an oath in accordance with CCP 2094, was examined and testified as follows:


EXAMINATION

BY MR. CONLAN:

Q    Mr. Roddewig, good morning.

A    Good morning, Mr. Conlan.

Q    You understand that you're under oath today;    09:08AM right?

A    Yes.

Q    Okay.  You have been deposed how many times?

A    50, 60, 70, somewhere in there.

Q    Okay.  So you know the ground rules    09:08AM basically; is that fair to say?

A    Yes.

Q    Is there any reason you cannot testify truthfully today?

A    No.    09:08AM

Q    What did you do to prepare for your deposition today?

A    Went back and read my report a couple of times.  I read Dr. Bell's report.  I looked at some of the things that we had produced to you with our    09:08AM

Page 6

report.  Talked with Mr. Segall and Ms. Thompson yesterday for a couple of hours here in the office.

Q    Is there anything that you did or anyone you talked to that would require a modification of the opinions you have offered in this case?

09:09AM

A    No.

Q    Is there any new information you looked at as part of the preparation for this deposition that you hadn't previously reviewed?

A    No.

09:09AM

Q    I'm sure you have heard this before, but when the deposition is over you're going to have a chance to review your transcript.

Do you understand that?

A    Yes.

09:09AM

Q    And do you also understand that you have an opportunity to make corrections to your testimony?

A    Yes.

Q    And do you understand that if you make any material changes to your testimony I or another counsel representing the plaintiffs will have the opportunity to comment on that in front of the judge or the jury?

09:09AM

A    If that's the rule, then that's the rule, sure.

09:09AM

Page  7

Q   And you understand if you make material changes to your testimony it could affect your credibility as a witness at trial?

A   Depends on what the material change is, I guess.                                                                    09:09AM

Q   Okay.

A   So it could, yes.  So it could.

Q   Okay.  You understand that it could?

A   Yes.

Q   Okay.  And I see you have a document in       09:10AM front of you there that I assume is your report.

A   Yes.

Q   I'm going to mark as Exhibit 23 a copy of your report.

(The aforementioned document was marked as     09:10AM Exhibit 23 and is attached hereto.)

Q   BY MR. CONLAN:  And when I'm asking you questions, if it's easier for you to review the color copy that you have in front of you, that's fine.

A   Thank you.                                   09:10AM

Q   Is that the complete copy of your report?

A   Yes.

Q   In front of you?

A   Yes.

Q   Okay.                                        09:10AM

Page 8

A    The one that we produced.

MR. SEGALL:  Do you have an extra copy?

MR. CONLAN:  I do.

Q    BY MR. CONLAN:  So I'm going to refer to that report sometimes as Exhibit 23, I may just call    09:10AM it your report.

Do you understand that?

A    Yes.

Q    I see you have some tabs there on your report, what is written on those?    09:10AM

A    Typos that I found.  And we can either go through those now or as you ask me questions if I, you know, flip to a page and there's a typo, I can let you know what it is.

Q    But do you have any notes written in the    09:11AM report anywhere other than on those tabs that are stuck to the side of the pages?

A    No.

Q    Yeah.  Why don't you tell me about the typos right now.    09:11AM

A    Okay.  So at page Roman Numeral III, Footnote 6, if you look at it you'll see it starts out saying "Lloyd dep" and then "Deposition of Mark Lloyd."  Well, "Lloyd dep" should be crossed out.

Q    Got it.    09:11AM

Page 9

A    Page 43, carryover paragraph at the top, where the third line says "3 of 2010 to quarter 4 of 2011," it should be "quarter 4 of 2012," not '11.

Page 69, there's three bullet points about halfway down the page under Article No. 5.  And that  09:12AM third bullet point, the second line should read, "Analyzes the economic value of environmental amenities."  The "of" is missing.

Q    Got it.

A    Page 99, footnote at the bottom of the page,  09:12AM 93, footnote at the bottom of the page, the very last line where it says, "Any independent analysis raw sales data," it should be "independent analysis of raw sales data."

Q    Got it.  09:13AM

A    Page 135, just before the beginning of that table that starts at the bottom of the page there's two paragraphs that are redundant, they both say the same thing.  And so one of those should be deleted.

And that's it on the typos.  09:13AM

Q    Okay.  Any other corrections to your report that you've noticed?

A    No.

Q    Looks like you gave it a pretty careful read before the deposition; is that fair to say?  09:13AM

Page 10

A    Yes.

Q    Let me ask you about the edit on Page 43 where the date quarter 4 of 2011 was corrected to say quarter 4 of 2012.

A    Okay.                                          09:14AM

Q    Who originally wrote that section of your report?

A    I did.

Q    Did you have any assistance in writing it?

A    In the writing of this section?                09:14AM

Q    Yes.

A    No.  Not that I -- well, let me look at it.

Q    Right.

A    Take a look.

     No.                                            09:14AM

Q    Okay.  And on Page 135, who wrote that section where we deleted that redundant paragraph?

A    That would have been me.

Q    Okay.  Did you carefully proofread your report before it was served last summer?      09:14AM

A    Yes.

Q    So actually just to correct my question, when was this served?  Earlier this summer in June of 2023?

A    Yes.                                           09:15AM

Page 11

Q    All right.  And in carefully reviewing your report before the deposition, you didn't see any other errors that you noted?

A    No.

Q    Okay.  Let me ask you about something on    09:15AM Page 71, you see the header there at 3.8?

A    Yes.

Q    Can you read it for me for the record?

A    "The Bell report fails to properly consider and calculate the past loss of use to the property    09:15AM owners as of September of 2019."

Q    What is the significance of the year 2019 there?

A    I don't recall.

Q    If you need to take a moment and look    09:16AM through that section, if you could see if that changes your testimony, I'd appreciate that.

MR. SEGALL:  And, Dick, if you need to look at the Bell report to refresh your recollection on this part we can get it for you.    09:16AM

THE WITNESS:  I don't have the Bell report in front of me.

MR. CONLAN:  I've got a copy of the Bell report if it would be easier for you to look at.  We can mark this as Exhibit 24.    09:17AM

Page 12

(The aforementioned document was marked as

Exhibit 24 and is attached hereto.)

MR. CONLAN:  Here's a copy for you.

THE WITNESS:  Let me look at the Bell

report.                                                    09:17AM

Do we have his earlier report from -- wasn't

there an earlier report in 2019?  It could be a

carryover from when I started working on this

referring to his earlier report.

MR. SEGALL:  That's right.  There was a          09:18AM

prior report measuring damages as of 2019.

THE WITNESS:  So that's probably what it

relates to.  I'd started my work in relationship to

his earlier report.

Q    BY MR. CONLAN:  Okay.  So just to get a      09:18AM

clear understanding of what happened, it's your

understanding that Dr. Bell submitted a report

sometime in 2019 and you began your analysis of Dr.

Bell -- or review of Dr. Bell's report around that

time; is that correct?                                     09:18AM

A    No.  I started my work in 2021.  But the

report that I originally was reviewing was his report

in 2019.  It wasn't clear that he was going to submit

an additional report until 2022.

Q    Understood.  When you were engaged to        09:18AM

Page 13

testify on behalf of Plains, what was the scope of your assignment?

A   I was told I'd be looking at Dr. Bell's report and reviewing and commenting on his report and his analysis.                                    09:19AM

Q   What is --

A   There was some -- there was some discussion initially as to whether I would do a separate report of my own that would have my own opinion.  And the decision was made that I would be reviewing Dr. Bell's   09:19AM report, not doing a separate report of my own.

Q   Okay.  And what is that called in the appraisal world?

A   An appraisal reviews.

Q   That's a term of art in the area in which   09:19AM you work?

A   Yes.

Q   So with respect to this statement in 3.8 on Page 71 of your report, is that an error?

A   I wouldn't call it an error.  I would call   09:19AM it a typo.

Q   Okay.  But it's a reference to a report other than the report that you're reviewing, which is the subject of this 2023 analysis that you did; correct?                                                    09:20AM

Page 14

A    Well, but the content of the rest of the section all relates to his later report, not to his 2019 report.  So it would be a typo.  I'd started reviewing his 2019 report and neglected to change the header on that section.                                    09:20AM

Q    Okay.  So it was a mistake?

A    It was a typo.

Q    Did you review Dr. Bell's deposition --

A    Yes.

Q    -- since it was taken?                            09:20AM

A    Yes.

Q    Did you --

A    Briefly.  I sat in on his deposition remotely and I briefly looked at some of his -- some of the dep, I have not read it all the way through.    09:20AM

Q    Okay.  Were you sitting in on the portion of the deposition where he responds to your report?

A    Yes.

Q    And did you review that again since that time or prior to this deposition?                         09:21AM

MR. SEGALL:  Objection; vague and ambiguous.

Do you mean the notes or the testimony?

Q    BY MR. CONLAN:  The transcript?

A    I did not look at the transcript section related to what he had said.  I tried to remember what   09:21AM

Page 15

he had said and then I looked at those notes that he handed in at the very end of his deposition.

Q    Did you take any notes about his notes?

A    No.

Q    Did you take any notes about his testimony?    09:21AM

A    No.  I just listened.

Q    Did you attend the deposition of Mike Arnold?

A    No.

Q    Did you review a transcript of the    09:21AM deposition of Mike Arnold?

A    Yes.

Q    When did you do that?

A    Last weekend.  Last week, last weekend.

Q    Did you take any notes on your review of the    09:21AM deposition transcript of Mike Arnold?

A    No.

Q    Did you see any testimony from Mr. Arnold that would cause you to change your opinion in this case?    09:22AM

A    No.

Q    Did you see any testimony from Mr. Arnold that surprised you?

MR. SEGALL:  Vague and ambiguous.

THE WITNESS:  No.  Because I didn't review    09:22AM

Page 16

his report, so I was learning about his report while I was listening to his deposition.

Q    BY MR. CONLAN:  In preparing your report, Exhibit 23, did you rely on the opinions of Mike Arnold in any way?                                    09:22AM

A    I'd have to look and see what I say about that.  There's different places in the report where I refer to his firm and refer to him, but I would have to answer that specifically as it relates to spots where I might have referenced him.                        09:22AM

Q    And where in your report would you look to determine to what extent you relied on Mike Arnold?

MR. SEGALL:  The document speaks for itself.

Q    BY MR. CONLAN:  I'm asking the witness --

A    Well, if I had it up on the screen in front    09:23AM of me I'd put in his name and see all the different places where it pops up.  But -- so there's no index to it, so I'd have to look at each place where I might have mentioned his firm or his name and see what it says about why I mention his name or his firm at that    09:23AM spot.

Q    Okay.  So I'm not asking you to identify every place in your report where you reference Mike Arnold, I'm sort of asking you generally if you prepare a report like this and you're potentially    09:23AM

Page 17

relying on another expert as foundation for your report, where would you refer to that as a material that you relied on, if you know?

A    It would be in the report somewhere.

Q    Well, we can all agree on that, but where in    09:23AM the report, if you know?

MR. SEGALL:  Objection.  The document speaks for itself, it's not a memory test.

Q    BY MR. CONLAN:  I'm not trying to test your memory, I'm just asking you in general where you would    09:24AM place that in the report, at the end, at the beginning, on a list of materials relied on?

A    I don't think I had a report from him when I produced my report.

Q    Okay.    09:24AM

A    And I do remember in there saying something in the report about what his value is reported going to be, but I did not have a report from him at that time.  So I remember that statement in the report, in    09:24AM my report, about what I considered related to Mr. Arnold.

I also think I said in my report that I discussed the market in Santa Barbara in the county with Mr. Arnold.  I inspected the property with Mr. Arnold.  Those are things that I remember that I    09:25AM

Page 18

say in the report about referencing Mr. Arnold.

MR. SEGALL:  And I'm just going to state for the record that there is a facts or data considered section of the report that you could refer the witness to.                                                          09:25AM

MR. CONLAN:  That's what I was trying to get to, Jordan.

Q    BY MR. CONLAN:  Sir, is it your best recollection today that at the time you completed this report, Exhibit 23, in June of 2023, you had not    09:25AM reviewed a written report of Mike Arnold?

A    That's my recollection.

Q    At the time you completed your report in June of 2023, had you reviewed and analyzed a report from somebody named Kristin Robrock?              09:25AM

A    Yes.

Q    I'm going to direct your attention to Page 17 of your report.  Toward the bottom of Page 17 there's a paragraph that starts with "Significant professional assistance."                                 09:26AM

Do you see that?

A    Yes.

Q    Okay.  The last sentence says, "In addition, we have consulted with Mr. Michael Arnold of Hammock Arnold Smith and Company, a California licensed real    09:26AM

Page 19

estate appraiser about local Santa Barbara County real estate market information."

Did I read that correctly?

A   Yes.

Q   Were you involved in the consultation with   09:26AM
Mr. Arnold personally?

A   Yes.  I toured the property with him, drove around through the marketplace in Santa Barbara with him.  Had lunch with him another time, discussed the market.   09:27AM

Q   Okay.  So that was part of your consultation with Mr. Arnold?

A   Yes.

Q   Was there any other discussions that you had with Mr. Arnold at any time?   09:27AM

A   Other than the times that I met with him? You mean on the phone did I talk with him?

Q   Well, the way you just testified it kind of sounded like you met him at the home, toured the home --   09:27AM

A   Oh, I actually met him at his office first.

Q   Okay.

A   With Mr. --

THE WITNESS:  Were you in that one?  Someone from your office was there.   09:27AM

Page 20

MR. SEGALL:  I joined you later.

THE WITNESS:  Yeah.  You joined later.  So met Mr. Arnold at his office, then we went out and we inspected the property, both properties, both Lot X and Lot H.  Went into the rest of the ranch as well.    09:27AM

Either on the way out or on the way back from that we talked about the Santa Barbara real estate market.  We talked about his experience, talked about my experience.

And then on my second trip back to look at    09:28AM the market again before submitting this report, I had lunch with Mr. Arnold.

Q    BY MR. CONLAN:  Okay.  So it sounds like you met with him on two specific days to discuss whatever it was --    09:28AM

A    Correct.  That's my recollection, yes. That's my recollection.

Q    And did you have any telephone calls with him at any time?

A    I don't think I did.  But I think one of my    09:28AM staff members may have, because through Mr. Arnold we were able to get access to the Multiple Listing Service data.  And so I think my colleague Annie Baxendale, who is my GIS expert had a conversation, one or two conversations with him about the MLS    09:29AM

Page 21

system.

Q    What is the significance, if any, of the information you learned from Mr. Arnold for the purpose of your report?

A    Well, it would be stated in the report.  He    09:29AM provided me general information about the Santa Barbara marketplace.

Q    Do you recall what that was?

A    He expressed the opinion that the -- there's a difference between the high end market in Santa    09:29AM Barbara and lower priced homes in Santa Barbara and in this market area, and that higher priced homes in his experience had not been appreciating at the same rate that the market in general had.  That was one of the things that I remember him saying.    09:29AM

I talked with him about areas to look at as potential local case study areas.  And he said I should make sure I drove through east Mesa, west Mesa, Hope Ranch.  And I told him I want to drive through Isla Vista as well, since that was right on the    09:30AM coastline and there seemed to be a lot of properties in Isla Vista.  And he described that as a very unusual area with a lot of college students there. It's a market -- mainly a lot of rental properties rather than owner properties exchanging hands that    09:30AM

Page 22

people necessarily live in without renting to students.

I remember him telling me he thought that the Montecito market was significantly different than the market out where the properties are.    09:30AM

Q    Did he tell you why?

A    It's a very high end area that's more densely developed than the area out where the properties are on the Gaviota Coast there.

Q    Did you do anything to test that view of his?    09:31AM

A    Well, I have had experience in Santa Barbara before, so I knew that distinction between the Montecito market and the rest of the market.

Q    So you agree with the distinction that he drew?    09:31AM

A    Well, it is a different market.  That doesn't mean that some of the sales that are in Montecito are -- are, you know, are not relevant, but it is a different submarket of the larger Santa Barbara marketplace than where the subject properties are located.    09:31AM

So I would agree with him on that.

Q    You understand that there are properties in Montecito that are -- that have significant acreage?    09:31AM

Page 23

A    There are some.  I remember one or more of the comps that I looked at in his report had acreage right down on the oceanfront.  So there are some, yes.

But I don't think -- I don't think any of them, if I recall, I could be wrong, I'd have to look    09:32AM at his comps, are as big as Lot X.  Certainly not as big as the rest of the ranch.

Q    When he talked to you about Hope Ranch, was there any discussion about whether that's comparable in any way to estates on the Gaviota Coast?    09:32AM

A    So do you mean Hope Ranch or Hollister Ranch?

Q    Hope Ranch?

A    Hope Ranch.  I don't remember talking with him specifically about comparability of Hope Ranch and    09:32AM the subject property.  It was more that if I wanted to try to understand what happened in the wake of the spill in some different areas along the coast.  Hope Ranch would be one of the areas that I should drive through and think about as a possible case study.    09:32AM

Q    Right.  So as I understood your testimony, he talked about different -- we'll just call them neighborhoods in Santa Barbara and --

A    Neighborhoods or submarkets I would say.

Q    Submarkets.  And he made the point that    09:32AM

Page 24

Montecito was distinguishable from the area where the spill occurred; correct?

A    Yes.

Q    And you generally agreed with that?

A    Yes.  Although that doesn't mean that it's    09:33AM not proper to also look at some sales there as evidence of market value.

Q    And did Mr. Arnold distinguish -- or draw a distinction between properties at Hope Ranch and the area where the spill occurred in the same way that he    09:33AM did with Montecito?

A    Not that I recall.

Q    Did you ask any questions about that, about whether that might be a less distinguishable submarket?                                                  09:33AM

A    Well, as I said, I was looking at Hope Ranch for a different purpose.  It was to try to understand what happened in other neighborhoods in Santa Barbara as a result of the spill and use them as case studies to understand if there was an impact from the spill    09:33AM generally on shorefront properties, where was it occurring and what was that impact.

Q    You made the point earlier that Mr. Arnold told you that the luxury market in Santa Barbara had not appreciated as much as other markets, for example,    09:34AM

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

East Mesa; is that correct?

MR. SEGALL:  Misstates the witness's testimony.

THE WITNESS:  Yeah, I'm not sure we specifically talked about East Mesa versus Santa Barbara market as a whole.  We talked about the high-end home market compared to Santa Barbara market as a whole and the FRED index for the Santa Barbara market as a whole compared to the high-end home submarket.

Q    BY MR. CONLAN:  And what did you do to check or vet the view of Mr. Arnold that the luxury market didn't appreciate in the same way as the rest of the Santa Barbara market?

A    We did some trend line comparisons, price comparisons of what happened within various price categories each year over time to understand what was happening in the high-end market compared to either Santa Barbara County as a whole in the MLS or compared to the FRED index.

Q    And what neighborhoods or submarkets did you look at for information about the luxury market?

A    We identified homes in a particular price range.  I would have to see where they fell.  It was a price range that we looked at rather than a particular

Page 26

submarket when it came to the high-end homes.

Q    What was the price range?

A    Well, there were three different price ranges that we looked at depending upon the -- the value in the Bell report and the date of that value in the Bell report.

09:35AM

So there's three different places in the report -- or in my report where I talk about that and how it relates to particular things in the Bell report.

09:35AM

Q    Do you recall which submarkets in Santa Barbara County you were looking at for that luxury market price range?

A    I was looking at the luxury market generally at certain price points in Santa Barbara, not in particular neighborhoods.

09:35AM

Q    Okay.  Do you remember anything specific about which neighborhoods some of these price points were in?

A    I'd have to look at the data, Mr. Conlan.  I don't remember.

09:36AM

Q    Could you look at your report?

A    Do you have a page?

Q    I'm just asking you if there's somewhere in your report you would know to look?

09:36AM

Page 27

A    Well, there are tables in the report that show the annual prices, price change --

Q    Okay.

A    -- each year in the different categories of the submarket that I was looking at as of -- as of    09:36AM particular dates.  But the addresses are not in the report as far as I recall.  They would be in the spreadsheet data that we provided.

Q    Did you do anything to look specific -- you're aware that in Santa Barbara County, two of the    09:36AM submarkets that would be considered luxury are Montecito and Hope Ranch; correct?

A    Well, it depends on how you define luxury. And I would have to look at my data on Hope Ranch compared to Montecito to see what the average prices    09:37AM were.  I'm not sure I understand the question.

Q    Well, you know, you said you have done work in Santa Barbara before.  You said you toured the marketplace with Mike Arnold and you did at some point some comparison of the different price ranges in the    09:37AM county.

And so it sounds like you're somewhat familiar with the submarkets in Santa Barbara County; is that fair to say?

A    Yes.    09:37AM

Page 28

Q    Okay.  And what do you consider to be the luxury submarkets in Santa Barbara County?

MR. SEGALL:  Assumes facts not in evidence.

THE WITNESS:  It depends on how you define luxury.  What I did is look at prices paid for homes    09:37AM within various price ranges as they related to Dr. Bell's report.  I wasn't analyzing one particular neighborhood as being a luxury submarket compared to another neighborhood as a luxury submarket for purposes of comparing how luxurious one market was    09:38AM compared to the other.

So --

Q    What --

A    -- Hope Ranch I was looking at for purposes of doing a close-to-shoreline versus    09:38AM farther-away-shoreline case study analysis.

Q    Do you have an understanding that Hope Ranch is one of the submarkets that has higher price ranges than many other markets in Santa Barbara?

A    Yes.    09:38AM

Q    And do you understand that Montecito is one of the submarkets, if it's considered a submarket, that has price ranges that are higher than many other submarkets in Santa Barbara?

A    Yes.    09:38AM

Page 29

Q    And can you think of any other submarkets as you sit here today that have price ranges as high as those two submarkets?

MR. SEGALL:  Vague and ambiguous.

Which two?                                    09:38AM

THE WITNESS:  You mean Hope Ranch and Montecito --

Q    BY MR. CONLAN:  Hope Ranch and Montecito?

A    I would have to look at the data, Mr. Conlan, I don't remember.  I do remember looking at    09:38AM Hollister Ranch, but again, I don't remember how that compares to those two markets.

Q    Did you use Hollister Ranch as a point of comparison in any way as part of your study?

A    No.  My recollection is the oil spill did    09:39AM not extend that far west to Hollister Ranch.  So for purposes of case study analysis I was trying to identify areas where the oil spill had resulted in shoreline oiling that I could do a case study analysis on.                                             09:39AM

Q    Who told you that the oil spill didn't extend to Hollister Ranch?

A    Well, I'd have to look at the actual point to the -- the west, but that's my recollection.  But I'd have to refresh it by looking at the SCAT maps and    09:39AM

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

at the various reports that I looked at related to the spill.

Q    So when you looked prepared your report in June of 2023 you looked at SCAT maps?

A    Yes.                                                    09:39AM

Q    Okay.  And when you looked at those SCAT maps it caused you to draw the conclusion that the beaches at Hollister Ranch had not been oiled?

A    I don't remember.  I remember in the data that I looked at, it says what the western extent of    09:39AM the oil was and then how far to the east it went.  And I don't remember, I'd have to look at the maps to see if Hollister Ranch was on, you know, which side of the demarkation line for how far west the oil spill went.

But in terms of sales data, it also didn't    09:40AM make a good case study because there aren't a lot of sales there that could be compared to understand shoreline oiling impacts versus impacts on interior properties.

Q    So what you're saying is that even if the    09:40AM beaches at Hollister Ranch had been oiled, it wouldn't make a good -- it wouldn't be a valuable thing for you to consider as part of your study?

MR. SEGALL:  Objection; misstates the witness's testimony.                                          09:40AM

Page 31

THE WITNESS:  No, I didn't -- I didn't say that, I was looking for case studies where we had a lot of sales that would be robust enough to understand what the effect of the oil spill was on the shoreline market versus a part of the market further inland as well as how the market might have changed from before the oil spill to after the oil spill.

09:41AM

And my recollection is the number of sales that I heard about in Hollister Ranch indicated to me that even if it was a shoreline that was oiled it wouldn't have made a very robust case study compared to either East Mesa or West Mesa or Hope Ranch.

09:41AM

Q    BY MR. CONLAN:  But Hope Ranch was not a part of your case study?

A    Correct.

09:41AM

Q    How many sales in a submarket would you need before you considered it robust enough to be part of your case study?

A    So let me explain why we did not do Hope Ranch.  We drove through Hope Ranch, we inspected it, the problem was there's not a lot of density of sales right up close to the shoreline.  And the number of sales along the shoreline were not as large as the number of sales that we saw in East Mesa.

09:41AM

And so we decided to do a case study on East

09:42AM

Page 32

Mesa rather than Hope Ranch because there's more properties, there are more sales, there are more things for us to analyze.

We had a similar problem with West Mesa, West Mesa was a little more attractive as a case study    09:42AM
area than Hope Ranch.  But East Mesa, we had plenty of sales and it allowed us to do a pretty thorough study of what happened before and after and within a quarter mile or two-tenths of a mile compared to further away in a distinct geography.    09:42AM

Q    Do you understand that the homes in Hope Ranch have private access to a private beach?

A    I'd have to look.  Some of them probably do, I don't know.  I don't remember.

Q    If you understood --    09:42AM

A    I know that in Dr. Bell's original report in the class action matter, he -- his opinion was that all properties that were both within a quarter mile or had access to a private beach were affected by the oil spill.  So I don't remember what he said about whether    09:43AM
Hope Ranch was one of those areas or not.

Q    If you understood it to be a fact that the homes in Hope Ranch had private access to a private beach, would that cause you to change your view on whether Hope Ranch should have been considered as part    09:43AM

Page 33

of your case study in this report?

MR. SEGALL:  Objection; misstates the witness's testimony and assumes facts not in evidence.

THE WITNESS:  Well, first of all, that's a hypothetical.  But as I said, the reason that we didn't use Hope Ranch as a case study is because I didn't think there were enough sales there to give us any kind of an indication of what the impact might have been.

Q    BY MR. CONLAN:  I believe you said that about Hollister Ranch, I'm asking you about Hope Ranch?

A    No, Hope Ranch, too.  I said that about Hope Ranch.

Q    Because you only looked at sales in areas within a certain distance from the shoreline; correct?

A    Well, I was trying to compare sales that were within a certain distance from the shoreline to interior sales in a same submarket or subneighborhood. And my recollection of when we looked at Hope Ranch, there weren't a lot of those sales, enough of those sales before and after to get some kind of a high quality case study, whereas East Mesa gave us that opportunity to do that as a case study in Santa Barbara.

Page 34

Q   You did that because in East Mesa it was your finding that there were certain number of sales within a certain distance from the shoreline; correct?

MR. SEGALL:  Objection; misstates the witness's testimony and assumes facts.          09:44AM

THE WITNESS:  I did it because there were a lot of sales that could be compared before and after. And if you look at the map you'll see all the yellow dots.

Q   BY MR. CONLAN:  In the entirety of East          09:44AM Mesa?

A   Correct, before and after.  And we could compare close to the shoreline compared to further away from the shoreline.

Q   Okay.  And why didn't you do the same thing          09:44AM with Hope Ranch?

A   Because there weren't enough sales for us to analyze that were close enough to the shoreline in my opinion to give us a case study that would have been as meaningful as looking at East Mesa.          09:45AM

Q   Did you rely on any valuations supplied by Mike Arnold in preparing your report?

A   I think I referenced in the report what I was told his value was going to be when he issued his report.  And I say something about that in the report,          09:45AM

Page 35

but I'd have to refresh my recollection what I do with
that in the analysis.

Q    Okay.  Did you do anything to check
Mike Arnold's work as an appraiser?

A    No.                                                    09:45AM

Q    Why not?

A    I wasn't asked to review his report.

Q    But you referenced the valuation that he
created; correct?

A    I reference what I was told his value would    09:46AM
be, yes.

Q    Okay.  And so when all you're doing is
referencing and you're not reviewing his report, then
your testimony is you don't need to vet it in any way?

A    I --                                                   09:46AM

MR. SEGALL:  Misstates the witness's
testimony.

THE WITNESS:  I was not asked to review his
report.  I did not have his report on the date that I
issued this report.  So the best I could understand    09:46AM
about what he was doing was what I was told his value
might wind up being.

Q    BY MR. CONLAN:  Would you agree with me that
there's a difference between what you were told to do
and what an appraisal review standard would require?    09:46AM

Page 36

A    I don't understand the question.

Q    Well, you were told to do something in this case; right?

A    I was asked to review Dr. Bell's report.  I was not asked to review Mr. Arnold's report.  And I didn't have Mr. Arnold's report to review.    09:46AM

Q    And you testified that what you were asked to do is the equivalent of an appraisal review in your world; correct?

A    For Dr. Bell's report, that's correct.    09:47AM

Q    Okay.  And if you are relying on information provided by Mike Arnold as part of your appraisal review, is there an obligation on your part to vet the information that Mr. Arnold supplies?

A    So tell me what information you're talking about.    09:47AM

Q    The valuation.

A    I didn't -- I didn't -- I was told that as a fact, that this is the likely value that he's coming up with.  Now, you let me look at what I do with that in the report and then I can respond to the question.    09:47AM

Q    You've got your report in front of you, why don't you tell me what you did with it?

A    Okay.  Do you know what page it's on?

Q    It's your report, sir.    09:47AM

Page 37

A     Well, I know, but --

MR. SEGALL:  200-page report, Larry.  Come on.

Q     BY MR. CONLAN:  Well, we just went through at the beginning of the deposition five or six typos      09:47AM on footnotes that you identified, so it seems to me -- and you testified that you reviewed it closely, so --

A     I did.

Q     -- I think you maybe have an idea where --

MR. SEGALL:  Dick, why don't you look at      09:48AM Page 172.

MR. CONLAN:  Thank you, Jordan.

MR. SEGALL:  You could have done this work, too.

THE WITNESS:  Yeah.  It's a long report.      09:48AM All right.  I see that I simply state facts from the reports, what the conclusions of value were in the reports.  I don't review them.  I don't change them.

Q     BY MR. CONLAN:  Is the valuation provided by      09:49AM Mr. Arnold a fact or is it an opinion?

A     Well, in terms of what I was told that this would be his value, it was a fact stated to me that he would have an opinion at this amount.

Q     Okay.  And is it your testimony that in      09:49AM

Page 38

incorporating that valuation as a fact in your report, you did not have an obligation as a licensed appraiser to vet the valuation that Mr. Arnold had been provided?

A    Correct.                                          09:49AM

Q    Did you also rely on the Schott appraisal?

MR. SEGALL:  Vague and ambiguous as to "rely."

THE WITNESS:  Yeah, I -- I agree.  Again, I mention the Schott appraisal there as a fact.  There    09:49AM are other places where I talk about the Schott appraisal as well.  And I would have to look at what I say there about the Schott appraisals.

Q    BY MR. CONLAN:  Did you rely on the valuation prepared by Mr. Arnold for the purposes of    09:50AM your report?

MR. SEGALL:  Asked and answered, vague and ambiguous.

THE WITNESS:  I put it in as a fact that this was going to be his opinion.  And so I presented    09:50AM it in the report as a fact.

Q    BY MR. CONLAN:  I understand that.

Is it an important part of -- foundational piece of your report, Mr. Arnold's opinion on value?

MR. SEGALL:  Vague and ambiguous.                09:50AM

Page 39

THE WITNESS:  Yeah.  I'm not sure I would call it a foundational piece, it certainly is in my report, so it's in the report.  But there's lots of things in the report.  I wouldn't call it a foundational piece; it's a point of comparison is what     09:50AM it is.

Q    BY MR. CONLAN:  Could it have been deleted from your report and your conclusions and opinions would be the same?

A    Yes.                                          09:50AM

Q    Okay.  And could the appraisal value supplied by Schott & Company have been removed from your report and the result would not change your opinions and conclusions?

A    Well, the sections of the report that     09:50AM comment on what their values are compared to the values in Dr. Bell's report would not be in it if I didn't have that information.  So that part of my report would not be there because I wouldn't have those reports to compare to Dr. Bell's report.     09:51AM

But other than that, my basic opinions would not have changed.

Q    As part of an appraisal review, is there a component where you create -- you as a licensed appraiser, create your own valuation?     09:51AM

Page 40

MR. SEGALL:  Vague and ambiguous.

Valuation of what?

Q    BY MR. CONLAN:  Of a property?

A    It depends.

Q    On what?                                    09:51AM

A    Depends on whether you're defining the appraisal review to include your own opinion of value.

Q    Okay.

A    You can have appraisal reviews that have your own opinion of value and appraisal reviews that     09:51AM don't, they just comment on other portions of an appraisal or other aspects of an appraisal report.

Q    Do you define your appraisal review as one -- in this case, in one as having an opinion of value?

A    Well, let's go back and see what I say.        09:52AM

Roman Numeral IV, "The Appraisal Review Report does not include the reviewer's own opinions of unimpaired market value of Lot X and Lot H.  It does include the appraiser's opinion concerning the impact on market value of Lot X and Lot H due to the          09:53AM environmental situation resulting from the Line 901 pipeline rupture and subsequent cleaning.

"This Appraisal Review Report does also include, however, our conclusions of the effect of correcting the misrepresentations, errors and        09:53AM

Page 41

omissions in the conclusions in that reviewed Bell report."

So that's what I did.

Q   Okay.  Can you turn to Page 12, please?

A   All right.                                    09:53AM

Q   Section 1.3, you cite to the Standards Rule 3-3(a) of USPAP; right?

A   Yes.

Q   And this is called Appraisal Review Developments?                                         09:54AM

A   Yes.

Q   And then there are three Roman numerals in there that show what an appraisal review requires; correct?

A   Correct.                                      09:54AM

Q   Okay.  And in those three Roman numerals there, is there anything related to creating or offering an opinion of value in the context of an appraisal review?

A   Well, it would be one of the possible things  09:54AM under Roman Numeral II.  There's no requirement that you do an opinion of value.  It's a possible thing that you could do in an appraisal review, but it's not required.

Q   Okay.  So in this -- in this standard of    09:54AM

Page 42

appraisal review, this is a guideline but it doesn't limit you from offering your own opinion of value, is that your testimony?

A    Correct.

Q    And so getting back to the page you just    09:54AM noted on Roman IV, you say, "This appraisal report does not include the reviewer's own opinions of unimpaired market value of Lot X and Lot H of the larger El Rancho Tijiguas property"; right?

A    Correct.    09:55AM

Q    You wrote that?

A    Yes.

Q    Okay.  And in choosing not to offer your own opinions of unimpaired market value of Lot X and Lot H, did you then in turn rely on somebody else for the    09:55AM unimpaired opinions of unimpaired market value?

MR. SEGALL:  Assumes facts not in evidence.

THE WITNESS:  Well, what I did was I took Dr. Bell's unimpaired opinions of market value and I corrected it based on the things that I did analyze.    09:55AM But I did not come up with my own opinion of market value, either unimpaired or impaired.

Q    BY MR. CONLAN:  Did you rely on Mike Arnold for his opinion of unimpaired market value?

MR. SEGALL:  Asked and answered.    09:56AM

Page 43

THE WITNESS:  I mentioned it as a fact in the report as I did with the Schott appraisals and just put those in as a point of comparison with the Bell report conclusions.

Q    BY MR. CONLAN:  When you put those in as a     09:56AM point of comparison in your report, did you do anything to vet their credibility?

MR. SEGALL:  Asked and answered.

THE WITNESS:  I did look at their qualifications.  They're licensed experienced     09:56AM appraisers.  As I said, I met with Mr. Arnold, he's got a lot of experience in the marketplace.

It appeared clear to me that he was an experienced qualified appraiser in the Santa Barbara marketplace.  Mr. Schott I never met, but I looked at     09:56AM his qualifications and he submitted reports, appraisal reports related to the properties.

So I'm simply, you know, commenting -- putting those in as points of comparison compared to Dr. Bell's values.     09:56AM

Q    BY MR. CONLAN:  I understand that.

So -- and I understand that you made your own -- you drew your own conclusions about Mr. Arnold's qualifications as an appraiser.

But when it came to the valuation that he     09:57AM

Page 44

had provided did you do anything to vet it?

MR. SEGALL:  Asked and answered many times.

THE WITNESS:  No, I did not do a review appraisal of Mr. Arnold's appraisal.

Q   BY MR. CONLAN:  I'm not asking if you did an  09:57AM appraisal review of his report, I'm asking you if you did anything to vet the valuation that Mr. Arnold had provided?

MR. SEGALL:  Asked and answered.

THE WITNESS:  I would -- you have to give me  09:57AM a definition of vet that's different from review somebody's report.

Q   BY MR. CONLAN:  Did you check it for credibility?

A   I checked his credentials for credibility.  09:57AM

Q   You testified to that --

A   I put it in as a fact.  Well, the fact is that this is what he says his opinion is of value.  So that fact is in the report.  It's like a lot of other facts that I have put into the report.  I did not -- I  09:58AM did not review his report under USPAP.

Q   I understand that.  And this is one of those questions you can answer yes or no.

Did you do anything to get yourself comfortable in any way that the valuation opinion  09:58AM

Page 45

provided by Mr. Arnold was reliable?

MR. SEGALL:  Asked and answered.  He already testified that he reviewed his qualifications.

THE WITNESS:  Yeah.

Q    BY MR. CONLAN:  Other than reviewing 09:58AM Mr. Arnold's qualifications and experience as an appraiser, did you do anything to analyze the opinion of value that Mr. Arnold had provided to determine whether you thought it was reliable?

A    I did not do a review appraisal.  That would 09:58AM be part of what you would do if you were doing a review appraisal.  And I did not do a review appraisal.

Q    Did you do any kind of modified review appraisal in any way to consider whether the value 09:59AM that Mr. Arnold had provided was reliable?

A    I did not do a review appraisal.  I put Mr. Arnold's opinion in as a fact in the case that this is reported to be the value that he was going to arrive at.  As a point of comparison with Mr. Schott's 09:59AM appraisals and with Dr. Bell's appraisals.

Q    Why did you not provide your own opinion of unimpaired market value of Lot X and Lot H?

A    As I indicated initially, when I was first contacted we thought that I might do my own report 09:59AM

Page 46

separately in terms of what the values might be.  And I was told that Plains would be hiring a local appraiser to do that and I should focus on a review of Dr. Bell's report.

Q    Have you done other appraisal reviews where  10:00AM you have offered your own opinion of value?

A    Yes.

Q    How many times?  Don't give me the number, you don't have to add them up.

A    Dozens.  Dozens.  Dozens.                        10:00AM

Q    It's not unusual is what you're saying?

A    Yes, that's correct.

Q    Okay.  Going back to Page 176, there's a table.

A    All right.                                        10:00AM

Q    Did you prepare that table?

A    Yes.

Q    Okay.  And below the table there's a paragraph that has a number of different figures in it.                                                       10:00AM

        Do you know where the figures in the table and in the paragraph below came from?

A    I guess I don't understand the question, Mr. Conlan.  Let me -- let me read the page before.

        So the $2 and $3.50 per square foot in the  10:01AM

Page 47

table on Page 176 comes from the information in the bottom paragraph of Page 175 related to Dr. Bell's previous testimony in a prior case involving the spill.

Q    Okay.                                          10:02AM

A    And then that would be multiplied by the area and the second column would be multiplied by the area of the homes.  And that would give the annual rent when that's multiplied by 12.  And then the five percent and three -- and the five percent and          10:02AM three percent also come from the prior page, first paragraph under the heading Rental Value Analysis, which was from Dr. Bell's report related to market rent.

Q    Okay.  And so in the paragraph below the          10:02AM table then you say, "Based on Dr. Bell's prior rental analysis," and then you go on to say that the values would be no greater than $20,660,000 and the value of Lot X would be no greater than 22,050,000; right?

A    Yes.                                          10:03AM

Q    Okay.  And is that your calculation?

A    I did the calculation, but it's based on information from Dr. Bell.

Q    Okay.

A    So that would be, you know, an indication if    10:03AM

Page 48

those numbers by Dr. Bell were applied by him, that's what the result would be.

Q    Going back to page Roman IV, the header near the middle of the page says, "Portions of the Bell report reviewed and corrected in this appraisal review 10:03AM expert report."

Do you see that?  I think you might be on the wrong page.  Or a different page.

A    Roman Numeral -- oh, regular 4, not Roman Numeral IV. 10:03AM

Q    Roman Numeral IV?

A    Okay.  And where are you?  One of the bullet points are you at?

Q    No.  The header that starts with the word Portions? 10:04AM

A    Oh, the header.  Okay.  All right.  I see that.

Q    Portions of the Bell report, that's my question.

A    Yes. 10:04AM

Q    Why are you reviewing portions of the Bell report as opposed to the entirety of the Bell report?

A    Because that's what I decided to focus on. You can have a review report that looks at various aspects of someone else's report, and those were the 10:04AM

Page 49

pieces of it that I considered important enough for me to review --

Q    Well --

A    -- in this assignment.

Q    Okay.  That's what you focused on and I understand that, but did you review the entirety of his report?

A    I read the whole report.

Q    But what you're saying -- what you're testifying to today is that these bullet points that you have listed below that heading are the portions I guess that you felt you had to correct?

MR. SEGALL:  Misstates the witness's testimony.

Q    BY MR. CONLAN:  Help me understand, did you write that header?

A    Yes.

Q    Okay.  Can you help me understand what it means?

A    Yes.  So the bullet points tell you the portions of the Bell report that I reviewed.  And to the extent that they needed correction I then corrected them.

Q    Okay.  So does that mean that there were no other portions of Dr. Bell's report that you believe

require correction?

A    No, it doesn't mean that.  These are the portions of his report that I looked at and analyzed. There may be other portions of his report that need corrections as well.                                    10:05AM

Q    But you focused on these only?

A    Correct.

Q    Okay.  And any particular reason why you didn't choose to correct everything you saw in Dr. Bell's report?                                    10:06AM

A    Well, first of all, I was not doing my own independent analysis of what the market value was before considering the spill and after, so that could have been something else that in a more extensive appraisal review I might have done.  But that was not   10:06AM part of the assignment here for me to come up with an independent unimpaired or impaired market value but rather to look at Dr. Bell's report, identify the portions of it that I thought should be reviewed and then to the extent that they needed correction to put   10:06AM in the corrections.

Q    Were there any other portions of Dr. Bell's report that you felt you wanted to correct and you ultimately didn't when your report was final?

A    Not that I can recall.                          10:06AM

Page 51

Q    Let's turn to the beginning of your executive summary, which is romanette (i).

A    Okay.

Q    The header at the bottom of the page says, "The pipeline rupture occurred on only a small portion    10:07AM of the subject property."

Did you write that?

A    Yes.

Q    And then you go on to kind of describe the scope of the spill and the scope of the clean-up, and    10:07AM I want to ask you some questions about that.

A    Okay.

Q    Okay.  Starting with the scope of the clean-up, if you roll over to the next page you see that little image of the El Rancho Tijiguas    10:07AM properties.  And below that you reference how the clean-up totalled only 12 acres.

A    It was the clean-up including the work staging area totalled 12 acres.

Q    Right.  Only 12 acres; right?    10:08AM

A    Correct.

Q    That was your word?

A    Well, that's what I have in here.  Let me see what I say the source is.  So the source is the Robrock report.    10:08AM

Page 52

Q    Right.  Is that word for word from her report, only 12 acres, do you know?

MR. SEGALL:  The document speaks for itself.

THE WITNESS:  I don't remember.  I'd have to look at her report.                                      10:08AM

Q    BY MR. CONLAN:  Do you consider 12 acres a small area or a substantial area?

A    It's a small area when compared to 287 acres in the entire property.

Q    Okay.  What if it's just you're considering     10:08AM it on its own, is a 12-acre clean-up of an environmental catastrophe, would you consider that to be a substantial clean-up area?

MR. SEGALL:  Incomplete hypothetical.

THE WITNESS:  Yeah, I'm not sure I know how     10:08AM to answer that.  It is what it is.  I mean, it's 12 acres.  I'm not -- I'm not sure what your point of comparison would be.

Q    BY MR. CONLAN:  I'm not asking you to compare it to anything else, I'm asking if you     10:09AM consider 12 acres significant in size for a clean-up of an environmental catastrophe?

MR. SEGALL:  And again, I object that it's an incomplete hypothetical.

THE WITNESS:  I mean, it is 12 acres, that's     10:09AM

Page 53

the area that was affected, so I don't understand what you mean by is that significant in size.  Significant in size compared to what, compared to other properties I have analyzed or compared to what?

Q    BY MR. CONLAN:  You live on the lake in    10:09AM Chicago?

A    I live about six -- six blocks in from the lake.

Q    Okay.  If your home six blocks in from the lake was the site of a pipeline rupture and oil spill    10:09AM and the clean-up area extended for 12 acres around it, would you consider that to be a significant area of clean-up?

A    I still don't understand the question. Significant by comparison to what?  I mean, I have    10:09AM been involved in clean-ups that involve thousands, hundreds of thousands of acres.  I mean, it is what it is, Mr. Conlan.  I don't understand what kind of a comparison you're trying to make.

Q    12 acres of a clean-up, 12 acres is a --    10:10AM it's a significant area of land; correct?

A    It's 12 acres, yeah.

Q    I mean, are you --

A    I don't -- I don't understand the question. I mean...    10:10AM

Page 54

Q    Are you trying to minimize 12 acres in referring to it as only 12 acres, what's the reason for using that word?

A    So the point --

MR. SEGALL:  Objection; argumentative.          10:10AM

THE WITNESS:  So the point here is that it's a 287-acre property.  And in terms of any consideration of the effect on use or the ability to go onto that property, only 12 acres of the 287 acres was affected at the most in terms of the use by the     10:10AM Plains pipeline and its consultants to take care of the spill.

I have been involved with properties where the area that was affected by a -- you know, spill or a groundwater situation was one acre.  I have been     10:11AM involved with some that were 300,000 or 400,000 acres, 600,000 acres.

So -- but it is -- but 12 acres is relatively small compared to 287 acres.  It's less than five percent.                                             10:11AM

Q    BY MR. CONLAN:  Do you have a view on whether the 12 acres, because the clean-up area was 12 acres, that it affects the entirety of the property or just that 12-acre portion of the property?

MR. SEGALL:  Vague and ambiguous.               10:11AM

Page 55

Q   BY MR. CONLAN:  In terms of a loss of use analysis?

MR. SEGALL:  I reiterate that the question is vague and ambiguous.

THE WITNESS:  All right.  So let me make    10:12AM sure I understand your question.  So Dr. Bell says that the entire property suffered a loss of use.  And if I remember his deposition, he says it's because they couldn't sell the property during that period of time.                                                    10:12AM

One of the things that I disagree with Dr. Bell on that is that there's a difference between marketing time delay and loss of use.  I would argue that what he calls loss of use is really a cost effect, because it was an extended marketing time that    10:12AM cost them the return on their money that they might have made.  And so that's a cost, whereas in terms of actual loss of use, the only part of the property for which there was a loss of use is this 12 or 12.86-acre portion.                                                  10:12AM

So that's how I would analyze the situation from the point of view of the difference between loss of use and cost.  I would put what he calls loss of use in as a cost rather than a loss of use.

Q   BY MR. CONLAN:  Okay.  So you've got your    10:13AM

Page 56

own view of a loss of use analysis as it relates --

what a loss of use analysis for this property where

the oil spilled would be and it's different than

Dr. Bell's?

        A    Yes.                                              10:13AM

        Q    Okay.  In the beginning of that section at

the bottom of the first page of the executive summary,

you've got some -- a figure in here of the amount of

crude oil spilled.

                MR. SEGALL:  What page are you on, Larry?      10:13AM

        Q    BY MR. CONLAN:  Romanette (i).

                And you say, "Spilled approximately

2,934 barrels of crude oil"?

        A    Yes.

        Q    Where did you get that information?              10:13AM

        A    I would have to look.  It's my recollection

that that was in some of the EPA reports or the NOAA

reports.  But let's see if I have another reference to

it in the main report.  I'm now looking at Pages 26

through 29 or 30 of my report.  See if I have a          10:14AM

footnote there.

                I don't see a footnote there, but it's my

recollection that would have come from one of the

governmental reports, either by the EPA or NOAA or the

State of California.                                          10:15AM

Page 57

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Q    Were you relying on Kristin Robrock for that information?

A    I don't remember if that's what she had in her report or not.

Q    Did you do anything to check the accuracy of     10:15AM
that figure that you recall?

A    Well, I'm not sure that makes a difference because we have the clean-up process and how long it took.  So whether it's -- and even if there's some different amount that people discuss in terms of how     10:15AM
much total oil may have gotten out into the ocean.

And I see those kinds of disagreements all the time, Deepwater Horizon, there's still a lot of disagreement over how much oil spilled.  But the important point is how long it look to clean it up on     10:15AM
the site and what they did to clean it up on the site.

Q    That was going to be my next question, but the first question I'd like you to answer is, did you do anything to check the accuracy of that volume number of the spill that you included in your report?     10:16AM

A    I took it either from a NOAA report, an EPA report or by the Robrock report.  I did not do any independent analysis of what the total size of the spill was.

Q    Okay.  And your view is that the volume of     10:16AM

Page 58

oil spill doesn't matter to the opinions you're

offering in this case?

    A   What's more important is the time that it

took to clean it up and also the time that it took

along the shoreline.  So whether the volume was 200    10:16AM

and -- what do we say here, 200 and --

        MR. SEGALL:  2,934.

        THE WITNESS:  2,900 barrels or more, the

clean-up time and the effort that it took was for

whatever the volume of the oil was.    10:17AM

    Q   BY MR. CONLAN:  Okay.  So in other words,

the volume of oil that you've cited here in your

report, this 2,934 barrels is not material to your

analysis?

    A   I'm not sure I understand the question.  I    10:17AM

mean, there often are disputes over how much oil was

spilled in these situations that I've studied, and

I've studied well over a dozen oil spills.

    What's important is what was the clean-up

process and how long did it take.    10:17AM

    Q   You have said that a couple of times.

    A   Yes.

    Q   I get that.  And my -- I'm just curious why

you included the volume number in your report if

what's important is the area of the clean-up and how    10:17AM

Page 59

long it took?

A It was a fact that I found in either a NOAA report or an EPA report or in the Robrock report.

Q So could your report have been completed without any reference to a spill volume? 10:18AM

A Yes.

MR. SEGALL: Larry, why don't we take a break when you come to whatever -- a natural stopping point. I think we've been going an hour and 15.

MR. CONLAN: Yeah. Okay. We can take a 10:18AM break right now.

THE VIDEOGRAPHER: The time is 10:17 a.m., we're off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 10:31 a.m., 10:31AM we're back on the record.

Q BY MR. CONLAN: Mr. Roddewig, you understand that you're under oath; right?

A Yes.

Q On the bottom of the second page of your 10:32AM executive summary, below that image of the spill site, you reference a date of September 2nd, 2015 when you say all restoration work on Lot X had been completed.

Do you see that?

A Yes. 10:32AM

Page 60

Q    Okay.  Did you verify that information or was that pulled from the Robrock report?

A    I took that from the Robrock report.

Q    Did you do anything to verify it?

A    No.                                          10:33AM

Q    And then you talk about the 106 days from May 19th to September 2nd, 2015.

And is that another fact that you took from the Robrock report?

A    Well, if the September 2nd, 2015 date is    10:33AM correct, then I counted the days, yes.

Q    Okay.  And as to that sentence you didn't do anything to vet that date provided by Robrock?

A    No.  Other than maybe I'd seen the same thing in some other reports, but I don't recall.  It's    10:33AM footnoted there to the Robrock report.

Q    Okay.  And then you understand that there was ongoing jurisdiction over the spill site by state and federal authorities for some period of time?

A    Yes.                                         10:33AM

Q    And you've got that as mid-April 2016?

A    That's when they signed off on the clean-up of the spill site and the restoration of the spill site being completed, according to the Robrock report.

Q    Okay.  Did you --                            10:34AM

Page 61

A    And that I think I have seen separate verification on that date.

Q    Do you know what the separate verification was?

A    I don't recall.                                    10:34AM

Q    Did you have any conversations with Kristin Robrock before your report was completed?

A    No.

Q    I'm going to hand you what's already been marked as Exhibit 22.                                    10:34AM

A    Okay.

Q    This is the Robrock report.  And if you could turn to the last page right before the tables, there's a timeline that is included?

A    Last page right before tables?  Okay.        10:35AM Somewhere are tables.

        MR. SEGALL:  Is it a numbered page?

        MR. CONLAN:  No, it's not.  And that's why I'm -- Figure -- it's Figure 3.  Right before that page.                                    10:35AM

        THE WITNESS:  Okay.  Getting there.

        All right.  1, 2, 3.  Okay.

Q    BY MR. CONLAN:  Do you see the timeline?

A    I do.

Q    In the middle portion of the timeline all    10:35AM

Page 62

the way over to the right there's a reference to "UC

closes out oversight after meeting final monitoring

endpoint."

Do you see that?

A    Yes.                                                    10:35AM

Q    Okay.  And that's a reference to looks like

March 2nd, 2017?

A    Yes.  My recollection is, though, that that

relates to the shoreline.  There was a rain event in

2017 and they had been waiting for a large rain event     10:36AM

to see if any of the weathered oil shoreline would

re-emerge as a result of ongoing rain.  And so that's

what that refers to.  It doesn't refer to the source

site on Lot X.

Q    And how do you know that?                             10:36AM

A    From seeing reports, either NOAA or EPA

reports.

Q    Okay.  How do you know the rain event

didn't -- that that same principle about the rain

event didn't apply equally to the spill location?        10:36AM

A    Because what I remember seeing is that they

said that relates to the shoreline clean-up and not to

the source site.

Q    Did it specifically say what you read, that

it didn't apply to the source site?                      10:36AM

Page 63

A    I don't remember.  What I do remember is that it was related to the -- to the rocky shoreline where they were looking to see if the rain event resulted in any weathered oil reappearing.

Q    Okay.  And then to the right of that    10:36AM reference there's a reference to the "Regional Water Quality Control Board," RWQCB, "issues case closure," and that's a date of April 2021.

Do you understand what that refers to?

A    I don't.  I don't remember that date.    10:37AM

Q    Do you know if that reference includes the spill site?

A    I don't remember.  I'd have to look at the report.

Q    Did those dates in the Robrock report affect    10:37AM your analysis as part of your appraisal review of Dr. Bell's report?

A    Yes, they did in terms of the East Mesa case study that we did.

Q    Did you consider those dates as part of    10:37AM whether there was an ongoing loss of use at the El Rancho Tijiguas properties?

A    So which dates are we talking about now, Mr. Conlan?

Q    The March 2nd, 2017 date and the April 2021    10:37AM

Page 64

date?

A    It's my understanding from having looked at information that the 2017 date related to the shoreline and the clean-up along the shoreline and did not relate to the source site.    10:38AM

MR. SEGALL:  Larry, maybe you should ask him about the one that says, "UC certifies Section 1 restoration complete."

Q    BY MR. CONLAN:  So you didn't consider that date, that March 2nd, 2017 date as part of your    10:38AM analysis of Dr. Bell's loss of use analysis?  I'm just asking you.

A    The loss of use analysis.

Q    Or any of Dr. Bell's analysis?

A    Well, yes, it relates to his -- yeah, it    10:38AM would relate to both his loss of use and his ongoing -- and his ongoing 25 percent impact.

Q    I'm asking you if that date was an important fact to consider or if you didn't consider it at all?

A    So this is the 2017 date?    10:38AM

Q    Correct.

A    Yes, it's important as it relates to the 25 percent impact and the East Mesa case study that I did.

Q    Okay.  And the April 2021 date, does that    10:39AM

Page 65

relate to your analysis in any way, is that a date

that you -- that is important to you?

A    Since I don't remember that report or what

was in it, I didn't consider it.

Q    Okay.  On the next page of your executive    10:39AM

summary, romanette (iii), the first full paragraph

there is a description of the shutdown of Line 901

after the May 2015 oil spill; right?

A    Yes.

Q    Okay.  Before I get into that, going back to    10:39AM

the picture in the middle of the page before, where

did that come from, that photograph?

A    I've seen that in a couple of places and I

would have to look.  I have seen that in different

places.  I don't remember specifically if it was in    10:40AM

the Robrock report as well as in one of the other

governmental reports that I have seen.

Q    Did you write the words on that picture or

were those words in it and you pulled it into your

report?                                                10:40AM

A    Those words were on the picture and I pulled

it in.

Q    Okay.  So you're not sure where it comes

from?

A    I don't remember.                               10:40AM

Page 66

Q    Okay.  Going back to romanette (iii), you say, "An application for permanent closure of the pipeline and its replacement with a new pipeline in the same corridor was made to Santa Barbara County in August of 2017."                                    10:41AM

Where does that information come from?

A    I don't remember.  It would be in one of the documents that we produced or in one of the documents that were already produced to me.  I don't remember the specific document.                                    10:41AM

Q    Do you have an understanding of the purpose of the application to replace the pipeline or the reason the application was submitted?

MR. SEGALL:  Lacks foundation.

THE WITNESS:  I don't recall.  I'd have to    10:41AM go back and look at the information in my file related to the application and what they said as to why they were going to replace it.

Q    BY MR. CONLAN:  Do you have any understanding or any reason to believe that if the    10:41AM pipeline hadn't ruptured and spilled there would be any effort made to replace it?

A    I don't know.

Q    Was an -- did you have an understanding of the scope of work that would arise out of a    10:42AM

Page 67

replacement of the pipeline?

A    Well, I have been involved in situations involving pipelines put in, so I generally have an understanding of what happens when a pipeline is put in.                                                     10:42AM

Q    Okay.  And you have a general understanding, but did you have an understanding of the scope of work with respect to the proposed replacement project of Line 901 and 903?

A    What I remember is they were going to          10:42AM
replace both lines, they were going to change the diameter, if I remember as well, and I don't remember if they were going to make it smaller or larger, but I remember they were going to replace it with a pipe of different diameter.                                           10:42AM

Q    Did you have an understanding of the scope of the replacement project in terms of how much area of land it would take?  Not along the length of the pipeline but, you know, sort of the -- the width of the work area, so to speak?                                   10:43AM

A    Well, That depends.  That would be negotiated with property owners in terms of paying them for the temporary --

Q    I'm not talking about --

A    -- easement.                                   10:43AM

Page 68

Q    That's a fair point.  But what I'm talking about is what Plains understood to be that how much area of each property was needed for this replacement project?

A    I don't remember.                                    10:43AM

Q    Did you have an understanding of how long that project was proposed to take if it had been approved?

A    I don't remember specifically, but it would be many years given the length of the 901 and the 903    10:43AM pipelines that were going to be replaced.  But I don't remember the specific plan as to how long they expected it would take.

Q    Did you have an understanding or do you have an understanding of how long -- of how the project    10:43AM would be staged?

So, you know, for example, on El Rancho Tijiguas where the pipeline crosses the entirety of Lot X, did you have an understanding at any point in time of how long it would take to replace that portion    10:44AM of the pipeline?

A    I don't recall if I saw any information related to that or if there is a report on that.

Q    Okay.  And let's say as of July 22nd -- or July 2022 when Dr. Bell's report was issued, you    10:44AM

Page 69

understood that the replacement application was still

pending; right?

A    Correct.

Q    Okay.  And as of that time then there was

still the potential that the entire stretch of          10:44AM

pipeline at the El Rancho Tijiguas properties was

going to be -- was intended to be replaced?

A    I don't recall if they were going to replace

the pipeline everywhere and every piece of it, I'd

have to look back and see what the plan was.          10:45AM

Q    Okay.  And if -- but you talked about how

you thought it was going to be a pipeline with a

different diameter; right?

A    Yes.

Q    And you understood that it was going to be a   10:45AM

pipeline with a different type of metal perhaps?

A    That I'd have to look back at the reports, I

don't recall.

Q    Okay.  Let's stick with the diameter.

A    Okay.                                             10:45AM

Q    You understood it was going to be a new

pipeline?

A    That's my recollection, yes.

Q    Okay.  And did the fact that there was the

potential for a new pipeline to be installed at Rancho  10:45AM

Page 70

Tijiguas affect your analysis in any way or your analysis of Dr. Bell's report in terms of loss of use, cost effect, risk effect, anything like that?

A    Well, it comes into play in my review of his pipeline case studies and the pipeline literature.  I looked at what he used to support his opinion related to the project and how that might affect use or value or risk.  And he used case study analysis.  He used review of literature of pipelines.  So I looked at that same material that he looked at and reviewed and critiqued it.

Q    What I'm asking you is, in your view, if there's a potential for the pipeline to be replaced in a fairly sizable construction project to be happening at these properties, would that impact in any way your view about loss of use, cost effect or risk effect at the El Rancho Tijiguas property?

A    Well, you're giving me a hypothetical.  And what I said was what I looked at was what he relied on to come up with his opinion and looked at the accuracy of that information that he relied on, and then based on my review and critique of the information that he looked at, I said what my conclusion was concerning what it indicated in terms of an impact from proximity to a pipeline.

10:46AM
10:46AM
10:46AM
10:46AM
10:47AM

Page 71

Q    I'd heard what you said, but what I'm asking -- and you've drawn your own conclusions that depart from Dr. Bell's conclusions.  And as -- I'm just going to summarize.

What you're saying is that if there was any    10:47AM loss of use, if there was any cost effect, if there was any risk effect, it was only for at most about a year at these properties; correct?

A    Well, no, I don't think I have said that. What I said is that when you properly look at    10:47AM Dr. Bell's case studies related to risk effect and they're properly analyzed, what they indicate is that from the case studies the -- whatever effect there might have been would have ended following the investigation and clean-up.  And while that    10:48AM investigation and clean-up was going on, the maximum -- or the most likely potential impact from his case studies was five percent.

As to the loss of use, what I did is simply recalculate his loss of use based on his rent analysis    10:48AM and his -- and the other -- the other factors that we talked about in that table that we already went through.

Q    Right.  But you've got a difference of opinion on the period of time any type of loss would    10:48AM

Page 72

occur at these properties; right?

MR. SEGALL:  Misstates the witness's testimony.

THE WITNESS:  We're talking about risk effect versus loss of use.                                          10:48AM

Q    BY MR. CONLAN:  I'm talking about any -- any kind of damage, you know, whether it's cost effect in your analysis, loss of use in Dr. Bell's analysis?

A    Well, let's consider them one at a time then, because I did different things on each part of     10:49AM his use, risk and cost effects.

Q    Okay.

A    So first, he -- he --

Q    Let's talk about risk so the record's clear, let's talk about risk effect, what is the outside date     10:49AM where there's no longer any risk at the properties in your view?

A    So, remember what I'm doing is I'm looking at his opinion that as of July of 2022 there was a 25 percent impact from risk based on his case studies.     10:49AM I went back and reviewed his case studies and concluded when they're properly analyzed they would indicate that first, the risk was much less than that and second, that any risk would have ended at about the period of time when the clean-up was completed.     10:49AM

Page 73

But my only opinion is that as of July of 2022 when he provides his opinion, there was no risk effect then and that at any earlier point during the clean-up and investigation it would have been five percent.

10:50AM

Q   Okay.  Now, how does the end of the clean-up period affect your analysis of Dr. Bell's loss of use analysis?

A   So on loss of use what I did is I said here's what Dr. Bell sets out as his loss of use going all the way to July of 2022.  And I first looked at what the normal marketing time would be based on my analysis of the marketplace there.  And then I deducted that normal marketing time from his loss of use calculation.

10:50AM

10:50AM

And then I also put in his rental value analysis as well in order to understand what his loss of use calculation would be deducting normal marketing time and then looking at his rental analysis.

Q   Is there an outside date that applies to that part of your review?

10:50AM

A   I don't understand the question.

Q   Well, let me point you to romanette (vi), which is a section of your executive summary called Conclusions from Review of the Bell Report.

10:51AM

Page 74

And the second bullet says, "The effect on the market value of Lot X was no greater than five percent, negative five percent, and lasted no later than April 2016, the date when the State of California announced that no further clean-up was necessary"; right?

A     Okay.  I see that.

Q     So what you're saying is, is that any effect from the spill on the market value of Lot X did not go beyond April 2016?

A     Well, it likely ended at that time.  If you look at the case study analysis, what it gets down to is quarters or, you know, a few months at a time when it's now demonstrated in a particular case study that there's no longer any impact.

So it would have taken some -- that information about the completion of the clean-up would have gone out into the marketplace right after that was completed.  And based on the case studies and the East Mesa case study it found that there was no impact even before clean-up was completed.

Around April of 2016, when the clean-up was completed, any impact on market value would likely have ended.  But from the point of view of my opinion, the important thing is that as of July of 2022 when he

10:51AM

10:51AM

10:52AM

10:52AM

10:52AM

Page 75

says there still was a 25 percent impact, there was no

impact as of that date based on the case studies and

the -- and the research that I did.

Q    Okay.  So when you conclude that the effect

on market value of Lot X lasted no later than            10:52AM

April 2016, you're focused on the remediation from the

spill of oil all over the property -- all over that

portion of the property; right?

A    Correct.

Q    Okay.  And -- and when you identify that       10:53AM

date as the date when the State of California

announced that no further clean-up was necessary and

there's no impact on market value beyond that date,

did you consider whether there's an impact on market

value due to the ongoing replacement project that was    10:53AM

at the county level for approval?

A    Well, that's a separate part of his analysis

where he looked at the pipeline literature and his

pipeline case studies.

Q    I'm asking you if it factored into your        10:53AM

conclusion about the effect on market value, that

there's an ongoing, a pending application to replace

the entire pipeline?

A    If you look at what I have in the -- in my

report related to reviewing and critiquing his          10:53AM

Page 76

pipeline research, my conclusion is that there likely was no additional impact from that pending application given the information in his report related to the pipeline literature.

All pipelines have the possibility for    10:54AM additional replacement or for fiber optic lines or for other types of lines to be put in place.  So there's always that possibility in a pipeline easement of something going in.  And I didn't see anything in the information he provided to support his opinion about a    10:54AM pipeline impact indicating that there would be any kind of ongoing impact from the pipeline replacement project over and above the impact from the spill itself.

Q    Do you have any view on whether the pending    10:54AM application to replace the entire pipeline has any effect on market value at the properties at El Rancho Tijiguas?

MR. SEGALL:  Asked and answered.

THE WITNESS:  So you're giving me a    10:54AM hypothetical, and what I've said is looking at the information that Dr. Bell provided in his report and correcting it for things that I thought were misrepresentations or we're looking at more detail in those, the information that he provided does not    10:55AM

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

support such an opinion.

I did not do a separate independent analysis of that.  I simply looked at what he provided and commented and corrected it.  And said based on the corrected version of the information that he provided, 10:55AM doesn't look like there's any impact from that pending pipeline proposal.

Q    BY MR. CONLAN:  So you're not denying that the replacement project application might have an effect -- hang on, let me finish my question, might 10:55AM have an effect on the market value of the properties at El Rancho Tijiguas, you're just saying you haven't done the analysis, you've only looked at what Dr. Bell did and from what he did you don't think it had an effect at all? 10:55AM

A    Correct.  Could it have an effect?  Sure.  There's a -- there's a possibility that it could have an effect.  But in order to understand that have to have a lot more information for me to have my own independent opinion on it. 10:56AM

Q    But if you were a prospective buyer of a luxury property on the Gaviota Coast and you were considering purchasing a significantly sized parcel for $35 million and you knew that there was a pending application to replace the entire pipeline across the 10:56AM

Page 78

entire front section of your property, do you think that would have an effect on market value or the sale potential?

A    Well, you're giving me a hypothetical.

Q    I am.                                               10:56AM

A    Let me -- and let me tell you what I would do to answer that question, and this is what I think Dr. Bell should have done.

The pipeline replacement proposal involved not only 901 but 903, and it went all the way west and    10:56AM then over the mountains into another county or two counties.  If he wanted to separately try to analyze what the effect of the pipeline replacement project might be he should have studied sales that occurred along the pipeline after the announcement of the    10:57AM pipeline replacement project and done some kind of a case study to understand if there was an effect.

But he didn't.  He doesn't have any sales at all in Santa Barbara marketplace related to either the effect of the oiling or the effect of the pipeline    10:57AM replacement project.

So that's what I would do in order to answer your hypothetical.

Q    Going back to romanette (iii) at the top of the page, you go on to say, "Approval of the    10:58AM

Page 79

application," and this is talking about the replacement application, "was pending as of the July 2022 date of the Bell report. However, as of the date of this review report, which is June 2023," your report, "that application is no longer pending because 10:58AM Line 901 was subsequently sold by Plains in late 2022."

What is the basis of that statement?

A   I have seen newspaper reports on that, for one. Online newspaper reports. 10:58AM

Q   That said what?

A   That the -- that Exxon bought the line and that Exxon did not have any plans to replace the line.

Now, I just saw this morning a newspaper report saying that the county denied Exxon's right to 10:59AM truck oil from their processing facility. So what does that mean about whether they might want to now replace the line, I don't know.

But that's the most recent information I saw was a story saying that they'd been denied the 10:59AM opportunity to truck oil.

Q   Do you have an understanding at all that Exxon is now -- as the owner of the pipeline, is now trying to just repair the pipeline and put it back in service? 10:59AM

Page 80

MR. SEGALL:  Assumes facts not in evidence.

THE WITNESS:  Yeah.

Q    BY MR. CONLAN:  I'm just asking if you have that understanding?

A    I don't.  I'm trying to remember what I     10:59AM
might have seen in recent weeks related to that.  I
don't recall.  I don't know.

Q    And if you were to learn that it's a fact that Exxon is -- does not want to replace the pipeline but instead wants to repair the pipeline that     10:59AM
ruptured, does that have any affect on your view of effect on market value of the properties at El Rancho Tijiguas?

A    Well, as I said, I looked at the support that Dr. Bell gave and analyzed it and determined that     11:00AM
based on the information that he looked at, including the published literature and the pipeline case studies that he did, that did not support such an opinion.

I also said in answer to your hypothetical that what I would do if I wanted to understand that     11:00AM
and form my own opinion would be look at what has actually happened related to sales along that pipeline or other pipelines that have been proposed to be replaced or have had ruptures and there's been discussion about whether they should be replaced or     11:00AM

Page 81

repaired or not, see what happens in those situations.

But he didn't include any of that kind of case study analysis in his report.

Q    So you don't have a view one way or the other on whether an ongoing replacement application or an intention to repair the failed pipeline would affect market value, you're just looking at market data and what Dr. Bell did?

MR. SEGALL:  Misstates the witness's testimony.

THE WITNESS:  What I said is that I looked at what Dr. Bell included in order to support his opinion and that it does not support his opinion that there would be an ongoing impact.

And I said what I would do if I was going to try to come to my own opinion would do some actual case study analysis of what has happened along either that pipeline since the discussion of replacing it or repairing it occurred or in other situations where pipelines have been repaired or replaced and see if that kind of discussion in the press creates enough attention publicly that it would be affecting actual prices in the marketplace.  But I have not done that.

Q    BY MR. CONLAN:  You didn't do that case study analysis?

11:01AM

11:01AM

11:01AM

11:01AM

11:02AM

Page 82

A    I have not and he didn't either.

Q    Would what has been happening at El Rancho Tijiguas in terms of the efforts to sell the property factor into a case study analysis that you might do to study the impact of a proposed replacement line or a 11:02AM repair project on the market value of the property?

MR. SEGALL:  Objection; vague and ambiguous and incomplete hypothetical.

THE WITNESS:  So now we're talking about the -- the discussion in my report related to the attempts 11:02AM to sell the property and whether that has some relationship to the pipeline project?

Q    Well, what I'm asking you is, if you were to do -- you said you would have to do your own case study to determine whether there's any impact on the 11:02AM market value by the replacement project or the repair project; correct?

A    Yes.

Q    Because right now in this case all you're doing is offering an opinion that the analysis that 11:02AM Dr. Bell did is not something you agree with?

A    Correct.  It's incorrect, his analysis.

Q    Right.  And if you were to do your own case study, would you consider as part of that case study the efforts to sell the properties at El Rancho 11:03AM

Page 83

Tijiguas?

A    Well, it depends on what that -- what that information was.  It could be a portion of a larger case study.  But typically I'd be looking for actual sales to compare and look at the length of time that    11:03AM it took to sell those sales if I was trying to get at the cost effect from delayed marketing, and also look at the prices paid compared to properties that were not on the pipeline.

So it might be something that I would    11:03AM consider, but I'd be looking more for actual sale prices along the pipeline right-of-way.

Q    And it wouldn't be important to you that the properties at El Rancho Tijiguas or the properties where the pipeline actually ruptured and spilled oil,    11:04AM that -- would that not factor into that case study you were proposed to do?

MR. SEGALL:  Objection; vague and ambiguous.

THE WITNESS:  Well, now you're talking about back to the clean-up rather than to the proposed    11:04AM project.  So they're two different things and they're two different things in Dr. Bell's analysis as well. To the extent I understand his analysis of the impact of the proposed pipeline replacement project.

Q    BY MR. CONLAN:  Well, what I'm trying to get    11:04AM

Page 84

to is you're talking about a potential case study, you know, that you haven't done but that you might do if the project -- if you were asked to --

A    Well, you asked me a hypothetical and I said this is what I would have to do to answer the hypothetical, so...                                  11:04AM

Q    Right.  But what you said was you would do an analysis of sales and essentially market data of properties where the pipeline runs; right?

A    Correct.  Yes.                                  11:04AM

Q    And I understand that.  But would you agree with me that the spill site is different, and what happens at the spill site is different than what happens at other properties where the pipeline runs but didn't rupture and spill, would that factor into your case study?                                  11:05AM

MR. SEGALL:  Assumes facts not in evidence.

THE WITNESS:  So one thing I do recall from Dr. Bell's deposition is he said no, that doesn't matter.  He said Lot H is affected in the same way as Lot X where the source site was from the point of view of the effect from the pipeline.                                  11:05AM

I would treat them as two different situations.  One, I'm trying to understand what's the effect of the -- of the oiling and the investigation                                  11:05AM

Page 85

of the clean-up on Lot X.

And then the other factor is okay, now what's the effect from the proposed pipeline replacement project or repair project.

Q   Do you have any understanding of any of the   11:06AM
case studies that appear in your report -- well, let me lay some foundation.

You -- you offer in your report a critique of the case studies that Dr. Bell relied on; right?

A   Correct.   11:06AM

Q   Okay.  And then do you offer your own case studies as a point of comparison?

A   No.  I looked at his case studies.

Q   His case studies only?

A   Yes.   11:06AM

Q   Okay.  And --

A   But many of them are case studies I've known and researched before, so...

Q   Okay.  Is there a distinction in your view of a case study that involves a property that was the   11:06AM
source of an oil spill like Lot X or properties that are just nearby an oil spill?

A   Well, let's talk about his case studies then, because some of them are source properties, his Mayflower Road case study involving the pipeline in   11:07AM

Page 86

Arkansas that was immediately behind the houses on Starlight Road, that pipeline either was on some of the property or butted right up against the houses on Starlight Road.

So that would be comparable to being a 11:07AM source site.  And then --

Q   All right.  Hold on.  Let's talk about that distinction.

A   Okay.

Q   Was the source on the properties or was it 11:07AM next to the properties?

A   Well, I would have to look.  I don't recall, I'd have to look at the detail.

Q   You don't know as you sit here today?

A   I can't recall. 11:07AM

Q   Okay.

A   But what I do know is that the oil flowed right out of that pipeline right onto the adjacent homes.

Q   Okay. 11:08AM

A   So I just don't recall if the pipeline actually went across some of their backyards or not.

And then on the other case studies, the Enbridge case study, one of the sales that he is using was as an unimpaired sale.  My research indicates was 11:08AM

Page 87

on Talmadge Creek, which is the location where the source of the pipeline rupture was. I would have to look exactly at where it was in Talmadge Creek to see if it was right at the location where the oil spilled out of that pipeline and went across a whole bunch of properties and into the creek.

And then the third thing I would comment on is when you're talking about a situation like the Deepwater Horizon oil spill where the oil washes up on the beaches, the oil is on the property and had to be cleaned up. And so, you know, that would be a -- would not be a source site, but it would be a, you know, a property that was affected by the oil directly.

And then one other comment before we move on. And I'm trying to remember in the Bellingham, Washington article that he reviewed and summarized. That pipeline went through some of the properties that were affected. And there was the explosion, there were people that were killed. And that pipeline had to be replaced. I don't remember how long a section that they replaced, but that definitely was a source site situation in his case studies.

So those were studied in -- in the situations that he reports on in at least some of the

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

case studies.

Q    In that Bellingham example that you just referred to, was the property where the pipeline actually exploded, was that property part of the case study, do you know?                                    11:10AM

A    It was in a whole neighborhood.  And I'd have to look back at what I gathered on that in the past.  But my recollection is that it did go through a neighborhood.

Q    Right.                                          11:10AM

A    A residential neighborhood.

Q    Right.  But I'm asking you something different, I'm asking you if it was similar to this situation where we're talking about a property where the pipeline actually ruptured, and that's the    11:10AM property at issue?

A    I don't remember.  I would have to look at the report from the professors at the University of Washington.

Q    Okay.  Can you turn to romanette (v) of your    11:10AM executive summary?

A    All right.

Q    There's a series of bullet points on that page and the third one from the bottom starts with "Failure to consider"?                                11:11AM

Page 89

A    Yes, I see that.

Q    "And offset against the Bell report damages conclusion"?

A    Yes.

Q    Is it the role of an appraiser to consider    11:11AM offsets in an appraisal report?

MR. SEGALL:  Vague and ambiguous.

THE WITNESS:  Well, if the purpose of your report is to estimate damages, and he says that's one of the purposes of his report, so if you're trying to    11:11AM estimate damages you have to consider reimbursements as part of the cost effect.

Q    BY MR. CONLAN:  If you are in a situation -- if you'd been in a situation where your estimated damage -- well, first of all, have you ever opined on    11:11AM behalf of plaintiffs in a contamination or spill litigation?

A    Yes.

Q    How many times?

A    I couldn't give you a number.  Not a lot.  I    11:12AM get a lot of calls from plaintiffs' attorneys and they talk with me about my credentials, but we don't get retained by them very frequently.  A few times.

Q    How many opinions have you offered in the course of your career that included appraisals of    11:12AM

let's just say contaminated properties?

A    Separate assignments, that's about the best that I could give you, and give you a rough estimate.

Q    I'm looking for a rough estimate, hundreds?

A    I wouldn't say it's in the multiple          11:12AM hundreds, maybe 100 to 150 off the top of my head, Mr. Conlan.

Q    Okay.  And those -- the vast majority are on the defense side; correct?

A    Yes.  I would say, yes.          11:12AM

Q    Okay.  And on the plaintiff side, less than five?

A    I don't recall.

Q    A handful?

A    I would have to look back, but there have          11:13AM been times when we've worked for plaintiffs on those assignments.

Q    In any of those few times that you have worked for plaintiffs, did you consider offsets?

A    I'm not sure I said a few, I said there are          11:13AM some, and I don't know the number.

Q    In any of those some of cases where you worked for plaintiffs, did you consider offsets as part of your value?

A    I don't recall.  I'd have to go back and          11:13AM

Page 91

look on a case-by-case basis.  And the same with times I have worked for defendants, I would have to look on a case-by-case basis.

Q   Okay.  Just going back to the section in your executive summary called Conclusions from the Review of the Bell Report, and then turning to the second page of that.    11:14AM

The bullet point at the top, I'm just trying to make sure I understand what your conclusion is in that top bullet point.    11:14AM

There you're talking about Lot X; correct?

A   Yes.

Q   Okay.  And you say, "The only damages that would conceivably be payable to the owners of Lot X would be 967,833"; correct?    11:14AM

A   Yes.

Q   And then you go on to say, "Since the home on Lot X was under construction in 2015 and not on the market until 2017, after any impact in market value from the pipeline rupture had ended, no damages should be payable to the owners of Lot X."    11:14AM

A   Correct.  For -- for impact on market value.

Q   So is it in your opinion damages of $967,000 or zero, that's what I'm a little confused by?

A   As of July of 2022 it's zero, because the    11:15AM

Page 92

effect on value would have ended this says by the date

that it was put on the market in 2017, based on the

analysis of the case studies and the East Mesa case

study.

Q    So what's the significance of the $967,000    11:15AM

number?

A    Because that is his corrected 25 percent

risk factor down to five percent based on analysis of

his support for the 25 percent risk factor multiplied

by his value gives you that maximum percentage when    11:15AM

you correct his case studies.

Q    So you take the value that is part of

Dr. Bell's conclusion and you say, "I'm going to

correct that," and it's actually 967,000?

A    No, that's not what I did.  I corrected his    11:16AM

risk effect percentage from 25 percent to five

percent.

Q    Okay.  So you take his risk effect

conclusion and you say, "I'm going to correct it"?

A    Correct.    11:16AM

Q    And it's actually 967,000; right?

A    Well, I'm saying --

Q    Hang on.  There's a second part of this

question.

A    Okay.    11:16AM

Page 93

Q    That's what you do first; right?

A    No.  First I look at his value.

MR. SEGALL:  In 2015.

THE WITNESS:  Correct.  Correct.  I look at his value.  And then I say let's look at his case    11:16AM studies that support his conclusion that there's a 25 percent effect as of a particular date.  And I say when the case studies are properly considered and corrected, that risk effect is only -- should only be five percent.  So then --                                    11:17AM

Q    BY MR. CONLAN:  Not 25 percent?

A    Correct.  So where he was multiplying his number by 25 percent, my conclusion was he should multiply it by only five percent based on the corrected case studies.  And so that's where the 967    11:17AM comes from.

Q    But then you take it one step further and you say but actually because the risk effect was completely gone by July 2022 there's actually -- that number is actually zero?                              11:17AM

A    As of July of 2022, yes, there's no impact on value based on his case studies and our East Mesa case study.

Q    Okay.  Can you turn to Page 10, please?

A    Okay.                                          11:18AM

Page 94

Q    In the -- one of the paragraphs in the

middle of the page that starts with "The purpose of

this appraisal review."

A    Yes.

Q    And you go on to talk about basically an          11:18AM

analysis or an evaluation of Dr. -- your report is an

evaluation of Dr. Bell's report by reference to USPAP,

the Uniform Standards of Professional Appraisal

Practice; right?

A    Yes.                                               11:19AM

Q    Okay.  In evaluating Dr. Bell's report by

reference to USPAP, are you as an appraiser required

to also comply with USPAP?

A    Yes.

Q    Okay.  And so this appraisal review report       11:19AM

that you prepared is subject to the standards of

USPAP; correct?

A    Yes.

Q    And do you know what area or what standards

of USPAP specifically deal with environmental          11:19AM

contamination?

A    Yes.

Q    Which?

A    809.

Q    Any others?                                       11:19AM

Page 95

A    Well, some extent Guide Note 4 when you're relying on reports prepared by others.  In general, you know, 1, 2, 3 and 4 would all be applicable, but they don't specifically talk about contamination situations.                                          11:20AM

Q    Okay.

A    Frequently asked question 175 in the frequently asked questions is important because that talks about how you find out what the generally accepted methods of the appraisal profession are.  And    11:20AM even though that doesn't specifically talk about contaminated properties, it gives you guidance as to where to look for the generally accepted methods. Those would be the ones that come to mind.

Q    Does AO-9 govern your appraisal review    11:20AM report?

A    Yes.

Q    And we talked about this earlier, this review report is also subject to Rule 3-3(a) of USPAP as well; right?                                          11:21AM

A    Correct.

Q    Have you written on AO-9 outside of this?

A    Yes.

Q    So you're pretty familiar with the language of AO-9?                                          11:21AM

Page 96

A    Yes.  It's always helpful to have in front of me, though, Mr. Conlan, if you're going to ask me questions about it, but...

Q    Okay.  Well, fair enough.  I think I gave you a copy of Dr. Bell's report; right?                    11:21AM

A    Yes.

Q    That's Exhibit 24?

A    Yes.

Q    And if you turn to Page 72 of that report.

A    Okay.                                              11:22AM

Q    It actually starts on Page 71.

A    Yes.

Q    You see that, and that's USPAP Advisory Opinion 9; correct?

A    Yes.                                              11:22AM

Q    And that's the actual advisory opinion or a copy of it; correct?

A    Yes.

Q    And then if you turn to Page 72 there's a section on environmental contamination, it's a little    11:22AM below the middle of the page.

A    Yes.  I see it.

Q    And that's the actual language of Advisory Opinion 9 on environmental contamination; correct?

A    Yes.                                              11:22AM

Page 97

Q    Okay.  And I'll mark as Exhibit 25.

Mr. Roddewig, what is Exhibit 25?

A    It's a recent article that I co-wrote with my colleague at JLL, Alex Argianas, that appeared in Valuation magazine a couple of months ago.    11:23AM

Q    Okay.  And this is called Off the Rails, Train Derailments, Hazardous Chemical Spills and Appraiser Responsibilities?

A    They -- they added the Off the Rails at Valuation.  The title that I gave them was Train    11:23AM Derailments, Hazardous Chemical Spills and Appraiser Responsibilities, so they put that in.

Q    "They," the Appraisal Institute?

A    "They" being Valuation magazine, and I'm not even sure what, you know, technically how Valuation    11:23AM magazine fits in with the Appraisal Institute, whether it's some kind of separate body.  It's certainly different from the Appraisal Journal.

(The aforementioned document was marked as Exhibit 25 and is attached hereto.)    11:24AM

Q    BY MR. CONLAN:  Is this an article about best practices that you wrote?

A    As it applies to this kind of a situation where there was a train derailment, yes.

Q    Okay.  And this kind of a situation where    11:24AM

Page 98

there's a train derailment also includes some level of

at least potential environmental contamination?

A    Can, yes.

Q    Okay.  And then you said that this was

co-written by somebody named Alexander Argianas?    11:24AM

A    Correct.

Q    And that person was involved in the

preparation of your report in this case as well;

correct?

A    I don't think so.  I don't see him, I don't    11:24AM

remember him being referenced.

Q    Take a look at Page 14 there.

A    Okay.

Q    Apparently there's another Argianas, huh?

A    Yeah, Chuck.  That's Alex's father.    11:24AM

Charles Argianas.

Q    So Alex is Chuck's son?

A    Correct.

Q    Okay.  All right.  So I'd like you to direct

your attention to Page 22 of your article, Exhibit 25.    11:25AM

A    All right.

Q    And there's a section where you're talking

about Advisory Opinion 9 in there; correct?

A    Yes.

Q    Okay.  And this article has -- has -- this    11:25AM

Page 99

page has two columns, and the column -- the left column just below the header USPAP Responsibilities Related to Potential Contamination, and the paragraph that starts with Advisory Opinion 9, I just want to make sure you're in the same place in the article I am.    11:26AM

A    I'm there.

Q    Okay.  And then you're talking about a definition of Advisory Opinion 9 where you say, second sentence, "AO-9 defines environmental contamination as."    11:26AM

Do you see that?

A    Yes.

Q    Is there any particular reason you didn't include the actual language, the actual definition of environmental contamination in that article?    11:26AM

A    I think I have it all in there.  I didn't put the word "generally" in quotes, but I think all the other words are in there.  Let's see, state agencies -- hang on.  Yeah, I think all the words are there.    11:27AM

Q    Okay.  So directing your attention to the copy of AO-9, which is in your left hand, the second sentence of that definition says, "Generally, the concentrations of these substances would exceed    11:27AM

Page 100

regulatory limits established by the appropriate federal, state and/or local agencies."

Did I read that correctly?

A    Yes.

Q    Okay.  And in your article, in referring to    11:27AM that section, you say, "AO-9 also states that the releases of such substances generally must exceed regulatory limits established by the appropriate federal, state and/or local agencies"; right?

A    Well, that's a good point.  The AO-9 says    11:28AM "would" and this says "must."

Q    So AO-9 does not say "must"; right?

A    That's correct.

Q    Okay.  Why did you use the word "must" in your article?    11:28AM

A    I don't remember.

Q    Does that change the accuracy of your -- what you call the definition of AO-9 in your article?

A    No.  I would say it would be better to say "would."    11:28AM

Q    Okay.  But you said "must"?

A    I did.

Q    And you don't remember why?

A    I don't.

MR. SEGALL:  There's a gotcha.    11:28AM

Page 101

MR. CONLAN:  Good one.

Q   BY MR. CONLAN:  Did you proof that article before it was published?

A   Yes.

Q   Did Alex Argianas proof it?                           11:28AM

A   Probably.

Q   If you were to write another article on USPAP AO-9 would you use the word "must" in the definition of environmental contamination?

A   I would use "would" and I would cite you as           11:29AM
the source for making sure that I did that properly.

Q   I'm going to remember that.

Going back to your report, sir, I'm finished with that article.

A   All right.                                            11:29AM

Q   And you can close the Bell report as well.

A   Okay.  But you've got my attention on that one, I will go back and see if the editors at Valuation magazine did some editing on it, but I will check my original one.                                     11:29AM

Q   Page 19 of your report, this is not a memory test, just address that up front.

But in the middle of Page 19 or toward the -- toward the -- just above the middle you say, you "Reviewed various other expert reports and       11:30AM

Page 102

documents produced by Plaintiffs and Defendants in the litigation."

          Do you see that?

     A    Yes, I do.

     Q    Okay.  Do you know what other various expert    11:30AM
reports you're referring to there?

     A    Did I already mention the Robrock report
here or not?  So that would be one.

     Q    We know you looked at Robrock, although you
refer to her two bullet points above that.    11:31AM

     A    Okay.

     Q    And we know you reviewed the Bell report.

          Can you think of any others you reviewed?

     A    Well, documents certainly, I can think of a
lot of documents I looked at, but I can't think of any    11:31AM
as I sit here, I'd have to look back.

     Q    What I'm trying to understand is if that
reference to expert reports also includes expert
reports from the Andrews litigation, if you know?

     A    Well, it would, I did look at Dr. Bell's    11:31AM
reports in that litigation.

     Q    Did you look at any other plaintiff side
reports in that -- expert reports in that litigation?

     A    I would have to go back and look,
Mr. Conlan.  I don't remember.  I know I did look at    11:31AM

his expert reports and I think he had two in the class certification. And I don't -- is the Andrews the class certification case? Because I know there's been other cases, too.

Q    Well, I wouldn't call it the class certification case, I would just call it the Andrews case. But yes, Dr. Bell did opine as an expert in that action, which did include certified classes, but this case also does in some parts, too. So just trying to clarify.

A    Well, I don't remember the names of the -- I know that there's also another case that's going on related to the pipeline itself, I guess. I don't remember the names of the plaintiffs in the cases, but I did look at Dr. Bell's reports in the case related to certification of a class related to shoreline properties within a quarter mile or a quarter mile plus those that had access to a beach.

Q    Right. And as part of your analysis of the East Mesa properties, you had an understanding of which -- of the level of oiling along -- on the beaches along East Mesa; correct?

A    Yes.

Q    Okay. You said that they were lightly oiled?

Page 104

A    Well, I'd have to go back and look at the SCAT map.  My recollection is that SCAT map showed most of that as lightly oiled, but again, I think I produced the SCAT maps, I would have to see if -- if every SCAT map that I produced showed lightly oiled or whether sometimes there was heavier oil or not.    11:33AM

Q    What I'm getting to is did you rely on the SCAT maps or did you do any review of the work of Dr. Igor Mezic?

A    I remember his name.  And I did look at some things related to him in that case.  I can't remember if I looked at an expert report or a declaration, I do remember the name.  I looked at some things related to him.    11:33AM

Q    Okay.  Going back to Page 19 of your report, a few bullet points below that you say you "Reviewed our prior investigations and case studies related to the effects of oil spills and pipelines on property prices and values."    11:33AM

A    Yes.    11:34AM

Q    Do you remember in particular any of those case studies?

A    Well, five of the six oil spill case studies that Dr. Bell uses I had previously researched.  The only one that I hadn't ever actually researched other    11:34AM

Page 105

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

than done some online investigation of it was the Mayflower Road one.  So I had developed information on all five of those.

And same thing goes with his literature review on pipelines that played into his analysis.  I had previously looked at a lot of that literature in the course of commenting on other experts' reports in other assignments.

Q    When you say you researched those case studies, have you ever incorporated them into any of your appraisal opinions or appraisal review opinions or reports?

A    In other reports, yes.

Q    Okay.  And I'm talking about the five that you had previously looked at that also appear in Dr. Bell's report?

A    Well, let me look at each one and see if -- let me look at the list.

So we have -- so Deepwater Horizon I certainly have.  And it was the subject of a presentation at the American Real Estate Society annual meeting.

The Pepco oil spill in Maryland, that's one that we've used many times before.

The one in Ohio involving the BP pipeline,

11:34AM

11:34AM

11:35AM

11:35AM

11:35AM

Page 106

that's one that we've used many times before.

The Enbridge analysis, I had not previously used that analysis before, but I had studied the Enbridge situation.

And the Bellingham, Washington one I had    11:36AM looked at and used previously in the summaries of literature related to pipelines.

What am I missing?  Have I got all of them or is there one more that --

So yeah, some of them I have used before.    11:36AM

Q    Okay.  And when you had used them before, did you -- or relied on them in a report, did you analyze the underlying data from those case studies as part of your reliance on them?

A    Yes.    11:36AM

Q    Okay.  And you did that for what reason?

A    Because they were case studies that I had considered appropriate to analyze to understand the effect of oil spills or pipelines on property prices, values and markets.    11:36AM

Q    Okay.  And that was in -- as part of a report on a potential contamination on a different property; correct?

A    Correct.

Q    And what did you do to analyze the data    11:37AM

Page 107

underlying those case studies?  What goes into that?

A    Well, typically what we do is we go out and inspect the site, we collect data either from the MLS database or the public record or both.  We analyze that data and we do various types of comparisons, either before and after a spill occurs or inside and outside an affected area or other types of analysis of the data that we collect from the actual marketplace, the sales data.

Q    I may have not have asked you a clear question.

A    Okay.

Q    I'm asking you about a situation where you're offering a report on a property that's subject to litigation, and as part of that report you're including case studies; right?

A    Yes.

Q    Okay.  And according to you, if you're going to rely on those case studies you've got to do your own independent analysis of those case studies; correct?

A    Yes.

Q    Okay.  And you do that to evaluate the reliability of the conclusions in the case studies; right?

Page 108

A    Correct.

Q    Okay.  So --

A    Let me stop, because I know you're talking about two different things here.  Okay.  One you're talking about when we do our own case studies what do    11:38AM we do, and I said we collect the data, we analyze it, we do various types of comparisons, either before and after an event or inside and outside an affected area. And we write up that case study based on the data.

When I'm looking at somebody else's    11:38AM published case study, I mean, I can report on what it says as something in the literature, but if I'm going to rely on that as my own opinion and base my opinion on it, I have to check the reliability of that under Guide Note 4.  You can't just rely on a published    11:39AM article as indicating an impact unless you have done the work required under Guide Note 4 to determine the reliability and credibility of that.

Q    How do you determine the reliability and credibility of a case study that's been previously    11:39AM published?

A    We go in and we check the data.  We go into the marketplace and we collect the data and we analyze it ourselves and compare it to what's in the published report.    11:39AM

Page 109

Q    Is that close to doing your own case study
of it?

A    It depends on the level of effort that goes
into that checking on it.  It depends; it will vary.

Q    Okay.  So in your criticism of Dr. Bell, you    11:39AM
are -- and I'm looking at Page 57 of your report, you
are criticizing him because you say with respect to
Case Studies 3, 4, 5 and 6 he did not make any
independent effort to collect and analyze data to test
the reliability of the conclusions in published    11:40AM
articles --

A    What page is this again?  57?

Q    57.  The top.

A    Okay.  Yes, I say that.

Q    Right.  And I'm just trying to understand    11:40AM
what goes into that and what your practice is.

So, for example, if you were relying on --
you have already testified that you had separately
before this case researched several of the case
studies that Dr. Bell relies on in his report; right?    11:40AM

A    Yes.

Q    Okay.  And you criticize him for not
independently analyzing the data underlying some of
those case studies; correct?

A    Well, he didn't look at our case studies, he    11:41AM

Page 110

looked at other people's case studies.  So I'm saying he should have independently looked at the data that supported those case studies.

Q    Right.  You're saying he took Case Studies 3, 4, 5 and 6 and just relied on them for what they said?                                             11:41AM

A    Well, and in terms of 6, he didn't report the entire story on 6 in the article that he looked at as a case study.

Q    Okay.  But if you were preparing an                11:41AM appraisal on the plaintiff side, and you were going to rely on Case Studies 3, 4, 5 and 6 as part of your appraisal, what would you do to analyze the data and test the reliability of those case studies, that's what I'm trying to understand?                                    11:42AM

A    Okay.  And I can give you an example of that.  And it wouldn't matter whether I'm working for a plaintiff or -- or a defendant.  You said if I was working for the plaintiffs.

So let me give you two examples from here.      11:42AM No. 3, the Pepco pipeline case study.  So he relies on an article written by Robert Simons and I think a couple of others that talked about what happened in the wake of this Pepco pipeline spill in Maryland. We've been on the opposite side of Robert Simons where  11:42AM

Page 111

he has used that article as support for his opinion. And what we have done many years ago is we actually went into that marketplace and collected the data, inspected the area, came up with control areas and did what he -- actually what Simons in the article actually said needed to be done.

It's likely that the impacts that Simons saw would end.  And so we went in to check and see if that was true.  And we published that and it's included in the back of my report as our critique.

So that's an example of what we do when we see somebody else who has done a case study, what we do to check the reliability of it.  And then there's one more --

Q    Hold on.

MR. SEGALL:  Let him finish.

Q    BY MR. CONLAN:  You're moving to a different case study and I have a question about that one --

A    Okay.

Q    -- so let me just ask you a question about that.

A    Sure.

Q    I'm not trying to interrupt you.

A    Okay.

Q    You did that as part of a litigation where

you were on the other side of the case from Robert

Simons; right?

    A    Yes.  And other people who had used it.  I

think Kilpatrick has used it in a couple of cases,

too.                                                      11:43AM

    Q    Okay.  And I understand that, because you're

trying to break down the other experts' opinions and

conclusions.

        But if you were -- I'll leave it at that.

        Why don't you go on to the other case study    11:43AM

you wanted to talk about and then I'll ask you some

other questions.

    A    Okay.  So the same with No. 5, the BP

pipeline in Franklin Township, Ohio, again, we have

been on the opposite side of Simons and on the          11:44AM

opposite side of others, including I think John

Kilpatrick, who has relied on that article that Simons

wrote without going in and independently checking the

reliability and accuracy of it.

        And so what we did is go into the actual        11:44AM

marketplace and collect the data and analyze the data

and see if the -- what Robert Simons said in the

article is reliable and accurate.

    Q    Okay.  When you went into the marketplace

and collected the data, did you -- had you done that    11:44AM

Page 113

in the case where you were adverse to Mr. Simons or you did it in some other situation?

A   I don't recall if the first time that we -- we have studied that situation twice, once originally and then we updated our analysis.  I don't remember if each time we were in opposition to Robert Simons or whether we were in opposition to someone else who was using that article as evidence of the impact of that pipeline and spill.  I don't remember.  I'd have to go back and see what the first use of it was.

Q   Okay.  So let me try to put it into perspective because I'm not quite understanding what you're saying.

Just looking at Case Study No. 1, the Enbridge pipeline rupture in the Kalamazoo River.  It's right at the top of your table.

A   Yes.

Q   If you were going to rely on a case study arising out of that pipeline spill.

A   Rely on somebody else's case study, is that what you're saying or do one myself?

Q   No, no.  Not do one yourself, but yeah, rely on somebody else's, whether it's an article or, you know, some other form, and you were going to rely on that as part of an oil spill that took place in Texas

Page 114

that you were opining on.

        A    Okay.

        Q    What would you do to test the reliability of
the Enbridge oil spill study?

        A    I'd do exactly what I did to Dr. Bell's                11:46AM
study.  I looked at what his conclusion was and his
analysis of it was and went in and checked the data
and analyzed the data.

            And then I looked at information that we had
related to individual appraisal reports we had done in    11:46AM
that larger market area in other cases north of
Marshall and looked at what the adjustments were in
the individual appraisal reports that we worked on
with local appraisers to see if I went in and took
just those three properties and adjusted them from the    11:46AM
other factors that local appraisers would use to
adjust prices, what did that show.

            And so that's what we did in that case.

        Q    That's what I'm trying to understand.  So
I'm not talking about any particular case, I'm trying     11:46AM
to understand that if -- it's your testimony that
anytime an appraiser includes a case study in his or
her analysis as part of it, you understand here
Dr. Bell's got six case studies that he relies on;
right?                                                    11:47AM

                                                         Page 115

A    Yes.

Q    Okay.  Is there a number of case studies that are typically relied on to provide foundation for an opinion?

A    No.                                                11:47AM

Q    Okay.  Is there a typical number?

A    I'm not sure there's a typical number, Mr. Conlan.  Sometimes I have seen three case studies, sometimes I have seen as many as ten case studies or more.  There's no typical number.                     11:47AM

Q    Okay.  And then for you, when you are preparing an appraisal or an opinion on damages and you rely on your own, not rebutting somebody else's analysis of a case study but identifying your own case studies that you rely on, is there a number that you    11:47AM typically use?

A    I don't think there's a typical number, it really depends on the situation that we're investigating.

Q    Okay.  I understand that.  So three to ten,    11:48AM something like that, roughly?

A    Roughly.

Q    Okay.  And have there instances --

A    I think there's times when I have done even more than that, but anyway.                          11:48AM

Page 116

Q    Okay.  So there's been times where you've relied on at least ten case studies as part of an opinion or a report that you prepared; right?

A    Yes.

Q    And in each of those -- for each of those    11:48AM case studies that you relied on, did you go and effectively redo the case study?

A    Well, you're confusing two things again.  I thought you were asking me about when we independently do case studies what do we do.  You're talking about    11:48AM reviewing somebody else's?  All right.  So let's go back to square one on this line of questioning.

Q    Yeah.  Let me set the table here.

A    Okay.  All right.

Q    I'm talking about a report that you prepare    11:48AM in a litigation.

A    Okay.

Q    And as part of that report you rely on case studies from other environmental catastrophes; right?

A    Somebody else's case study?    11:49AM

Q    Yes.

A    I'm not sure we do that.  I mean, if we're talking about an article we're not going to, you know, rely on -- we may discuss the literature to give some general background on how published literature    11:49AM

Page 117

addresses a particular issue in the field of

contamination.  But if we're going to use it as an

actual case study we'll go in and do our own analysis

of the data.

So there's a difference between talking    11:49AM

about the literature and saying, "Here's a survey of

the literature and here's what people say these kinds

of situations have as an impact."

And that's different from then saying, "All

right.  So now I'm going to have a case study that I'm    11:49AM

going to rely on for my specific opinion concerning an

impact."

Q    Okay.

A    Those are two different things.

Q    All right.  So understand what Dr. Bell did    11:50AM

here, I'm not asking you for your opinion on how he

did it.

A    Okay.

Q    But I'm asking -- I'm just asking you to

understand for the purpose of this question what he    11:50AM

did and he relied on in one way or the other these six

incidents; right?  And some kind of report on those

incidents; right?

A    Well, it's a mixed bag.  Okay?  I can't tell

from his No. 1 case study whether he did that research    11:50AM

Page 118

himself at Landmark Research or whether they're

relying on somebody else.

No. 2, it's clear that they communicated

with people and that that was research that they did

on their own.                                           11:50AM

No. 3, it appears to me from everybody I've

seen in their -- everything I've seen in their

write-up that they're just relying on the Simons

article and that they didn't do any independent

verification of the data.                               11:50AM

No. 4, they talked to a person in the local

market involved in -- a broker involved in the

Mayflower case and then also talked about the -- the

settlement, how much the settlement was.  I didn't see

any -- in what they've produced and what they said, I   11:51AM

didn't see any independent data that they analyzed.

No. 5, they did not do any independent data

analysis as far as I can tell.  They basically just

reported what Simons had reported.

And No. 6, they just reported not all of the  11:51AM

information that was in the article that they relied.

So a couple of them maybe they did some independent

research on their own, but the others it appears that

they just relied on what was in the published article.

Q    And your testimony is that what would be  11:51AM

Page 119

required is to do independent research on every single one of them?

A    If you're going to use it as a case study.

Q    Okay.

A    If you're going to rely on it for your    11:51AM opinion of what an impact on value is.

Q    And that's what you do in every instance where you rely on an incident as a case study, you do your own independent analysis of it?

A    Well, again, you're asking two different    11:52AM things.  We do our own case studies.  If we're looking at somebody else's case study.

Q    That's what I'm talking about.

A    Okay.  So I'm looking at somebody else's case study and we want to analyze it, we will do our    11:52AM own independent analysis unless we're just reporting on this is what the person says.

Q    Okay.  So if you're just reporting on this is what the person says, you're not going to do an entire analysis of that report to test the reliability    11:52AM of its conclusions?

A    Well, that's a different question, because I may not have the report in which that case study has been part of somebody else's opinion.

So again, go back to the literature versus    11:52AM

Page 120

relying on a case study.  It's perfectly appropriate

in appraisal practice to look at what the literature

says, just like we look at what the literature says in

Dr. Bell's books or in my articles or in his articles

or Michael's articles about what they say the methods     11:53AM

are.  And it's perfectly appropriate to look at what

the literature -- the published literature related to

how others have analyzed the impact of contamination.

        But if you're then going to rely on an

opinion of someone else to arrive at your own opinion     11:53AM

of an impact, Guide Note 4 comes into play and says

you have to do something to assure that the

information in conclusion in that article or case

study that you're going to rely on for your own

opinion is accurate and reliable.                         11:53AM

        MR. SEGALL:  Can we just go off the record

for a second?  I just want to talk about the timing.

        MR. CONLAN:  Yeah.  Let me just ask one

other question.

        MR. SEGALL:  Yeah.  Absolutely.              11:54AM

        THE WITNESS:  We're kind of going in

different directions here and I don't quite understand

what you're asking me.

    Q   BY MR. CONLAN:  What I'm trying to

understand is, what do you do?  Is it discretionary?     11:54AM

Page 121

How far do you have to go to test the reliability of

the underlying conclusions?

A    Well, it varies from situation to situation,

Mr. Conlan.  I mean, for example, on his Enbridge

pipeline Case Study No. 1, I did a much simpler      11:54AM

analysis of that than, you know, I did on Pepco

pipeline when I was critiquing the Simons use of that

or that I did on the BP pipeline.

So it really depends on how far you feel you

need to go to show that it might not be accurate or      11:54AM

reliable.

Q    And conversely, if you want to get

comfortable that it's accurate and reliable it's sort

of discretionary in the mind of an appraiser in how

far you go to test that accuracy; is that fair to say?   11:54AM

A    Well, then the credibility of that testing

would kind of stand on its own.

Q    Yeah.  I understand that.

A    I mean, there is no specific -- there is no

specific statement in USPAP as to when you're doing a    11:55AM

contaminated property case study how far you have to

go, other than what might be in the Jackson/Bell

article on case study analysis that I'd have to go

back and look at that came out 15 or 20 years ago.

Q    And when you refer to the Jackson/Bell case   11:55AM

Page 122

study analysis, you're referring to Dr. Bell is the

author of that; correct?

    A   Correct.  Yeah, there was an article that he

wrote with Tom Jackson that talks about case study

analysis, but I think it related to source sites.    11:55AM

    Q   Okay.

    A   Rather than to, you know, larger groups of

properties.  And I think it was a commercial --

commercial- and industrial-focused article.

    Q   Okay.    11:55AM

    A   But I'd have to look at that to see if

there's anything in that that says, you know, you

should go to this level in a case study analysis.  I

just don't remember.

    Q   Did you do that as part of your criticism of    11:56AM

Dr. Bell case studies in this case?

    A   Do what?  I don't understand.

    Q   Look at his article regarding how to analyze

a case study?

    A   I don't remember if I looked at that as part    11:56AM

of this or not.

    Q   Okay.  Thank you.

        MR. CONLAN:  We can go off the record.

        THE VIDEOGRAPHER:  The time is 11:56 a.m.

We're off the record.    11:56AM

Page 123

(A brief recess was taken.)

THE VIDEOGRAPHER:  The time is 12:06 p.m.
We're back on the record.

Q    BY MR. CONLAN:  Mr. Roddewig, you understand
that you're still under oath; right?                    12:07PM

A    Yes.

Q    I'd like to direct your attention to Page 32
of your report.

Bottom of Page 32, Section 3.2, you say,
"The appraisal profession has long recognized that        12:07PM
environmental conditions typically have only temporary
effects on prices and values."

And that's part of the basis for your view
that in this particular case the effect on price and
value at least with respect to Lot X only lasted until    12:08PM
the remediation was complete in the summer of 2016;
correct?

A    Well, it's based on the case studies that
indicate that, that typically in a situation like this
the effect ends sometime after the investigation or       12:08PM
remediation is completed.  And that fits in with what
the literature has often found.

Q    Often found but not always; correct?

A    Correct.  And I've been involved in
situations where I've found impact still going on many     12:08PM

Page 124

years afterwards in situations in which I have opined that there's a permanent impact.

Q    Right.  And in some situations there's -- you know, even if that -- there's not a permanent impact there could be an impact due to environmental conditions or issues related to environmental conditions that could go on for years; correct?

12:08PM

A    Yes.  It depends on how long the investigation and the clean-up goes on.  And then whether the market in reaction to that recovers.

12:09PM

Q    And in your critique of Dr. Bell's report here, did you look at your own -- I know you looked at the East Mesa analysis, did you also look at your own other market data other than that, separate and apart from that?

12:09PM

A    You mean in the Santa Barbara marketplace?

Q    Yeah.

A    Yes.  We looked at the information related to the days on the market for properties at various price points at various points in time.  So that was additional information that we looked at.  That's what comes to mind in terms of what else we did in the local market.

12:09PM

Q    Have you ever studied a case where there's been an incident like an oil spill or some other

12:10PM

Page 125

catastrophe where as a result of that event there's an ongoing -- there's a remediation, but in addition to the remediation there's an ongoing potential like there was here where there's a pipeline replacement project proposed or the potential to repair the same     12:10PM pipeline eight years down the road?

A    I'd have to look at the Enbridge situation. I know that there was a repair or replacement component to fixing that problem.  But I'd have to go back and look at the published information on that,     12:10PM but I think that's one.

Let me think what else related to pipelines where we looked at repair or replacement of a pipeline.  Well, the Bellington (sic), Washington one in terms of what that published article said about the     12:11PM effect was certainly a portion -- at least a portion of that pipeline was going to have to be replaced because it exploded.  And I'd have to look at the full article to see if they were going to replace the whole thing or some long section of it.     12:11PM

I don't remember in Mayflower Road case study how much of that pipeline they were going to repair or replace.  But I'd have to go back and look at those situations.

Q    Any others that you can think of?  Any other     12:11PM

Page 126

events that you have studied?

A   I'm thinking.

Q   Not just in this case, in any part of your career?

A   You mean related to pipelines?          12:11PM

Q   Yeah, pipelines?

A   As to whether we looked at a repair and replacement project and what effect that had?

Q   No.  Where there was a situation where the pipeline ruptured and spilled or sent gas out and          12:12PM there was a remediation, but then in relation to the rupture there was also an ongoing effort to either replace it or repair it that lasted for, you know, eight years?

A   As I said, I'd have to go back and look.          12:12PM The Enbridge situation comes to mind.

Q   You don't have to go back through the ones you just mentioned.

A   Okay.

Q   I'm just wondering if there are any others?    12:12PM

A   Well, Pepco, I know that they had to repair that one due to the rupture, but I don't remember how many years that was going to take.

I can't think of others as I sit here.

Q   Have you studied an event where after a          12:12PM

Page 127

pipeline ruptured it was out of service for eight years or more following the rupture?

MR. SEGALL:  Assumes facts not in evidence.

THE WITNESS:  Not that I can recall.

Q    BY MR. CONLAN:  Okay.  And just to address    12:13PM your counsel's objection, have you ever studied a situation or an event where a pipeline ruptured and following the rupture there was no longer oil or gas or anything like that flowing through it for eight years or more?    12:13PM

A    Well, break it into two pieces.  I don't recall, you know, how long the delays might have been in some of the situations I've studied.  And I can't recall anything that long in previous work that I have done.    12:13PM

Q    Okay.  So you have never studied how that period of time where the pipeline is out of service has affected the value of properties in proximity to it?

A    Well, I think I told you how I would do it    12:14PM in this situation by gathering actual data, but I can't recall having done that in a prior situation.

Q    Okay.  And you acknowledge on Page 33 that at least in some situations an event or an environmental condition, the period of time where it    12:14PM

Page 128

could have an impact varies, and you say could last from only a few days to a few weeks, a few months or a few years depending on the length of the investigation, remediation and clean-up; right?

A    Correct.  When it's a temporary impact it    12:14PM
can -- it can last for a number of years.

Q    Right.  And on Page 34 you have included two graphics here, both of which are called I believe the Detrimental Condition Model; right?

A    Yes.                                            12:15PM

Q    What's the point of including those here?

A    Well, similar to the first publication of a model like this back in 1991 or 1992, it shows that as the investigation and remediation goes on, the potential effects on price and value change and lessen    12:15PM
over time.

And so that's the purpose of this is to show that the typical scenario shows that price effects, market value effects change over time and typically go down as investigation, remediation continues.    12:15PM

Q    And you understand that there are variations of this type of model; right?

MR. SEGALL:  Vague and ambiguous.

THE WITNESS:  Yes.  I have even put my own variations in the course that I did for the Appraisal    12:16PM

Page 129

Institute in 2001.  Slightly different version of the model.

Q    BY MR. CONLAN:  Okay.  And the graphic at the top of the page where it says Exhibit 1.3 is Detrimental Condition Model, you took that from a book   12:16PM published -- or I guess written by Randall Bell; correct?

A    Yes.

Q    Okay.  And you're aware that there are other similar graphs like that one in that same section of   12:16PM the book?

A    Well, he's got various detrimental conditions and he shows different graphs for different types of detrimental conditions.

Q    Right.                                            12:16PM

A    This is the general model that he has in the book.

Q    Okay.  This is one of the graphs that appears in his book; correct?

A    Correct.                                         12:17PM

Q    Okay.  And is there another name for this model?  Is it known in the appraisal world by some other term?

A    Yes.  Remediation life cycle is the other typical term that refers to it.                       12:17PM

Page 130

Q    Okay.  And I think I just heard you say that you -- have you created graphs like this in your career?

A    Yes.

Q    Okay.  What is the -- if you start at the    12:17PM lower left corner of this graph at the top of the page, you see where it says B, and that's where the detrimental condition occurs?

A    Yes.

Q    And then it goes over to the right and then    12:17PM up and over to the right and up and so on and so forth?

A    Yes.

Q    Okay.  What is that part of the graph called?    12:17PM

A    Which part of the graph?

Q    That section that goes over and up and over and up, is there a term for that?

A    Well, each -- part of it would be the occurrence, then there's the investigation, then    12:18PM there's the assessment period, the repair period, the ongoing period.  And those are kind of referred there.

You know, you see at B it says detrimental condition occurs and then you got C, the assessment period and then you go up to D, the repair period,    12:18PM

Page 131

then you go up to E, the ongoing period.  And the market resistances, if any, is part of the ongoing period.

Q    Okay.  I see what it says there, but is there some definition or term of what that analysis is 12:18PM called in the appraisal world?

A    I'm not sure I understand the question. It's remediation life cycle?

Q    Okay.  You don't know or you don't understand my question? 12:18PM

A    Well, I call it the remediation life cycle.

Q    The whole graphic?

A    Well, the recovery, the recovery period is the remediation life cycle.

Q    And on Page 35 of your report when you're 12:19PM talking about this remediation life cycle, you say in the middle of that first paragraph, "At each stage, cost, use and risk factors can vary depending upon the 'case-by-case' circumstances at play"; right?

A    Yes. 12:19PM

Q    And there's a number of different case-by-case circumstances that could go into the cost, use and risk factors in any given situation; right?

A    Yes. 12:19PM

Page 132

Q    And that could determine whether the impact of environmental condition lasts a few days or several years; right?

A    Yes.

Q    What those case-by-case circumstances are?    12:20PM

A    Yes.

Q    Have you ever heard of the principle of substitution?

A    Yes.

Q    What does it mean?    12:20PM

A    Well, I could look at the appraisal of real estate on it, but --

Q    I don't need an exact quote.  I just need your understanding in general of the definition.

A    Yes.  You're trying to find a property that    12:21PM properly substitutes for the property that you're analyzing in order to understand what might happen to the property that you're analyzing by looking at substitutions that you could acquire or utilize in place of the property that you're looking at.    12:21PM

Q    Is it a way to understand market value of a property?

A    It's one of the inputs to the concept of market value and market analysis is to think about the concept of substitution.    12:21PM

Page 133

Q    Okay.  So to try to put it in perspective in this case, we've got Lot X with a -- at the time of the spill a partially developed single-family residence; right?

A    Yes.  There was still work to be done.          12:22PM

Q    Right.  And there's an oil spill on that property?

A    A portion of it, yes.

Q    On a portion of the property.

And at some point that property, the home is      12:22PM
completed and goes up for sale; right?

A    Yes.

Q    So I understand that the world doesn't work this way, but to put the principle of substitution into context here, if there was another property like      12:22PM
Lot X that had the same home that was, say, you know, 25 miles up the coast of California, same home, same size property but no pipeline on the property and no previous oil spill on the property.

Follow me?                                          12:22PM

A    Yes.

Q    Okay.  Would that be a way to look at the value of the property where the pipeline ruptured and spilled and the market value of that by comparing it to the market value of the almost identical property      12:23PM

Page 134

but without a pipeline, without an oil spill?

MR. SEGALL:  An incomplete hypothetical.

THE WITNESS:  The 25 miles away is -- is --
could be in a different market, so I'm not sure that
would meet the definition of substitution.                12:23PM

But what you have to understand is that this
is a theoretical concept, the principle of
substitution, but you have to measure it in the actual
marketplace of buyers and sellers and what is paid for
the alternative property.  You can't just say someone    12:23PM
wouldn't buy this property because there's another
property like it that didn't have an oil spill on it.

You have to -- motivations of buyers are
different from one situation to the next.  And there
may be something about this particular property even     12:24PM
with the oil spill on it that someone may really like
and say, "Well, I'm willing to accept any risk."

And another buyer might not.  So it's a nice
theoretical concept, but the way that you get at
whether it works or not is to actually look at prices     12:24PM
that are being paid and try to compare them.

Q    Okay.  Let me try to frame it a different
way.

A    Yeah.

Q    Let's say there's two identical properties,       12:24PM

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

the same location, Rancho Tijiguas right next to each other.

A    Okay.

Q    Okay?  And instead of a pipeline running through Lot X, Plains was trucking oil and it was driving through Lot X and it spilled 3,000 barrels of oil out of a truck and it went all over that portion of property and, you know, it was cleaned up over the course of a year.

And the property next door, identical house, identical size, essentially the identical view, there was never a Plains oil truck on the property and it never spilled any oil.

You with me?

A    Yes.

Q    Okay.

A    It's a hypothetical, but so far I'm with you.

Q    Right.  Okay.  So if after the clean-up both properties were for sale and the property where the oil had spilled, there's a possibility that there might have to be some kind of ongoing analysis of the clean-up or Plain's ability to, you know, use an easement on the property to, you know, truck oil or something like that.

12:24PM
12:24PM
12:25PM
12:25PM
12:25PM

Page 136

Would you -- in a comparison like that, what would you think a reasonable buyer would do in terms of which property is more attractive to purchase and how would that affect market value?

MR. SEGALL:  Again, it's an incomplete    12:25PM hypothetical.

THE WITNESS:  So let me make sure I understand what you're saying.  You've got two properties that are right next to each other, topography is the same, access to a road is the same,    12:26PM the houses are exactly the same, the views are the same, the only difference is that one had an oil spill and it's been cleaned up, but there's still additional investigation that may go on on the one so it's not past the complete remediation stage?    12:26PM

Q    BY MR. CONLAN:  No, no.  Assume the remediation's done.

A    It's done.

Q    But let's say --

A    You said something about there's still the    12:26PM right to bring a truck in somehow and --

Q    So let's say Plains was still -- was trying to get the right to drive back onto the property with a truck full of oil.  Okay?  They didn't have it, but they were trying to get it.  Okay?  Remediation's    12:26PM

Page 137

done.  I want to get that out of the picture.

So does it affect the market value of the two identical homes if one, the spill hadn't occurred there and Plains isn't trying to get back on the property with a truck full of oil compared to the one next door?                                                    12:27PM

A    So can I understand more about why the truck full of oil is going to come back on the property?  I mean, is there a road going through it that they --

Q    Just assume there's a reason that Plains wants to get onto the property with a truck full of oil?                                                    12:27PM

A    Well, I would need the facts related to --

Q    That's the fact.

A    And is this something that is required to be told to a potential buyer under California notice requirements on what you have to tell potential buyers about?                                                    12:27PM

Q    Yes.  Well, at some point during the transaction, yes.                                                    12:27PM

A    Okay.  Well, that might be something that would affect some of the buyers.

Q    Would it affect the market value?

A    I don't know.  I would have to study the situation and see if I could find some market data in                    12:27PM

Page 138

some kind of similar situation.  And the best I can think of would be situations in which after an oil spill has occurred and there's been a clean-up that there's a continuing -- and I'm trying to think of the right word, recorded deed or something that -- that gives the -- someone the right to come back onto the property later and check.  And in that situation, if there's some kind of recorded instrument, that could be a difference that could affect the property.

But I will also add the following.  I have seen situations where there's a -- there's a contamination situation that affects an area and, I'll talk about the Chinese drywall class action that I was involved in.  What I found is that after the clean-up occurred, there was so much information about the particular property and that it had been investigated and cleaned up that there was actually a premium paid for the property that had been investigated and cleaned up.  Because there wasn't as much information known about the environmental situation at the neighboring properties.  Same model, same house.

So it can vary.  Some people might in the course of looking at that property where the spill occurred say, "Well, now I know exactly what the soil situation is, it's been investigated, it's been

Page 139

cleaned up, where is this one next door, hmm, was there some contaminated dirt or something on that from some previous event that hasn't been investigated?"

So it depends on the circumstances.

Q    It depends on the circumstances.                    12:29PM

And as you sit here today as an appraiser, you can't really tell what the effect of that comparison would be on the value of one property versus the other, the one next door; correct?

A    Well, I can tell you what I'd do to                 12:29PM
understand it, but, you know, you can't -- you can't have -- it's a theoretical question and the only way to know whether it really would have an effect or not is to go and investigate the marketplace to see how that kind of a situation plays out in the marketplace.   12:30PM

Q    And to investigate the marketplace you've got to -- part of that would be looking at sales of comparable properties; right?

A    Yes.  You could look at sales of comparable properties.                                                 12:30PM

Q    Okay.  In this case, one of the things you did was looked at sales of homes on the East Mesa in Santa Barbara; right?

A    That was for a case study to determine what the effect of the oil spill would have been generally    12:30PM

Page 140

on the marketplace and how long that effect lasted on the marketplace.

Q    But you used that as a direct comparison to the effect of the oil spill on the El Rancho Tijiguas property; correct?                                    12:30PM

MR. SEGALL:  Misstates the witness's testimony.

THE WITNESS:  Well, I used it as a case study in the same way that I looked at the case studies that Dr. Bell used that were not direct        12:31PM substitutions for what happened at Lot X.

Q    BY MR. CONLAN:  Okay.

A    He used similar kinds of case studies to see what the effect was in other situations.  He didn't use any case studies in Santa Barbara, however.     12:31PM

Q    Did you drive through the East Mesa neighborhood?

A    Yes.  A number of times.

Q    It's a compressed neighborhood, would you agree?                                                          12:31PM

A    I'm not sure I know what you mean by compressed, but it's well defined.

Q    And the parcels are fairly small in comparison to El Rancho Tijiguas?

A    Yes, they are.  That's what made it such a     12:31PM

Page 141

good case study because we had a lot of sales data and a lot of properties close to the shore compared to a little further away from the shore that could be analyzed.

Q    Would you agree with me that most of the parcels in the East Mesa are a quarter acre or less?

A    Yes.

Q    Okay.  And would you agree with me that the prices of the homes, the average prices of the homes in East Mesa are far less than the average price of the homes in Hope Ranch or Montecito?

A    Yes.

Q    Okay.  And far less than --

A    Well, I'd have to -- in terms of far less than Hope Ranch, I'd have to look at our data on Hope Ranch.  They are less in East Mesa, but I don't remember what the percentage difference is.

Q    Okay.  And certainly far less than at least the marketed price of the homes at El Rancho Tijiguas; right?

A    Yes.  But then so were the homes in the Enbridge case study that Dr. Bell did and the homes in Mayflower, Arkansas and the homes -- the condos along the shoreline in Alabama and the homes in Orange Beach in, you know, the Pepco case study.

Page 142

Q    And you understand that at none of the homes that traded in the East Mesa there was an oil spill?

A    Well, there was shoreline oiling.

Q    Right.

A    They weren't source sites.  They were what 12:33PM would be non-source sites that were oiled.

Q    And would you consider the oiling at the Lot X site light oiling?

A    No.

Q    But the -- 12:33PM

A    On the -- on the 12 acres, no.

Q    But your understanding of the oiling along the beach in the East Mesa submarket is that it was light oiling generally; right?

A    Generally.  I'd have to go back and check 12:33PM the SCAT maps to see if some of the times when they did a SCAT map survey that there was more than just light oiling.

Q    Did you do any more of a focused analysis on the properties that actually had beach front as part 12:33PM of their parcel on the East Mesa?

A    I don't think so.  I think we did 0.2 miles compared to greater than that within the East Mesa neighborhood up to Cliff Drive, which kind of formed a divider between the higher part of East Mesa where 12:34PM

Page 143

there was topography and views that came into play, whereas south of Cliff Drive it was the smaller lots, they were more -- more uniform in type of home than up above Cliff Drive.

Q    And most of them were not directly on the    12:34PM
coast, they were in proximity to the coast; right?

A    Yes.  There was quite a few along the
shoreline.  And we do have some of those sales, but
I'd have to look at the data to see how those
specifically compared to sales across the street or a    12:34PM
little further inland than East Mesa.

Q    Were there any other submarkets that you
considered other than East Mesa as part of that case
study?  Or say to use as an alternative?

A    Well, I said we looked at West Mesa and we    12:34PM
looked at Hope Ranch.  I also drove to the other side
of Santa Barbara, looked around where the El Escorial
condominiums are and thought about trying to do
something with that, but it's a higher rise
condominium or a mid rise condominium off the    12:35PM
shoreline.

I drove over into Montecito, but there's,
you know, different numbers of properties over there.
So those were the other places I drove through.  But
as I said earlier, East Mesa gave us the best    12:35PM

Page 144

opportunity to have a real robust study with a lot of
sales that we could analyze.

Q    Did you have any concern that the East Mesa
submarket was just too different from the property
that is the subject of this case?                          12:35PM

A    Well, it wasn't -- it wasn't any more
different from the subject properties than the other
case studies that Dr. Bell was using.

Q    Did you -- well, that didn't quite answer my
question.                                                  12:36PM

Did you have any concern about whether East
Mesa is an appropriate comparison to --

A    No, I had no concerns.

Q    And would you agree with me that if there
were a higher number of sales in Hope Ranch, that         12:36PM
would have been a more approp -- or right along the
coast in Hope Ranch, that would have been a more
appropriate case study?

A    Possibly, but I think the other issue with
Hope Ranch is that the sizes of the lots varied, too.     12:36PM
And so trying to figure out a comparison of prices in
Hope Ranch given the variation in the size of the lots
and how much land there was compared to the house and
the house sizes would have made that comparison more
difficult to do.                                           12:36PM

Page 145

Could it have been done, probably.  But East Mesa had as you indicated homes that were generally on smaller lots and a lot of homes, and it is a good case study for understanding what happened in the Santa Barbara marketplace from the shoreline oiling and the    12:37PM investigation and clean-up.

Q    Have you ever done a case study involving just a single property?

A    Yes.

Q    Was there any consideration in this case of    12:37PM doing a case study of, you know, whatever number of properties had traded in Hope Ranch near the shoreline?

A    So let me make sure I understand what you mean by a case study of a single property.  So if --    12:37PM if I'm -- say I'm appraising a -- I can remember a number of these assignments, I'm appraising an industrial facility that has a RCRA problem in the back and there's an area that is under institutional controls because they can't really remediate that    12:38PM whole area, instead they've capped it, you know, I would compare individual prices for other similar industrial properties that sold under similar conditions to see what kind of effect it had on the value compared to those that didn't have that.    12:38PM

Page 146

So, you know, that would be a case study where you might look at a series of individual properties rather than a -- than a general effect in a whole neighborhood.  But if we're dealing with an oil spill that's going on for a period of time and one of    12:38PM the issues is how long did that impact affect prices in the marketplace, well, then doing something like we did in East Mesa or the kinds of case studies that Dr. Bell claimed he was doing to look at the effect over time on a larger number of properties are -- is a    12:39PM helpful kind of case study.

Q    If you can turn to Page 64 of your report, please.

A    64?

Q    Yeah.                                            12:39PM

A    All right.

Q    The bottom of Page 64, this is the section of your report analyzing East Mesa home sales.  You got this table that shows sales within .2 miles of the shoreline, sales farther than .2 miles of the    12:39PM shoreline and it ranges from 2010 up through 2021.

Do you see that?

A    Yes.

Q    Okay.  And in the years 2020 and 2021, you see a significant bump in the change in price per    12:40PM

Page 147

square foot; correct?

A    Yes.

Q    And you see it actually jumps up pretty significantly to 13 percent and then to 20 percent on homes farther than .2 miles from the shoreline and 50 percent for homes within .2 miles of the shoreline; correct?

A    Correct.

Q    Okay.  Just in general, do you have an understanding of why those price increases occurred?

A    It's a popular location in the marketplace where people want to live.

Q    Have you ever done any studies on what happened to home prices during and, you know, after COVID?

A    Yes, I have.  So that could be another reason.  People during the COVID epidemic in 2020 and 2021, there were lots of markets around the country where people wanted to get a home away from a more dense urban environment and would be buying homes that were more isolated or further out in the suburbs or in the suburbs as compared to downtown.  So yes, we have looked at that.

Q    Okay.  And did you look at it in relation to the Santa Barbara County market at all in this action?

12:40PM

12:40PM

12:41PM

12:41PM

12:41PM

Page 148

A    No.

Q    Why did you --

A    Other than what's reported here.  I mean, if there was a COVID effect in 2020 and '21 it would be reflected in the prices.                    12:41PM

Q    Okay.  And why did you stop at 2021 instead of extending through 2022 here?

A    I would have to look back at the data. Maybe we started writing this up in early 2022 and so we stopped at 2021.                    12:42PM

Q    Did you do -- at any point in time --

A    And then I think the other thing too we have is that Dr. Bell's opinion is as of July of 2022, so it would only be a partial year if we were to go into 2022 to try to bring it all the way up to his -- his    12:42PM data value.

Q    At any point in time when you were analyzing the sales and the increase in prices in the East Mesa of Santa Barbara, did you get an understanding of the price increase countywide as opposed to just in this    12:42PM East Mesa submarket?

A    Yes.  It's in our report.

Q    Where is it in your report?

A    You go to Page 66.  Middle table there.

Q    Okay.  35 percent?                    12:43PM

A    And bottom -- bottom of 66 carrying over to 67. So yes, that was Santa Barbara County home sales I think out of the MLS.

Q    Okay. Average sale price, I guess, increase as of June 2021 was almost 36 percent; right?    12:43PM

A    Yes.

Q    Did you have any discussions with Mike Arnold about that figure?

A    Not specifically about this figure, no.

Q    Did you have any discussions with Mike    12:43PM
Arnold about his view of -- of price increases across the board in Santa Barbara County during this period of time?

A    Only generally as we discussed the high-end market and changes in price at various high-end price    12:44PM
points compared to the FRED index. I'm not sure I ever talked with him about the MLS comparisons over time.

Q    What did -- and would you agree with me that    12:44PM
the FRED index is a good data point in understanding market values?

A    It can be. I mean, we used it a lot. I use it in this report when we're doing neighborhood comparisons. I think we used in the Mayflower report for purposes of trend line comparisons.    12:44PM

Page 150

Q    Do you know if Mike Arnold relies on FRED?

A    I seem to recall from his deposition that he says he doesn't typically.

Q    Okay.  Any views on that?

A    Well, but --                                    12:44PM

MR. SEGALL:  Vague and ambiguous --

THE WITNESS:  Go ahead.

MR. SEGALL:  Just lacks foundation, vague and ambiguous.

THE WITNESS:  But I think he also said for    12:45PM
purposes if he was doing a trend line comparison he might rely on it if he was looking at a trend line comparison with, you know, the county as a whole versus the neighborhood as a whole kind of in the way that we've done it.                                    12:45PM

But he doesn't use it to get at his market conditions adjustment on individual property appraisals that he's doing.

Q    BY MR. CONLAN:  What was the view that Mike Arnold shared with you on the average price    12:45PM increase in the luxury market in Santa Barbara County?

A    I seem to recall him telling me initially that he didn't think it had appreciated at all over the last, you know, ten years or so when you look at the downturn and then the upturn.  I think he said in    12:45PM

Page 151

his deposition two percent or four percent, something
like that.

Q    Do you agree with that?

A    Well, my data -- well, that's in the luxury
market.                                                    12:45PM

Q    Yeah.

A    I'm not sure he expressed an opinion on the
Santa Barbara market as a whole but on the luxury
market he was saying two percent to four percent.

Q    Luxury market where, across the country?    12:46PM
How would he know that?

A    No, I thought he said in Santa Barbara.

Q    Right.

A    His latest analysis was two percent to
four percent.                                              12:46PM

Q    Right.  And what I'm asking you is if you
agree with that, that the luxury market in Santa
Barbara County has a price increase of only two
percent to four percent?

A    Well, at the price points that I analyzed I    12:46PM
was coming up with two percent to 2.25 percent on the
sale prices that I analyzed in the three different
places here where I talk about the luxury market at
different price points at different points in time.

Q    Two percent to four percent --              12:46PM

Page 152

A    2.25.

Q    -- between what date range?

A    I'm sorry?

Q    Between what date range?

A    Well, it varied.  I did three different    12:46PM
studies on that.  And we'd have to look at each one as
it related to opinions in the Bell report.  So there's
three different places in my report where I talk about
what we did to look at change in prices in the luxury
market.                                                  12:47PM

Q    Well, in the East Mesa section you're
looking at changes in the market over the course of
about 11 years; right?

A    Correct.

Q    Okay.  And in the other submarkets you       12:47PM
looked at were you looking at the same date range?

A    I think one of the studies we did was 2009
to 2015 and then I'd have to look at the other ones.
It depended on the dates of value in the Bell report
that we were comparing the market change at that price  12:47PM
point to.

Q    Okay.  And are you drawing a distinction
between those luxury markets that you studied compared
to the East Mesa which increased at least in terms of
average sale price from 2010 at 1.3 million to          12:47PM

Page 153

2.7 million as of June 2021?

A    Yes.

Q    Okay.  And it's your view that the luxury market did not experience a similar increase in average sale price?                                    12:48PM

A    Well, the luxury market that would be the appropriate market to look at for sale prices for Lot X and Lot H did not; correct.

Q    And remind me what luxury market specifically you were looking at there.              12:48PM

A    Well, we'd have to -- we did not pick particular neighborhood submarkets, instead we looked at homes in a price range over a period of time in the Santa Barbara marketplace.  So those would have been in different locations, but they were within a price      12:48PM range that we analyzed to see for that type of property selling in that price range what was the annual percentage increase over time.

Q    Okay.

        MR. CONLAN:  Why don't we take a break.      12:48PM

        THE VIDEOGRAPHER:  The time is 12:48 p.m. We're off the record.

                (A lunch recess was taken.)

Page 154

Los Angeles, California, Thursday, September 28, 2023

1:39 p.m.

---oOo---

AFTERNOON SESSION

THE VIDEOGRAPHER:  The time is 1:39 p.m. We're back on the record.

EXAMINATION (Resumed)

BY MR. CONLAN:

Q   Mr. Roddewig, welcome back.  You understand   01:40PM
that you're still under oath; right?

A   Yes.

Q   Okay.  Before we broke for lunch, I was
talking with you about some of the price increases in
Santa Barbara County.                                01:40PM

In your analysis of the East Mesa submarket
you've got a variety of tables that show increases in
home prices over time; right?  It's on Pages 64 and
65.

A   Yes.                                          01:41PM

Q   And then you've got on Page 66 two other
tables, one of which is Santa Barbara County compared
to East Mesa from 2010 through June 2021, and then
below that you have got comparison of change in price
ratios, similar thing, it's a comparison of East Mesa  01:41PM

Page 155

to the rest of Santa Barbara County; right?

A    Yes.  Grouped according to groups of years.

Q    Okay.  That Santa Barbara County data that you're referring to there, was there any limitation on prices in that?                                           01:41PM

A    Not that I recall.

Q    Okay.  So any sales in the county -- was it any sales outside of the East Mesa?

A    I don't recall.  I think it was residential sales only from the MLS.  And I don't recall if that     01:42PM excluded East Mesa or included East Mesa.

Q    Okay.  So it was residential sales across the county and either with or without East Mesa, you're not sure?

A    Correct.                                                 01:42PM

Q    Okay.  If you look at the table in the middle of Page 66, that shows a -- and these are year-over-year price increases; right?  Or decreases?

A    Yes.

Q    Okay.  But at least from 2019 to 2020 it     01:42PM looks like it's about flat and then 2020 to 2021 it's up 35 percent; right?

A    For Santa Barbara County as a whole?

Q    Right.

A    Well, no, it would have gone up 14.7 percent     01:43PM

Page 156

in 2019 and another 14.6 percent in 2020.  And then
through June of 2021 for those six months, another
35.8 percent.

Q    Okay.  Okay.  So it was 14 percent, up
another 14 percent, and then it jumped another almost    01:43PM
36 percent?

A    Correct.

Q    And then likewise, on to East Mesa it was in
'19, '20 and '21 up 2 1/2 percent, up almost four
percent, and then up again a little more than 44    01:43PM
percent?

A    Correct.

Q    And then we were talking about your analysis
of the luxury market, which I think you gave sort of a
couple different price ranges on, one was 10- to 35    01:44PM
million and the other was 4- to 10 million; is that
right?

A    I think there was a third one, too.

Q    Which was what?

A    Well, I'd have to find it, but they related    01:44PM
to different dates of value in the Bell report.  And
the -- so there were three -- there were three
different comparisons that I recall.

Q    Okay.  Well, turn to Page 173 of your
report, please.    01:44PM

Page 157

Up at the top of that page, you see in the first paragraph a reference to residential sales in Santa Barbara County between 10 million and 35 million.

And you say in 2015, 16 compared to 2022; right?                01:44PM

A    Yes.

Q    Okay.  And then below that you've got another range, which is 4 million to 10 million?

A    Correct.                01:45PM

Q    Between 2012 and 2022; right?

A    Correct.

Q    Are those two of the three ranges that you were just referring to?

A    Yes.                01:45PM

Q    Okay.  And as you sit here, does this refresh your recollection on what the third range was?

A    No.  There's someplace else in the report where we have a third range.

Q    Was the third range just related to ranch                01:45PM
sales?

A    I don't think so.

Q    Okay.  All right.  Well --

A    I think it related to a different date of value in the Bell report.                01:45PM

Page 158

Q   Okay.  So I've got some questions about these analyses.

For the 10- to $35 million range, why did you choose the years 2015 and '16 and then compare it to 2022 and not include any sales in between?     01:46PM

A   I don't understand the question.

Q   Well, if you look back to what you did with the East Mesa neighborhood, which is on Page 66.

A   Okay.

Q   You did a year-over-year comparison, 2010     01:46PM all the way up through June 2021; right?

A   Yes.

Q   Okay.  And then when you go back to Page 173, it looks like you -- and you kind of explain this in your footnote, but you refer to sales in 2015     01:46PM and '16 and then you compare it to sales in 2022; right?

A   Yes.

Q   But that doesn't include sales in '17, '18, '19, '20 and '21; correct?     01:46PM

A   It doesn't show the annual change in those years.

Q   Why not?

A   Because what we're trying to get at here is different from what we're trying to do in East Mesa,     01:47PM

Page 159

East Mesa we're trying to understand what the impact of the oil spill might have been each year compared to years before the spill, whereas here this relates to the price appreciation related to Dr. Bell's report and his value change from '15 to '22 in his chart that he had in his report.

Q   Right.  But you're still comparing -- you're still doing an analysis of change in price over time; right?

A   Correct.

Q   Okay.  Is there some data that was in the '17, '18, '19 and '20 and '21 years that you didn't want to be included in that analysis?

A   No, it wasn't that.  It was that we were trying to see what the average increase in price was between those two years.  If you take 2015, '16 and then you compare it to 2022, what was the average annual appreciation rate.

Q   Why did you do that differently than you did with the price range of 4 million to 10 million then?

A   I would have to go back and look at what we were using the 4 million to $10 million range related to.  I think it related to an earlier appraised value by one of the appraisers for the rest of the ranch, which I think there was either a 2012 or 2010

Page 160

appraisal.  That worked into one of my charts here.

Q   At any point in time, did you just get the MLS data for Santa Barbara County for sales between 10 million and 35 million for every year from 2010 to 2022?  And is that shown on a worksheet anywhere?    01:49PM

A   I think we produced the list of sales that went into this.  So there is a sales sheet that we provided you.

Q   Right.  And that sales sheet reflects the two sales in 2016, the seven in 2015 and the 18 in    01:49PM 2022; right?  For your Footnote 154?

A   Yeah.  I don't recall if there were other sales in between or if that was all.  I'd have to look at the data that we provided you.

Q   Okay.  What I'm asking you is if at any -- I    01:49PM understand what you wrote here and you've said why.

What I'm asking you is if anywhere in your materials or at any point in time you created a table that just shows in the 10- to $35 million range year over year the sales increase or decrease?    01:49PM

MR. SEGALL:  Counsel, he just said he doesn't recall.

THE WITNESS:  I would have to look at the list of sales that we provided you and see what year they were.  I don't remember.    01:50PM

Page 161

Q   BY MR. CONLAN:  Okay.  Why didn't you include a table to show your work on this point in your report?

A   Because it's a different purpose.  This is to look at his actual values as of two different points in time and try to extract between the one point in time and the other point in time what was the average price increase between those two points, whereas over here what we're trying to look at in East Mesa on Page 66 is if there was an impact from the spill on value and on prices, can we see it on a year-by-year basis.

So it was two completely different purposes.

Q   Okay.  But you're drawing a conclusion that there's an appreciation range and you're contrasting this with Dr. Bell, you're drawing a conclusion that there's an appreciation rate of only 2.03 percent per year.

A   Average.

Q   On average?

A   Yeah.  If you take the 2015, '16 and you compare to 2022 and you do a present value -- and you do a present value on it to see what the annual rate of appreciation, that's what it comes out to.

Q   And why didn't you create a table to show

01:50PM

01:50PM

01:50PM

01:51PM

01:51PM

Page 162

the analysis on how you got to 2.03 percent here?  Any

particular reason?

A    Well, because he has a value as of July of

2022 and I think he also had a value as of 2015 and

he's saying that that was 6.72 percent stabilized.  So    01:51PM

we wanted to see what happens when you actually

compared 2015 or '16 to 2022 looking at the change in

price for those homes.

Q    Okay.  But in your work file then there's

some calculation somewhere that shows how you got to    01:51PM

2.03 percent?

A    Yes.  Well, I'm not sure it's in the work

file.  I would look at the document that we provided

you and look at what the average price was in 2015,

'16 and look at the average price in 2022 and take out    01:52PM

my calculator and see what it shows me in terms of an

average price per year.

Q    I assume you would have done that

calculation on paper before you plugged it into your

report, though; right?  Is that fair to say?    01:52PM

A    No.  I would have done it right here on

this.  I don't even use the 12C, I use the 10B, which

is a dinosaur.  No, I just do it here and put it in

the report.

No, would I have maybe jotted down a number    01:52PM

Page 163

on a scrap piece of paper so I could remember what my

first number was before I put in the second number,

yeah, maybe.  But I didn't have a set of notes where I

did that.

Q    Okay.  Why did you cap that range at 35    01:52PM

million?

A    I'm not sure I found anything higher than

that.  Maybe there was, but I'd have to look and see.

Plus I think that gave us an over/under related to the

values in his report.  So that we had a range that    01:53PM

bracketed the values in his report.

Q    Okay.  The paragraph below that talks about

this range of 4 million to 10 million; right?

A    Correct.

Q    And there's a zero missing in the 4 million;    01:53PM

right?

A    There is a zero missing in the 4 million,

yes.

Q    Okay.

A    Thank you.  I missed that typo.    01:53PM

Q    Another typo?

A    Yeah.

Q    Okay.  This one looks like you looked at all

of the years between 2012 and 2022; correct?

A    I don't think so.    01:53PM

Page 164

Q    Did you only look at 2012 compared to 2022?

A    I'd have to look back at the data.  That's my recollection.  Let me look here.  I'd have to look at the data, Mr. Conlan.

Q    So it says during the years between 2012 and 2022.

A    I'd have to look at the data that we gave you.  I don't recall.  But my recollection is it would have been comparing 2012 to 2022 without looking at the years in between.  But again, I'd have to look at the data.

Q    Okay.  And in that instance, what you found was an average price increase of only 2.25 percent annually?

A    Correct.

Q    So your best understanding of what you did was you took the -- do you remember how many sales were in the analysis?

A    No, I don't.  I'd have to look at the data that we provided you.

Q    Okay.  So your best understanding today is that you looked at sales in 2012 and you looked at sales in a comparable range in 2022 only; right?

A    I said I don't recall.  I would have to look at the data.  That's my recollection.  But I'd have to

Page 165

look at the data to see what we did.

Q    Okay.  And then what, was it your understanding -- let's just assume that your recollection that you testified to today is what happened, 2012 sales compared to 2022 sales.          01:55PM

A    Okay.

Q    In the 4- to $10 million range.

A    Okay.

Q    Is it your understanding that you just took the average sale price in 2012 and compared it to the   01:55PM average sale price in 2022 and that number in 2022 is only two and a quarter percent higher?

A    Per year.

Q    Per year?

A    Per year.                                                  01:56PM

Q    Well, how do you know if it's per year if you're only comparing 2012 to 2022?

A    Because say if I have a million dollar average value in 2012 and I have $1,600,000 average value in 2022, I can calculate what the annual rate of   01:56PM change would be over time between those two numbers.

Q    Okay.  So a little over two percent per year, so you're talking about approximately 20 percent increase in value in that price range from 2012 to 2022; right?  Approximately?                            01:57PM

Page 166

A    Well, I would have to look and see if it was compounded or not.  Again, I'd have to look at the data and see if it was a straight average of every year in between or whether it was a compounded calculation.                                                    01:57PM

Q    Who did the work for you?

A    I did the work.

Q    Who pulled the sales reports for you?

A    Well, the data, the MLS data came from the MLS service that was downloaded by my colleague    01:57PM Annie Baxendale.

Q    Okay.  Did you do anything to vet whether she had downloaded a complete set of data?

A    I think we had the Santa Barbara County residential data, that's my recollection.                01:57PM

Q    I understand what you believe that your colleague pulled for you, but did you have anybody check the work that she did to make sure she pulled a complete set?

A    I checked it.  I talked with her about it.    01:58PM

Q    Did you go onto MLS and run your own search?

A    No.

Q    Same question for the 10- to $35 million range, did you go onto MLS and confirm that there were only two sales in that price range in 2016, seven in    01:58PM

Page 167

that price range in 2015 and 18 in that price range in
2022?

Q    I looked at the data that we had downloaded
and that's what was in the data that we had
downloaded.                                              01:58PM

Q    Okay.  But you didn't independently look at
MLS yourself?

A    Other than in the data that we had
downloaded, I did not go up and download MLS data from
the original MLS site.                                   01:58PM

Q    And when you say "we had downloaded," you
mean the information that your colleague Ms. --

A    Yes.

Q    -- Baxendale had downloaded?

A    Yes.                                                01:58PM

Q    Okay.  For both date ranges; right?

A    Yes.

Q    And if it turns out that there were more
sales within that price range that were not included,
would that be an error in your analysis?                 01:59PM

A    No, it would be additional information I'd
want to look at.  But the data that we downloaded,
this is what we found in the data that we downloaded.
But if there's more data I'd be glad to look at it.

Q    Okay.  In the 4 million to $10 million price  01:59PM

Page 168

range that you analyzed, and where you arrived at a

2.25 percent year-over-year price increase, as you sit

here today, what did you do with the data that your

colleague downloaded from MLS, did you plug it into an

Excel sheet?                                              02:00PM

    A   I think we did for East Mesa, had that in an

Excel sheet.  I don't recall on the 10 million to 35

million and on the 4 million to 10 million whether we

did that or whether I just -- well, we probably did,

we probably did a filter for certain price range and    02:00PM

had that come into -- yes, come into Excel and then I

looked at it on Excel and did the calculations.  So

that's how we would have done it.

    Q   Would you have had Excel do the calculations

or did you do it on your pocket calculator?             02:01PM

    A   I don't remember.  Sometimes I do it on

Excel and sometimes I do it on my pocket calculator.

I don't remember on that.

    Q   We talked about this at the beginning of the

day, just so I'm clear, on Page 71, in that header for  02:01PM

Section 3.8 you refer to September of 2019 and that

was supposed to be which year?

    A   I'm sorry, where are you now?

    Q   The header, 3.8.

    A   On Page?                                         02:02PM

Page 169

Q    71.

A    On 71, header 3.8.  Okay.

Q    You had 2019 in there because that was when you first started working on it or something to that effect and --                                          02:02PM

MR. SEGALL:  I think he testified that it was the date of the original Bell report.

THE WITNESS:  So this should have been July of 2022.

Q    BY MR. CONLAN:  Okay.  Did Mike Arnold give    02:02PM you any written information at any point in time?

A    Not that I recall.

Q    When he told you about his two percent annual -- approximately two- to four percent annual price increase, did he specify what he had done to    02:03PM arrive at that?

A    So he didn't tell me about that, I saw that in his deposition.

Q    Okay.

A    What he had told me when I met with him is    02:03PM he thought that there was little, if any, price increase in the years that he had been looking at this end of the market.

Q    Okay.  I remember you said that.

When he told you that there was little, if    02:03PM

Page 170

any, price increase, and he was saying essentially --
when he said that to you, that the price was flat in
that luxury range from 2010 to 2022?

A    No.  I think he indicated that it had gone
down earlier and then had come back up but that it        02:03PM
hadn't yet come all the way back up to where it was
before the recession.  And I don't remember, you know,
what he said, if anything, specifically about 2017 to
2022, other than he thought he hadn't gone up very
much.                                                     02:04PM

Q    Okay.  So in other words, if there was a --
let's say a $10 million home in 2008 and then it went
down -- or 2010, whenever, it went down after that and
then it slowly climbed back up, by the time he got to
2022 it was at 10 million or maybe a little bit more      02:04PM
on the same home; right?

A    I don't remember if he got that specific,
Mr. Conlan.  I remember he said he thought that there
hadn't been much price appreciation over time in the
high-end luxury market.  And I don't think he gave me     02:04PM
a percentage when I talked with him.

Q    Did he give you a number of sales or
appraisals that he was relying on for that?

A    No.

Q    Okay.  Did you ask him?                              02:04PM

Page 171

A    No.

Q    On Page 87, sir, this is a list of your conclusions from your review of the Bell report; correct?

A    Yes.                                                    02:06PM

Q    Toward the bottom of the page, the second to last bullet point, you say, "The Bell report significantly overestimates the unimpaired market value of the land comprising the entirety of El Rancho Tijiguas."                                              02:07PM

What are you comparing that to when you say he's overestimating the unimpaired market value?

A    To his number compared to the little analysis I did of his comps in here and using the comps that were most similar in his analysis, what    02:07PM happens to that number.

Q    But going back to the beginning of your report, you had said that your opinions -- or the appraisal review report does not include your own opinions of unimpaired market value?                          02:07PM

A    Correct.

Q    Okay.  Help me understand how that's different from what you're saying on Page 87 when you say that Dr. Bell overestimated the unimpaired value?

A    Because I did not go out and collect my own    02:08PM

Page 172

comparables and do my own adjustments.  All that this

is looking at the comparables that he had in his value

and saying hmm, if he had looked at this set of his

comparables that were more similar to the property

that he was appraising, the value would have only been  02:08PM

this and not what he had.

Q   Where does Mike Arnold's valuation of the

unimpaired value factor into that analysis that you

did?

A   I don't think it does.  I would have to look  02:08PM

at where this paragraph relates to in the full report.

I think it relates to Bell's comparables.

Q   Did you ever develop an understanding that

Mike Arnold's unimpaired value is not that far off

from Dr. Bell's unimpaired value?                        02:08PM

A   I noticed that.

Q   Okay.  And does that affect your opinions in

any way?

A   Not really.  I mean, it is what it is.

Q   Does it -- if Dr. Bell significantly          02:09PM

overestimated the unimpaired market value, does that

mean that Mr. Arnold also overestimated the unimpaired

market value?

A   Well, this relates to the section of

Dr. Bell's report that relates to the ranch, I think.   02:09PM

Page 173

Q    Yeah.

A    Right?  I don't think -- I'd have to look back at Mr. Arnold's report, because I read it and didn't do any significant review of it.  I don't remember if he even deals with the value of the rest    02:09PM of the ranch in his report.

Q    Who are you talking about?

A    Arnold.

Q    Okay.  Well, lower in that paragraph you say, "And as indicated in the addenda has    02:09PM significantly overestimated the unimpaired values of Lot H and Lot X."

And Mr. Arnold did establish an unimpaired value for those parcels, didn't he?

A    Yes.    02:10PM

Q    And that was fairly close to Dr. Bell's?

A    I don't remember.

Q    If it was fairly close to Dr. Bell's, would it mean that Mr. Arnold had also significantly overestimated the unimpaired value?    02:10PM

MR. SEGALL:  Vague and ambiguous as to "fairly close."

THE WITNESS:  So I guess I would have to look at what you're referring to.  So show me what you're referring to in the addenda.    02:10PM

Page 174

Q    BY MR. CONLAN:  It's not my report, it's your report, you're the one who referred to the addenda there.

A    Okay.  What paragraph are we on in here?

Q    Page 87, second to last bullet point.    02:10PM

A    Okay.

Q    Last part of that paragraph.

A    Well, that's based on the capitalized rental value analysis that's in the addenda that we already talked about, that's at Page 175, 176.    02:11PM

Q    And how is that a distinction between the value that Mike Arnold came up with compared to the value that Dr. Bell came up with?

A    I don't know.  I'm not comparing those two things there, what I'm doing is referring to the    02:11PM calculations on 175 to 176 based on Dr. Bell's rental analysis.  I'm not comparing it to Mr. Arnold's appraisal in that sentence.

Q    Okay.  Why don't you look at Page 173, please.    02:11PM

A    All right.

Q    There are two calculations there in the middle of that page.

There's a slight difference between them, but they both include separate values for Lot X and    02:12PM

Page 175

Lot H; right?

  A  I'm sorry, where are you?

  Q  Right in the middle of the page.

  A  There's a heading in the middle of the page?

  Q  No, there's no heading, there's a    02:12PM calculation that says Lot X, there's a value of --

  A  Oh, 173?

  Q  Yeah.

  A  Okay.  I was looking at 172.  All right. Let me look at this.    02:12PM

    Okay.  So what is your question?

  Q  You see the reference to Lot X?

  A  Yes.

  Q  And it says $28,120,000; right?

  A  Yes.    02:13PM

  Q  Okay.  And where does that figure come from?

  A  It would come from the numbers on the prior page.

  Q  Which is the Schott appraisal, and then did you adjust those numbers?    02:13PM

  A  Well, that's what I'm checking on right now. I'd have to look back and try to understand where those numbers -- what numbers those started from.

  Q  Okay.  Well, look to the numbers below that where you talk about Mike Arnold's numbers as of 2022.  02:16PM

Page 176

A    Okay.

Q    Okay.  I guess as of August 2022.

A    All right.

Q    And then look at that and then go to

Exhibit 24, please, and look at Page 35.                    02:16PM

A    Which exhibit is 24?

MR. SEGALL:  He's talking about the Bell

report.

Q    BY MR. CONLAN:  The Bell report.

A    Page what?                                          02:16PM

Q    35.

A    Okay.

Q    And you see the table on Page 35 of

Dr. Bell's report?

A    Yes.                                               02:16PM

Q    And he's got the unimpaired value there of

Lot X and Lot H.

A    Yes.

Q    Lot X is $31.5 million and Lot H is

$29.5 million.                                              02:16PM

A    Yes.

Q    Okay.  Then if you look back to your report

where you've got Mr. Arnold's values as of August

2022, which is slightly later, he's got Lot X at

28 million and Lot H at 26 and a half million; right?    02:17PM

Page 177

A    Correct.

Q    Mr. Arnold's numbers are about 3 million below Dr. Bell?

A    Yes.

Q    Is that close in your view?                02:17PM

A    Yes.

Q    Do you think that the numbers on Page 35 of Dr. Bell's report showing the unimpaired value are overestimated?

A    Well, I don't have an opinion on that, I    02:17PM
don't have my own opinion as to what the values are. What I do say is if you use some of the other information in Dr. Bell's report and you do the kind of calculation that I did at Page 175 and 176, you get different numbers.                                  02:17PM

Q    What calculation are you referring to on Page 175 and 176?

A    The market value, rental value approach. You get 20,660,000 at the top end for Lot H and you get $22,050,000 at the top end for Lot X.        02:18PM

Q    And those are lower than the unimpaired values that Mr. Arnold came up with; right?

A    Correct.

Q    Your calculations?

A    They're calculations.  I don't have an     02:18PM

Page 178

opinion as to whether those are the values or not.

I'm just saying this is what the mathematical result

is if you look at Dr. Bell's rental analysis and the

rents and put that into a calculation at the

three percent to five percent rate of return.          02:18PM

Q   And it's as a result of that calculation you
did that you say Dr. Bell significantly overestimated
the values, unimpaired values; right?

A   I'm not sure that's where that comes from.
I think that is related to the ranch analysis, that's     02:19PM
another part of my report.

Q   Well, go back to Page 87.

A   Okay.

Q   Which is referring to the addenda of your
report.                                                 02:19PM

A   Okay.

Q   And you say that Dr. Bell or the Bell report
significantly overestimates --

A   Hang on right there.  So that bullet point
on 87 refers to both my report itself and the addenda.   02:19PM
Okay?  And I just report at the end of that bullet
point.  And if you look at the rental value analysis
in the addenda, it's also overestimated.  But the
63.27 to 76.36 million comes from another portion of
my report here.                                          02:20PM

Page 179

Q    Yeah.  I got that.

A    Okay.

Q    But I'm talking about the second part of that paragraph where you say, "As indicated in the addenda, has significantly overestimated the                02:20PM impaired -- unimpaired values of Lot H and Lot X when based on a capitalized rental value analysis"; right?

A    Correct.

Q    And you draw that conclusion by going to the table and calculation you did on Page 176; right?                02:20PM

A    Correct.

Q    Okay.  And to do that calculation you started with the unimpaired values that Dr. Bell had identified on his table in his report; right?

A    Correct.  That would be a comparison to --                02:21PM yes, to those values in his report.

Q    Okay.  So you're saying --

A    That these are lower at Page 175 and 176 based on the capitalized rental value approach, the results are lower than in that other table that                02:21PM Dr. Bell provides.

Q    Okay.  So if you were to -- so it follows then if you were to do this calculation using Mike Arnold's unimpaired values, it would also be a significant overestimate of the unimpaired values;                02:21PM

Page 180

correct?

A    Well, Mike Arnold doesn't present an opinion

of rental value.  Dr. Bell presents an opinion of the

rental rate in his previous testimony.  So I don't

know what Mike Arnold would conclude the rental value    02:21PM

would be.

Q    Did you have any conversations with

Mike Arnold or -- well, start with Mike Arnold about

his unimpaired values that he reached or was the first

time you saw that when you read his deposition?    02:22PM

A    No.  As I indicate in the report, it was

reported to me what his value was likely to be.  And

so I had to work with that when I did my report

because I didn't have his report until after mine was

finalized.    02:22PM

Q    Did you have any concern about what that

figure was when you were preparing your report because

it was fairly close to Dr. Bell's figures?

A    I'm not sure I even looked at that to

compare the two.  They are what they are.  What I did    02:22PM

is focus on Dr. Bell and said if you look at his

rental value analysis, this is what happens.  And if

you look at the comps that he used for the value of

the rest of the ranch and try to think about which of

the comps are the better comps, this is what happens.    02:22PM

Page 181

Q    Okay.  Can you turn to Page 174 of your

report, please?

A    Okay.

Q    You reference a couple of -- I'll just call

them transactions; right?                              02:23PM

A    Okay.

Q    The Dr. Sayeh transaction and the Sarah

Ojjeh transaction; right?

A    Okay.

Q    Have you done any work since this report was   02:23PM

written to consider the effect of what happened with

the Dr. Sayeh transaction?

A    No.  I just heard that it has not closed.

It has not gone through.

Q    Okay.  And if it doesn't go through, what     02:24PM

does it mean to your analysis?

A    I don't know.  I would have to understand

the reasons for why it didn't go through.

Q    Why does that matter to you?

A    Well, in order to know why it didn't go       02:24PM

through, but otherwise it doesn't matter.  I mean,

this is what it was as of the date that I wrote my

report.  But now the transaction has not gone through,

I'd be interested to know why, but my report stands as

it does as of the date of my report and the date of    02:24PM

Page 182

Dr. Bell's report.

Q    You know and you talked about it somewhere else in your report, about a different transaction where an offer was made and then -- and then withdrawn or the transaction was cancelled and you have a difference of opinion with Dr. Bell on the reason for it; right?  Do you know what I'm referring to?

A    No.

Q    All right.  Let me point you to it.  Go to your executive summary, please.

A    Okay.

Q    Right in the middle of the page you're talking about --

A    Which page?

Q    Sorry.  Yeah, romanette (v).

A    (v).  Okay.

Q    You're talking about your views and a proposed sale in February of 2020 for Lots X and H that did not go through; right?

A    Yes.

Q    And I understand the point you're trying to make in that, but did you do any analysis of the pricing on that offer?

A    No.

Q    Okay.  Would that offer and the pricing

02:24PM

02:25PM

02:25PM

02:25PM

02:26PM

Page 183

factor into your analysis in any way?

A    Not sure I understand the question.

Q    If you were doing an appraisal of the property, would -- not an appraisal review but your own appraisal, would you factor in the pricing of an    02:26PM offer that had been withdrawn?

A    Probably, yes.  We are required under standards to report on recent offers and sales.  And I don't think it says anything in there about not commenting on withdrawn offers, that would be    02:26PM something that you would report on that there was an offer but it was withdrawn.

Q    Okay.  Mr. Roddewig, do you have any experience in statistics?

A    Some, yes.    02:29PM

Q    Do you perform regression analyses?

A    Yes.

Q    What kind?

A    I do a lot of linear regression modeling in conjunction with some of my colleagues, we'll do    02:29PM multi -- multiple variable progression modeling as well.

Q    Okay.  So in other words, when you say linear regression you're talking about simple regressions?    02:29PM

Page 184

A    Front line analysis with either polynomial lines or straight lines.

Q    Are you capable on your own of doing multiple regression analysis?

A    Yes.  Using a program.  I mean, I can plug    02:29PM
the things into the program and get the results, yes.

Q    Do you ever offer your own multiple regression in any kind of an expert report or do you kind of rely on one of your colleagues for that?

A    Typically do it in conjunction with one or    02:29PM
more of my colleagues, but I have testified on multiple regression modeling.

Q    At any point in time, did you develop an understanding about the relationship of ownership of the different parcels at El Rancho Tijiguas?    02:31PM

A    I guess I don't understand the question. There are different partnerships that own different pieces of it.

Q    Do you understand there's common ownership?

A    There's some common cross ownership in the    02:31PM
different entities is what I understand.

Q    Do you understand there's ultimate common ownership in the parcels?

MR. SEGALL:  Vague and ambiguous.

THE WITNESS:  I don't know what you mean by    02:31PM

Page 185

"ultimate common ownership."

Q   BY MR. CONLAN:  When you go from the LLCs to the ultimate members of the LLCs, do you understand that there's common ownership across the entire ranch?

A   You mean the same number people involved?   02:31PM

Q   Meaning the same people?

A   Same people, I don't remember.

Q   Okay.  Does that -- common ownership of the parcels, just focusing on Lot H and Lot X, does that affect your analysis or your review of Dr. Bell's   02:32PM report?

A   When you say common ownership you mean the fact that the people involved in each parcel, even though the ownership interests might be different between them, that it's the same people in each   02:32PM parcel?

Q   Yeah.  Assume that the owners of Lot X are the same as the owners of Lot H and the owners of the other parcels on the ranch are ultimately the same people.   02:32PM

A   In terms of the names of the people?

Q   Right.

A   Am I to assume that their ownership interest in each one is the same?

Q   I don't -- you don't have to.   02:32PM

Page 186

A     Okay.

Q     I mean, you can.  I'm just saying if you assume that the ultimate owner of the entire ranch is the same with respect to each parcel, does that affect your analysis of Dr. Bell's report?                    02:32PM

A     No.

Q     Doesn't matter to you?

A     Well, I guess I don't understand the question.  Each one is owned by a separate entity.

Q     Right.                                            02:32PM

A     There would be different controlling, who might control what portion of the -- of that partnership or entity.  I don't know the answers to, but they're in separate legal entities for some reason.                                               02:33PM

Q     Okay.  Does that matter to you?

A     Not in terms of the analysis that I did.

Q     Okay.  Does it matter to you in terms of your analysis of Lot H versus Lot X, that they're commonly owned?                                        02:33PM

A     In terms of my analysis, I don't think so, no.  Other than -- you know, I have thought about the fact that when Lot X was still having the mansion constructed on, Lot H was already on the market.  And to the extent there is that crossover and they       02:33PM

Page 187

essentially are the same entity, putting both of those

on the market, one might compete with the other.

So maybe they were thinking about trying to

sell Lot H first before putting Lot X on the market so

that they wouldn't be -- the two lots wouldn't be          02:34PM

competing against each other.

That's the only way that I can think about

how it might affect the analysis in terms of marketing

time.

Q    Does the fact that the two parcels are right    02:34PM

next to one another affect your review of Dr. Bell's

report?

A    Well, there is a parcel in between.  They

are not immediately adjacent, there's the entryway to

the main ranch parcel is in between the two of them.     02:34PM

Q    Right.  Does it affect your analysis in any

way?

A    Only to the extent that if Dr. Bell says

that Lot H is affected in the same way as Lot X,

there's another parcel in between them and it would be   02:34PM

even further removed from the source site on the

12 acres on Lot X.  And the house on Lot H is even

further away than the house on Lot X from the 12 acres

where the spill and the clean-up occurred.

Q    Did the proximity of the two properties        02:35PM

Page 188

factor into your review of -- other than what you just

said, your review of Dr. Bell's report?

A    Well, it did to the extent that he's got the

same risk percentage on each of them, even though one

had oil on it, one did not, one required clean-up, the    02:35PM

other did not.  So yes, I think I commented on that in

here.

Q    Okay.

A    Under -- under his own kind of analysis of

what happens to properties that have contamination on    02:35PM

it compared to properties that are proximate but don't

even have oil on it.  He didn't seem to differentiate

between the two lots.

Q    And is that criticism impacted in any way by

the fact that there's common ownership of the    02:36PM

properties and they're all part of the same -- they're

both part of the same development?

A    Well, he's looking at risk from the point of

view of the next buyer, not from the point of view of

ownership when he's looking at the risk percentage.    02:36PM

So under his own type of analysis that he

does where there's a difference between properties

that are directly contaminated and properties that are

proximate and not adjacent, I would expect to see a

difference in the percentage impact that he would    02:36PM

Page 189

apply to Lot X and to Lot H.

Q    Are you aware that at certain points in time the entirety of El Rancho Tijiguas was for sale as a single property?

A    Yes.                                                    02:36PM

Q    Okay.  Does that affect your opinion and your critique of Dr. Bell in any way?

A    No.

Q    You comment on what you call double counting --                                               02:37PM

A    Yes.

Q    -- in your -- in your appraisal review.

Is it your testimony that a property cannot incur damage from a risk effect that is separate from a use effect?                                             02:37PM

A    No, that is not my testimony.

Q    Okay.

A    So if you look at AO-9 and you look at what it talks about in terms of use effect, it talks about changes in highest and best use as a risk effect.  Or    02:38PM as a use effect.

So there certainly can be a difference in -- there can certainly be both a use effect and a risk effect.  What I'm more concerned about is that when Dr. Bell looks at these case studies and he calls the    02:38PM

Page 190

25 percent impact that he's seen as his risk effect,

what's actually happening in those case studies is the

buyers in the marketplace are analyzing the potential

impact on their use of the property in the future.

So there's -- there's both -- there's a use    02:38PM

effect built into any kind of risk analysis that you

do when you look at case study analysis.  And I

indicated earlier in my testimony that I would think

that the marketing delay is not a use effect but it's

a cost effect rather than a use effect in my opinion.    02:39PM

Q    So is it possible then to have a separate

valuation assigned to a risk effect on the one hand

all related to the same event and another value

related to a loss of use and both of those values

could be recoverable?                                   02:39PM

A    I don't understand the question.

MR. SEGALL:  Calls for a legal conclusion.

Q    BY MR. CONLAN:  You're talking about double

counting --

A    Yes.                                            02:39PM

Q    -- right?

And you're basically saying it's one or the

other; right?

A    No.  I'm saying that what he did is he

calculates this loss of use and he should be properly    02:39PM

Page 191

looking at that as a cost rather than a use impact,

cost related to the additional marketing time.

And then there is no -- the only impact on

use was the actual use of the 12.86 acres during the

period of time that the investigation and remediation    02:40PM

was going on.  That was covered by the payments that

Plains was making to the owner of the property.

And then when you look at the risk effect,

what he calls a risk effect in his case studies, that

effect includes the market's perception of the ongoing    02:40PM

use impact of the prior contamination situation.

So there's a use effect built into that case

study analysis that he does that relates to how the

market would perceive the limitations on the future

use of the property.  And then as I said, I would    02:40PM

define what he calls the use effect as a cost related

to the additional delay and how you've lost your

return on some portion of what you would get if you

had sold it over a period of time that there was a

delay in marketing.    02:41PM

That's all that I'm getting at.

Q    Okay.  You have said that.

Let's just talk about Lot X to begin with.

So your conclusions on Lot X is that at some point in

time there may have been a million dollars in damages    02:41PM

Page 192

due to risk effect, but by the time of the Bell report in July of 2022 that number is zero; right?

A    Correct.

Q    So there's no damages for risk effect?

A    No impact on market value as to risk effect    02:41PM at the day of his --

Q    On Lot X?

A    On Lot X in July of 2022.

Q    And use effect, which you say is really a cost effect on Lot X, your conclusion is what?    02:41PM

A    It would be -- well, I recalculated his numbers and said if he had done the calculation this way, here is what it would be and I would have to look at the chart.

Q    Can you tell me what it is?    02:42PM

A    I'm sorry?

Q    Can you tell me what it is, what your recalculation is?

A    I think it's at Page 77, so this would be the recalculation of what he calls loss of use.    02:42PM

Q    Okay.  And you've got 2,914,977; right?

A    Correct.

Q    Can you look back to romanette (vi), which is part of your -- I'll just call it summary conclusions in your executive summary?    02:43PM

Page 193

A    Okay.  I'm there.

Q    The second from the bottom bullet point, you say, "The corrected loss of use result would be 2,271,477."

A    Yeah.  I think that's after deducting the payments that Plains made.                                    02:43PM

Q    Okay.

A    I think.  That's my recollection.

Q    And that was my next question.

Do you know anything about the negotiation of that rental rate during the remediation period?                  02:44PM

A    No.

Q    Do you know whether it was a fair price or not?

A    I know they agreed to it.                              02:44PM

Q    That's all you know?

A    That's all I know, yes.

Q    Okay.  And you would understand that when there's a major oil spill on a property the owner's got an interest in getting somebody in there,           02:44PM especially the responsible party for the oil spill to get it cleaned up as soon as possible; right?

A    Yes.

Q    And would you understand in that circumstance it's not really an arm's length            02:44PM

Page 194

negotiation because there's an imminent threat to the

property and to the properties around it because of

the oil spill?

A    I don't know if I would go that far.  I

don't know what was involved in their negotiations.        02:44PM

I mean, on the one hand, you know, the owner

of the property wants to get it cleaned up, but he

also wants to get as much as he can for the time that

it might take and the interference with the use of

that portion of the property.                               02:45PM

So I think they both have incentives to

negotiate properly.  I don't know if I would call it

necessarily at arm's length, depends on the

circumstances.  And I don't know the circumstances of

this one.                                                   02:45PM

Q    Do you know whether there was any

reservation of rights in whatever agreement was made

on that rental rate related to the remediation?

A    What do you mean by reservation of rights?

Q    Meaning I'm the owner of Lot X and Plains     02:45PM

just dumped thousands of barrels of oil out of a

pipeline onto my property and into the ocean and they

got to get on and start cleaning it up, and Plains

says, "Well, we'll give, you know, you $100 a day

because we don't like to pay money to people after we       02:45PM

Page 195

spill oil."

And the owner says, "Well, I want, you know,

$25,000 a day."

And they've got to get this negotiation

concluded quickly.  So they end up at $5,000 a day.    02:46PM

And the owner says, "That's fine, I'll accept that

now, but I'm not agreeing that this is the final

number and this is the actual rental value of my

property."

Do you know anything about what went into    02:46PM

that negotiation?

        A    No.

                MR. SEGALL:  Asked and answered, lacks

foundation, calls for a legal conclusion.

                THE WITNESS:  I know what the agreed amount    02:46PM

was per day.

        Q    BY MR. CONLAN:  You just took that figure

and factored it in as an offset in your calculation;

right?

        A    Correct.  Because that was what was received    02:46PM

by the owner of Lot X.

                MR. CONLAN:  Why don't we take a break.

                THE VIDEOGRAPHER:  The time is 2:47 p.m.

We're off the record.

                (A brief recess was taken.)    03:03PM

Page 196

THE VIDEOGRAPHER:  The time is 3:02 p.m. We're back on the record.

Q    BY MR. CONLAN:  Okay.  Mr. Roddewig, you understand that you're still under oath; right?

A    Yes.                                        03:03PM

Q    Okay.  I had been asking you earlier about some of the MLS, Santa Barbara County MLS data.  In particular, regarding the luxury ranges you analyzed of 10 million to 35,000,000 and 4 million to 10 million.                                        03:03PM

Do you recall that?

A    Yes.

Q    And you talked about some of the data your colleague had pulled?

A    Yes.                                        03:03PM

Q    And you referenced I think a couple times data that you gave us; right?

A    I believe so, yes.

Q    Which I assume is part of your report, your work file?                                        03:03PM

A    Yes.  My production.

Q    Okay.  Go to your report and go to Page 195, please.

So this is the facts data considered and it's a list of materials.  And a lot of it is pretty        03:04PM

Page 197

specific.  And you're welcome to go down and look through those, but I was looking through this to find what MLS information you had produced.  And I see on Item 57 there's sort of a general reference to sales data obtained from the Santa Barbara MLS.          03:04PM

Do you see that?

A    Yes.

Q    Okay.  And you're welcome to look.  I don't see any other references in here to MLS data, do you?

A    No.                                              03:04PM

Q    As you sit here, do you know what was included in that sales data obtained from Santa Barbara MLS?

A    No.  As I said, I believe we produced what we downloaded and used in our analysis.          03:05PM

Q    How was it provided to you by your colleague?

A    We got access to the MLS.  She went up and downloaded residential data.  I'm not -- as I said, I'm not sure if she downloaded all the residential    03:06PM data for the whole county or whether she downloaded it for certain parts of the county, I don't remember.  I would have to look at the data.

Q    What do you remember the data looking like?

A    I remember it being converted into an Excel    03:06PM

Page 198

spreadsheet.

Q   By your team?

A   Yes.

Q   So somewhere in your file there's a
collection of sales data from MLS, Santa Barbara     03:06PM
County; right?

A   Correct.

Q   And then there's some Excel worksheet where
the data has been compiled in a different format;
right?     03:06PM

A   I think it was downloaded into the Excel
file is the way we typically do it.

Q   Downloaded from MLS into the Excel file?

A   Correct.

Q   And is that data, is it on a per property     03:06PM
basis or is it averaged?

A   No, it shows individual transactions.

MR. CONLAN:  Okay.  This might be a question
for you, Jordan.

I don't think we have the sales data.     03:07PM

MR. SEGALL:  Okay.

MR. CONLAN:  I had asked Maggie a couple of
weeks ago if you guys had produced everything and she
said yeah, it's either publicly available or it's in
this list, meaning stuff we have.     03:07PM

Page 199

If you look past this there's a whole list of Bates stamped documents, which obviously we have.

MR. SEGALL:  Right.

MR. CONLAN:  So I would like to see what that item is, whether it's separate sales reports and an Excel file or just an Excel file, whatever it is.          03:07PM

THE WITNESS:  I can tell you it would just be an Excel file because that's how we do this when we do the MLS downloads, we download it directly into an Excel file.                                            03:07PM

MR. CONLAN:  Okay.

THE WITNESS:  My staff does that.

MR. CONLAN:  And your understanding is that that was passed along with the rest of your report to your counsel?                                       03:08PM

THE WITNESS:  That's my understanding that it was produced.

MR. SEGALL:  If you haven't found it we can double-check.

MR. CONLAN:  So with that, I don't have any other questions.  And I don't think this will be necessary, but I'm going to reserve my right to ask you some additional questions about that data once we get it.  I probably don't need to, but just for the record.                                              03:08PM

Page 200

THE WITNESS:  If we do that can we do it remotely so I don't have to travel out here?

MR. CONLAN:  Yeah.

MR. SEGALL:  Okay.  You mean you're all done?                                                           03:08PM

MR. CONLAN:  I'm finished.

MR. SEGALL:  Thanks for being so efficient.

THE VIDEOGRAPHER:  The time is 3:08 p.m.  We are off the record.

(Time Noted:  3:08 p.m.)

Page 201

PENALTY OF PERJURY


     I, RICHARD J. RODDEWIG, do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.


          EXECUTED this _____ day of _____, 20__, at _____, _____.
                         (City)                    (State)




               _____
                         RICHARD J. RODDEWIG

                         Volume I

Page 202

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, Rochelle Holmes, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated this 10th day of October, 2023

*Rochelle Holmes*

Rochelle Holmes

CSR No. 9482, CCRR No. 0123

Page 203

JORDAN SEGALL

Jordan.segall@mto.com

_____, 20__

Grey Fox, Llc et al. v. Plains All American Pipeline L.P. et al.

9/28/2023, RICHARD J. RODDEWIG (#6107468)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at clientservices-yom@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 204

Grey Fox, Llc et al. v. Plains All American Pipeline L.P. et al.

RICHARD J. RODDEWIG (#6107468)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

RICHARD J. RODDEWIG                        Date

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

Grey Fox, Llc et al. v. Plains All American Pipeline L.P. et al.

RICHARD J. RODDEWIG(#6107468)

ACKNOWLEDGEMENT OF DEPONENT

I, RICHARD J. RODDEWIG, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____     _____

RICHARD J. RODDEWIG                          Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20___.




                    _____

                    NOTARY PUBLIC

Page 206

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973