**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-232-DWD |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHARMACIA LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ... 1
RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS ... 3
STATEMENT OF ADDITIONAL MATERIAL FACTS ... 20
LEGAL STANDARD ... 25
ARGUMENT ... 25
I. The City Is Not Entitled To Summary Judgment On Its Trespass Claim ... 25
A. The Presence Of PCBs Does Not Constitute A Tangible, Physical Invasion ... 26
B. The City Has Not Shown That Old Monsanto Intended To Invade East St. Louis Properties ... 28
II. *Nullum Tempus* Does Not Apply, So The City's Claims Are Time-Barred. ... 31
A. The City Cannot Sidestep Unfavorable Evidence By Invoking A Pleading-Stage Standard At Summary Judgment ... 31
B. The Undisputed Evidence Confirms That *Nullum Tempus* Does Not Apply ... 35
1. The City Is Not Vindicating A Public Interest. ... 35
2. The City Has No Obligation To Act On Behalf Of The Public. ... 38
3. The City Has Expended No Funding To Address PCB Contamination. ... 40
CONCLUSION ... 40

Defendants Monsanto Company ("Monsanto"), Pharmacia LLC ("Pharmacia"), and Solutia Inc. ("Solutia") (collectively "Defendants") hereby oppose Plaintiff City of East St. Louis's (the "City") motion for partial summary judgment on liability for trespass (Count IV) and on defendant's first affirmative defense.

## INTRODUCTION

More than forty years after the former Monsanto Company ceased manufacturing polychlorinated biphenyls ("PCBs") at its W.G. Krummrich plant in Sauget, Illinois ("Sauget Plant"), the City seeks to hold Old Monsanto's alleged successors-in-interest liable for common-law trespass, alleging that trace levels of these imperceptible chemicals purportedly settled on certain vacant properties decades ago, after being released from the Sauget Plant. The undisputed material facts show that Defendants, not the City, are entitled to summary judgment on that claim, both because the claim is time-barred and because it fails on the merits. The City's motion for summary judgment ("Mot.") should be denied.

The City's trespass claim fails on the merits for three independent reasons. *First*, a plaintiff may state a damages claim for trespass only as to properties it actually owns. As Defendants have shown, however, the City does not own—and in many cases, has never owned—most of the parcels it claims were trespassed upon. *See* Dkt. 283 at 23 ("Def. Mot."). *Second*, even as to parcels the City does own, the City cannot prove trespass merely by pointing to the presence of intangible particulate matter on those parcels. The entry of invisible particulates onto the property does not constitute the kind of *physical invasion* that interferes with the *possession* of property, a necessary element of trespass. *Third*, and perhaps most fundamentally, the undisputed evidence certainly does not show that Monsanto had the requisite intent or knowledge regarding the alleged intrusion on the City's property. Each of these flaws independently defeats the City's claim.

Separate from the failures of proof on the elements of the City's claims, the City also brings those claims decades too late. Recognizing as much, the City seeks summary judgment on Defendants' statute-of-limitations defense by invoking the principle of *nullum tempus*—*i.e.*, that "time does not run against the King." Def. Mot. 23. But *nullum tempus* applies to statutes of limitations only when (1) the government's suit advances the public interest, (2) the government is obligated to act on behalf of the public, and (3) the government has devoted significant public revenues to remedying the problem the suit seeks to redress. *See Champaign Cnty. Forest Pres. Dist. v. King*, 291 Ill.App.3d 197, 200 (1997). The City cannot show *any* of those factors, much less all of them. First, the City's suit does not seek to vindicate any public right. The claimed damages are premised on the City's proprietary interests in its *own* property, which it holds in the same capacity as any private landowner. Second, this suit is discretionary, not mandatory. In bringing suit, the City is not fulfilling any legal *obligation* it owes to the public. Third, the City has not expended any public funds to address PCB contamination, and it has presented no evidence that it intends to do so. To the contrary, 40% of any recovery the City seeks here would go ultimately to its private contingency-fee counsel.

With no record evidence to support any of the *nullum tempus* factors, the City asks the Court to deem *nullum tempus* applicable on the pleadings alone. That request flouts basic rules of civil procedure. And in any event, *nullum tempus* is inapplicable even as the City has pleaded its case. The Court should deny the City's motion.

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**1.** "Monsanto manufactured PCBs at the Krummrich plant from 1936 to 1977. Ex. 1 (Dfts. Corp. Rep. Dep.) at 22:2-7."

**Response:** Admitted for purposes of this motion.

**2.** "Monsanto manufactured 99%-plus of the PCBs that were intentionally manufactured in the United States. Ex. 1 (Dfts. Corp. Rep. Dep.) at 37:17-38:1; Ex. 2 (Hitchens Dep.) at 93:3-7."

**Response:** Admitted in part and disputed in part. While Old Monsanto produced 99% of intentionally manufactured PCBs in North America from 1936 to 1977, Old Monsanto did not produce "all PCBs in North America," nor can it be assumed that "PCBs found anywhere" originated with Old Monsanto. Ex. 1 at 38.

In addition to PCBs manufactured for use in end products, a variety of industrial processes involving the presence of chlorine, carbon, and high temperatures generate PCBs as an inadvertent byproduct. Dkt. 283-6 at 5; *see* 47 Fed. Reg. 24,976, 24,989 (EPA June 8, 1982) ("PCBs can be generated from virtually any starting hydrocarbon structure," and "PCB formation appears to be possible whenever chlorine and carbon are present in a reaction vessel at elevated temperatures"). Such processes include pigment production, the manufacturing of silicone products and their precursors, secondary copper smelting operations, the manufacturing of metallic titanium, and the synthesis of dozens of other organic chemicals. Dkt. 283-6 at 6; Dkt. 283-22 at 99-100; Dkt. 283-7 at 31.

Facilities performing these types of processes were located near the Sauget Plant, which is situated "in a heavily industrialized area, referred to as the Sauget Industrial Corridor." Dkt. 283-6 at 14; Dkt. 283-24 at 361. As of 2000, "active . . . facilities in the area included Big River Zinc (zinc smelter), Cerro Copper (copper smelter), Clayton

Chemical (waste oil and spent solvent recycling and recovery), Ethyl Corporation (petroleum additives), Resource Recover Group (waste recycling), Sterling Steel Castings (foundry), Trade Waste Incineration (hazardous waste treatment), and Union Electric (electricity distribution), in addition to bulk storage warehouses." Dkt. 283-6 at 15. Several of these industrial facilities, including Cerro Copper and Sterling Steel Castings, were in the immediate vicinity of Old Monsanto's Sauget Plant. Dkt. 283-6 at 87 (Fig. 3.3). The operations of any of these facilities "may be associated with [byproduct] PCBs." Dkt. 283-6 at 39-42 (identifying "more than 100 possible sources that could have handled or released PCBs . . . located in the vicinity of" East St. Louis and explaining that documented uses "includ[e] paint and/or ink processing/manufacturing, metal foundries and other metals manufacturing and/or scrapping facilities, specialty chemical companies, disposal sites and junkyards, electrical utilities, and rail operations").

Byproduct PCB generation may "exceed peak product PCB production." Dkt. 283-6 at 7.

**3.** "700 million pounds is a reasonable estimate of the total PCBs that Monsanto produced at the Krummrich plant. Ex. 3 (Reible Dep.) at 117:5-12."

**Response:** Admitted for purposes of this motion.

**4.** "The Krummrich plant is located on the southern boundary of East St. Louis. Ex. 1 (Dfts. Corp. Rep. Dep.) at 22:2-10."

**Response:** Admitted in part and disputed in part. The Krummrich plant was located near the southern boundary of East St. Louis, but the plant itself was located in Sauget, Illinois. Ex. 1 at 16.

**5.** "Almost all of the PCB manufacturing process at the Krummrich plant was an outdoor process, exposed to the elements; the Krummrich plant did not have a roof. Ex. 1 (Dfts. Corp. Rep. Dep.) at 93:6-15, 341:8-14."

**Response:** Admitted in part and disputed in part. The manufacturing process at the Sauget Plant was designed to be a "closed process." Ex. 2 at 341:15-19.

**6.** "In the 1930s and 1940s, Monsanto adapted a mechanism by which it ventilated PCBs and residues to the outside atmosphere. Ex. 1 (Dfts. Corp. Rep. Dep.) at 45:10-15."

**Response:** Admitted in part and disputed in part. Old Monsanto designed the PCB manufacturing process to be an "enclosed process." Dkt. 283-25 at 610:24-612:4. Although "[t]here were vents at certain points" in the Sauget Plant, "the vents were not necessarily intended release points" for PCBs. *Id.* at 607, 611-612; *see also id.* at 611 ("It was not intended that [PCBs] be released anyplace."). Monsanto did attempt to take advantage of "*natural* ventilation" to minimize potential dangers to its workers. *Id.* at 607 (emphasis added). Any facility processes that were "vented without treatment were expected to lead to de minimis releases" of PCBs. Dkt. 283-8 at 13; *see also id.* at 8 (existing estimates of releases "would truly be considered de minimis air emissions" under existing scientific understanding prior to the 1966-68 discovery of environmental presence of PCBs). Any concentrations that were vented were "very, very low," Ex. 1 at 77:18-78:10, and would have been "highly, highly diluted" before leaving the plant site, *id*. at 209:20-21.

**7.** "It was the modus operandi at the Krummrich plant through the entire PCB manufacturing period to 'fume out' PCB emissions to outside. Ex. 1 (Dfts. Corp. Rep. Dep.) at 45:16-22."

**Response:** Disputed. Monsanto designed the manufacturing process for PCBs to be an enclosed process, Dkt. 283-25 at 599-600, and although some quantity of PCBs may have been released during the manufacturing process, the "intent" was never to fume out PCB waste, *id.* at 600-02, 611. PCBs may have been released "[t]o some extent," Ex. 1 at 45, but any ventilated waste streams would have gone through a scrubber that "would take out most or all of the PCBs," Dkt. 283-25 at 603. Given the available evidence at the time, Old Monsanto's "expectation" would have been that "those emissions were at such a low level that they w[ould] be immediately diluted by the air," *id.* at 722, and "would have condensed . . . on the plant site," *id.* at 608.

**8.** "The PCBs were vented to reduce the concentrations in the area where the workers were and transport the PCB concentration somewhere else. Ex. 1 (Dfts. Corp. Rep. Dep.) at 608:1-6."

**Response:** Admitted in part and disputed in part. *See supra* ¶ 7.

**9.** "When the PCB fumes or emissions were vented away from the workers, they were vented to the atmosphere by wind and air. Ex. 1 (Dfts. Corp. Rep. Dep.) at 211:15-24."

**Response:** Admitted in part and disputed in part. *See supra* ¶ 7.

**10.** "Vents were specific places in the manufacturing process where there was the opportunity for PCB vapors to be emitted into the general plant atmosphere and be disseminated by air currents to the atmosphere. Ex. 1 (Dfts. Corp. Rep. Dep.) at 212:10-20."

**Response:** Admitted in part and disputed in part. *See supra* ¶¶ 6-7.

**11.** "Monsanto knew when it instituted the program of venting that PCBs were carried through the air and transported. Ex. 1 (Dfts. Corp. Rep. Dep.) at 608:7-10."

**Response:** Admitted in part and disputed in part. Monsanto believed that PCBs would settle "very close to the facility . . . on the plant site." Dkt. 283-25 at 608. Monsanto did not know or believe that PCBs would be "transported" beyond the plant site. Characterizing these manufacturing practices as a "program of venting" is also misleading because Monsanto's representative also testified that "the vents were not necessarily intended release points." *Id.* at 607.

**12.** "Emissions of fumes and vapors would be expected to travel in a downwind direction. Ex. 3 (Reible Dep.) at 108:12-109:24."

**Response:** Disputed. Monsanto assumed that PCBs entering the air would, due to their density, have remained "very close to the facility . . . on the plant site." Dkt. 283-25 at 608:11-18. And fumes and vapors "associated with particulates or even condensing solids . . . would not travel as far as if they were vapors that were dissolved in the air." Ex. 3 at 109:19-24.

**13.** "The Krummrich facility certainly released PCBs that would have been carried by the wind to locations downwind. Ex. 3 (Reible Dep.) at 126:5-17."

**Response:** Disputed. Disputed as to any characterization that Old Monsanto knew that PCBs "would have been carried by the wind to locations downwind." *See supra* ¶ 11. Releases of PCBs from the Sauget Plant "were relatively limited" and "minimal." Dkt. 283-8 at 7, 13.

**14.** PCBs in air can eventually settle out of the air. Ex. 1 (Dfts. Corp. Rep. Dep.) at 210:2-4.

**Response:** Admitted for purposes of this motion.

**15.** "Monsanto has no information to contradict the assumption that concentrations of PCBs vented from the Krummrich plant would eventually have affected the local environment. Ex. 1 (Dfts. Corp. Rep. Dep.) at 77:9-23, 78:19-79:7; Ex. 4 (Dfts. Corp. Rep. Dep. Ex. 16)."

**Response:** Disputed. Before the late 1960s, "[t]he techniques and technology to conduct analysis at the trace levels needed were not available . . . to find PCBs in the environment or to evaluate PCBs' environmental properties." Dkt. 283-22 at 31:12-17. But "the expectation was that those emissions were at such a low level that they w[ould] be immediately diluted by the air, and . . . would be at such low concentrations that they wouldn't have any impact on surrounding areas." Dkt. 283-25 at 722-23.

**16.** "Monsanto did not know what levels of PCBs people in the community surrounding the Krummrich plant might be exposed to. Ex. 1 (Dfts. Corp. Rep. Dep.) at 209:2-10, 210:5-11."

**Response:** Disputed. In the City's cited deposition excerpt, Defendants' corporate representative testified that Monsanto "knew that [people in the community] were exposed at levels lower than what their workers were being exposed to," and that the exposure level of workers in the Sauget plant was closely monitored. Ex. 1 at 209-11. Any PCB releases were "highly, highly diluted before they would ever even be considered to leave the plant site." *Id.* at 209.

**17.** "During the PCB manufacturing period, Monsanto understood that there would be 'some persistence associated with PCBs that were released in the environment by whatever mechanism.' Ex. 1 (Dfts. Corp. Rep. Dep.) at 342:5-24."

**Response:** Disputed. The scientific understanding of PCBs developed over the course of the "manufacturing period" that the City references here. The City's chemical expert, Dr. Mitchell Erickson, conceded that before the 1960s, "[t]he techniques and technology to

conduct analysis at the trace levels needed were not available . . . to find PCBs in the environment or to evaluate PCBs' environmental properties." Dkt. 283-22 at 31. Monsanto could not have "understood" the extent to which PCBs would persist in the environment when it did not even have the capacity to measure trace levels of PCBs.

**18.** "Five pounds per day is a reasonable estimate of PCB emissions to the air from the Krummrich plant during the PCB manufacturing period. Ex. 3 (Reible Dep.) at 25:21-27:15."

**Response:** Admitted for purposes of this motion that 4.9 pounds per day is a reasonable estimate for 1936-1977. Dkt. 283-8 at 8.

**19.** "The chemical structure of PCBs has been known in the literature since the late 1800s. Ex. 1 (Dfts. Corp. Rep. Dep.) at 249:2-12, 537:2-10; Ex. 5 (Dfts. Corp. Rep. Dep. Ex. 43)."

**Response:** Admitted for purposes of this motion.

**20.** "Persistence and stability are chemical properties of PCBs that dictate their behavior in the environment. Ex. 3 (Reible Dep.) at 150:11-16."

**Response:** Admitted for purposes of this motion.

**21.** "PCBs' chemical stability, insulating properties, and inflammability contribute to their presence in the environment. Ex. 6 (Boston Report) at 9."

**Response:** Admitted for purposes of this motion.

**22.** "Monsanto understood throughout the PCB manufacturing period that PCBs are persistent and stable. Ex. 3 (Reible Dep.) at 37:4-38:23, 106:10-21."

**Response:** Disputed. *See supra* ¶ 17.

**23.** "PCBs' persistence and stability means they are not subject to normal degradation. Ex. 3 (Reible Dep.) at 43:23-44:6, 141:17-24."

**Response:** Admitted in part and disputed in part. While PCBs are not "easily biodegradable," PCBs are still subject to "some degree of microbial degradation." Ex. 3 at 44. Degradation levels among PCBs vary "depending on the amount of chlorine in the PCB itself." *Id.*

**24.** "PCBs are very stable under normal conditions. Ex. 1 (Dfts. Corp. Rep. Dep.) at 250:13-251:1."

**Response:** Admitted for purposes of this motion.

**25.** "PCBs' stability is linked to their persistence. Ex. 1 (Dfts. Corp. Rep. Dep.) at 254:23-255:5."

**Response:** Admitted for purposes of this motion.

**26.** "Monsanto used the fact that PCBs are persistent and indestructible as a selling point. Ex. 1 (Dfts. Corp. Rep. Dep.) at 254:18-22."

**Response:** Admitted in part and disputed in part. Disputed in so far as "persistent and indestructible" refers to PCBs' persistence in the environment. When Monsanto described PCBs as virtually indestructible in advertisements, it addressed the end use and intended use of PCB-containing products, not the persistence of PCBs in the environment. Ex. 2 at 342:14-24.

**27.** "PCBs' persistence includes their resistance to biological activities in the environment. Ex. 1 (Dfts. Corp. Rep. Dep.) at 285:9-23."

**Response:** Admitted for purposes of this motion.

**28.** "Monsanto knew in 1948 that a PCB-containing Aroclor product resists attack by biological influences. Ex. 1 (Dfts. Corp. Rep. Dep.) at 285:6-23; Ex. 7 (Dfts. Corp. Rep. Dep. Ex. 196)."

**Response:** Disputed. Monsanto knew in 1948 that a PCB-containing Aroclor product resisted attack by molds or mildews, but Monsanto did not consider the products' biodegradability at the time. Ex. 2 at 285:6-23.

**29.** "Monsanto described PCBs as 'Virtually Indestructible' in its advertising. Ex. 8 (Reitman Dep.) at 151:4-152:14; Ex. 9 (Reitman Dep. Ex. 12)."

**Response:** Admitted in part and disputed in part. Although Monsanto literally used those words, when Monsanto described PCBs as virtually indestructible in advertisements, it was referring to the end use and intended use of PCB-containing products, not the persistence of PCBs in the environment. Ex. 2 at 342:14-24.

**30.** "The City owns 100 properties identified by parcel number and street address (the "Parcels"). Ex. 10 (JLL Report) at 13–17, 53."

**Response:** Admitted for purposes of this motion.

**31.** "The Parcels are located north, northeast, and east of the Monsanto plant. Ex. 10 (JLL Report) at 48; Ex. 11 (EH&E Report) at 8; Ex. 12 (Coghlan Dec.)."

**Response:** Admitted for purposes of this motion.

**32.** "PCB fumes or vapors released into the atmosphere will travel with the wind in a downwind direction. Ex. 3 (Reible Dep.) at 108:12–109:24."

**Response:** Admitted in part and disputed in part. Admitted for purposes of this motion that fumes or vapors released into the atmosphere would be moved by the wind. Disputed insofar as fumes and vapors "associated with particulates or even condensing solids . . . would not travel as far as if they were vapors that were dissolved in the air." Ex. 3 at 109:19-24.

**33.** "The predominant wind direction in the St. Louis area is blowing from the south. Ex. 13 (Meteoblue Wind Rose) (reproduced below), cited by Ex. 14 (Reible Report) at 11 n.24, see also Ex. 15 (Limoli Dec.); Ex. 16 (Turner Dep.) at 19:6–20:8."

**Response:** Not supported by the citation and disputed. The source states that the predominant wind directions in the St. Louis area were south to southeasterly and north to northwesterly. Dkt. 283-8 at 11.

**34.** "Wind patterns in the St. Louis area have not changed dramatically between 1945 and the present and contemporary wind data are representative of wind patterns for the previous several decades. Ex. 17 (Turner Report) at 3–4; Ex. 18 (Turner Dec.)."

**Response:** Admitted for purposes of this motion.

**35.** "Air pollutants emitted from the Krummrich facility would frequently be transported to the City. Ex. 16 (Turner Dep.) at 19:6–20:8."

**Response:** Disputed. Releases of PCBs from the Sauget Plant "were relatively limited" and "minimal." Dkt. 283-8 at 7, 13.

**36.** "In the late spring and summer of 2022, the City conducted soil sampling that found PCBs to be present on the Parcels in amounts ranging from 0.01 to 22.6 parts per million (ppm). Ex. 10 (JLL Report) at 13–17; Ex. 6 (Boston Report) at 4 & App'x B-2; Ex. 11 (EH&E Report) at 8–16, A-1 – A-7; Ex. 12 (Coghlan Dec.)."

**Response:** Admitted for purposes of this motion.

**37.** "There is no natural background level of PCBs. Ex. 1 (Dfts. Corp. Rep. Dep.) at 307:5–11."

**Response:** Admitted in part and disputed in part. *See supra* ¶ 2.

**38.** "The Krummrich facility contributed 'some' of the PCBs found in East St. Louis. Ex. 19 (Herman Dep.) at 49:23–51:5, 160:1–11."

**Response:** Admitted in part and disputed in part. *See supra* ¶ 2.

**39.** "Up to 13% of the homolog 9 and 10 PCBs found on the Parcels 'can reasonably be attributed' to the Krummrich facility. Ex. 20 (Hitchens Report) at 30; Ex. 2 (Hitchens Dep.) at 161:12–16."

**Response:** Disputed. Soil samples collected from Old Monsanto's Alabama plant indicated an average 13% concentration of homolog 9 and 10 PCBs. Dkt. 283-7 at 18. Homolog 9 and 10 PCBs represent only "0.5% of the PCBs in Aroclors" manufactured at the Sauget Plant from 1936 to 1977. *Id.* at 18-20. Homolog 9 and 10 PCBs are associated with third-party uses of PCB-containing products and byproduct PCBs produced by chemical processes in several other industries. Dkt. 283-6 at 36.

**40.** "Some of the PCBs found on the tested parcels in East St. Louis are likely or probably Monsanto's PCBs. Ex. 1 (Dfts. Corp. Rep. Dep.) at 339:14–340:20."

**Response:** Admitted in part and disputed in part. *See supra* ¶¶ 2, 39.

**41.** "It cannot be said that zero percent of the PCBs identified in East St. Louis came from the Krummrich facility. Ex. 3 (Reible Dep.) at 125:24–126:4; Ex. 19 (Herman Dep.) at 37:14–38:18; Ex. 2 (Hitchens Dep.) at 95:22–25."

**Response:** Admitted in part and disputed in part. *See supra* ¶ 2.

**42.** "No 'actual' or 'probable' sources of the PCBs found in East St. Louis, other than the Krummrich facility, have been identified. Ex. 19 (Herman Dep.) at 67:24–68:8, 97:12–16, 166:1–8."

**Response:** Disputed. In addition to PCBs manufactured for use in end products, a variety of industrial processes involving the presence of chlorine, carbon, and high temperatures generate PCBs as an inadvertent byproduct, and facilities performing these types of processes were located near the Sauget Plant. *See supra* ¶ 2.

**43.** "Monsanto cannot say what percentage of the PCBs in City are attributable to any particular non-Krummrich source. Ex. 2 (Hitchens Dep.) at 97:2–10; Ex. 8 (Reitman Dep.) at 262:24–263:13."

**Response:** Admitted for purposes of this motion.

**44.** "Monsanto cannot say what mass or volume of PCBs may have been emitted from any particular non-Krummrich source. Ex. 2 (Hitchens Dep.) at 179:13–17, 180:21–181:4, 186:6–188:8, 196:9–24; Ex. 8 (Reitman Dep.) at 261:25–262:10."

**Response:** Admitted for purposes of this motion.

**45.** "Monsanto cannot say how PCBs from non-Krummrich sources may have been transported to or deposited on the Parcels. Ex. 8 (Reitman Dep.) at 252:25–254:19, 256:8–261:24."

**Response:** Disputed. PCBs from non-Krummrich sources could be deposited on the properties by third parties using or disposing of PCB-containing finished products. Dkt. 283-9 at 5-6 (Monsanto did not create the finished products); Dkt. 283-10 at 5-6 (arguing that PCBs could be released from finished products); Dkt. 283-6 at 31-42 (the "fingerprint" of the PCBs on the parcels differs from what one would expect if they were mostly derived from PCB emissions from the plant, and multiple uses or products may be the source on various properties). To the extent PCBs are transported through the air, the presence of PCBs on the parcels from sources other than the Sauget Plant, *see supra* ¶¶ 2, could be due

to such transport, Dkt. 283-7 at 31. In addition, the residential burning of household waste is a source of byproduct PCBs that "can result in direct impacts to the parcels via PCB-containing debris such as ash." *Id.* at 31, 35-36.

**46.** "The observation of the PCBs on the City's property is real. Ex. 3 (Reible Dep.) at 204:17–25."

**Response:** Disputed. Although trace levels of PCBs have reportedly been detected in soils through scientific testing by experts, PCBs at these levels are intangible and imperceptible chemicals not subject to "observation" by unaided human senses; they are "colorless, odorless, and tasteless." Dkt. 283-5 at 7.

**47.** "The City did not give Monsanto permission to put PCBs on the City's land. Ex. 21 (Bell Rebuttal Dep.) at 182:6–14; Ex. 22 (City Corp. Rep. Dep.) at 226:9–18; Ex. 23 (Wagner Dec.)."

**Response:** Admitted in part and disputed in part. Admitted for purposes of this motion that the City did not expressly give Old Monsanto permission to put PCBs on particular parcels of City land. Disputed, insofar as the City implies that Old Monsanto intentionally "put PCBs" on property outside the plant, or that the City timely objected to the purported presence of PCBs on parcels it owns. Monsanto designed the manufacturing process to be an "enclosed process." Dkt. 283-25 at 610:24-612:4 ("It was intended to be a closed process. There were vents at certain points" but it "was not intended that [PCBs] be released anyplace."); *id.* at 601:21-25 (noting that the Sauget Plant's "physical reactors are outside" but that "the reaction to make the PCBs [was] intended to be enclosed"); *id.*at 599:5-22 ("There was . . . no intentional release of PCBs from [the venting] process.").

**48.** "Soil samples taken at particular points in East St. Louis can reasonably be expected to be representative of the soil concentration in the surrounding area, regardless of property boundaries. Ex. 24 (Coghlan Sept. 10, 2024 Report) at 2; Ex. 12 (Coghlan Dec.)."

**Response:** Disputed. Wide variation is possible between parcels. In some cases, the City's expert admitted, the sampling method employed by the City's testing contractor measured one parcel as having "a total PCB concentration that's nearly 20 times higher" than an adjacent parcel. Ex. 4 (Rebuttal Deposition of Kevin M. Coghlan ("Rebuttal Dep.")) 23:19-24:19.

**49.** "None of Monsanto's experts have identified any scenario under which the PCB contamination observed in the City would have been deposited according to property boundaries. Ex. 24 (Coghlan Sept. 10, 2024 Report) at 2; Ex. 12 (Coghlan Dec.)."

**Response:** Disputed. For instance, land-cover changes (such as clearing, vegetation removal, or excavation) may take place on some parcels but not others. Dkt. 283-6 at 47-50. The use or disposal of PCB-containing finished products manufactured by third parties may also vary among parcels. *Supra* ¶ 45. Residential burning of household waste is a source of byproduct PCBs that "can result in direct impacts to the parcels via PCB-containing debris such as ash" and may occur differently from one parcel to another. Dkt. 283-7 at 31, 35-36.

**50.** "GPS data was not relied upon to determine the sampling locations on the Parcels. Ex. 25 (Coghlan Jan. 24, 2025 Report) at 5; Ex. 12 (Coghlan Dec.)."

**Response:** Admitted in part and disputed in part. While certain individual samplings may not have relied upon GPS data, Kevin Coghlan, the City's expert, invoked GPS data to analyze the accuracy of parcel identification. *See* Ex. 5 at 2; Dkt. 283-37 at 4-6; Dkt. 283-

7 at 12. Coghlan was not present for the soil sampling and did not participate in collecting the samples, Dkt. 283-27 at 69, so he was forced to rely on GPS data to determine sampling locations.

**51.** "Lots to be sampled were identified on published St. Clair County Property Tax Inquiry records prior to sampling. Hard copies of lot line maps and online aerial imagery were used to identify site features and to approximate lot boundaries. Lot boundaries were measured in the field using measuring tapes from the fixed locations of objects, including utility poles, manhole covers, building perimeters, and fence lines. Ex. 25 (Coghlan Jan. 24, 2025 Report) at B-1 – B-17; Ex. 12 (Coghlan Dec.)."

**Response:** Admitted in part and disputed in part. Admitted that the City's expert Coghlan claims that field workers used the methods listed in an attempt to identify sites and lots. Disputed that this led to accurate collection on the lots—for example, the majority of the parcels sampled included "borings that were collected from outside of the parcel boundaries" based on data provided. *See* Dkt. 283-6 at 28; Dkt. 283-7 at 14. And Coghlan was not present when the field work was performed. Dkt. 283-27 at 12:16-21, 14:7-11.

**52.** "The City's Second Amended Complaint alleges that 'Monsanto manufactured PCBs and other chemical products at the [Krummrich] Plant from approximately 1936 through 1977,' and that '[a]s a byproduct of Monsanto's PCB manufacturing operations and waste handling practices, PCBs were emitted into the atmosphere and onto East St. Louis lands.' 2d Am. Compl. (ECF No. 129) ¶¶ 1–2 & n.1"

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**53.** "The City's Second Amended Complaint alleges that

> East St. Louis properties are grossly contaminated with Monsanto PCBs the average concentration was 1,431 ppb and the highest detected concentration was 22,686 ppb with higher concentrations detected generally downwind and closest to the Monsanto Plant. In addition, this testing confirmed that the types and concentrations of PCBs present in East St. Louis properties pose a substantial risk to human health and safety.

2d Am. Compl. (ECF No. 129) ¶ 11."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**54.** "The City's Second Amended Complaint alleges that

> The locations at which PCBs have been detected at levels that pose a risk to public health and safety are spread out throughout the City and include properties that are part of, or in the vicinity of public parks, schools, roadways, sidewalks, bus stops, offices, and other public areas and facilities. As a result, the contamination affects the public's collective right to safely access and use the City's public areas and facilities. In addition, because PCBs are volatile, the zone of risk created by the contamination is not limited to the physical area of the contaminated properties themselves. PCBs can become airborne and move throughout the City, posing a risk to the health and safety of people anywhere within East St. Louis who might come into contact with the chemicals.

2d Am. Compl. (ECF No. 129) ¶ 75."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**55.** "The City's Second Amended Complaint alleges that 'Monsanto's PCBs now grossly contaminate East St. Louis,' and that 'this toxic PCB contamination will cost East St. Louis millions and millions of dollars because it is forced to attempt to clean up PCBs from its lands if they are to ever have any residential or commercial utility and value.' 2d Am. Compl. (ECF No. 129) ¶ 67."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**56.** "The City's Second Amended Complaint alleges that 'East St. Louis will incur massive remediation and abatement costs caused by Monsanto's toxic PCB contamination of vast swaths of its land.' 2d Am. Compl. (ECF No. 129) ¶ 68."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**57.** "The City's Second Amended Complaint alleges that 'The City lacks the financial resources to pay for PCB remediation through its traditional revenue sources," that "[i]ts budgets in recent years have generally totaled approximately $30–$40 million, with $14–20 million designated for the General Fund.' 2d Am. Compl. (ECF No. 129) ¶ 77."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**58.** "The City's Second Amended Complaint alleges that 'the City's inability to make PCB-contaminated properties available for public use and recreation diminishes the quality of life for its residents and visitors and otherwise affects the interests of the community at large.' 2d Am. Compl. (ECF No. 129) ¶ 78."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**59.** "The City's Second Amended Complaint seeks as damages '[a]n award of past, present, and future costs to abate and remediate the Monsanto PCB toxic contamination.' 2d Am. Compl. (ECF No. 129) ¶¶ 101(B), 124(B), 158(B)."

**Response:** Admitted for purposes of this motion that the Second Amended Complaint so alleges.

**60.** Section 2-133 of the City Code provides in part that

> The city manager shall be the chief administrative and executive officer of the city. He may head one or more departments, and shall be responsible to the city council for the proper administration of all affairs of the city. The city manager shall have the power and be required to:
> * * *
> (9) Enforce all laws and ordinances of the city.

Ex. 26 (City Code § 2-133).

**Response:** Admitted as to the existence of the ordinance.

**61.** Section 50-79 of the City Code provides that

> Whenever any nuisance shall be found on any premises within the city, the officials are authorized to cause such nuisance to be summarily abated in such a manner as may be directed.

Ex. 27 (City Code § 50-79).

**Response:** Admitted as to the existence of the ordinance.

**62.** Section 62-2 of the City Code provides that

> The health department shall cause all nuisances to be abated or removed which it may deem prejudicial or obnoxious to the public health or comfort and shall make such sanitary regulations as it may think necessary or expedient to prevent the introduction or spreading of any contagious, malignant, infectious or pestilential disease.

Ex. 28 (City Code § 62-2).

**Response:** Admitted as to the existence of the ordinance.

**STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. At the trace levels reportedly observed on the 100 parcels owned by the City, PCBs are imperceptible to human senses. PCBs have "no known taste or smell." EPA, *What Are PCBs?*, tinyurl.com/mfk8p8z9 (last accessed April 4, 2025). They are "colorless, odorless, and tasteless." Dkt. 283-5 at 7.

2. Knowledge about the potential environmental and health effects of PCBs has changed over time. Dkt. 283-22 at 73-77.

3. According to the City's chemical expert, Dr. Mitchell Erickson, "[e]nvironmental PCB analysis emerged in the late 1960s, as instrumentation and techniques became available[,] and scientists slowly became aware of PCBs in various environmental compartments." Dkt. 283-22 at 31:9-12.

4. Until at least the 1960s, "there was no instrumentation available to detect" PCBs in the "air." Dkt. 283-23 at 135, 136.

5. Before this development in the 1960s, according to Dr. Erickson, "[t]he techniques and technology to conduct analysis at the trace levels needed were not available . . . to find PCBs in the environment or to evaluate PCBs' environmental properties." Dkt. 283-22 at 31:12-17. Indeed, "[n]ot only were there limits to the technology to find PCBs at part-per-million and part-per-billion levels, but there was a lack of awareness. Scientists did not even know to ask the question." Dkt. 283-22 at 31:22-32:1.

6. Old Monsanto took steps to ensure that PCBs would not escape from the Sauget Plant. From the beginning, Old Monsanto designed the manufacturing process to be an "enclosed process." Dkt. 283-25 at 610:24-612:4 ("It was intended to be a closed process. There were vents at certain points" but it "was not intended that [PCBs] be released anyplace."); Dkt. 283-25 at 601:21-25 (noting that the Sauget Plant's "physical reactors are outside" but that "the reaction to make the PCBs [was] intended to be enclosed"); *id.* at 599:5-22 ("There was . . . no intentional release of PCBs from [the venting] process.").

7. In the 1960s, Old Monsanto further reviewed the PCB-manufacturing process to ensure that there were no intentional releases of PCBs into the atmosphere. Dkt. 283-25 at 599:23-600:20.

8. The company also built a dedicated wastewater treatment plant for the company's complex; as a result, Old Monsanto's sewage waste from the Sauget Plant was never released into East St. Louis. Dkt. 283-26 at 699:19-700:5; Dkt. 283-6 at 22-23.

9. In the late 1960s and early 1970s, the company installed a series of settling basins and catch tanks to minimize the loss of PCBs in the manufacturing process. Dkt. 283-26 at 693:24-694:23.

10. In 1971, Old Monsanto began operating a state-of-the-art incinerator "to safely dispose of PCBs." Dkt. 283-4 at 7; Dkt. 283-6 at 23. This was a significant investment—at the time, "other commercially available waste incinerators were not able to manage a PCB waste stream." Dkt. 283-7 at 2.

11. Old Monsanto's operation of the incinerator was "closely monitored" by the U.S. Environmental Protection Agency ("EPA") "to confirm that it was operating as designed," and at normal operating temperatures, it "achieved 99.9998% destruction of PCBs." Dkt. 283-7 at 2. The EPA inspected Old Monsanto's incinerator in 1976, concluding that the exhaust from the incinerator was essentially PCB-free. Dkt. 283-25 at 725:12-730:1.

12. Despite the fact that there are active clean-up activities around the plant in Sauget, no regulatory authority—neither the federal EPA nor the Illinois Environmental Protection Agency—requested that Old Monsanto clean up the parcels at issue in this litigation or placed them on the national priorities list. Dkt. 283-26 at 703:11-20. The City also never notified the company of any alleged PCB contamination in East St. Louis. *Id.* at 703:21-25.

13. Old Monsanto "voluntarily ceased sales of open-use PCB systems in 1970, and by 1972, had ceased sales of semi-closed systems." Dkt. 283-6 at 18. It voluntarily ceased all

production in 1977, two years before the EPA banned the production of most PCBs. Dkt. 283-3 at 113; Dkt. 283-6 at 19; Dkt. 283-4 at 4.

14. On February 3, 2021—more than 40 years after Old Monsanto ceased manufacturing PCBs at the Sauget Plant in 1977—the City filed this lawsuit against Defendants in the Circuit Court of St. Clair County, Illinois. Defendants removed the case to this Court on March 1, 2021, Dkt. 1, and the City filed its operative Second Amended Complaint on April 24, 2023, Dkt. 129.

15. In January 2020, the City engaged counsel at the Driscoll Firm, LLC, Sanders Phillips Grossman, LLC, and Chatham & Baricevic, LLC, on a contingency-fee basis, to pursue litigation in this matter. Dkt. 263-8 at 6. The contingency-fee agreement was signed by John Baricevic, City Attorney and member of the firm Chatham & Baricevic, LLC. *Id.* Under its terms, the City's counsel at the three firms would recover as a fee 40% of any sum awarded or negotiated by the City. *Id.*; *see also* East St. Louis City Council Meeting (Jan. 9, 2020), https://www.facebook.com/estlcityhall/videos/527243471479394 (noting that outside counsel represent the City on contingency and that they stand to gain a portion of the City's recovery).

16. The City's claims are based on PCB levels detected in soil samples collected at 273 vacant parcels of real estate. Dkt. 129 ¶¶ 10, 11.

17. The City concedes that it owns only 100 of the 273 properties at issue. Dkt. 283-37 at 1.

18. The City's expert Kevin Coghlan proposed that "remediation of PCB-impacted soil" on the properties should involve "removal to an estimated depth of 2 feet at all parcels where the total concentration of PCB congeners exceeds 0.23 [ppm]." Dkt. 283-4 at 26.

19. Coghlan selected the 0.23 ppm cleanup level, he testified, based on EPA's "regional screening level for PCBs." Dkt. 283-27 at 109.

20. Of the 100 parcels owned by the City, Coghlan calculated that 18 parcels have PCB levels at or below 0.23 ppm. Dkt. 283 Appendix; Dkt. 283-54; Dkt. 283-48.

21. The EPA provides "Regional Screening Levels" that apply to all U.S. regions and are intended to provide a uniform screening standard for chemical exposure levels at Superfund sites. The presence of a chemical in excess of a Regional Screening Level means that additional work should be undertaken to determine whether remediation is needed. Dkt. 283-2 at 16, 50-51.

22. The EPA has made clear that these Regional Screening Levels "are not cleanup standards and should not be used as cleanup levels." Dkt. 283-6 at 10. The question whether remediation is needed—and, if so, what kind of remediation—depends on the chemical levels and the nature of the location. Dkt. 283-5 at 29; Dkt. 283-7 at 14; Dkt. 283-6 at 37, 49.

23. Another of the City's experts, Dr. Mitchell D. Erickson, suggested a different abatement standard in his report: "[R]emediation of residential soils will require excavation of any soil contaminated above one part PCB per million parts soil . . . and replacement with clean soil." Dkt. 283-55 at 116. Forty-eight of the 100 parcels owned by the City have PCB levels at or below 1 ppm. *See* Dkt. 283 Appendix; Dkt. 283-54; Dkt. 283-48.

24. Under TSCA standards, the cleanup level for a low-occupancy lot (like the parcels at issue here) is 25 ppm—"over 100x the cleanup goal (0.23 [ppm]) that Mr. Coghlan used." Dkt. 283-6 at 30-31. None of the parcels sampled showed total PCB concentrations greater than 25 ppm. *See* Dkt. 283-1; Dkt. 283-54; Dkt. 283-48; Dkt. 283-5 at 30-31.

25. EPA cleanup efforts from industrial pollution in East St. Louis were well known by the 2000s. Dkt. 283-29, Dkt. 283-30 at 47, 68-69.

26. The City had undertaken no efforts to address PCB contamination on the 273 parcels before this suit. *See*, *e.g.*, Dkt. 283-45 at 72 (City Director of Regulatory Affairs unaware of any efforts to remediate); Dkt. 283-46 at 45 (Mayor unaware of any City efforts to find grants to address PCB contamination).

## LEGAL STANDARD

Summary judgment is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment": The court "construe[s] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

## ARGUMENT

### I. The City Is Not Entitled To Summary Judgment On Its Trespass Claim

The City has failed to prove trespass. As a threshold matter, the City owns only 100 of the 273 properties at issue. *See* City SMF ¶ 30 (conceding as much). "To sustain a cause of action for trespass to real property, a plaintiff must allege a wrongful interference with his actual possessory rights in the property." *Loftus v. Mingo*, 158 Ill.App.3d 733, 744 (1987). The City plainly cannot prove trespass for properties in which it has no "possessory rights." Judgment is therefore warranted for Defendants as to the 173 properties that the City does not own. *See* City SMF ¶ 30.

As to the 100 properties the City does own, the City cannot show that the presence of PCBs constitutes the kind of tangible, physical invasion necessary for trespass. And even if imperceptible chemicals could constitute an actionable trespass, the City has not shown that Old Monsanto had the requisite intent to cause PCBs to invade East St. Louis properties.

### A. The Presence Of PCBs Does Not Constitute A Tangible, Physical Invasion

A trespass is "an invasion of the interest in the exclusive possession of land, as by entry upon it." *In re Chi. Flood Litig.*, 176 Ill.2d 179, 204 (1997) (quotation marks omitted). As the Illinois Supreme Court has explained in distinguishing trespasses from nuisances, trespass requires "a crass physical invasion." *Id.* at 205. This is because a trespass claim "deal[s] only with the interest of the possessor in holding his land free from physical intrusions," not "the invasion of other interests . . . such as his interest in its enjoyment free from annoyances." *City of E. St. Louis v. Netflix, Inc.*, 630 F.Supp.3d 1003, 1018 (S.D. Ill. 2022) (quoting Restatement (Second) of Torts, ch. 7 (1965)). A trespass claim accordingly requires that "tangible matter" invade the plaintiff's property. *Id.* (applying Illinois law); *see also* Dan B. Dobbs et al., The Law of Torts § 53 (2d ed. 2024) ("Because the action for trespass was conceived as a means of protecting *possession*, a tangible entry upon the land has been traditionally required." (emphasis added)).

The City's trespass claim fails as a matter of law because the City cannot demonstrate an "actual physical invasion" of the East St. Louis properties by a "tangible thing." *Netflix*, 630 F.Supp.3d at 1018. Courts have widely recognized that intangible "particulate" matter, such as PCBs, cannot sustain a trespass claim. *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 700-01, 705 (Minn. 2012) (presence of pesticide carried by the wind onto plaintiff's land does not support a trespass claim because pesticide is intangible, particulate matter); *see also Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F.Supp.2d 751, 772 (S.D. W. Va. 2009) (holding that chemicals are intangible under "the traditional rule requiring a trespass to involve an invasion of property by tangible objects"). The leading treatises recognize the same: "The traditional common law rule . . . provides that a trespass only exists where the invasion of land occurs through a physical, tangible object, and under that rule, intangible matter or energy, such as smoke, noise, light, and vibration, are insufficient to constitute a trespass." 75 Am. Jur. 2d Trespass § 29 (2018);

*see* 7 American Law of Torts § 23:9 (2025) ("An invasion of land by intangible substances, such as gases and odors, has usually been considered not to constitute a trespass."). This Court—a "federal cour[t] sitting in diversity"—"ought to be circumspect in expanding the law of a state beyond the boundaries established in the jurisprudence of the state." *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997).

Here, PCBs are intangible, microscopic chemicals that are "'invisible to the naked eye,' and 'lack a characteristic odor or appearance.'" *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017). As described by one of the City's experts, PCBs are "colorless, odorless, and tasteless." SAMF ¶ 1. The alleged presence of PCBs in the soil thus does not interfere with any possessory right and cannot support a claim for trespass. *See Rhodes*, 657 F.Supp.2d at 772; *Johnson*, 817 N.W.2d at 700-01, 705.

*NutraSweet Co. v. X-L Engineering Co.*, 933 F.Supp. 1409 (N.D. Ill. 1996), *aff'd*, 227 F.3d 776 (7th Cir. 2000), is not to the contrary. *See* Mot. 13-14. There, one of the defendant manufacturer's employees repeatedly dumped bucketfuls of a "milky brown liquid" into "a standing pool of water" on the corner of the defendant's property. *NutraSweet*, 933 F.Supp.at 1412-13. This repeated dumping caused "extremely high levels of groundwater contamination," with the soil "emitt[ing] a 'strong petrochemical odor.'" *Id.* at 1412, 1414. On numerous occasions, the standing pool of liquid physically "extended" from the defendant's property "to the [plaintiff's] property," *id.* at 1413, and experts further opined that "the hazardous substances in the groundwater eventually travelled to [plaintiff's] land" through the "groundwater flow system," *id.* at 1421. Those facts are readily distinguishable from this case. Dumping chemical-filled wastewater into a standing pool that directly invades the plaintiff's land and that travels to the plaintiff's land via groundwater flow may well present a *physical* invasion that impairs the owner's exclusive right to

possess the property. By contrast, the mere presence of trace levels of imperceptible chemicals in soils, without more, is not. Thus, while *NutraSweet* may have pushed the limits of common-law trespass doctrine, finding trespass here would stretch those limits beyond their breaking point.

### B. The City Has Not Shown That Old Monsanto Intended To Invade East St. Louis Properties

Even if the City's trespass theory were otherwise actionable, the City still cannot succeed because it fails to show that Old Monsanto "knew with substantial certainty" that PCBs from the Sauget Plant would contaminate land in East St. Louis, as is required for the intentional trespass claim it has raised. *Dial v. City of O'Fallon*, 81 Ill.2d 548, 553 (1980) ("conduct intended to cause an intrusion on the plaintiff's premises" is the "only . . . type of invasion wherein recovery may be sought purely on the basis of the tort of trespass"); *see* Dkt. 129 at 29 (raising intentional trespass claim); Dkt. 271 at 14 (same). As the City acknowledges, to show intentional trespass, it must demonstrate that Old Monsanto "intended or knew with a high degree of certainty that" its manufacturing processes would cause PCBs to invade East St. Louis lands. *Dietz v. Ill. Bell Tel. Co.*, 154 Ill.App.3d 554, 559 (1987). In other words, Old Monsanto's acts must have been "done 'with knowledge that [they] will to a substantial certainty result in the entry of the foreign matter.'" *Dial*, 81 Ill.2d at 555-56 (quoting Restatement (Second) of Torts § 158, cmt. i (1979)). The record does not show that the company knew to a substantial certainty that the alleged invasion of East St. Louis properties here would occur.

The record does not support the City's claim that Old Monsanto "intentionally discharged PCBs from its plant" despite knowing that PCBs "travel through [the] air" and "persist in the environment." Mot. 14-15. To the contrary, Old Monsanto took extensive measures to *prevent* harmful levels of PCBs from escaping the Sauget Plant throughout the entirety of its operations. From the start, Old Monsanto designed its manufacturing process to be "an enclosed process,"

with no intention that PCBs "be released anyplace." SAMF ¶ 6. Although the enclosed manufacturing process included vents, there was "no intentional release of PCBs from [that] process." SAMF ¶ 6. When the City states the Sauget Plant had an "outdoor process," Mot. 4, 15, it conflates the nature of the *facility* with the *manufacturing process* itself—the Sauget Plant's "physical reactors are outside," but "the reaction to make the PCBs" took place in a "closed . . . system" and was "intended to be enclosed." Resp. to SMF ¶ 47.

Old Monsanto's efforts to prevent the release of PCBs continued throughout its operation. In the 1960s, Old Monsanto reviewed its PCB-manufacturing process to further minimize PCB releases, and the company built a dedicated wastewater treatment plant to prevent the Sauget Plant's sewage waste from being discarded in East St. Louis. SAMF ¶¶ 7-8. In the late 1960s and early 1970s, the company installed a series of settling basins and catch tanks to further prevent the loss of PCBs during the manufacturing process. SAMF ¶ 9. And in 1971, the company installed a state-of-the-art incinerator "to safely dispose of PCBs," achieving 99.9998% destruction of PCBs. SAMF ¶ 10. Those latter steps coincided with the emergence of new modes of "environmental PCB analysis" in the 1960s; as the City's chemical expert Erickson acknowledged, before then, the technology was not "not available" to evaluate PCBs' environmental properties. SAMF ¶ 5.

Moreover, given the available evidence at the time, Monsanto would likely have assumed that any PCB particles released into the air would have been so dense that they would have probably condensed "very close to the facility . . . on the plant site." Resp. to SMF ¶ 11. The "expectation" would have been that "those emissions were at such a low level that they w[ould] be immediately diluted by the air." Resp. to SMF ¶¶ 7, 15.

Even if the City could demonstrate that Old Monsanto knew that PCBs would be disseminated to the local community, it points to no evidence that Old Monsanto intentionally

caused PCBs to reach the specific parcels at issue here or knew that its operations would, "to a substantial certainty, result in the entry of [PCBs]" on those parcels. *Dial*, 81 Ill.2d at 555-56. Neither the federal EPA nor the Illinois Environmental Protection Agency asked Old Monsanto to remediate the parcels here or placed them on the National Priorities List. SAMF ¶ 12. And the City never notified the company of any alleged PCB contamination in East St. Louis prior to initiating this lawsuit. SAMF ¶ 12.

Ultimately, even though the City repeatedly acknowledges that it must show that Old Monsanto "knew to a substantial certainty" that a trespass would occur, the City can assert only that it "was foreseeable" that PCBs would "blow north toward the Parcels." Mot. 16. That does not establish intent or knowledge to a substantial certainty—simply put, "the presence of PCBs on the [City's] properties [could] not be said to be the 'immediate or inevitable consequence' of Monsanto's manufacture . . . of PCB-containing products." *Abbatiello v. Monsanto Co.*, 522 F.Supp.2d 524, 542 (S.D.N.Y. 2007) (dismissing trespass claim based on manufacture, sale, and delivery of PCBs).

The City's reliance on *Dial* only highlights the lack of sufficient evidence. Mot. 13-14. In *Dial*, the defendant city closed a sewage overflow pipe, causing sewage to back up into the plaintiff's home. 81 Ill.2d at 549. The Illinois Supreme Court confirmed that to prove intentional trespass, the plaintiff needed to show "a high degree of certainty that an intrusion of another's property will result from the act of the defendant." *Id.* at 555. The defendant's conduct satisfied that high bar only because city employees *testified* that they "knew" and "assumed" that when the overflow pipe was closed, there would be "some backup," and it was "clear that the backup in the sewers resulted from the intentional closing of the overflow." *Id.* at 554; *see also* Mot. 13 (agreeing that *Dial* turned on this fact). Unlike the defendant in *Dial*, the record here establishes that Old

Monsanto could not have become aware of even *potential* PCB presence in East St. Louis until the late 1960s, when scientific knowledge and tools enabled this type of inquiry. SAMF ¶¶ 4-5. There certainly is no evidence that Old Monsanto *knew to a substantial certainty* at any time before it ceased manufacturing PCBs that harmful levels of PCBs would be released into the air from the manufacturing process and settle on the properties at issue here.

Nor does *NutraSweet* negate the requirement for the City to show knowledge and intent. *NutraSweet* did not address these issues, as the City appears to recognize. *See* Mot. 13-14, 18-20 (relying on *NutraSweet* only to contend that trespass can occur through "vehicle . . . of nature," and that trespass can occur even if other sources contribute to the physical invasion).

Because the undisputed facts establish that Old Monsanto did not know to a substantial certainty that its actions would cause PCBs to accumulate on the City's parcels in East St. Louis, the Court should grant summary judgment to Defendants on the City's trespass claim and deny summary judgment for the City.

## II. *Nullum Tempus* Does Not Apply, So The City's Claims Are Time-Barred

The City does not dispute that its claims are time-barred under the relevant statutes of limitations and repose if the *nullum tempus* doctrine is inapplicable. *See* Def. Mot. 30-35. *Nullum tempus* does not change that result.

### A. The City Cannot Sidestep Unfavorable Evidence By Invoking A Pleading-Stage Standard At Summary Judgment

As Defendants explained in their own motion for summary judgment, the undisputed facts show that *nullum tempus* is inapplicable here because the City's suit does not seek to vindicate public rights. *See* Def. Mot. 35-39. Illinois courts consider three factors in assessing whether *nullum tempus* applies: (1) the effect of the suit on the public interest; (2) whether the City is obligated to act on behalf of the public; and (3) the public revenues spent to remedy the problem

the suit seeks to redress. *Champaign*, 291 Ill.App.3d at 200. Ample undisputed evidence shows that each factor supports Defendants. As to the public-interest factor, the City's experts concede that PCBs on the vacant parcels at issue are "not likely" to pose a health risk to the public at large beyond the particular parcels—parcels that the City owns in a proprietary capacity like any private landowner. Def. Mot. 36. Indeed, the City has agreed to *share* its recovery with outside counsel at private law firms via a contingency-fee arrangement, further divesting the action of any sovereign character. *Id.* at 37. And the City has no legal obligation to bring these parcel-specific claims and has expended no public funding to address the presence of PCBs. *Id.* at 38-39.

The City does not contest these undisputed facts. Instead, it asks this Court to ignore them. According to the City, the Court should decide "whether the doctrine of [*nullum tempus*] applies" based on "the pleadings[,] *without regard to the facts adduced in discovery*." Mot. 21 (emphasis added). The City appears to believe that because *nullum tempus* can be resolved in this case as a matter of law, the Court need not consider the facts uncovered during discovery and should base its conclusion solely on the allegations in the complaint. *See* Mot. 20-23. That is patently incorrect. This case is at the summary-judgment stage, and federal courts are "not confined to the factual allegations in a complaint when considering a motion for summary judgment." *Richards v. U.S. Steel*, 869 F.3d 557, 567 n.5 (7th Cir. 2017). At summary judgment, the Court *must* evaluate the evidence to decide whether the moving party has "show[n]" both that "there is no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). Under Rule 56, a summary-judgment motion is decided based on—not in spite of—"the evidence before the court." *Abstract & Title Guar. Co., Inc. v. Chicago Ins. Co.*, 489 F.3d 808, 810 (7th Cir. 2007).

These blackletter procedural rules apply irrespective of which substantive issues are being considered, and it would be remarkable if the rule were different for *nullum tempus*. It is not: Federal courts routinely consider the evidence in evaluating the applicability of *nullum tempus*. *See*, *e.g.*, *Village of Roxana v. Shell Oil Co.*, 2013 WL 4510164, at *6 (S.D. Ill. Aug. 26, 2013); *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 447 (3d Cir. 2003) (affirming grant of judgment as a matter of law on *nullum tempus* determination based on the evidence in the case); *Town of Smyrna v. Mun. Gas Auth. of Ga.,* 129 F.Supp.3d 589, 595 (M.D. Tenn. 2015) (determining that *nullum tempus* did not apply on summary judgment after considering the evidence); *see also City of Chicago v. Equte LLC*, 2023 WL 6173593, at *9 (N.D. Ill. Sept. 19, 2023) (rejecting *nullum tempus* arguments "recycl[ed]" from a motion to dismiss where the moving party presented nothing new at summary judgment). In that regard, the applicability of *nullum tempus* is not, as the City suggests, merely a matter of "appl[ying] . . . a statute of limitations to a cause of action." Dkt. 271 at 20 (quoting *Travelers Cas. & Sur. Co. v. Bowman*, 229 Ill.2d 461, 466 (2008)). Rather, *nullum tempus* turns on applying the *Champaign* factors to the facts of the case. *Champaign*, 291 Ill.App.3d at 200. *Travelers* is not to the contrary; it resolved a statute-of-limitations dispute between private parties and did not address *nullum tempus*.

The City's citations to Illinois law do not change the analysis. *Illinois* law does not govern *federal* civil procedure, *see Doermer v. Callen*, 847 F.3d 522, 529 (7th Cir. 2017) ("federal procedural rules govern"), and the state-law cases cited by the City lend it no support anyway. Each Illinois case evaluating *nullum tempus* based on the complaint's allegations arose *on a motion to dismiss*. *See* Mot. 21 (discussing *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 475-76 (1989); *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 346 Ill.App.3d 264, 275 (2004); *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill.2d 457, 466 (1983)). It is

entirely unilluminating that those *pleading-stage* cases considered only the allegations in the pleadings. At summary judgment, Illinois courts apply the same principles as federal courts: The "trial court need not wear judicial blinders and may look beyond the complaint at other evidence appropriate to a motion for summary judgment." *Pekin Ins. v. Wilson*, 237 Ill.2d 446, 460 (2010) (citation and quotation marks omitted). The entire "purpose of summary judgment is to determine whether a genuine issue of material fact exists" based on the "evidence." *Thompson v. Gordon*, 241 Ill.2d 428, 438 (2011). No federal or state rule limits the Court's consideration to the pleadings at the summary-judgment stage.

Adopting the City's rule would allow the City to use artful pleading to conclusively defeat statute-of-limitations arguments at the summary-judgment stage, even when the undisputed evidence shows that the claims are time-barred. Timeliness is often evaluated in light of the evidence. While courts may use the pleadings to select which statute of limitations governs the cause of action (and even then may "look behind the allegations" when doing so), Mot. 23 n.17 (citing *Armstrong v. Guigler*, 174 Ill.2d 281, 286 (1996)), courts regularly rely on *evidence* of the date of injury, knowledge, and similar considerations to determine whether the applicable limitations period *bars* the plaintiff's claims. Indeed, timeliness defenses "typically turn on facts" that are not included in the pleadings. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *see Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

This Court should reject the City's plea for a *sui generis* summary-judgment rule applicable only to *nullum tempus*. As with any other issue decided at the summary-judgment stage, the Court should determine whether there is any dispute of material fact and whether the movant is entitled to judgment as a matter of law.

### B. The Undisputed Evidence Confirms That *Nullum Tempus* Does Not Apply

As Defendants have shown, the City meets none of the criteria for *nullum tempus*. *See* Mot. 35-40. The Court should grant summary judgment to Defendants because the City's claims are time-barred.

*Nullum tempus* can save an untimely claim brought by the sovereign only when it is seeking to vindicate public rights. A municipality seeking to vindicate its "private rights" is "subject to statutes of limitation to the same extent as individuals." *Brown v. Trs. of Schs.*, 224 Ill. 184, 187 (1906); *see Latronica*, 346 Ill.App.3d at 269 ("when the entity is acting in a private capacity, its claim may be subject to a limitations defense"). In evaluating the public-rights doctrine, "the Court looks to substance over form." *City of Chicago v. Doordash, Inc.*, 2024 WL 4252797, at *6 (N.D. Ill. Sept. 20, 2024). The "bare fact" that litigation "is brought in the name of the People . . . is not controlling." *People ex rel. Town of New Trier v. Hale*, 320 Ill.App. 645, 652 (1943). Rather, courts consider the three *Champaign* factors listed above: (1) the effect on the public interest; (2) whether the City is obligated to act on behalf of the public; and (3) the public revenues spent to remedy the problem the suit seeks to redress. 291 Ill.App.3d at 200. All three factors cut against the City.

#### 1. The City Is Not Vindicating A Public Interest

As to the public interest, "Illinois cases that have applied *nullum tempus* typically have done so in actions involving threats to public health, safety, and property that have the potential to affect the *entire* municipality" or the public generally. *DoorDash*, 2024 WL 4252797, at *7. Examples cited by the City include cases implicating the "safety of all persons" using public streets, *Shelbyville Restorium, Inc.*, 96 Ill.2d at 464; a "public building housing the offices of the Illinois Attorney General in Springfield" that contained asbestos, *People v. Asbestospray Corp.*, 247 Ill.App.3d 258, 259 (1993); the maintenance of "public roadways and highways," *People ex*

*rel. Dep't of Transp. v. Molter*, 133 Ill.App.3d 164, 167 (1985); a refuse-disposal operation that violated state law (and that was challenged by a state environmental agency acting on behalf of the public), *Pielet Bros. Trading, Inc. v. Pollution Control Bd.*, 110 Ill.App.3d 752, 758 (1982); and "debts . . . incurred for the benefit of the general public," *City of Chicago ex rel. Scachitti v. Prudential Sec., Inc.*, 332 Ill.App.3d 353, 364 (2002).

The City's claim, in contrast, is based on alleged injury to specific "City-owned Parcels" that the City holds in a proprietary capacity, just like a private landowner. Mot. 11; Dkt. 129 ¶ 11 ("City-owned lots"); *id.* at 37 (seeking damages for "East St. Louis's lands"); *see also* Dkt. 283-37 at 1 (City's remediation expert focusing on the properties the City owns); Dkt. 283 at 22-28 (City lacks standing as to other parcels). The City's experts concede that PCBs on these vacant parcels are "not likely" to pose a health risk to the public at large beyond the particular parcels at issue. Dkt. 283-39 at 56; Dkt. 283-27 at 115.[1]

Additionally, the loss-of-use damages that the City seeks are a quintessential private remedy for a landowner, awardable "where a breach deprives a plaintiff of the use of personal property." *Wilson v. DiCosola*, 352 Ill.App.3d 223, 225 (2004); *see* Restatement (Second) of Torts § 931, cmt. b (1979) (loss-of-use damages go to "[t]he owner of" the property).[2] Thus, despite the

---

[1] Indeed, no expert provided any estimate as to whether PCBs on the vacant parcels could become airborne at concentrations that would pose a health risk to others, so any such claim would be speculative and unsupported.

[2] The City cites *O'Fallon Dev. Co. v. City of O'Fallon*, 43 Ill.App.3d 348, 353 (1976), for the proposition that "[a] municipal corporation holds its property in trust for the public." Dkt. 271 at 27. But that inapposite line of cases simply prohibits municipalities from using their property to benefit some citizens at the expense of others. *E.g.*, *id.* at 355; *Hackett v. Trustees of Schs.*, 398 Ill. 27, 32 (1947) (concerning diverting municipal property to private use); *Cnty. of Cook v. Kellogg Co.*, 374 F.Supp.3d 744, 751 (N.D. Ill. 2019) (same). Those cases do not disturb the principle that ordinary "common law rules" govern cases where a municipality exercises its property rights "in its proprietary capacity," and that a municipality is held "to the same legal standards" as any other property owner. *Woods v. N. Pier Terminal Co.*, 131 Ill.App.3d 21, 23 (1985).

City's framing, this is a textbook private-rights case—one in which the City invokes rights belonging "'only to the government or some small, distinct subsection of the public at large,'" not to "the *general* public." *Village of DePue v. Viacom Int'l, Inc.*, 713 F.Supp.2d 774, 781 (C.D. Ill. 2010) (emphasis added) (citation omitted); *DoorDash*, 2024 WL 4252797, at *7 (same).

The City contends (Mot. 26-27) that *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 346 Ill.App.3d 264 (2004), and *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428 (1989), support its argument. They do not.

In *Latronica*, the court found at the motion-to-dismiss stage that a public interest was sufficiently pled for purposes of a nuisance claim where the city alleged that the defendant's "waste" on a vacant lot in Chicago "contributed to the creation of mounds of waste" that "caused dust, dirt, and other materials to become airborne and to spread to the nearby community." 346 Ill.App.3d at 266-67, 271. Here, the City produced *no* evidence—as would be required at the summary judgment stage—that PCBs spread from the soils on the properties at issue to the public at large, nor did the City otherwise present evidence that PCBs from the parcels at issue endangered public health at all.

In *A, C & S, Inc.*, the court found a "sufficient interest in the general public" when the board of education sued for costs it had expended to remediate asbestos in public-school classrooms that were "used for mandatory classroom attendance as well as for other public functions." 131 Ill.2d at 474. But an education board's effort to recover funds it had expended in order to protect "a large segment of th[e] State's population" in "public schools" from asbestos exposure (*id.*) bears no resemblance to this case, where outside counsel retained on contingency seek a payout based on purported damages to vacant plots of land that are not open to the public. As the City's expert recognized, many of the parcels are not even "accessible to a paved street"

because the "streets have decayed to the point of not being recognizable streets." Dkt. 283-31 at 150. And another of the City's experts acknowledged that he knew of no plans to redevelop the area. Dkt. 283-27 at 139. With no evidence that these lots pose a public-safety risk, the City has identified no public interest here.

The City's retention of a "private firm" through a "contingency fee arrangement" cements this suit's essentially private character. *DoorDash*, 2024 WL 4252797, at *8; *see* Dkt. 129 (City represented by private firms). "[I]f the state becomes a partner with individuals, or engages in business, it divests itself of its sovereign character and is subject to the statute [of limitations]." *New Trier*, 320 Ill.App. at 651 (quoting *Brown*, 224 Ill. at 186). Thus, "in circumstances where a private law firm—as opposed to a public entity—stands to recover a significant portion of penalties sought, the public character of the proceeding is lessened." *DoorDash*, 2024 WL 4252797, at *8.

**2. The City Has No Obligation To Act On Behalf Of The Public**

As to the obligation to act on behalf of the public, the City bears no *legal duty* to remediate trace levels of imperceptible chemicals in the soils on its properties or to seek historical loss-of-use damages. "Each Illinois case applying *nullum tempus* has involved a more specific duty to act" imposed by a state statute, *DoorDash*, 2024 WL 4252797, at *9, whereas the City's nuisance, trespass, product-liability, and negligence claims are ordinary claims rooted in the common law. *See also* Def. Mot. at 45-47 (explaining that the City's ordinance-based nuisance claims are also based on a misreading of the ordinances). The City contends that it must maintain its property in a reasonably safe condition, Mot. 28, but cites a case where a city abated a traditional public nuisance created by a third party, in which dumping on city land was a nuisance and hazard because of its potential to spread "onto the public way and nearby properties." *Latronica*, 346 Ill.App.3d at 290. It says nothing about whether the City is obligated to act here, given that the purported

nuisance is on the City's properties and that *none* of these properties requires remediation under the EPA's standards for low-occupancy use. SAMF ¶ 24; Def. Mot. at 2–3, 20, 26, 28.

The City cites *Latronica* for the proposition that it has a *duty* to act simply because a statute "authorize[s]" it to act. Mot. 28. Common sense and the law are otherwise. In *Latronica*, the court held *both* that the City was authorized to act *and* that it was obligated to abate the nuisance under Chicago's municipal code. 346 Ill.App.3d at 273 (explaining that the municipal code "impose[d] a duty upon the City to" abate pollution because the commissioner was "required" to initiate proceedings by regulation). By contrast, the ordinances cited here do not even *contemplate* a freestanding judicial action against a chemical manufacturer for imperceptible chemicals in the soils of the City's own properties. Def. Mot. 45-47. And they certainly impose no "specific duty" to act, *DoorDash*, 2024 WL 4252797, at *9; they speak in general, discretionary terms about abating nuisances that landowners fail to take care of themselves. *See* Municipal Code § 50-79 (City officials "are authorized" to abate nuisances); *id.* § 62-2 (long-defunct health department shall abate certain nuisances "*which it may deem*" harmful in its discretion (emphasis added)).

Moreover, to the extent third parties believed they were being harmed by the alleged presence of imperceptible PCBs in the soils of the City's long-vacant parcels, those private persons could vindicate their own interests through their own suits. *See also David M. Swain & Son v. Chi., Burlington & Quincy R.R. Co.*, 252 Ill. 622, 626 (1911) (a private person may bring claims for public nuisance if he suffers "some special damage"). This is accordingly not a case where "the public is incapable of acting on its own behalf," *City of Chicago v. Equte LLC*, 2022 WL 2132630, at *5 (N.D. Ill. June 14, 2022), or where "the governmental plaintiff's failure to act would leave the public without a remedy," Mot. 28 (citing *Village of Roxana*, 2013 WL 4510164, at *6). *See DoorDash*, 2024 WL 4252797, at *10 ("Nor is the Court convinced that the City is the

only party who can remedy DoorDash's alleged misconduct"). The government thus does not have the type of "legal *obligation* to undertake the action" required to trigger *nullum tempus*. *DePue*, 713 F.Supp.2d at 783 (emphasis added); *see DoorDash*, 2024 WL 4252797, at *9 ("discretion by government decisionmakers" undermines second factor).

### 3. The City Has Expended No Funding To Address PCB Contamination

As to expending public revenues to remedy the problem, the City concedes that it has expended no material funding to address PCB contamination, and the City has presented no evidence showing any intent to do so in the future. *See*, *e.g.*, SAMF ¶ 26 (Mayor unaware of any City efforts to find grants to address PCB contamination); Mot. 30 n.20. The "costs of prosecuting this lawsuit" are not "evidence of public expenditures since the City was not 'required by law to undertake' this suit." *DoorDash*, 2024 WL 4252797, at *10 (quoting *DePue*, 713 F.Supp.2d at 784).

* * *

Because the City brings suit in a non-sovereign capacity, the *nullum tempus* doctrine is inapplicable, and the City's claims are "subject to the lapse of time." *People ex rel. City of Chi. v. Com. Union Fire Ins.*, 322 Ill. 326, 331 (1926).

## CONCLUSION

The Court should deny summary judgment for the City and grant summary judgment for Defendants on the City's trespass claim and Defendants' statute-of-limitations defense.

Dated: April 4, 2025

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Russell B. Balikian*
Russell B. Balikian (*pro hac vice*)
rbalikian@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8535

Justine Goeke (*pro hac vice*)
jgoeke@gibsondunn.com
200 Park Ave
New York, NY 10166
Telephone: 212.351.5372

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**KING & SPALDING LLP**

*/s/ Tracie J. Renfroe*
Tracie J. Renfroe (pro hac vice)
trenfroe@kslaw.com
Mitchell B. Bryant (pro hac vice)
mbbryant@kslaw.com
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: 713.751.3200

*Attorneys for Defendants Monsanto Company, Solutia Inc. and Pharmacia LLC*

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Tyler W. Schwettman*
Adam E. Miller (6206249)
amiller@shb.com
Tyler W. Schwettman (6333327)
tschwettman@shb.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Telephone: 314.690.0200

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

*/s/ Charles R. Hobbs II*
Charles R. Hobbs II (625917)
Ron.Hobbs@lathropgpm.com
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
Telephone: 314.613.2800

*Attorneys for Defendant Solutia Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 4th day of April 2025, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Tyler W. Schwettman*

*Attorney for Defendants*