IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CITY OF EAST ST. LOUIS, ILLINOIS,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, *et al.*,<br><br>Defendants. | Case No. 3:21-cv-232-DWD |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........ 1

RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS ........ 2

I. Polychlorinated Biphenyls And Their Applications ........ 2

II. Monsanto's W.G. Krummrich Plant ........ 9

III. EPA's Regulatory Authority Under TSCA And CERCLA ........ 11

IV. The City's Lawsuit ........ 16

A. The Vacant Properties ........ 16

B. The City's Invalid Assignment Of Rights ........ 19

C. PCB Levels In Identified Properties ........ 21

D. Procedural Background ........ 24

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ........ 24

A. Monsanto Manufactured PCBs Near East St. Louis from 1936 to 1977. ........ 24

B. Monsanto Knew That PCBs Are Toxic and Potentially Harmful to Humans. ........ 24

C. Monsanto Intentionally Vented PCBs to the Atmosphere. ........ 25

D. There Was a High Degree of Certainty that the PCBs Monsanto Vented Would Invade the City's Land. ........ 25

E. There Was a High Degree of Certainty that the PCBs Monsanto Vented Would Remain on the City's Land. ........ 26

F. The PCBs that Monsanto Vented Have Invaded the City's Land. ........ 27

G. The City's Pleadings and the Law Establish that It Asserts a Public Right. ........ 29

The City Acts in the Public Interest ........ 29

The City Is Obligated to Act ........ 30

The City Is Required to Expend Public Funds ........ 31

H. The Facts Establish that the City Asserts a Public Right. ........ 32

The City Acts in the Public Interest ........ 32

The City Is Obligated to Act ..... 33

The City Is Required to Expend Public Funds..... 34

I. Monsanto's PCB Pollution Has Injured the City and its Property. ..... 35

J. The EPA Advises that PCB Contamination in the City Requires Further Investigation and Precaution. ..... 36

LEGAL STANDARD ..... 39

ARGUMENT ..... 39

I. THE CITY HAS STANDING TO PURSUE ITS CLAIMS. ..... 39

a. The City Has Standing for the 100 Parcels Presently Owned. ..... 41

b. The City Has Standing for the 47 Previously-Owned Parcels. ..... 45

c. The City Has Standing for the Remaining 125 Parcels. ..... 47

d. The City's Injury Is Fairly Traceable to Monsanto. ..... 47

II. THE CITY'S CLAIMS ARE NOT TIME-BARRED. ..... 47

a. *Nullum Tempus* Applies to the City's Action. ..... 47

1. Whether *Nullum Tempus* Precludes the Application of Statutes of Limitation Is a Pure Question of Law. ..... 48

2. The City's Action Asserts an Interest in Protecting Public Property and Health. ..... 50

3. The City Is Obligated to Act. ..... 54

4. The City Is Required to Expend Public Funds. ..... 56

b. There Is a Material Dispute of Fact as to When the City Had Notice of the PCB Contamination. ..... 58

III. THE CITY'S CLAIMS ARE VIABLE ON THE MERITS. ..... 59

a. The City's Public Nuisance Claim Is Viable. ..... 60

b. The City's Trespass Claim Is Viable. ..... 63

1. Monsanto Knew to a Substantial Certainty that the PCBs It Intentionally Vented Would Invade the City's Land. ..... 63

2. The PCB Contamination Constitutes a Trespass. .......................... 66

c. The City's Negligence Claim Is Viable. ................................................... 68

d. The City's Claims for Nuisance Abatement Are Viable. .......................... 70

1. Monsanto Fails to Establish that the Court Cannot Order Abatement. ...................................................................... 71

2. Monsanto Fails to Establish that City Code Sections 50-79 and 62-2 Do Not Authorize Civil Relief. ................................................ 73

IV. THE PRIMARY JURISDICTION DOCTRINE SHOULD NOT BE APPLIED. 74

CONCLUSION ........................................................................................................ 77

## PRELIMINARY STATEMENT

Monsanto's motion for summary judgment confirms that the City's claims for public nuisance, trespass, negligence, and nuisance abatement must proceed to trial.

***First***, the City has standing to pursue prospective relief (cleanup costs or abatement) as to all parcels that have PCB contamination, and standing to pursue retrospective damages for all parcels it owns now or did in the past. Monsanto attempts to engraft on the City's common law claims standards found in regulations promulgated under the Toxic Substances Control Act. But those standards do not govern standing (or liability) even in cases brought under the federal environmental laws,[1] and so certainly cannot govern standing here.

***Second***, the City's claims are not time-barred. Conspicuously absent from Monsanto's discussion of the *nullum tempus* doctrine is any reference to the Illinois Supreme Court decisions that govern the doctrine's modern application.[2] That is no oversight—Monsanto omits mention because they and their progeny show the doctrine is applied unfailingly to cases touching on the public's health, safety, and property. And those decisions are of course binding on this Court in its application of Illinois law. *Nullum tempus* thus precludes application of the statutes of limitation and repose (and laches). Even if the Court sees differently, there are material disputes of fact as to when the City's claims accrued, so the limitations issues must be decided by the jury.

***Third***, the City's claims are viable on the merits. The City's public nuisance claim is consistent with precedent holding that industrial contaminants on public land interfere with public rights. The City's trespass claim is both supported by the evidence (much of it supplied by Monsanto's own witnesses) and consistent with Seventh Circuit precedent holding that Monsanto

---

[1] *See Liebhart v. SPX Corp.*, 917 F.3d 952, 957–61 (7th Cir. 2019).

[2] *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 600–03 (Ill. 1989); *City of Shelbyville v. Shelbyville Restorium, Inc.*, 451 N.E.2d 874, 875–79 (Ill. 1983).

itself suffered an intentional trespass (as a matter of law) via chemical contamination.[3] The City's negligence claim rooted in the emissions from Monsanto's plant goes unchallenged, so it necessarily survives. And the City's claim for equitable abatement under the common law and the City Code does not require that this Court to join the other property owners to issue an order that will obligate only Monsanto.

***Fourth***, the Court should not delay resolution of this case indefinitely by staying the City's equitable claims to apply the primary jurisdiction doctrine. Courts decline to apply the doctrine even in cases brought under the federal environmental laws; there is much less reason to do so here when only common and municipal law is at issue. And the EPA neither has instituted formal administrative proceedings nor given the City any timeframe for further action. The City's state law rights should not be impaired while the EPA sits on its hands.

For all these reasons, Monsanto's motion for summary judgment should be denied.

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

### I. Polychlorinated Biphenyls And Their Applications

1. PCBs are non-flammable organic chlorine compounds. Ex. 1 at 8; Ex. 2 at 2. They consist of a class of "209 discrete chemical compounds, known as congeners, that contain one to ten chlorine atoms attached to a biphenyl molecule." Ex. 3 at 2. At the trace levels reportedly observed on the 273 subject parcels, PCBs are imperceptible to human senses; they are "colorless, odorless, and tasteless." Ex. 4 at 7.

**RESPONSE: Admitted in part and disputed in part.** Admitted that PCBs are non-flammable organic chlorine compounds; and that they consist of a class of "209 discrete chemical compounds, known as congeners, that contain one to ten chlorine atoms attached to a biphenyl molecule."

Disputed that the amounts observed on the subject parcels are accurately characterized as "trace levels." There is no natural background level of PCBs. Ex. 1 (Dfts. Corp. Rep. Dep.) at 307:5–11. City expert Dr. Keri Hornbuckle has studied PCBs for 35 years; she has tested for PCBs in dozens of places around the U.S., including cities, remote areas, industrial communities, and the largest Superfund sites on the east and west coasts. Ex. 29 (Hornbuckle Dep.) at 136:9–13,

[3] *NutraSweet Co. v. X-L Eng'g Corp.*, 933 F. Supp. 1409 (N.D. Ill. 1996), *aff'd*, 227 F.3d 776 (7th Cir. 2000).

142:11–19. Hornbuckle states that, when comparing the PCB concentrations measured in East St. Louis with her prior measurements and "[a]ll the reported soils we could find in the literature," "the [PCB] concentrations in East St. Louis are higher than we have seen elsewhere in the United States and most of the rest of the world." *Id.* at 101:24–103:4.

Further disputed that at those levels PCBs are imperceptible to human senses. Monsanto admits that PCBs "can cause skin conditions up to and including chloracne and . . . can have transient physiological action"; "they do have effect on the skin, they remove the oils from the skin and can cause rashes . . . . and vapors probably do irritate the membranes of the nose and throat." Ex. 1 (Dfts. Corp. Rep. Dep.) at 282:21–283:12. The EPA purportedly tested for PCBs in the City in the 2010s and found PCB levels ranging from 0.2 to 17 ppm, which levels are comparable to those found in the City's sampling. *See* SMF ¶¶ 29, 94. A document describing that sampling event included an Illinois Environmental Protection Agency "fact sheet" regarding PCBs. Ex. 30 (Wagner Dep.) at 79:12–82:5; Ex. 31 (Wagner Dep. Ex. 17). The fact sheet advises that "[i]n people, PCBs can affect the skin and may cause *chloracne*–small, pale, yellow skin lesions that may last from weeks to years." Ex. 31 (Wagner Dep. Ex. 17) at PROD0000261. Another EPA document purportedly arising from the EPA's sampling events noted PCB levels ranging from 0.6 to 7 ppm; the EPA "recommend[ed] [that] residents who live on land with contamination levels of PCBs above EPA's health screening level [of 1 ppm] follow the advice from the Illinois Department of Public Health to reduce exposure to soil contaminants" by doing things like "[w]ash[ing] children's hands and faces often" and "[k]eep[ing] windows closed on windy days" "to help keep dust from being blown inside." Ex. 30 (Wagner Dep.) at 99:13–101:20; Ex. 32 (Wagner Dep. Ex. 19) at PROD0000142.

2. "Each unique PCB molecule or congener may be grouped by the number of chlorine atoms it contains." Ex. 3 at 2. Since there are a total of ten possible chlorine sites on the biphenyl ring, "there are ten congener classes or isomers," also known as "homologs." Ex. 3 at 2. PCB products include many different congeners involving varying chlorine concentrations. Ex. 5 at 5.

**RESPONSE: Admitted.**

3. PCB manufacturing in the United States began in 1929, when Swann Chemical Company began manufacturing "Aroclors"—Swann's trade name for PCB mixtures—at its Anniston, Alabama facility. Ex. 1 at 9; Ex. 2 at 2-3; Ex. 6 at 2. Aroclor is also the trade name that Old Monsanto later applied to certain of its PCB mixtures after acquiring Swann. Ex. 3 at 5.

**RESPONSE: Admitted.**

4. "[D]ue to a variety of beneficial chemical properties," such as low volatility, chemical stability, and nonflammability, PCBs were commercially popular and were widely used in a range of end products, including compressor lubricant, hydraulic fluid, heat transfer fluid, caulk, sealants, paints, and coatings. Ex. 5 at 5; *see* Ex. 7 at 4; Ex. 8 at 5-6; Ex. 2 at 5; Ex. 9 at 4-5. PCB-based fluids had a significantly lower fire risk than alternative fluids for use in electrical applications like transformers. Ex. 2 at 2-5. And PCB-based fluids were used as fire-safety fluid in many other applications, including hydraulics, heat-transfer systems, and compressors. Ex. 2 at 47.

**RESPONSE: Admitted.**

5. The commercial applications for PCBs generally fell into three categories. PCBs were used in: (1) completely closed systems, which are sealed off from the environment (such as capacitors, transformers, and electromagnets); (2) semi-closed systems, which are partially but not entirely sealed off from the environment (such as hydraulic systems); and (3) open systems, in which the PCB-containing material is embedded in an unenclosed commercial product (such as coatings, inks, adhesives, and plasticizers). Ex. 5 at 5.

**RESPONSE: Admitted.**

6. PCBs were deemed essential for certain uses from the time they were first manufactured until the time Old Monsanto ceased making them. During World War II, for example, the government issued Necessity Certificates to Old Monsanto and funded multiple expansions of Old Monsanto's PCB-manufacturing facilities in Alabama to support PCB production for the military and defense contractors. *See* Ex. 2 at 117; Ex. 10 at 3-5. During the War, the majority of PCBs that Old Monsanto produced were for use by the U.S. military in applications such as banding and sheet rubber, electrical transformers, non-flammable wire and cable coatings, heat-resistant paint, and missile-launch tubes. *See* Ex. 10 at 4 (rubber and transformers); Ex. 11 at 3 (cable and wire coatings); Ex. 12 at 2 (heat-resistant paint); Ex. 13 at 2 (missiles). Old Monsanto continued to manufacture PCBs for the government and defense contractors into the 1970s. Many products had exacting specifications for fire resistance, thermal and electrical conductivity, and other attributes requiring the use of PCBs, and military specifications continued to call expressly for Old Monsanto's PCB-containing Aroclor products. *E.g.*, Ex. 14 at 4; Ex. 15 at 1; Ex. 16 at 1; Ex. 2 at 37, 41.

**RESPONSE: Disputed; not supported by the record citation.**

Exhibit 2 (ECF No. 283-3) is the expert report of Harri Kytomaa. The report is unverified and unsworn, and is not accompanied by an affidavit or declaration, and therefore is inadmissible for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Est. of Northington v. City of Indianapolis*, No. 1:21-CV-00406-RLM-TAB, 2023 WL 11970037, at *3 (S.D. Ind. Mar. 31, 2023) (refusing to consider on summary judgment party's own expert report that is not verified, sworn, or accompanied by affidavit or declaration) ; *Mickelson v. Mickelson*, No. 11 C 5061, 2013 WL 3774004, at *5 (N.D. Ill. July 18, 2013) (same). Even if considered, the report does not support the assertions made. Cited page 117 concerns the growth of East St. Louis during World War II; it says nothing specific to PCBs or their use in the War. Cited pages 37 and 41 support at most that a military specification dated January 15, 1952, named PCBs in the specification, and another dated December 20, 1950, could be met only by PCBs. It does not establish the duration those specifications were in effect.

Exhibit 10 (ECF No. 283-11) is largely illegible. The first and sixth pages reflect that the document is a communication from the Monsanto Chemical Company "[t]o the Secretary of War"; it does not support the assertion that the document is or evinces anything that the government issued to Monsanto. The same is true of Exhibit 11 (ECF No. 283-12).

Exhibit 12 (ECF No. 283-13) is a "FEDERAL SPECIFICATION" dated September 22, 1961; there is no indication it has anything to do with Monsanto or its PCB products.

Exhibit 13 (ECF No. 283-14) appears to be a letter from Raytheon Company to Monsanto Industrial Chemicals Co. that communicates to Monsanto hearsay statements made by an unidentified government employee to someone at Raytheon; those statements are not admissible under any hearsay exception or exclusion. *See* Fed. R. Civ. P. 56(c)(2); *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).

Exhibit 14 (ECF No. 283-15) is of unclear origin and makes no intelligible references to Aroclors or other PCB-containing products.

Exhibit 15 (ECF No. 283-16) is a document of unclear origin captioned "Sales Summary" and dated December 1959; it supports at most that Monsanto sold Aroclor products to some U.S. government entities in 1959 and the prior year.

Exhibit 16 (ECF No. 283-17) appears to be a Monsanto internal memo dated September 8, 1970, regarding a customer called Marblette Company; the memo reflects that Marblette had a government contract to provide electrical wire, that Aroclor 1254 was used in the wire, and that the military had approved that use. It does not establish the timeframe or duration of that contract, or that the use of Aroclor was required as opposed to permitted.

Furthermore a Monsanto internal memo dated January 21, 1957, from R. Emmet Kelly, one of the medical doctors at Monsanto, reflects that Monsanto discussed with the U.S. Navy the potential for using PCB-containing product Pydraul 150 in submarines, but "[n]o matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine." Ex. 33 (Moore Dep.) at 32:9–36:19.

7. After Old Monsanto decided in the early 1970s to terminate PCB manufacturing for certain applications like paint, adhesives and sealants, the federal government invoked the Defense Production Act to order Old Monsanto to manufacture PCBs for such uses by military contractors. *See* Ex. 17 at 1 (directing Old Monsanto to accept purchase orders for Aroclor 1242 "pursuant to Section 101 of the Defense Production Act of 1950"). Old Monsanto complied with the government's directive, but it explained that it had otherwise ceased selling PCBs "for the uses which we understand [the defense contractors] intend for the Aroclor 1242," in light of "the increasing environmental concerns expressed about products containing polychlorinated biphenyls (PCBs)." *See* Ex. 18 at 1.

**RESPONSE: Admitted.**

8. From the 1930s to the 1970s, PCBs were also deemed essential to the maintenance of the nation's electric grid. In 1971, the federal government convened an Interdepartmental Task Force, which in 1972 issued a report determining the continued use of PCBs to be "necessary" in certain electrical applications because no alternative product was available. *See* Ex. 19 at 14. The report stated that the "use of PCBs should not be banned entirely," and that the "continued use for transformers and capacitors in the near future is considered necessary because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use." Ex. 19 at 2-5, 81.

**RESPONSE: Not supported by the record citation.** The cited material does not support that "PCBs were . . . deemed essential to the maintenance of the nation's electric grid" at any point prior to May 1972.

9. Knowledge about the potential environmental and health effects of PCBs has changed over time. Ex. 20 at 73, 77. According to the City's chemical expert, Dr. Mitchell Erickson, "[e]nvironmental PCB analysis emerged in the late 1960s, as instrumentation and techniques became available and scientists slowly became aware of PCBs in various environmental compartments." Ex. 21 at 31; *see* Ex. 22 at 135, 136 (until at least the 1960s, "there was no instrumentation available to detect" PCBs in the "air"). Before that, "[t]he techniques and technology to conduct analysis at the trace levels needed were not available . . . to find PCBs in the environment or to evaluate PCBs' environmental properties." Ex. 21 at 31. Indeed, "[n]ot only were there limits to the technology to find PCBs at part-per-million and part-per-billion levels, but there was a lack of awareness. Scientists did not even know to ask the question." Ex. 21 at 31. As late as 1988, an EPA scientist researching PCBs found no convincing clinical evidence that PCBs cause chronic health effects in humans. Ex. 20 at 142-43.

**RESPONSE: Disputed.**

Monsanto knew from early on that PCBs could be toxic and harmful to humans. By the late 1930s and early 1940s, Monsanto was aware that PCBs are toxic because it had observed health problems in workers at the Anniston facility and published studies had documented that inhalation exposure produced systemic toxicity in rats. ECF No. 283-39 (Olson Dep.) at 194:1–196:11. Those early studies on rats failed to observe any dose that was without toxicity; that is significant because humans cannot be dosed with PCBs for research purposes, so animal studies are necessary to establish a safe level of exposure for humans. ECF No. 283-39 (Olson Dep.) at 194:1–197:17. Even today, according to the National Institute for Occupational Safety and Health (NIOSH), "human and animal studies have ***not*** demonstrated a level of exposure to PCB's that will ***not*** subject the worker to possible liver injury." *Polychlorinated Biphenyls (PCB's): Current Intelligence Bulletin 45*, NIOSH, tinyurl.com/4bykn5sy (emphasis added) (cited by Monsanto, *see* Mot. for Summ. J. Dfts.' 1st Am. Countercl. (ECF No. 263) at 7 ¶ 13).

Monsanto also knew that PCBs would persist in the environment. During the PCB manufacturing period, Monsanto understood that there would be "some persistence associated with PCBs that were released in the environment by whatever mechanism." Ex. 1 (Dfts. Corp. Rep. Dep.) at 342:5–24. The chemical structure of PCBs has been known in the literature since the late 1800s. Ex. 1 (Dfts. Corp. Rep. Dep.) at 249:2–12, 537:2–10; Ex. 5 (Dfts. Corp. Rep. Dep. Ex. 43). Persistence and stability are chemical properties of PCBs that dictate their behavior in the environment. Ex. 3 (Reible Dep.) at 150:11–16. PCBs' chemical stability, insulating properties, and inflammability contribute to their presence in the environment. Ex. 6 (Boston Report) at 9. Monsanto understood throughout the PCB manufacturing period that PCBs are persistent and stable. Ex. 3 (Reible Dep.) at 37:4–38:23, 106:10–21.

10. Knowledge of alternatives to PCBs for various industrial applications—and willingness to use them—has also changed over time. For instance, fire-safety developments in the 1970s provided several new approaches to mitigating fire risks, including the rise of improved automatic sprinkler systems and other fire systems, leading to greater willingness to

use non-PCB fluids in electrical equipment. Ex. 2 at 86-87. Still, even into the 1980s, no one-for-one substitutes had yet been developed to substitute for PCB fluids in reducing fire risks. Ex. 2 at 27-31, 83-88.

**RESPONSE: Admitted.**

11. In addition to PCBs manufactured for use in end products, a variety of industrial processes involving the presence of chlorine, carbon, and high temperatures generate PCBs as an inadvertent byproduct. Ex. 5 at 5; *see* 47 Fed. Reg. 24,976, 24,989 (EPA June 8, 1982) ("PCBs can be generated from virtually any starting hydrocarbon structure," and "PCB formation appears to be possible whenever chlorine and carbon are present in a reaction vessel at elevated temperatures"). Such processes include pigment production, the manufacturing of silicone products and their precursors, secondary copper smelting operations, the manufacturing of metallic titanium, and the synthesis of dozens of other organic chemicals. Ex. 5 at 6; Ex. 21 at 99-100; Ex. 6 at 31.[4]

**RESPONSE: Disputed.**

City expert Dr. Keri Hornbuckle is a University of Iowa Distinguished Chair (the highest rank at the University of Iowa, held by only about a dozen of over 5,000 professors at the university) who has studied PCBs for 35 years and inadvertent PCBs for over 10 years. Hornbuckle Dep (Ex. 29) at 136:7-13, 139:6-13, 143:14–144:10. Hornbuckle knows inadvertent PCBs to be produced only by the manufacturing of brilliantly-colored organic pigments and silicon rubber. *Id.* at 92:10–16. Hornbuckle read all of the references in Monsanto's experts' reports and found no evidence to support the assertion that inadvertent PCBs are produced through the production of titanium dioxide. *Id.* at 98:21–99:18. Hornbuckle also evaluated whether other industrial firms in the East St. Louis could be a significant source of PCBs in the East St. Louis soil by looking for silicon rubber produces, brightly-colored paint pigment producers, or chemical manufacturing plants; she did not identify any such facilities of size other than the Krummrich plant, and did not find any explanation for the high concentration of PCBs in East St. Louis

---

[4] Facilities performing these types of processes were located near the Sauget Plant, which is situated "in a heavily industrialized area, referred to as the Sauget Industrial Corridor." Ex. 5 at 14; Ex. 23 at 361. As of 2000, "active . . . facilities in the area included Big River Zinc (zinc smelter), Cerro Copper (copper smelter), Clayton Chemical (waste oil and spent solvent recycling and recovery), Ethyl Corporation (petroleum additives), Resource Recover Group (waste recycling), Sterling Steel Castings (foundry), Trade Waste Incineration (hazardous waste treatment), and Union Electric (electricity distribution), in addition to bulk storage warehouses." Ex. 5 at 15. Several of these industrial facilities, including Cerro Copper and Sterling Steel Castings, were in the immediate vicinity of Old Monsanto's Sauget Plant. Ex. 5 at 87 (Fig. 3.3). The operations of any of these facilities "may be associated with [byproduct] PCBs." Ex. 5 at 39-42 (identifying "more than 100 possible sources that could have handled or released PCBs . . . located in the vicinity of" East St. Louis, and explaining that documented uses "includ[e] paint and/or ink processing/manufacturing, metal foundries, and other metals manufacturing and/or scrapping facilities, specialty chemical companies, disposal sites and junkyards, electrical utilities, and rail operations").

except for the Krummrich plant that purposefully produced about a quarter of the world's total PCBs. *Id.* at 147:2–17, 155:23–156:18, 169:3–17.

Monsanto expert Kurt Herman (whose report is cited as above as Exhibit 5 (ECF No. 283-6)) admits that he cannot say that any of the alternative PCB sources that he identified are "actual[ ] sources" of PCB contamination in the City, or that any of the sources he identified contributed even one pound of PCBs to the PCB contamination in the City. Ex. 19 (Herman Dep.) at 45:1–47:11, 48:3–10. He identified "potential" sources, but did not go further to see if they are "actual" or "probable" sources of the PCB contamination at issue in this case. *Id.* at 67:24–68:8. Nor did Herman consider wind data in connection with analysis of those alternative sources. *Id.* at 49:5–8. Herman admits that the Krummrich plant contributed "some" of the PCB contamination found on the Tested Parcels. *Id.* at 50:4–51:5.

Monsanto expert Brian Hitchens (whose report is cited above as Exhibit 6 (ECF No. 283)) admits he has no estimate of the mass or volume of PCBs emitted from any non-Krummrich source. Ex. 2 (Hitchens Dep.) at 179:13–17, 180:21–181:4, 196:9–24. Likewise, Hitchens cannot say what percentage of the PCBs found in the City came from any non-Krummrich source, and cannot say that 100% of the PCBs found in the City came from non-Krummrich sources. *Id.* at 95:22–25, 97:2–23. Hitchens admits that the PCBs found on some parcels are not typically created as byproduct PCBs, and the Krummrich facility is the likely source of those. *Id.* at 141:6–142:2.

City expert Dr. Mitch Erickson (whose deposition testimony is cited above as Exhibit 21 (ECF No. 283-22)) testified that any PCBs produced through combustion of organic compounds containing carbon, hydrogen, or chlorine are "typically very small low-yield chemical reactions." *Id.* at 100:7–19.

12. The burning of household trash can also generate PCBs. Ex. 21 at 100.

**RESPONSE: Admitted in part and disputed in part.** Admitted that it may be possible for the burning of household trash to generate PCBs; disputed that the amounts generated are material or relevant in this case. Monsanto expert Brian Hitchens admits that he has no data on the mass or volume of PCBs that may be generated from the burning of household trash except for an EPA estimate of 2.86 milligrams (mg) of PCBs released per kilogram of burned household trash, or 6.87 mg of PCBs per household per day; he further admits has no data regarding the number of times that household trash was burned on any of the Tested Parcels. Ex. 2 (Hitchens Dep.) at 201:8–202:3, 207:12–15. For comparison purposes, one pound is equal to 453,592 mg, and Monsanto expert Danny Reible admits that the Krummrich plant emitted five pounds of PCBs (or 2,267,960 mg) to the atmosphere on average for each day that the plant produced PCBs from 1936 to 1977. Ex. 3 (Reible Dep.) at 25:21–27:15.

13. Byproduct PCBs "have been produced globally both before and after [the Toxic Substances Control Act] was enacted." Ex. 5 at 6. Today, "byproduct PCB generation may, in fact, exceed peak product PCB production." Ex. 5 at 7.

**RESPONSE: Disputed.** The assertion that "byproduct PCB generation may, in fact, exceed peak product PCB production" is based on a 2024 paper titled "Is current generation of polychlorinated biphenyls exceeding peak production of the 1970s?" by David Megson, Ifeoluwa Grace Idowu, and Courtney D. Sandau (the "Megson Paper"). *See* ECF No. 283-6 (Herman Report) at 5 (citing Megson Paper); Ex. 34 (Erickson Dep. Ex. 11) (Megson Paper). The Megson Paper is not a peer-reviewed scientific article, but a "discussion paper," which is "like an opinion." Hornbuckle Dep. (Ex. 29) at 158:5–19. The Megson Paper is "pure speculation" and makes assumptions that are "not reasonable," including that all chemical manufacturing plants in the United States released as many inadvertent PCBs as the EPA permitted maximum amount of release, which is "not a reasonable hypothesis" and "not backed up with any data." *Id.* at 158:14–159:17. Moreover, the Megson Paper was published during the pendency of this litigation by authors including Court D. Sandau, who Monsanto proffered in this litigation as a retained expert witness (*see* ECF No. 270-1 at 5),[5] and includes the "Declaration of competing interest" that Sandau "reports a relationship with Monsanto Co. that includes: consulting or advisory and paid expert testimony" and that the other authors "are also . . . associated with these litigation matters." Ex. 34 (Erickson Dep. Ex. 11) at 6.

Furthermore, Exhibit 5 (ECF No. 283-6) is the expert report of Kurt Herman. The report is unverified and unsworn, and is not accompanied by an affidavit or declaration, and therefore is inadmissible for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Est. of Northington v. City of Indianapolis*, No. 1:21-CV-00406-RLM-TAB, 2023 WL 11970037, at *3 (S.D. Ind. Mar. 31, 2023) (refusing to consider on summary judgment party's own expert report that is not verified, sworn, or accompanied by affidavit or declaration) ; *Mickelson v. Mickelson*, No. 11 C 5061, 2013 WL 3774004, at *5 (N.D. Ill. July 18, 2013) (same).

## II. Monsanto's W.G. Krummrich Plant

14. Old Monsanto's Sauget Plant began producing PCBs in 1936, after Old Monsanto acquired Swann Chemical Company in 1935 and the rights to its Aroclor patent. Ex. 5 at 2, 5.

**RESPONSE: Admitted.**

15. Old Monsanto manufactured Aroclors at the Sauget Plant from 1936 until 1977. Ex. 6 at 3. Old Monsanto also manufactured Aroclors at a plant in Anniston, Alabama. Ex. 6 at 2. The company produced 12 types of Aroclors, designated by number. Ex. 6 at 4. The last two digits represent the percentage of chlorine in the mixture; Aroclor 1254, for example, consisted of 54% chlorine. Ex. 6 at 4. Liquid Aroclors, which included 1221, 1016, 1242, 1248, 1254, 1260, and 1262, were the most common Aroclors in production. Ex. 6 at 4.

---

[5] On April 2, 2024, after the City filed its motion to exclude Sandau's expert testimony (ECF No. 270), counsel for Monsanto notified the City by letter that "Defendants hereby withdraw their expert designation of Court D. Sandau, Ph.D. . . . Dr. Sandau will not be testifying at trial, and none of our other experts will rely on Sandau's opinions." Ex. 35 (Hobbs Ltr.).

**RESPONSE: Admitted.**

16. Old Monsanto took steps to ensure that PCBs would not escape from the Sauget Plant. From the beginning, Old Monsanto designed the manufacturing process to be an enclosed process. Ex. 24 at 611-12. In the 1960s, Old Monsanto further reviewed the PCB-manufacturing process to ensure that there were no intentional releases of PCBs into the atmosphere. Ex. 24 at 599-600. The company also built a dedicated wastewater treatment plant for the company's complex; as a result, Old Monsanto's sewage waste from the Sauget Plant was never released into East St. Louis. Ex. 25 at 699-700; Ex. 5 at 22-23. And in the late 1960s and early 1970s, the company installed a series of settling basins and catch tanks to minimize the loss of PCBs in the manufacturing process. Ex. 24 at 694.

**RESPONSE: Disputed.** Almost all of the PCB manufacturing process at the Krummrich plant was an outdoor process, exposed to the elements; the Krummrich plant did not have a roof. Ex. 1 (Dfts. Corp. Rep. Dep.) at 93:6–15, 341:8–14. In the 1930s and 1940s, Monsanto adapted a mechanism by which it ventilated PCBs and residues to the outside atmosphere. *Id.* at 45:10–15. It was the modus operandi at the Krummrich plant through the entire PCB manufacturing period to "fume out" PCB emissions to outside. *Id.* at 45:16–22. The PCBs were vented to reduce the concentrations in the area where the workers were and transport the PCB concentration somewhere else. *Id.* at 608:1–6. When the PCB fumes or emissions were vented away from the workers, they were vented to the atmosphere by wind and air. *Id.* at 211:15–24. Vents were specific places in the manufacturing process where there was the opportunity for PCB vapors to be emitted into the general plant atmosphere and be disseminated by air currents to the atmosphere. *Id.* at 212:10-20.

17. In 1971, Old Monsanto began operating a state-of-the-art incinerator "to safely dispose of PCBs." Ex. 3 at 7; Ex. 5 at 23. This was a significant investment—at the time, "other commercially available waste incinerators were not able to manage a PCB waste stream." Ex. 6 at 2. Old Monsanto's operation of the incinerator was "closely monitored" by the EPA "to confirm that it was operating as designed," and at normal operating temperatures, it "achieved 99.9998% destruction of PCBs." Ex. 6 at 2. The EPA inspected Old Monsanto's incinerator in 1976, concluding that the exhaust from the incinerator was essentially PCB-free. Ex. 24 at 725-30.

**RESPONSE: Admitted.**

18. Despite the fact that there are active clean-up activities around the plant in Sauget, no regulatory authority—neither the federal EPA nor the Illinois Environmental Protection Agency—requested that Old Monsanto clean up the parcels at issue in this litigation or placed them on the national priorities list. Ex. 25 at 703. The City also never notified the company of any alleged PCB contamination in East St. Louis. Ex. 25 at 703.

**RESPONSE: Admitted in part and disputed in part; not supported by the record citation.** The cited testimony from Exhibit 25 (ECF No. 283-26) supports only that the City did not tell Monsanto that "it needed cleanup [of] parcels of land within [the City] for alleged PCB contamination" "during [the witness's] time at Monsanto"; *id.* at 703:21–25; the witness's time at

Monsanto (or related entities) was from February 1966 to 1974 and 1975 to 1997, *id.* at 683:23–684:1, 685:20–686:13; Ex. 36 (Dfts. Corp. Rep. Dep. Ex. D1). Otherwise, admitted.

19. Old Monsanto "voluntarily ceased sales of open-use PCB systems in 1970, and by 1972, had ceased sales of semi-closed systems." Ex. 5 at 18. It voluntarily ceased all production in 1977, two years before the EPA banned the production of most PCBs. Ex. 2 at 113; Ex. 5 at 19; Ex. 3 at 4.

**RESPONSE: Admitted.**

20. In 1979, as information about PCBs' potential health effects continued to emerge, the EPA required manufacturers largely to cease PCB production under the Toxic Substances Control Act of 1976 ("TSCA"). Ex. 5 at 5; *see* Ex. 1 at 9; 15 U.S.C. § 2605(e)(2)(A). The EPA's regulations, however, continue to permit PCB use in completely closed applications, Ex. 5 at 5, and they "allow inadvertently generated PCBs . . . at defined concentrations, under certain conditions, and with requirements to report to EPA and maintain certain records," EPA, Learn About Polychlorinated Biphenyls (July 26, 2024), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls.

**RESPONSE: Admitted.**

## III. EPA's Regulatory Authority Under TSCA And CERCLA

21. Today, the EPA regulates sites potentially contaminated by PCBs under both TSCA and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

**RESPONSE: Admitted.**

22. TSCA provides specific standards for the cleanup and disposal of PCB waste based on the intended use of the site and the type of PCB waste present. As relevant here, "[u]nder TSCA the cleanup goal for PCBs in low occupancy areas, such as vacant lots, is 25 [ppm]." Ex. 5 at 30-31. The "low occupancy" designation is "consistent with the current use of the occupied parcels" in this case. *See* Ex. 5 at 30 ("low occupancy" means annual occupancy "for less than 335 hours (an average of 6.7 hours per week) for bulk PCB remediation waste (soils)" under 40 C.F.R. § 761.3). The City's soil-sampling expert, Kevin Coghlan, agreed that all properties at issue here are "low occupancy" under TSCA. Ex. 26 at 132.

**RESPONSE: Disputed.**

Exhibit 5 (ECF No. 283-6) is the expert report of Kurt Herman. The report is unverified and unsworn, and is not accompanied by an affidavit or declaration, and therefore is inadmissible for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Est. of Northington v. City of Indianapolis*, No. 1:21-CV-00406-RLM-TAB, 2023 WL 11970037, at *3 (S.D. Ind. Mar. 31, 2023) (refusing to consider on summary judgment party's own expert report that is not verified, sworn, or accompanied by affidavit or declaration) ; *Mickelson v. Mickelson*, No. 11 C 5061, 2013 WL 3774004, at *5 (N.D. Ill. July 18, 2013)

(same). Moreover, it is inappropriate for an expert witness to interpret the meaning of regulations. *See, e.g.*, *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The only legal expert in a federal courtroom is the judge," so it was impermissible for expert witness to "testif[y] about the meaning of the statute and regulations"); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900–01 (7th Cir. 1994) (district court made "a serious mistake" by allowing experts to "testif[y] that the [matter at issue] did not comply with the federal standards," because "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts"), *abrogated in irrelevant part by Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1012–14 (7th Cir. 2020); *Wildearth Guardians v. Pub. Serv. Co. of Colo.*, 853 F. Supp. 2d 1086, 1090 (D. Colo. 2012) (impermissible for expert witness to interpret and apply the Clean Air Act, its regulations, and state's implementation plan).

Furthermore, the TSCA does not preempt or otherwise govern the City's claims in this action. *See* 15 U.S.C. §§ 2617(g)(1)(A) ("Nothing in this chapter . . . nor any standard, rule, [or] requirement . . . implemented pursuant to this chapter, shall be construed to preempt, displace, or supplant any State or Federal common law rights . . . ."); (g)(1)(B) ("[N]othing in this chapter . . . shall preempt or preclude any cause of action for . . . property damage, or other injury based on negligence, strict liability . . .or any other legal theory of liability under any State law."); (g)(2)(A) ("Nothing in this chapter . . . nor any rules, regulations, requirements, . . . or orders issued pursuant to this chapter shall be interpreted as . . . dispositive in any civil action."); 2619(c)(3) ("Nothing in this section shall restrict any right which any person . . . may have under . . . common law . . . to seek any other relief."). Consistent with those express statements, courts have held the TSCA does not preempt common law claims. *See, e.g.*, *Chappell v. SCA Servs., Inc.*, 540 F. Supp. 1087, 1100 (C.D. Ill. 1982) (TSCA does not preempt common law nuisance claim arising from defendant's operation of PCB-containing landfill). Hence the TSCA standards are irrelevant and inadmissible under Federal Rule of Evidence 402 and inadmissible on summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

23. TSCA's implementing regulations include detailed procedures, including for self-implementing cleanups. They impose "specific regulations on pre- and post- remedial sampling of PCB-contaminated waste." Ex. 5 at 11; 40 C.F.R. § 761.61(a)(2). Before any corrective action for PCBs may be taken, the EPA must be notified. *See* 40 C.F.R. § 761.61(a)(3)(i) ("At least 30 days prior to the date that the cleanup of a site begins, the person in charge of the cleanup or the owner of the property where the PCB remediation waste is located shall notify, in writing, the EPA Regional Administrator[.]"). The City's expert, Coghlan, admitted that the "type of corrective action . . . prescribed in [his] expert witness report" would "likely" "require EPA notification and approval." Ex. 26 at 122.

**RESPONSE: Disputed.** The City incorporates by reference its response to SMF ¶ 22.

24. CERCLA, meanwhile, authorizes the federal government to respond to the release of PCBs and created the Superfund trust to pay for federal response actions. Ex. 5 at 7. "The CERCLA response process requires a series of steps including preliminary site assessment and inspection, completion of a remedial investigation (RI) and feasibility study (FS), remedy selection, remedial design, and remedial action before site completion and closure." Ex. 5 at 7; *see* 42 U.S.C. ch. 103.

**RESPONSE: Disputed.** The City incorporates by reference its response to SMF ¶ 22. The CERCLA, like the TSCA, does not preempt or otherwise govern the City's claims in this action. *See* 42 U.S.C. §§ 9652(d) ("Nothing in this chapter shall affect . . . the obligations or liabilities of any person under other . . . State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants."); 9659(h) ("This chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law . . . ."). Consequently, courts have held that it generally does not preempt state law actions. *See, e.g.*, *Vill. of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 786–87 (7th Cir. 2008) (CERCLA did not preempt Illinois municipality's action under nuisance ordinance). Hence the CERCLA standards are irrelevant and inadmissible under Federal Rule of Evidence 402 and inadmissible on summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

25. Under CERCLA, the EPA provides "Regional Screening Levels" that apply to all U.S. regions and are intended to provide a uniform screening standard for chemical exposure levels at Superfund sites. The presence of a chemical in excess of a Regional Screening Level simply means that additional work should be undertaken to determine whether remediation is needed. Ex. 1 at 16, 50-51. The EPA has made clear that these Regional Screening Levels "are *not* cleanup standards and should *not* be used as cleanup levels." Ex. 5 at 10 (quoting EPA, *Regional Screening Levels* (2023), https://www.epa.gov/risk/regional-screening-levels-rsls) (emphases added). The question whether remediation is needed—and, if so, what kind of remediation—depends on the chemical levels and the nature of the location. Ex. 5 at 29; Ex. 7 at 14; Ex. 6 at 37, 49.

**RESPONSE: Disputed.** The City incorporates by reference its response to SMF ¶¶ 22 and 24. Exhibit 1 (ECF No. 283-2), Exhibit 6 (ECF No. 283-7) and Exhibit 7 (ECF No. 283-8) are the expert reports of Catherine Boston, Brian Hitchens and Danny Reible, respectively. Those reports are unverified and unsworn, and are not accompanied by an affidavit or declaration, and therefore are inadmissible for summary judgment purposes for the same reasons as the report of Kurt Herman.

Furthermore, Monsanto has judicially admitted that regional screening levels "are risk-based concentrations derived from standardized equations combining exposure information assumptions with EPA toxicity data" and "are considered by the [EPA] to be protective for humans (including sensitive groups) over a lifetime." ECF No. 179 (1st Am. Countercl.) ¶ 28.

26. After Old Monsanto ceased PCB production, the EPA undertook PCB cleanup actions for the Sauget Plant, as well as at two neighboring Superfund sites in the Sauget area. Ex. 26 at 30; Ex. 27 at 4; Ex. 28 at 1; *In re Solutia Inc., 500 Monsanto Ave., Admin. Order On Consent*, U.S. EPA Region 5, Docket No. R8H-5-00-003 (May 3, 2000). Site clean-ups concluded as early as 2000. *See* U.S. Env't Prot. Agency, *Five Year Report, Sauget Area 2 Superfund Site* 17 (June 26, 2008), https://semspub.epa.gov/work/05/302666.pdf ("removal action" to address PCB contamination in Sauget Area 2 "was completed on April 5, 2000").

**RESPONSE: Admitted.**

27. Both the EPA's involvement and the alleged soil contamination in the south end of East St. Louis (where the claimed parcels are located) were well-known by the 2000s. Ex. 29 at 47 (City Manager explaining that he knew that EPA "did some studies and some testing at one period of time . . . and determined that there was some high levels of contamination in the south end area"); Ex. 30 at 68-69 (City Manager testifying that prior to 2006, when he worked for the Housing Authority, he knew that "the south end portion of town" is "a contaminated area," which affected housing-development ideas); Ex. 31 at 57-58 ("very clear that there was soil contamination in the south end pertaining to Monsanto"); Ex. 32 at 10 (in connection with Sauget site clean-ups, "[e]veryone EPA spoke with said they knew there was contamination in the area"); Ex. 30 at 44-45 (alleged industrial contamination, along with Old Monsanto's cessation of PCB production and the ban on PCBs in the late 1970s, "was certainly no secret in the community").

**RESPONSE: Admitted in part and disputed in part; not supported by the record citation.**

The cited testimony from Exhibit 29 (ECF No. 283-30) does not support the assertion that witness Robert Betts knew about contamination within the City. Betts testified that he was aware of testing which "determined that there was some high levels of contamination in the south end *area*," but he then clarified that he was referring to "a cleanup of some sort *in Sauget* some years ago [that] *fell short of including East St. Louis*." *Id.* at 47:18–22, 48:5–9. Moreover, Betts did not acquire that knowledge when he was "at City Hall" as City Manager; it was just his "knowledge being a resident of East St. Louis." *Id.* at 48:10–12. And Betts did not know for sure what kind of contamination was at issue. *Id.* at 46:23–48:1 ("Probably lead and probably PCBs. I'm not sure exactly. I haven't seen the report per se.").

Exhibit 30 (ECF No. 283-31) is represented to be the testimony of the City Manager; it is in fact the testimony of Dr. Randall Bell, the City's real estate expert, and is unrelated to the assertions made.

The cited testimony from Exhibit 31 (ECF No. 283-32) refers to "soil contamination . . . pertaining to Monsanto" generally, not PCBs specifically. *Id.* at 58:4–6.

The cited statement from Exhibit 32 (ECF No. 283-33) are the hearsay statements of unidentified persons who purportedly told the EPA that the knew of "contamination in the area." These statements are not within any hearsay exception and therefore are inadmissible on summary judgment. *Prude*, 76 F.4th at 661. Moreover, there is no basis to conclude that the "area" referenced is within the City rather than Sauget or elsewhere. The Sauget Area cleanup projects did not include East St. Louis, *see* Ex. 30 (Wagner Dep.) at 51:1–23, and the City was not told about them. Ex. 22 (City Corp. Rep. Dep.) at 37:20–38:6 ("[T]here were environmental studies going on directly adjacent to the City, and no one involved in those environmental studies, including [Monsanto], notified the city of issues.").

Otherwise, admitted.

28. Indeed, the longtime City Attorney for East St. Louis (serving from 1999 to 2017) was for a time simultaneously counsel for the Village of Sauget at the Area 1 and Area 2 Superfund proceedings. Ex. 33 at 38, 41; Ex. 34 at 43. He testified that "everybody at city hall

was aware of environmental cleanup" occurring "directly to the south of city hall." Ex. 33 at 38. He also testified that he believed the City was "aware that there was a Super Fund cleanup that was underway there. . . . I think it was general knowledge in the community." Ex. 33 at 41.

**RESPONSE: Disputed; not supported by the record citation.**

The cited testimony from Exhibit 33 (ECF No. 283-34), the deposition of Michael Wagner as Rule 30(b)(6) representative for the City, is taken out of context. Wagner's testimony is that the City's officials "were aware that there was a Super Fund cleanup," but "*[a]s to specifics, I don't think they had any knowledge*." *Id.* at 41:3–5 (emphasis added). While City Hall "was aware of [the] environmental cleanup," Wagner does not believe there were "specific conversations about PCBs." *Id.* at 38:18–21. "[N]o one involved in those environmental studies, including [Monsanto], notified the city of issues." *Id.* at 37:22–38:1.

29. To investigate the effects of historical manufacturing, the EPA also tested the south end of the City for PCB contamination in 2009 and renewed its testing in 2012. Ex. 34 at 79-82; Ex. 35 at 1. Between 2012 and 2016, the EPA sent letters to two City mayors about the presence of PCBs in the south end of the City. *See* Ex. 34 at 83, 94; Ex. 33 at 220-27; Ex. 35 at 1. Initial sampling revealed PCB levels ranging from 0.2 to 17 ppm, and the EPA suggested "additional investigation in this area to assess how contamination levels should be considered during future development." Ex. 34 at 1; *see also* Ex. 6 at 38. The EPA, however, has since taken no further action, and the City has not engaged with the EPA to take additional steps. Ex. 33 at 184, 186-87; Ex. 34 at 57-58, 93; Ex. 26 at 37-38, 123.

**RESPONSE: Admitted in part and disputed in part; not supported by the record citation.**

The cited testimony does not reflect that the City received any letters from the EPA about PCB contamination. Exhibit 35 (ECF No. 283-36) is a document that, on its face, appears to be letter from the EPA Region 5 to former City Mayor Emeka Jackson-Hicks dated September 9, 2016. Michael Wagner was the City's corporate counsel as of September 2016, was one of the City officials primarily responsible for communicating with the EPA, and reviewed a "large" repository of City documents in connection with his Rule 30(b)(6) testimony in this case. ECF No. 283-35 (Wagner Dep.) at 79:12–20, 82:14–83:12; ECF No. 283-34 (City Corp. Rep. Dep.) at 16:22–17:19, 39:3–40:13. Wagner testified that he had never seen the September 2016 letter or otherwise been made aware of it until it was presented to him at his deposition in this case; nor was he otherwise aware that the EPA conducted PCB sampling in East St. Louis during the 2009 to 2015 timeframe. ECF No. 283-35 (Wagner Dep.) at 79:12–17, 80:8–82:10, 85:4–9; ECF No. 283-34 (City Corp. Rep. Dep.) at 161:2–163:5.

Wagner likewise testified that he had no knowledge of the City receiving an undated, unsigned document that, on its face, appears to be a letter from an EPA project manager to former City Mayor Alvin Parks. ECF No. 283-35 (Wagner Dep.) at 93:22–99:8; Ex. 37 (Wagner Dep. Ex. 18); ECF No. 283-34 (City Corp. Rep. Dep.) at 163:6–164:3.

Wagner likewise testified that, before his deposition in this case, he was not aware of an EPA fact sheet dated October 2012 that refers to PCB sampling that the EPA purportedly conducted in East St. Louis in 2012; Wagner did not know whether the City ever received that document. ECF

No. 283-35 (Wagner Dep.) at 99:13–103:13; Ex. 32 (Wagner Dep. Ex. 19); ECF No. 283-34 (City Corp. Rep. Dep.) at 164:7–17.

Otherwise, admitted.

## IV. The City's Lawsuit

30. On February 3, 2021—more than 40 years after Old Monsanto ceased manufacturing PCBs at the Sauget Plant in 1977—the City filed this lawsuit against Defendants in the Circuit Court of St. Clair County, Illinois. Defendants removed the case to this Court on March 1, 2021, Dkt. 1, and the City filed its operative, Second Amended Complaint on April 24, 2023, Dkt. 129.

**RESPONSE: Admitted.**

31. The City is represented in this litigation by private attorneys retained by the City pursuant to a contingency-fee agreement. East St. Louis City Council Meeting (Jan. 9, 2020), https://www.facebook.com/estlcityhall/videos/527243471479394 (noting that The Driscoll Firm represents the City on contingency and stands to gain one-third of the City's recovery). It asserts multiple common-law and ordinance-based causes of action based on alleged PCB contamination purportedly released from the Sauget Plant. The City stakes its claims on PCB levels detected in soil samples collected at 273 vacant parcels of real estate. Dkt. 129 ¶¶ 10, 11.

**RESPONSE: Admitted.**

32. Discovery has revealed that the City owns only 100 of the 273 properties at issue. *See, e.g.*, Ex. 36 at 1.

**RESPONSE: Admitted.**

33. The City recently attempted to orchestrate an assignment of claims for 73 additional properties, but it now acknowledges that this assignment was invalid. Ex. 29 at 51-54.

**RESPONSE: Not supported by the record citation.** The cited testimony is from the deposition of the City's City Manager, Robert Betts, and is unrelated to the assertion made.

## A. The Vacant Properties

34. During discovery, the City produced a list of 273 properties in the southern part of East St. Louis that it claims have been contaminated by Old Monsanto's operations in Sauget. *See* Ex. 37; Ex. 4 at 2; Ex. 6 at 6 n.4.

**RESPONSE: Admitted.**

35. The 273 parcels are vacant, undeveloped lots that serve no residential or commercial purposes. Ex. 30 at 106, 129. The City's damages expert, Dr. Bell, noted: "[T]he 273 properties today are vacant a hundred percent." Ex. 30 at 20, 21-24; *see also* Ex. 6 at 37 ("At the time of and since the 2022 sampling event, all of the City-owned parcels with representative data

were undeveloped and vacant."). He also noted that many of the parcels are "not accessible to a paved street" because the "streets have decayed to the point of not being recognizable streets." Ex. 30 at 150. The City's corporate representative, Michael Wagner, likewise testified that, without going through each parcel individually, he was confident that "the vast majority of [the parcels] are vacant." Ex. 33 at 69.

**RESPONSE: Admitted in part and disputed in part; not supported by the record citation.** The cited portions of Exhibit 30 (ECF No. 283-31) do not support that the lots "serve no residential or commercial purposes." Rather, "the majority of [the lots] were once developed." *Id.* at 106:21–23. That the parcels are vacant now makes them "ripe for redevelopment" (putting aside the PCB contamination) because the "parcels . . . [can be] package[d] . . . together to make them attractive for redevelopment for new construction," and "there's no resident[s] that live[ ] there that [developers are] going to have to relocate." ECF No. 283-34 (City Corp. Rep. Dep.) at 240:8–241:15. Otherwise, admitted.

36. The City's sampling expert Coghlan testified that most of the lots lack any structures in which anyone could conceivably reside, Ex. 26 at 82; indeed, as of 2023, only four structures of any sort existed on any of the lots, Ex. 5 at 29. Coghlan also testified that, "given the conditions of the lots," they likely "have been vacant for some time." Ex. 26 at 82, 105. He noted that most of the parcels are overgrown by vegetation, which imposes "a natural barrier to occupancy on the lot, from people spending any time on the lots." Ex. 26 at 83-84.

**RESPONSE: Admitted in part; not supported by citation to the record.** Exhibit 5 is the unverified and unsworn expert report of Kurt Herman, and is inadmissible on summary judgment as set forth in response to SMF ¶ 13. Otherwise, admitted.

37. Coghlan further testified that, other than his sampling crew, he was unaware of anyone who had been potentially exposed to PCBs on the lots. Ex. 26 at 116-18. And "as long as the lots are vacant and no one's exposed," he explained, "you can't have the risk" of harm to human health from PCBs. Ex. 26 at 115. None of the City's experts offered any opinion "on the magnitude of actual human health risk that might exist to entrants on any of the parcels" at issue. Ex. 26 at 115; Ex. 38 at 56 (explaining that those who were "not in a location" were "not likely to have excess exposure").

**RESPONSE: Disputed.** Coghlan's testimony that no one has been exposed to PCBs on the parcels (except for the sampling team) is qualified in that "as soon as they become a residential lot, then that changes." ECF No. 283-27 (Coghlan Dep.) at 115:16–20. Monsanto expert Catherine Boston admits that the purpose of remediation is to prepare property for future use; "you remediate a site to clean up residual contamination to prevent *future* exposure." Ex. 38 (Boston Dep.) at 173:15–24 (emphasis added). Boston further admits that she is "in no position to try to speculate what the future risk management decisions could be," and that she "do[es]" not get to tell the City how they can use the parcels" in the future. *Id.* at 75:1–12, 172:6–14. Rather, the City "as the owner, decides the future use of its properties." *Id.* at 176:23–177:5. The City's desire is to make the properties safe for unrestricted use. ECF No. 271-11 (Coghlan Report) at 26 ("The desired outcome of any remediation of the East St. Louis neighborhood is to return it to unrestricted reuse amenable to residential occupancy."); ECF No. 271-12 (Coghlan

Dec.); ECF No. 283-39 (Olson Dep.) at 60:23–61:7 ("I don't know what plans the [C]ity has but to make [the lots at issue] safe for unrestricted use . . . .").

Furthermore, City experts Dr. James Olson and Dr. David Carpenter have opined that the PCB contamination on the parcels presents a human health risk both presently and if the parcels are to be occupied in the future. The Olson testimony cited above is qualified in that "exposure can be across some distance." ECF No. 283-39 (Olson Dep.) at 56:12–17. Olson's opinion in this case is that there is "increased risk due to the exposure to unacceptable levels of PCBs in soil," and that where the level of PCBs in soil is greater than 0.23 ppm, "there would be an unwanted excess exposure to risk, specifically [the] risk of cancer." *Id.* at 54:12–17, 62:14–17. This opinion is based on scientifically appropriate risk assessment methodology (including the most state-of-the-art exposure assessment quantification and the most recent toxicology data) to be protective at the level of one excess cancer case in one million people. *Id.* at 62:2–13. Olson's research in Anniston, Alabama (the location other than Sauget where Monsanto produced PCBs) has demonstrated that the presence of PCBs in soil is "clearly" a route of human exposure, and there is "fairly good" correlation between areas with heavily contaminated soil and higher PCB levels in human serum. *Id.* at 150:2–151:16. Carpenter similarly opines that, based on research he has done in other locations, "the residents of East St. Louis are at elevated risk for a number of different diseases," and "state[s] with confidence that a specific individual that is exposed to PCBs through contaminated soil is going to be at elevated risk for this whole litany of different diseases." Ex. 39 (Carpenter Dep.) at 38:8–20, 40:7–17. Those diseases include cancer, *id.* at 42:16–20 ("[T]here is no level of the PCB exposure that does not increase the risk specifically of cancer."), 112:2–5 (PCBs "cause every kind of cancer"); as well as reduced immune function, *id.* at 122:15–21 ("[T]he weight of the evidence says that PCBs reduce immune function."); and reduced cognitive function, *id.* at 124:1–125:18 ("[O]f all the PCB health effects, the effects on brain and behavior, specifically the IQ and memory, is the strongest.").

38. According to the City's own reports and historical newspapers, the area in which the parcels are located has, for decades, suffered from economic headwinds unrelated to environmental concerns about PCBs. The City's website explains that "the once heavily industrialized City has been a victim of an industrial decline and subsequent resident flight for many years." Ex. 39 at 2. According to a master development plan that the City adopted in 2011, the City's population peaked in 1950, and an "industrial exodus beg[a]n" in 1955 "with a 25 percent drop in employment at Alcoa, the largest employer in the area," followed by the 1959 closing of the Armour and Company slaughterhouse and the subsequent closing of Swift & Co. Ex. 40 at 127. As early as 1960, an East St. Louis Plan Commission report stated that the south end of the city already "contain[ed] the most extensive area in need of a major redevelopment program"—48% of the housing units in this area were classified as "dilapidated," and 29% lacked a private bathroom. Ex. 41 at 67, 76. By 1979, the "City's assessed value [had] fall[en] to $38 million, compared to $169 million in 1970." Ex. 40 at 127. A 1979 City Council resolution determined that a significant area of the south end of the City was "a slum, blighted and decadent area," without reference to PCBs. Ex. 42 at 3. And a 1983 newspaper article detailed how worsening economic conditions had transformed the "boom town," which was then experiencing significant "deca[y]." Ex. 42 at 1.

**RESPONSE: Disputed.** General awareness that PCBs had been emitted from Krummrich plant was a "serious contributory factor" and "principal reason" that the area of the Tested Parcels has

become a blighted area. Ex. 21 (Bell Rebuttal Dep.) at 85:6–86:22, 227:25–229:2. This is demonstrated, *inter alia*, by case studies showing that environmental concerns lead to blight and abandonment. ECF No. 283-31 (Bell Dep.) at 124:13–125:15, 235:3–237:11. Robert Betts is the City's City Manager; he lived in East St. Louis from 1970 to 2000, and previously served as Development Manager of the Housing Authority of East St. Louis from 1994 to 2006, as City Manager from 2006 to 2010, and as Director of Regulatory Affairs and 2011 to 2015. Ex. 40 (Betts Dep.) at 12:16–13:5, 17:13–20:10. Betts testified that the City didn't even consider residential development in the south end "because of the contaminated areas out there" and the desire not "to put kids in harm's way"; it "was no secret about the south end part of town, stay away from it if you could." *Id.* at 69:5–71:8.

39. The City has not identified any concrete plans for redeveloping the 273 parcels for residential or commercial use, and redevelopment would encounter substantial barriers unrelated to the presence of PCBs. The City's fact witness, Dorene Hoosman, testified that the City could not sell many of the vacant parcels it owned on the south end of East St. Louis because "they're not large enough to build anything on" due to the narrow lot sizes. Ex. 43 at 92-93. Wagner testified that, because residential redevelopment would require rebuilding infrastructure (like sewage systems) from "scratch," any attempt at redevelopment would be for industrial or heavy commercial use—and he pointed to no concrete plans. Ex. 33 at 91. Similarly, Coghlan testified that he had "not seen any plans on redevelopment for that area," noting only that the City's mayor had once expressed to him a general "desire to do some redevelopment and . . . for some housing." Ex. 26 at 139.

**RESPONSE: Admitted in part and disputed in part.** While Hoosman testified that the vacant parcels on the south end were too small to be sold individually, she also said they could be sold to "add . . . on to" other property. ECF No. 283-44 at 93:2–9. Wagner similarly testified that the fact the vacant parcels are "ripe for redevelopment" (putting aside the PCB contamination) because the "parcels . . . [can be] package[d] . . . together to make them attractive for redevelopment for new construction," and "there's no resident[s] that live[ ] there that [developers are] going to have to relocate." ECF No. 283-34 (City Corp. Rep. Dep.) at 240:8–241:15. Otherwise, admitted.

40. The City had undertaken no efforts to address PCB contamination on the 273 parcels before this suit. *E.g.*, Ex. 44 at 72 (City Director of Regulatory Affairs unaware of any efforts to remediate); Ex. 45 at 45 (Mayor unaware of any City efforts to find grants to address PCB contamination); Ex. 34 at 1 (City no longer has a health department to abate nuisances).

**RESPONSE: Admitted.**

### B. The City's Invalid Assignment Of Rights

41. Discovery revealed that the City today owns just 100 of the 273 parcels at issue in this case. Ex. 6 at 6-7; Ex. 23 at 6, 53. St. Clair County, in the role of trustee, owns 73 of the parcels. Ex. 23 at 6, 53. The remaining 100 parcels are held by private persons or entities other than the City, such as the East St. Louis Housing Authority, the East St. Louis School District, and the East St. Louis Township. Ex. 23 at 53.

**RESPONSE: Admitted.**

42. The City has never owned 126 of the 273 properties. Ex. 6 at 6 & n.6; Ex. 47. Of the remaining 147 parcels, the City does not currently own 47 of the parcels, and has not owned them since 2011 at the latest. Ex. 47; Ex. 48 at 5.

**RESPONSE: Admitted.**

43. More than three years after the City filed suit—and after discovery revealed that the City does not own the vast majority of the 273 parcels at issue—the City attempted to acquire an assignment of rights from St. Clair County. On August 30, 2024, Lonnie Mosley, the Trustee Committee chairman, purported to assign to the City any claims the County might pursue for the 73 properties it owned. *See* Ex. 49 at 2-3 (purporting to assign to the City the County's "right, title, and interest in and to all claims, causes of action, and choses in action for damages to the [73 listed] Properties that [the County] has or may have"). The City signed the General Assignment on September 3, 2024, agreeing to pay "$10.00 Dollars per Parcel" for the assignment of claims. Ex. 49 at 2-3.

**RESPONSE: Admitted.**

44. After the City disclosed the General Assignment in this litigation, this Court "extend[ed] the current scheduling order" for additional discovery on the assignment and its effect on the City's claims. Dkt. 219 (Minute Entry).

**RESPONSE: Admitted.**

45. On October 21, 2024, Mark A. Kern, Chairman of the St. Clair County Board, requested a legal opinion from James A. Gomric, the St. Clair County State's Attorney, on the validity of the assignment of claims for the 73 parcels. Ex. 50 at 1. Chairman Kern's request explained that the General Assignment "reflect[ed] the purported signature of Lonnie Mosley as Chairman of 'St. Clair County Trustee,'" but that "[n]o minutes or agendas reflect this agreement coming before the Trustee Committee or the full County Board." Ex. 50 at 1. Chairman Kern sought "a formal opinion . . . as to the legal effect and sufficiency" of the General Assignment. Ex. 50 at 1.

**RESPONSE: Admitted.**

46. On November 7, 2024, Attorney Gomric issued a formal opinion concluding that the transfer was "utterly void" because it failed to comply with Illinois procedural requirements for formal county action. Ex. 51 at 3 (quoting City of Belleville v. Ill. Fraternal Ord. of Police, 312 Ill. App. 3d 561, 563 (2000)). He explained that Illinois law recognizes the County Board as the proper entity to conduct business on behalf of the County, and that the majority of the Board must be present to transact business. Ex. 51 at 2-3 (citing 55 ILCS 5/5-1004; id. 5/2-1005). While St. Clair County had endowed the Trustee Committee of the County Board with certain powers to review tax programs and supervise tax sales, neither the Committee nor the Board had approved the General Assignment. Ex. 51 at 2-3. Instead, the General Assignment was signed only by the Trustee Committee chairman, Lonnie Mosley. Attorney Gomric concluded that Mr.

Mosley lacked authority to unilaterally convey the County's interest in the 73 parcels, so "the General Assignment is void, invalid, and of no legal effect/sufficiency." Ex. 51 at 2-3.

**RESPONSE: Admitted.**

47. Beyond the General Assignment's procedural invalidity, Attorney Gomric also concluded that "substantively, the General Assignment belies the County's responsibility as tax trustee for *all* interested taxing districts under Section 21-90 of the Illinois Property Tax Code (35 ILCS 200/21-90)." Ex. 51 at 3.

**RESPONSE: Admitted.**

48. The City's counsel prepared the General Assignment, gave it to Mr. Mosley's nephew (with whom one of the City's attorneys had a "friendly" relationship), and instructed the nephew that counsel wanted "the chairman of the trustee committee to sign it" in connection with ongoing litigation against Defendants. Ex. 52 at 16-19. Mr. Mosley, in turn, signed the document at his nephew's request. Ex. 52 at 16, 22.

**RESPONSE: Admitted in part; not supported by the record citation.** Admitted that Roy Mosley, Jr., testified that C.J. Baricevic, "[t]he younger," (who is not an attorney of record for the City in this litigation) gave him a copy of the General Assignment and told him that "[w]e need the chairman of the trustee committee to sign this form"; and that Mosley, Jr., testified that he and Baricevic have a "friendly" relationship. ECF No. 283-53 (R. Mosley, Jr. Dep.) at 12:20–15:13, 19:13–16. Mosley, Jr. testified that he did not know who wrote or prepared the document he was asked to sign. *Id.* at 12:8–16.

49. The City has now conceded that the General Assignment is void and did not effect a transfer of any of the County's claims. Ex. 29 at 51-54.

**RESPONSE: Admitted.**

## C. PCB Levels In Identified Properties

50. The 273 parcels at issue have been sampled twice in connection with this suit—once in 2020, and again in 2022. Ex. 33 at 51, 53. The initial round of sampling in 2020 was undertaken "to help determine whether or not there was a threshold level of PCB contamination that would support a lawsuit," with testing financed "on behalf of counsel" and not involving any "city funds." Ex. 33 at 58-59. The 2022 sampling, which likewise was funded by outside counsel, was conducted by Environmental Health & Engineering ("EH&E"). Ex. 33 at 231. Kevin Coghlan—a principal scientist at EH&E—later testified on the City's behalf. *See* Ex. 26. Coghlan is a frequent plaintiff expert in PCB cases. *E.g.*, *Erickson v. Pharmacia LLC*, 548 P.3d 226, 235 (Wash. Ct. App.) (excluding two of Coghlan's three methodologies for calculating historical, pre-remediation PCB levels at a school), *review granted*, 556 P.3d 1098 (Wash. 2024).

**RESPONSE: Admitted in part and disputed in part; not supported by the record citation.**

Disputed that the City has no financial obligations related to the 2022 testing; the City is responsible for reimbursing those costs. *See* ECF No. 283-34 (City Corp. Rep. Dep.) at 59:5–10.

Citation to a single other PCB case in which Coghlan testified on behalf of the plaintiffs does not establish that Coghlan "is a frequent plaintiff expert in PCB cases." Moreover, a judicial opinion in another matter is not "material[ ] in the record," Fed. R. Civ. P. 56(c)(1)(A), and is not subject to judicial notice for the truth of the matter asserted. *See In re Valentine Hill Farm LLC*, 580 B.R. 815, 820–21 (Bankr. S.D. Ind. 2018) ("A court can take judicial notice of the fact that a document was filed, but not the truth or veracity of that document's contents . . . ."); *Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017) ("[W]hen courts take judicial notice of administrative records, only the existence of the documents themselves including the findings therein are judicially noticeable, and not the contents of the documents for the truth of the matters asserted.").

Otherwise, admitted.

51. In 2022, EH&E collected samples from the parcels to determine PCB levels. Ex. 26 at 79. "Three to five individual samples" were combined into a "single sample" for each parcel and analyzed" for PCB congeners. Ex. 3 at 8; Ex. 26 at 67. Coghlan proposed that "remediation of PCB-impacted soil" on the properties should involve "removal to an estimated depth of 2 feet at all parcels where the total concentration of PCB congeners exceeds 0.23 [ppm]." Ex. 3 at 26. He selected the 0.23 ppm cleanup level, he testified, based on EPA's "regional screening level for PCBs," Ex. 26 at 109, even though Regional Screening Levels are not intended to be used as cleanup values, *supra* ¶ 25. Given that selected target level, Coghlan did not propose any remedial action for parcels "that had total PCB concentrations of less than or equal to 0.23 [ppm]." Ex. 26 at 139; Ex. 3 at 1 (arguing for "remediation . . . to reduce the level of contamination below the" Regional Screening Level). Of the 100 parcels owned by the City, Coghlan calculated that 18 parcels have PCB levels at or below 0.23 ppm. *See* Appendix; Ex. 53; Ex. 47.

**RESPONSE: Admitted in part and disputed in part.** Coghlan selected the 0.23 ppm cleanup level because it was recommended by City expert Dr. James Olson. ECF No. 283-27 (Coghlan Dep.) at 108:11–24 ("[T]he definitive guidance on the level that we should be using came from Dr. Olson, who is the toxicologist on the case. Q. . . . You said the definitive guidance on the level that we should be using came from Dr. Olson, correct? A. Yes. Q. When you say 'definitive guidance for the level we should be using,' you're referring to a cleanup level? A. That is correct."). Dr. Olson, in turn, selected the 0.23 ppm level because it is based on scientifically appropriate risk assessment methodology (including the most state-of-the-art exposure assessment quantification and the most recent toxicology data) to be protective at the level of one excess cancer case in one million people. ECF No. 283-39 (Olson Dep.) at 61:13–62:17. Monsanto likewise has judicially admitted that regional screening levels "are risk-based concentrations derived from standardized equations combining exposure information assumptions with EPA toxicity data" and "are considered by the [EPA] to be protective for humans (including sensitive groups) over a lifetime." ECF No. 179 (1st Am. Countercl.) ¶ 28.

Otherwise, admitted.

52. Another of the City's experts, Dr. Mitchell D. Erickson, suggested a different abatement standard in his report: "[R]emediation of residential soils will require excavation of any soil contaminated above one part PCB per million parts soil . . . and replacement with clean soil." Ex. 54 at 116. Forty-eight of the 100 parcels owned by the City have PCB levels at or below 1 ppm. *See* Appendix; Ex. 53; Ex. 47.

**RESPONSE: Disputed.** Erickson is not offering opinions about any issue of policy as to which of the City's properties need to be remediated or the standard for remediation because it is not within his expertise or the scope of his engagement. Ex. 41 (Erickson Dep.) at 176:17–177:6.

53. Under TSCA standards, the cleanup level for a low-occupancy lot (like the parcels at issue here) is 25 ppm—"over 100x the cleanup goal (0.23 [ppm]) that Mr. Coghlan used." Ex. 5 at 30-31. None of the parcels sampled showed total PCB concentrations greater than 25 ppm. *See* Appendix; Ex. 53; Ex. 47; Ex. 5 at 30-31.

**RESPONSE: Disputed.** The City incorporates by reference its response to SMF ¶ 22.

54. For the Court's convenience, the number of parcels with PCBs at or below thresholds identified above is summarized in the Appendix submitted with this motion.

**RESPONSE: Admitted in part and disputed in part.** The Appendix incorrectly states that there are 52 currently-owned parcels with a PCB concentration greater than 1 ppm and less than or equal to 25 ppm. ECF No. 283-1 at A4. According to the table prepared by Monsanto's own real estate expert, there are 54 currently-owned parcels with a PCB concentration greater than 1 ppm. Ex. 10 (JLL Report) at 17 ("City Owned & Over 1.0 ppm" column sums to 54).

55. The City retained a separate expert, Dr. Erickson, to analyze Coghlan's soil-sample findings and determine the likely source of the PCB contamination on the identified parcels. Ex. 54 at 97. Erickson's report acknowledged "unusually high concentrations of nona- and decaCBs," *i.e.*, the heaviest-chlorinated PCBs, around the Sauget Plant. Ex. 54 at 29. Old Monsanto only briefly produced these heaviest-chlorinated PCBs and ceased producing them in 1949, Ex. 6 at 4, 20, 26, 29; Ex. 5 at 19 (Fig. 3.4), and these PCBs can be produced as byproducts of other processes, Ex. 5 at 4-5. Erickson later acknowledged in his deposition that he could not "explain why" these heaviest-chlorinated PCBs were found in "trees sampled in Sauget but not in Anniston," the location of Old Monsanto's other PCB-production facility. Ex. 54 at 183.

**RESPONSE: Admitted in part and disputed in part.**

Monsanto produced the heaviest-chlorinated PCBs for thirteen years (from 1936 to 1949), which is more than "briefly." Ex. 42 (Erickson Report) at 105–06 (Table 13); Ex. 43 (Erickson Dec.).

There is no evidence that higher-chlorinated PCBs were produced inadvertently in the East St. Louis or Sauget area. The City incorporates by reference its response to SMF ¶ 11.

Dr. Erickson explained in his rebuttal report that higher-chlorinated PCBs have been found in the Anniston soil. Ex. 44 (Erickson Sept. 27, 2024 Report) at 20 ("[M]ore highly chlorinated PCBs, especially Aroclor 1268, have been consistently found around Anniston. In 2001, hundreds of

residential soil samples were analyzed . . . . Highly chlorinated Aroclors are consistently overrepresented in the Anniston environment, compared to Monsanto-Anniston's production figures, much like what was found in the ESTL soils."); Ex. 43 (Erickson Dec.) He further explained that the PCBs present in the Sauget tree samples may be explained in part or in whole by "re-entrainment of dust that was previously contaminated by PCBs from [the Krummrich plant]" caused by the removal of contaminated sediment in the Sauget Area Superfund projects. Ex. 45 (Erickson Sept. 10, 2024 Report) at 18; Ex. 43 (Erickson Dec.); SMF ¶ 26.

The City incorporates by reference its objection to the unverified and unsworn expert reports of Kurt Herman and Brian Hitches as stated in response to SMF ¶¶ 22, 25.

Otherwise, admitted.

**D. Procedural Background**

56. On March 12, 2024, this Court dismissed Count II of the City's operative complaint for lack of jurisdiction. Six claims therefore remain: common-law public nuisance (Count I); nuisance under East St. Louis Municipal Code §§ 50-79, 62-2 (Count III); trespass (Count IV); design defect (Count V); failure to warn (Count VI), and negligence (Count VII).

**RESPONSE: Admitted.**

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

**A. Monsanto Manufactured PCBs Near East St. Louis from 1936 to 1977.**

57. Monsanto manufactured 99%-plus of the PCBs that were intentionally manufactured in the United States. Ex. 1 (Dfts. Corp. Rep. Dep.) at 37:17–38:1; Ex. 2 (Hitchens Dep.) at 93:3–7.

58. 700 million pounds is a reasonable estimate of the total PCBs that Monsanto produced at the Krummrich plant. Ex. 3 (Reible Dep.) at 117:5–12.

59. The Krummrich plant is located on the southern boundary of East St. Louis. Ex. 1 (Dfts. Corp. Rep. Dep.) at 22:2–10.

**B. Monsanto Knew That PCBs Are Toxic and Potentially Harmful to Humans.**

60. By the late 1930s and early 1940s, Monsanto was aware that PCBs are toxic because it had observed health problems in workers at the Anniston facility and published studies had documented that inhalation exposure produced systemic toxicity in rats. ECF No. 283-39 (Olson Dep.) at 194:1–196:11.

61. Those early studies on rats failed to observe any dose that was without toxicity; that is significant because humans cannot be dosed with PCBs for research purposes, so animal studies are necessary to establish a safe level of exposure for humans. ECF No. 283-39 (Olson Dep.) at 194:1–197:17.

**C. Monsanto Intentionally Vented PCBs to the Atmosphere.**

62. Almost all of the PCB manufacturing process at the Krummrich plant was an outdoor process, exposed to the elements; the Krummrich plant did not have a roof. Ex. 1 (Dfts. Corp. Rep. Dep.) at 93:6–15, 341:8–14.

63. In the 1930s and 1940s, Monsanto adapted a mechanism by which it ventilated PCBs and residues to the outside atmosphere. Ex. 1 (Dfts. Corp. Rep. Dep.) at 45:10–15.

64. It was the modus operandi at the Krummrich plant through the entire PCB manufacturing period to "fume out" PCB emissions to outside. Ex. 1 (Dfts. Corp. Rep. Dep.) at 45:16–22.

65. The PCBs were vented to reduce the concentrations in the area where the workers were and transport the PCB concentration somewhere else. Ex. 1 (Dfts. Corp. Rep. Dep.) at 608:1–6.

66. When the PCB fumes or emissions were vented away from the workers, they were vented to the atmosphere by wind and air. Ex. 1 (Dfts. Corp. Rep. Dep.) at 211:15–24.

67. Vents were specific places in the manufacturing process where there was the opportunity for PCB vapors to be emitted into the general plant atmosphere and be disseminated by air currents to the atmosphere. Ex. 1 (Dfts. Corp. Rep. Dep.) at 212:10-20.

**D. There Was a High Degree of Certainty that the PCBs Monsanto Vented Would Invade the City's Land.**

68. Monsanto knew when it instituted the program of venting that PCBs were carried through the air and transported. Ex. 1 (Dfts. Corp. Rep. Dep.) at 608:7–10.

69. Emissions of fumes and vapors would be expected to travel in a downwind direction. Ex. 3 (Reible Dep.) at 108:12–109:24.

70. The Krummrich facility certainly released PCBs that would have been carried by the wind to locations downwind. Ex. 3 (Reible Dep.) at 126:5–17.

71. PCBs in air can eventually settle out of the air. Ex. 1 (Dfts. Corp. Rep. Dep.) at 210:2–4.

72. Monsanto has no information to contradict the assumption that concentrations of PCBs vented from the Krummrich plant would eventually have affected the local environment. Ex. 1 (Dfts. Corp. Rep. Dep.) at 77:9–23, 78:19–79:7; Ex. 4 (Dfts. Corp. Rep. Dep. Ex. 16).

73. Monsanto did not know what levels of PCBs people in the community surrounding the Krummrich plant might be exposed to. Ex. 1 (Dfts. Corp. Rep. Dep.) at 209:2–10, 210:5–11.

74. During the PCB manufacturing period, Monsanto understood that there would be "some persistence associated with PCBs that were released in the environment by whatever mechanism." Ex. 1 (Dfts. Corp. Rep. Dep.) at 342:5–24.

75. Five pounds per day is a reasonable estimate of the average PCB emissions to the air from the Krummrich plant during the PCB manufacturing period. Ex. 3 (Reible Dep.) at 25:21–27:15.

**E. There Was a High Degree of Certainty that the PCBs Monsanto Vented Would Remain on the City's Land.**

76. The chemical structure of PCBs has been known in the literature since the late 1800s. Ex. 1 (Dfts. Corp. Rep. Dep.) at 249:2–12, 537:2–10; Ex. 5 (Dfts. Corp. Rep. Dep. Ex. 43).

77. Persistence and stability are chemical properties of PCBs that dictate their behavior in the environment. Ex. 3 (Reible Dep.) at 150:11–16.

78. PCBs' chemical stability, insulating properties, and inflammability contribute to their presence in the environment. Ex. 6 (Boston Report) at 9.

79. Monsanto understood throughout the PCB manufacturing period that PCBs are persistent and stable. Ex. 3 (Reible Dep.) at 37:4–38:23, 106:10–21.

80. PCBs' persistence and stability means they are not subject to normal degradation. Ex. 3 (Reible Dep.) at 43:23–44:6, 141:17–24.

81. PCBs are very stable under normal conditions. Ex. 1 (Dfts. Corp. Rep. Dep.) at 250:13–251:1.

82. PCBs' stability is linked to their persistence. Ex. 1 (Dfts. Corp. Rep. Dep.) at 254:23–255:5.

83. Monsanto used the fact that PCBs are persistent and indestructible as a selling point. Ex. 1 (Dfts. Corp. Rep. Dep.) at 254:18–22.

84. PCBs' persistence includes their resistance to biological activities in the environment. Ex. 1 (Dfts. Corp. Rep. Dep.) at 285:9–23.

85. Monsanto knew in 1948 that a PCB-containing Aroclor product resists attack by biological influences. Ex. 1 (Dfts. Corp. Rep. Dep.) at 285:6–23; Ex. 7 (Dfts. Corp. Rep. Dep Ex. 196).

86. Monsanto described PCBs as "VIRTUALLY INDESTRUCTIBLE" in its advertising. Ex. 8 (Reitman Dep.) at 151:4–152:14; Ex. 9 (Reitman Dep. Ex. 12) at ESTL_OLDMONS0025509.

**F. The PCBs that Monsanto Vented Have Invaded the City's Land.**

87. In 2022, the City sampled 273 properties within its boundaries for the presence of PCBs (the "Tested Parcels"). *See* SMF ¶ 50.

88. The City currently owns 100 of the Tested Parcels, identified by parcel number and street address. Ex. 10 (JLL Report) at 13–17, 53.

89. The Tested Parcels are located north, northeast, and east of the Monsanto plant. Ex. 10 (JLL Report) at 48; Ex. 11 (EH&E Report) at 8; Ex. 12 (Coghlan Dec.).

90. PCB fumes or vapors released into the atmosphere will travel with the wind in a downwind direction. Ex. 3 (Reible Dep.) at 108:12–109:24.

91. The predominant wind direction in the St. Louis area is blowing from the south. Ex. 13 (Meteoblue Wind Rose) (reproduced below), cited by Ex. 14 (Reible Report) at 11 n.24, *see also* Ex. 15 (Limoli Dec.); Ex. 16 (Turner Dep.) at 19:6–20:8.




92. Wind patterns in the St. Louis area have not changed dramatically between 1945 and the present and contemporary wind data are representative of wind patterns for the previous several decades. Ex. 17 (Turner Report) at 3–4; Ex. 18 (Turner Dec.).

93. Air pollutants emitted from the Krummrich facility would frequently be transported to the City. Ex. 16 (Turner Dep.) at 19:6–20:8.

94. In the late spring and summer of 2022, the City conducted soil sampling that found PCBs to be present on the Tested Parcels in amounts ranging from 0.01 to 22.6 parts per million (ppm). Ex. 10 (JLL Report) at 13–17; Ex. 6 (Boston Report) at 4 & App'x B-2; Ex. 11 (EH&E Report) at 8–16, A-1 – A-7; Ex. 12 (Coghlan Dec.).

95. There is no natural background level of PCBs. Ex. 1 (Dfts. Corp. Rep. Dep.) at 307:5–11.

96. The observation of the PCBs on the City's property is real. Ex. 3 (Reible Dep.) at 204:17–25.

97. The Krummrich facility contributed "at least some" of the PCBs found in East St. Louis, including "some" of homolog 9 and 10 PCBs. Ex. 19 (Herman Dep.) at 50:4–51:5, 160:1–11.

98. Up to 13% of the homolog 9 and 10 PCBs found on the Tested Parcels "can reasonably be attributed" to the Krummrich facility. Ex. 20 (Hitchens Report) at 30; Ex. 2 (Hitchens Dep.) at 161:12–16.

99. Some of the PCBs found in East St. Louis are likely or probably Monsanto's PCBs. Ex. 1 (Dfts. Corp. Rep. Dep.) at 339:14–340:20.

100. It cannot be said that zero percent of the PCBs identified in East St. Louis came from the Krummrich facility. Ex. 3 (Reible Dep.) at 125:24–126:4; Ex. 19 (Herman Dep.) at 37:14–38:18; Ex. 2 (Hitchens Dep.) at 95:22–25.

101. No "actual" or "probable" sources of the PCBs found in East St. Louis, other than the Krummrich facility, have been identified. Ex. 19 (Herman Dep.) at 67:24–68:8, 97:12–16, 166:1–8.

102. Monsanto cannot say what percentage of the PCBs in City are attributable to any particular non-Krummrich source. Ex. 2 (Hitchens Dep.) at 97:2–10; Ex. 8 (Reitman Dep.) at 262:24–263:13.

103. Monsanto cannot say what mass or volume of PCBs may have been emitted from any particular non-Krummrich source. Ex. 2 (Hitchens Dep.) at 179:13–17, 180:21–181:4, 186:6–188:8, 196:9–24; Ex. 8 (Reitman Dep.) at 261:25–262:10.

104. Monsanto cannot say how PCBs from non-Krummrich sources may have been transported to or deposited on the Tested Parcels. Ex. 8 (Reitman Dep.) at 252:25–254:19, 256:8–261:24.

105. The City did not give Monsanto permission to put PCBs on the City's land. Ex. 21 (Bell Rebuttal Dep.) at 182:6–14; Ex. 22 (City Corp. Rep. Dep.) at 226:9–18; Ex. 23 (Wagner Dec.).

106. Soil samples taken at particular points in East St. Louis can reasonably be expected to be representative of the soil concentration in the surrounding area, regardless of property boundaries. Ex. 24 (Coghlan Sept. 10, 2024 Report) at 2; Ex. 12 (Coghlan Dec.).

107. None of Monsanto's experts have identified any scenario under which the PCB contamination observed in the City would have been deposited according to property boundaries. Ex. 24 (Coghlan Sept. 10, 2024 Report) at 2; Ex. 12 (Coghlan Dec.).

108. GPS data was not relied upon to determine the sampling locations on the Parcels. Ex. 25 (Coghlan Jan. 24, 2025 Report) at 5; Ex. 12 (Coghlan Dec.).

109. Lots to be sampled were identified on published St. Clair County Property Tax Inquiry records prior to sampling. Hard copies of lot line maps and online aerial imagery were used to identify site features and to approximate lot boundaries. Lot boundaries were measured in the field using measuring tapes from the fixed locations of objects, including utility poles, manhole covers, building perimeters, and fence lines. Ex. 25 (Coghlan Jan. 24, 2025 Report) at B-1 – B-17; Ex. 12 (Coghlan Dec.).

## G. The City's Pleadings and the Law Establish that It Asserts a Public Right.

<u>The City Acts in the Public Interest</u>

110. The City's Second Amended Complaint alleges that "Monsanto manufactured PCBs and other chemical products at the [Krummrich] Plant from approximately 1936 through 1977," and that "[a]s a byproduct of Monsanto's PCB manufacturing operations and waste handling practices, PCBs were emitted into the atmosphere and onto East St. Louis lands." 2d Am. Compl. (ECF No. 129) ¶¶ 1–2 & n.1.[6]

111. The City's Second Amended Complaint alleges that

> East St. Louis properties are grossly contaminated with Monsanto PCBs the average concentration was 1,431 ppb and the highest detected concentration was 22,686 ppb with higher concentrations detected generally downwind and closest to the Monsanto Plant. In addition, this testing confirmed that the types and concentrations of PCBs present in East St. Louis properties pose a substantial risk to human health and safety.

2d Am. Compl. (ECF No. 129) ¶ 11.

112. The City's Second Amended Complaint alleges that

[6] The fact cited here (as well as in SOF ¶¶ 53–59) is that the pleading was filed containing the referenced allegations, not the truth of the matter asserted in the allegations. The Court can take judicial notice of such matters, and the City requests that the Court do so. *See Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 676 n.2 (7th Cir. 2009).

> The locations at which PCBs have been detected at levels that pose a risk to public health and safety are spread out throughout the City and include properties that are part of, or in the vicinity of public parks, schools, roadways, sidewalks, bus stops, offices, and other public areas and facilities. As a result, the contamination affects the public's collective right to safely access and use the City's public areas and facilities. In addition, because PCBs are volatile, the zone of risk created by the contamination is not limited to the physical area of the contaminated properties themselves. PCBs can become airborne and move throughout the City, posing a risk to the health and safety of people anywhere within East St. Louis who might come into contact with the chemicals.

2d Am. Compl. (ECF No. 129) ¶ 75.

The City Is Obligated to Act

113. Section 2-133 of the City Code provides in part that

> The city manager shall be the chief administrative and executive officer of the city. He may head one or more departments, and shall be responsible to the city council for the proper administration of all affairs of the city. The city manager shall have the power and be required to:
>
> * * *
>
> (9) Enforce all laws and ordinances of the city.

Ex. 26 (City Code § 2-133).[7]

114. Section 50-79 of the City Code provides that

> Whenever any nuisance shall be found on any premises within the city, the officials are authorized to cause such nuisance to be summarily abated in such a manner as may be directed.

Ex. 27 (City Code § 50-79).

115. Section 50-80 of the City Code provides that

> It shall be the duty of the duly authorized authorities to serve a written notice upon the owner, occupant, agent or person in possession, charge or control of any lot, building or premises in or upon which any nuisance may be found or who may be the owner or cause of any such nuisance requiring such persons to abate the nuisance in such manner as shall be prescribed within a reasonable period of time, provided that it shall not be necessary in any case for such authorized authorities to specify in the notice the manner in which any nuisance shall be

[7] The Court may properly take judicial notice of the City's ordinances, and the City requests that the Court do so. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002).

> abated, unless such authorized authorities shall deem it advisable to do so, and such notice may be given or served by any authorized authority who may be directed or deputed to give or make such notice. No person so notified shall neglect or refuse to comply with the requirements of such order by abating such nuisance within the time specified. If such nuisance is not abated within the time specified in such notice, it shall be the duty of such authorized authority to proceed at once to cause such nuisance to be abated; provided, further, that whenever the owner, occupant, agent or person in possession, charge or control of the premises in or upon which any nuisance may be found is unknown or cannot be found, the authorized authority shall proceed to abate such nuisance without notice. In either case, the expense of such abatement shall be collected from the person who may have created, continued or suffered such nuisance to exist.

Ex. 46 (City Code § 50-80).

116. Section 62-2 of the City Code provides that

> The health department shall cause all nuisances to be abated or removed which it may deem prejudicial or obnoxious to the public health or comfort and shall make such sanitary regulations as it may think necessary or expedient to prevent the introduction or spreading of any contagious, malignant, infectious or pestilential disease.

Ex. 28 (City Code § 62-2).

<u>The City Is Required to Expend Public Funds</u>

117. The City's Second Amended Complaint alleges that "Monsanto's PCBs now grossly contaminate East St. Louis," and that "this toxic PCB contamination will cost East St. Louis millions and millions of dollars because it is forced to attempt to clean up PCBs from its lands if they are to ever have any residential or commercial utility and value." 2d Am. Compl. (ECF No. 129) ¶ 67.

118. The City's Second Amended Complaint alleges that "East St. Louis will incur massive remediation and abatement costs caused by Monsanto's toxic PCB contamination of vast swaths of its land." 2d Am. Compl. (ECF No. 129) ¶ 68.

119. The City's Second Amended Complaint alleges that "The City lacks the financial resources to pay for PCB remediation through its traditional revenue sources," that "[i]ts budgets in recent years have generally totaled approximately $30–$40 million, with $14–20 million designated for the General Fund." 2d Am. Compl. (ECF No. 129) ¶ 77.

120. The City's Second Amended Complaint alleges that "the City's inability to make PCB-contaminated properties available for public use and recreation diminishes the quality of life for its residents and visitors and otherwise affects the interests of the community at large." 2d Am. Compl. (ECF No. 129) ¶ 78.

121. The City's Second Amended Complaint seeks as damages "[a]n award of past, present, and future costs to abate and remediate the Monsanto PCB toxic contamination." 2d Am. Compl. (ECF No. 129) ¶¶ 101(B), 124(B), 158(B).

**H. The Facts Establish that the City Asserts a Public Right.**

The City Acts in the Public Interest

122. Dr. James Olson is professor emeritus in the Department of Epidemiology and Environmental Health at the University at Buffalo. His experience with PCBs includes serving on the steering committee for the Anniston Community Health Survey, a project that evaluated blood and DNA samples of residents of Anniston, Alabama (the other place in the U.S. where Monsanto manufactured PCBs). ECF No. 283-39 (Olson Dep.) at 13:2–14:12, 16:14–17:15.

123. Dr. Olson opines there is "increased risk due to the exposure to unacceptable levels of PCBs in soil," and that where the level of PCBs in soil is greater than 0.23 ppm, "there would be an unwanted excess exposure to risk, specifically [the] risk of cancer." *Id.* at 54:12–17, 62:14–17.

124. This opinion is based on scientifically appropriate risk assessment methodology (including the most state-of-the-art exposure assessment quantification and the most recent toxicology data) to be protective at the level of one excess cancer case in one million people. *Id.* at 62:2–13.

125. Dr. Olson further opines that "exposure [to PCBs] can be across some distance"; for example, because PCBs in "dust and particulate and soil" can blow from one area to another. ECF No. 283-39 (Olson Dep.) at 56:12–17; *see also* Ex. 47 (Zeliger Dep.) at 201:15–17 ("When that soil becomes airborne through wind blowing, the dust that's created exposes people to levels of PCBs.").

126. Olson's research in Anniston, Alabama (the location other than Sauget where Monsanto produced PCBs) has demonstrated that the presence of PCBs in soil is "clearly" a route of human exposure, and there is "fairly good" correlation between areas with heavily contaminated soil and higher PCB levels in human serum. *Id.* at 150:2–151:16.

127. The International Agency for Research on Cancer ("IARC") has concluded that PCBs are a known human carcinogen based on both mechanistic plausibility and human studies that support carcinogenic activity. ECF No. 283-39 (Olson Dep.) at 199:16–201:6.

128. Dr. David Carpenter is a public health physician who is the Director of the Institute for Health and the Environment and a Professor of Environmental Health Sciences at the University at Albany. Carpenter served as an "Invited Expert" on the IARC panel that reviewed the evidence for the carcinogenicity of PCBs. Ex. 48 (Carpenter Report) at 2–3; Ex. 49 (Carpenter Dec.).

129. Carpenter similarly opines that, based on research he has done in other locations, "the residents of East St. Louis are at elevated risk for a number of different diseases," and "state[s] with confidence that a specific individual that is exposed to PCBs through contaminated soil is going to be at elevated risk for this whole litany of different diseases." Ex. 39 (Carpenter Dep.) at 38:8–20, 40:7–17.

130. Those diseases include cancer, *id.* at 42:16–20 ("[T]here is no level of the PCB exposure that does not increase the risk specifically of cancer."), 112:2–5 (PCBs "cause every kind of cancer"); as well as reduced immune function, *id.* at 122:15–21 ("[T]he weight of the evidence says that PCBs reduce immune function."); and reduced cognitive function, *id.* at 124:1–125:18 ("[O]f all the PCB health effects, the effects on brain and behavior, specifically the IQ and memory, is the strongest.").

131. Monsanto admits that PCBs "can cause skin conditions up to and including chloracne and . . . can have transient physiological action"; and that "they do have effect on the skin, they remove the oils from the skin and can cause rashes . . . . and vapors probably do irritate the membranes of the nose and throat." Ex. 1 (Dfts. Corp. Rep. Dep.) at 282:21–283:12.

132. According to the National Institute for Occupational Safety and Health (NIOSH), "human and animal studies have ***not*** demonstrated a level of exposure to PCB's that will ***not*** subject the worker to possible liver injury." *Polychlorinated Biphenyls (PCB's): Current Intelligence Bulletin 45*, NIOSH, tinyurl.com/4bykn5sy (emphasis added) (cited by Monsanto, *see* Mot. for Summ. J. Dfts.' 1st Am. Countercl. (ECF No. 263) at 7 ¶ 13).

The City Is Obligated to Act

133. Michael Wagner is an Illinois attorney who served as corporate counsel for the City from 1999 through November 2017. In that role, he was responsible for duties including drafting legislation, attending city council meetings, meeting with department heads and administrative appointees regarding day-to-day legal questions, handling union negotiations, working with entities overseeing the City's budget, obtaining insurance, and communicating with regulatory entities (including the U.S. Environmental Protection Agency and the Illinois Environmental Protection Agency) about environmental matters, including industrial contamination; Wagner gained a significant amount of knowledge concerning the organization and operation of the City's government. Wagner also testified in this matter as the City's Rule 30(b)(6) corporative representative on a variety of topics related to PCBs. Ex. 22 (City Corp. Rep. Dep.) at 11:1–14, 14:13–15:6, 31:23–32:6; Ex. 50 (City Corp. Rep. Dep. Ex. 1); Ex. 30 (Wagner Dep.) at 23:16–18; ECF No. 271-23 (Wagner Dec.).

134. When Wagner's law firm was hired to serve as corporate counsel for the City, it was through a resolution which memorialized that "the Mayor and City Council are charged with maintaining the health, safety and welfare of the citizens of East St. Louis." Wagner's understanding as the City Counselor was that the Mayor and City Council were charged to do those things, and that their principal roles including maintaining the health, safety, and welfare of the citizens of East St. Louis. As City Counselor, Wagner endeavored to assist the City in fulfilling those responsibilities. Ex. 30(Wagner Dep.) at 22:9–23:15; Ex. 51 (Wagner Dep. Ex. 2) at ESTL073421.

135. Testifying on behalf of the City, Wagner affirmed that the role of the City government includes protecting the health and safety of occupants and visitors to the City, and that responsibility and duty is shared by the Mayor, the City Manager, the City Council, and all appointed department heads, including the police department. Ex. 22 (City Corp. Rep. Dep.) at 32:7–33:9.

136. Robert Betts has been the City's City Manager (*i.e.*, the person who is responsible for the day-to-day operation of the City) since 2023; he previously served as Development Manager of the Housing Authority of East St. Louis from 1994 to 2006, as City Manager from 2006 to 2010, and as Director of Regulatory Affairs and 2011 to 2015. Ex. 40 (Betts Dep.) at 12:16–13:5, 17:13–20:10, 24:20–25:9.

137. In 2008, during Bett's first term as City Manager, the City adopted a "Resolution Adopting Goals for the City of East St. Louis," which recites that "the Mayor and City Council of the City of East St. Louis, as stewards of the public trust and resources, are committed to the delivery of services which maintain and improve the health, safety, welfare and quality of life in this community for residents, corporate citizens, public entities, and our visitors." Ex. 40 (Betts Dep.) at 53:16–54:5; Ex. 52 (Betts Dep. Ex. 2).

138. Betts testified that the City adopted that 2008 resolution because the duties and responsibilities of the City government include "making sure that we exhaust all efforts to improve the health and safety of our citizens." Ex. 40 (Betts Dep.) at 54:6–16.

<u>The City Is Required to Expend Public Funds</u>

139. The City's remediation expert, Kevin Coghlan, has estimated the costs of remediating the PCB contamination in the City to the level of 0.23 ppm or below to be $50,230,141 (when considering all Tested Parcels) or $22,285,792 (when considering only the 100 parcels presently owned by the City). ECF No. 271-11 (EH&E Report) at 26–27; ECF No. 271-25 (EH&E Jan. 24, 2025 Report) at A-1; ECF No. 271-12 (Coghlan Dec.).

140. The City has responsibility for reimbursing the costs incurred for PCB sampling in this suit. *See* ECF No. 283-34 (City Corp. Rep. Dep.) at 59:5–10.

141. The City has a lot of vacant property and has engaged many different developers in efforts to revitalize the City with development ranging from residential to light commercial to heavy commercial to industrial. The south end of the City has been more difficult to develop due to the front-end costs of evaluating the known contamination, as well as the costs of remediation that would be necessary to make the property available for development. Ex. 22 (City Corp Rep. Dep.) at 227:18–229:18.

142. Aside from the contamination, the south end of the City is ripe for redevelopment because the City's parcels can be packaged together to make them attractive for new construction; that the properties are vacant is a positive because it eliminates the cost of relocating individual residents. Ex. 22 (City Corp Rep. Dep.) at 240:8–241:15.

143. The City has never had the financial resources to undertake PCB testing of the kind performed by the City's counsel in 2020 and 2022. Ex. 22 (City Corp Rep. Dep.) at 215:10–22.

**I. Monsanto's PCB Pollution Has Injured the City and its Property.**

144. The City's real estate expert, Dr. Randall Bell, calculated "risk effect" damages representing the loss in value of the Tested Parcels attributable to PCB pollution (except for those parcels that are smaller than 1,000 square feet). Bell Dep. (Ex. 53) at 195:20–196:11, 231:2-232:14.

145. Risk effect (or "stigma") damages flow from the principle of substitution; if a buyer is considering one property that is contaminated and another that is not, the buyer will choose the property that does not pose a potential health risk. Bell Dep. (Ex. 53) at 218:3–25.

146. Dr. Bell determined, based on case studies of similarly situated neighborhoods, that the loss in value of the Tested Parcels attributable to PCB pollution is 100% (assuming the pollution is not remediated). Bell Dep. (Ex. 53) at 196:13–197:2, 233:2–234:5.

147. General awareness that PCBs had been emitted from Krummrich plant was a "serious contributory factor" and "principal reason" that the area of the Tested Parcels has become a blighted area. Bell Rebuttal Dep. (Ex. 21) at 85:6–86:22, 227:25–229:2.

148. Dr. Bell also calculated "use effect" damages to measure the value of the City's loss of use of the Tested Parcels over the period of time that the properties have been contaminated with PCBs. Bell Dep. (Ex. 53) at 223:21–225:13.

149. Dr. Bell calculated the lost use damages by using monthly rental rates based on average market value rental rates for improved and unimproved properties in East St. Louis or other communities in St. Clair County, Illinois. Bell Dep. (Ex. 53) at 177:18–180:22, 186:1–14

150. Within the real estate appraisal profession, loss of use is measured by rental (lease) rates regardless of whether there is an intent to rent (lease) the property; the rate is a proxy for the value of use. Bell Dep. (Ex. 53) at 194:7–25, 230:5–231:1.

151. The PCB pollution in the City gives rise to lost use damages regardless of whether or how the property was used during the period that it was polluted, because the pollution interferes with the right to exclude, the right to quiet enjoyment, and the right to lease (because a responsible owner would not lease a contaminated property to a third party and potentially incur third party liability). Bell Rebuttal Dep. (Ex. 53) at 115:11–117:24, 119:3–121:14.

152. Monsanto expert Catherine Boston admits that the purpose of remediation is to prepare property for future use; as she testified, "you remediate a site to clean up residual contamination to prevent future exposure." Ex. 38 (Boston Dep.) at 173:15–24.

153. Boston further admits that she is "in no position to try to speculate what the future risk management decisions could be," and that she "do[es]" not get to tell the City how they can

use the parcels" in the future. Rather, the City "as the owner, decides the future use of its properties." Ex. 38 (Boston Dep.) at 75:1–12, 172:6–14, 176:23–177:5.

154. The City's desire is to make the properties safe for unrestricted use. ECF No. 271-11 (Coghlan Report) at 26 ("The desired outcome of any remediation of the East St. Louis neighborhood is to return it to unrestricted reuse amenable to residential occupancy."); ECF No. 271-12 (Coghlan Dec.); ECF No. 283-39 (Olson Dep.) at 60:23–61:7 ("I don't know what plans the [C]ity has but to make [the lots at issue] safe for unrestricted use . . . .").

## J. The EPA Advises that PCB Contamination in the City Requires Further Investigation and Precaution.

155. The EPA purportedly issued a document titled "Results Released for Homes and Former Dead Creek Area," dated October 2012, which states that

> U.S. Environmental Protection Agency Region 5 has just released the results from soil sampling of residential yards and the former Dead Creek area in East St. Louis. EPA collected these samples to find out whether PCBs carried by the wind or released from past industrial activity in the area were present in the soil. This recent work is a follow up to soil sampling conducted in November 2009 where PCBs were found to be present at some residential properties and parks in East St. Louis and Sauget. . . .
>
> Results show that PCB contamination was found in soil at most residences sampled and at some locations at the former Dead Creek but at low levels. Levels of PCBs at 8 of 9 properties sampled were slightly above screening levels used by EPA to assess health risks to the public. . . .
>
> * * *
>
> On August 14 and 15, EPA sampled surface soil at 9 residences in East St. Louis. The residences sampled were chosen based on air modeling that suggested PCB contamination could be present in soil from former industrial activities near these neighborhoods."

ECF No. 283-35 (Wagner Dep.) at 99:13–101:20; Ex. 32 (Wagner Dep. Ex. 19).

156. Michael Wagner (the City's former corporate counsel and Rule 30(b)(6) representative in this case, *see* SMF ¶ 133) testified individually and on behalf of the City that he has no knowledge that the City ever received that October 2012 EPA document or otherwise was made aware of the sampling event it describes. ECF No. 283-35 (Wagner Dep.) at 99:13–103:13; ECF No. 283-34 (City Corp. Rep. Dep.) at 164:7–165:20, 168:12–169:11.

157. The October 2012 EPA document "recommends [that] residents who live on land with contamination levels of PCBs above EPA's health screening level [of 1 ppm]," or "anyone who may be concerned about contamination where they live," should "follow the advice from the Illinois Department of Public Health to reduce exposure to soil contaminants" by doing things like "[w]ash[ing] children's hands and faces often" and "[k]eep[ing] windows closed on

windy days . . . . to help keep dust from being blown inside." Ex. 30 (Wagner Dep.) at 99:13–101:20; Ex. 32 (Wagner Dep. Ex. 19) at PROD0000142.

158. There is an undated, unsigned document that appears on its face to be a letter from an EPA project manager to Alvin Parks, who was the City's Mayor from approximately 2007 through 2015. The document states that

> The United States Environmental Protection Agency (EPA) sampled soil at four residences along Wilford Avenue in East St. Louis on August 14 and 15. . . . The composite soil sample was analyzed for polychlorinated biphenyls (PCBs). The sampling was conducted based on information obtained by EPA that suggests that the far southern and western areas of East St. Louis could be impacted from historical industrial operations to the south.
>
> The level of PCBs found in backyard soil at the four homes typically exceeded the EPA health screening level of 1 part per million (ppm) for residential soils recommended by EPA. The level of PCBs ranged from 0.6 to 7 parts per million. For your information, enclosed is a fact sheet from the Illinois Department of Public Health on how people can reduce exposure to contaminants in soil. Also enclosed is an EPA fact sheet that describes the sampling event. EPA will be evaluating all the sampling results in the East St. Louis area and will keep you informed of our progress.

ECF No. 283-35 (Wagner Dep.) at 93:22–94:5; Ex. 37 (Wagner Dep. Ex. 18).

159. Wagner testified individually and on behalf of the City that he has no knowledge that the City ever received the undated, unsigned document or otherwise was made aware of the sampling event it describes. ECF No. 283-35 (Wagner Dep.) at 93:22–94:23; ECF No. 283-34 (City Corp. Rep. Dep.) at 163:6–164:3, 168:12–169:11.

160. There is a document dated September 9, 2016, that appears on its face to be a letter from the EPA Region 5 Chief of Remediation and Re-use Branch to former City Mayor Emeka Jackson-Hicks. The document states that

> In 2012, the United States Environmental Protection Agency (EPA) wrote to (then) Mayor Parks to report the results of backyard soil contamination sampling at residences along Wilford Avenue in East St. Louis. In the letter, EPA recommended that sampling continue in the area just south of Wilford Avenue, which is zoned for residential use. The 2012 sampling was a continuation of sampling begun in the in [sic] 2009 to investigate whether local historical manufacturing had contaminated residential areas. In 2015, EPA sampled additional properties in this area to determine whether local historical industrial operations could have spread contamination.
>
> The sampled soil was in an area zoned for residential use near the City's western boundary adjacent to the Solutia, Inc., W.G. Krummrich facility, in Sauget, IL. Sampling occurred from April 29-30, 2015, and included the collection of 20 (composite) soil samples from mainly undeveloped properties located between the

> facility boundary and residential locations sampled in 2012. Please refer to the enclosed figure. The properties, which are primarily owned by the City of East St. Louis and the CDC Development Corporation, are located in the TIF 3C Redevelopment Project Area.
>
> EPA collected the samples from the top six inches of the ground from City-owned parcels and in grassy areas in City rights-of-way, and analyzed them for polychlorinated biphenyls (PCBs) in a laboratory. A number of the sample results exceeded the EPA health screening-level for residential soils of one part per million (ppm) for total PCBs. The levels of PCBs ranged from 0.2 to 17 parts per million PCB.
>
> EPA is evaluating the samples from 2009, 2012, and 2015 to determine whether the sampled area qualifies for removal actions or whether more information is needed to make that determination. EPA recommends that additional investigation be performed in this area to assess how contamination levels should be considered during future development. For your information, enclosed is a fact sheet from the Illinois Department of Public Health on how people can reduce exposure to contaminants in soil.

ECF No. 283-35 (Wagner Dep.) at 79:12–82:5; Ex. 31 (Wagner Dep. Ex. 17).

161. Wagner testified that he had never seen the September 2016 document or otherwise been made aware of it until it was presented to him at his deposition in this case; nor was he otherwise aware that the EPA conducted PCB sampling in East St. Louis during the 2009 to 2015 timeframe. ECF No. 283-35 (Wagner Dep.) at 79:12–17, 80:8–82:10, 85:4–9; ECF No. 283-34 (City Corp. Rep. Dep.) at 161:2–163:5.

162. The City's current mayor, Charles Powell, likewise testified he had never seen the September 2016 document or otherwise been made aware of it until it was presented to him at his deposition in this case, and only learned of the purported EPA sampling through discussions with the City's attorneys. Ex. 54 (Powell Dep.) at 25:16–27:18, 29:6–33:9; Ex. 55 (Powell Dep. Ex. 2).

163. The September 2016 document attached an Illinois Environmental Protection Agency "fact sheet" regarding PCBs. The fact sheet advises that "[i]n people, PCBs can affect the skin and may cause *chloracne*–small, pale, yellow skin lesions that may last from weeks to years." It further advises "[a]voiding contact with contaminated soils and sediments." Ex. 30 (Wagner Dep.) at 79:12–82:5; Ex. 31 (Wagner Dep. Ex. 17) at PROD0000261.

164. Reviewing the documents described in SMF ¶¶ 155, 158, and 160 now, the City interprets them as placing responsibility on the City to move forward and telling the City that it needed to take action on its own. Ex. 22 (City Corp. Rep. Dep.) at 215:1–8, 232:14–24.

165. Wagner was aware of the EPA Sauget cleanup project (*see* SMF ¶¶ 26) in his capacity as corporate counsel for the Village of Sauget. That cleanup project did not include any property within the City. Ex. 30 (Wagner Dep.) at 43:8–44:1, 48:5–17, 51:1–23.

166. No one involved in the EPA Sauget cleanup project, including Monsanto, notified the City about it. Ex. 22 (City Corp. Rep. Dep.) at 37:20–38:6.

167. City officials may have been generally aware of the EPA Sauget cleanup project but did not have knowledge "as to specifics." Ex. 22 (City Corp. Rep. Dep.) at 40:22–41:7.

168. The EPA has not issued any orders or consent decrees regarding the PCB contamination in the City. Ex. 19 (Herman Dep.) at 126:14–24.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). To avoid that result, "the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [its] favor." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013).

## ARGUMENT

### I. THE CITY HAS STANDING TO PURSUE ITS CLAIMS.

Monsanto first argues that the City lacks standing to recover for "[m]ost" or "[a]ll"[8] of the parcels that its testing has shown to be contaminated with PCBs. Dfts.' Mot. at 22. This argument is suspect from the start, given that the Supreme Court's most recent and comprehensive review of Article III standing used industrial property pollution as the archetypal example of a case where standing cannot be doubted. As Justice Kavanaugh wrote:

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. . . .
>
> * * *

[8] Another portion of Monsanto's brief concedes the standing argument does not apply to 24 parcels. *See* Dfts.' Mot. at i ("The City Lacks Standing To Recover For All But 24 Parcels.").

> [This] lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property.

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). Fuller analysis shows no more support for Monsanto's position.

Monsanto contends the City has suffered no injury-in-fact, that is, the " 'invasion of a legally protected interest which is (a) concrete and particularized,' and (b) actual or imminent, not conjectural or hypothetical." *Sierra Club v. U.S. E.P.A.*, 774 F.3d 383, 388 (7th Cir. 2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). "The magnitude . . . of the injury is not critical," *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 656 (7th Cir. 2011) (Posner, J.), and "[i]njury-in-fact for standing purposes is not the same thing as the ultimate measure of recovery." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013). Establishing injury-in-fact thus is distinct from proving success on the merits or calculable damages. *See Sierra Club*, 774 F.3d at 389 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)) (courts addressing standing "must be careful not to decide the questions on the merits . . . and must therefore assume that on the merits the plaintiffs would be successful in their claims"); *Abbott* 725 F.3d at 808 ("The fact that a plaintiff may have difficulty proving damages does not mean that he cannot have been harmed."). Applying these principles shows that the City has standing to recover prospective relief, retrospective relief, or both as to all the Tested Parcels.[9]

---

[9] When discussing prospective relief, Monsanto considers only the City's request for an equitable abatement order. The City also seeks damages for the cost of cleanup. SMF ¶¶ 121, 139.

**a. The City Has Standing for the 100 Parcels Presently Owned.**

Monsanto does not dispute that the City presently owns 100 of the Tested Parcels. For those parcels, Monsanto claims the City must show "elevated PCB levels," Dfts.' Mot. at 24, and that the City cannot do so. Monsanto is wrong on both counts.

The City has standing, first, because the PCB contamination has diminished the parcels' value. SMF ¶¶ 144–46. "[M]onetary harm" is a "[t]raditional tangible harm[ ]" that "easily meet[s] the concreteness requirement." *Ewing v. MED-1 Sols.*, LLC, 24 F.4th 1146, 1151 (7th Cir. 2022). And diminution in property value is a form of monetary harm that supports standing in environmental contamination cases. *See Kathrein v. City of Evanston, Ill.*, 636 F.3d 906, 914 (7th Cir. 2011) ("A demonstrable reduction in the market value of one's property is an injury in fact for standing purposes."); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014) (plaintiffs who did not allege "actual contamination" of their properties nevertheless had standing because they alleged "diminution in the value of their land stemming from [the defendant's contamination"); *Millman v. RTX Corp.*, No. 1:16-CV-312-HAB, 2024 WL 4986613, at *8 (N.D. Ind. Dec. 5, 2024) (plaintiffs had standing based on "diminution of their property values"); *Forest Park Nat. Bank & Tr. v. Ditchfield*, 881 F. Supp. 2d 949, 963 (N.D. Ill. 2012) (plaintiff had standing because it was "easy to infer damage to property value based on significant [perchloroethylene] contamination on an adjacent property"). This diminution in value exists regardless of whether the PCB contamination on the parcels exceeds any given threshold, SMF ¶ 144, and so does the City's injury.

Monsanto errs by relying primarily on cases involving personal injury.[10] This case is about property damage (that also threatens human health). The distinction, when it comes to matters of standing, is demonstrated well by one of Monsanto's own authorities, *Millman v. RTX Corp.* The plaintiffs there had chemical contamination on their property and brought both personal injury and property claims. *See* 2024 WL 4986613 at *2–3. One plaintiff had a diagnosed medical condition allegedly caused by the contamination; others did not, but asserted "an increased risk of health issues." *Id.* at *6. Those non-diagnosed plaintiffs were found without standing, *see id.* at *7–8; Monsanto latches onto that finding to support its argument. *See* Dfts.' Mot. at 25. Yet Monsanto ignores that the presence of the contaminants on the plaintiffs' property supplied standing for all their property-based claims (negligence, nuisance, and trespass). *See id.* at *8 (plaintiffs have standing for negligence claim based on diminution in property values), *9 ("[T]he alleged release of contaminants by [the defendant] into the [plaintiffs'] property confers standing onto the [plaintiffs] to pursue both trespass and nuisance claims."). So too here—the only difference being that all the City's claims arise from damage to property, so the presence of Monsanto's PCBs on the City's property (and the associated harm) provides all the injury-in-fact that the City requires. This is true both for prospective relief (remediation is necessary to cure the diminution in value) and retrospective relief (the City lost use due to the contamination).

---

[10] Beyond *Millman* (addressed in the body text), Monsanto authorities *Tiger v. Verizon Communications Inc.*, and *C.W. v. Textron, Inc.* involve only claims for personal injury. *See Tiger*, No. 2:23-CV-1618, 2025 WL 437019, at *1 (W.D. Pa. Feb. 7, 2025) (seeking a "Court-supervised, [defendant]-funded medical-monitoring program"); *C.W.*, No. 3:10 CV 87, 2014 WL 4979211, at *1 (N.D. Ind. Oct. 3, 2014) (plaintiffs "claim that vinyl chloride has caused a number of illnesses in their children"). The other Monsanto authority involving contaminants, *Emerald Coast Utilities Authority v. 3M Co.*, dealt with a plaintiff water supplier whose executive director admitted "there was not a water quality problem" and "the water was safe." 746 F. Supp. 2d 1216, 1222 (N.D. Fla. 2010). Those fatal admissions aside, the *Emerald Coast* holding is in tension with Eleventh Circuit decisions that came both before (*Parker*) and after (*Adinolfe*) and thus has little persuasive value.

Indeed, the City has standing even without the diminution-in-value evidence. When the plaintiff's claims are for damage to property, the invasion of chemical contamination is an injury all by itself. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004) ("[F]actual showing that the soil on [the plaintiff's] land was contaminated, that [underground storage tanks] were leaking, and that solid waste migrated onto the [plaintiff's] property is sufficient to satisfy the injury-in-fact requirement."); *City of Aurora v. Get Green Recycling Inc.*, No. 23 C 3187, 2024 WL 98381, at *4 (N.D. Ill. Jan. 9, 2024) (plaintiff city has standing for "garden variety trespass" claim through allegations that "contaminated stormwater" has or is "contaminating City owned property"); *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 437 (E.D. Pa. 2015) ("In the context of environmental law, evidence of pollution on one's land ordinarily satisfies the standing inquiry. . . . The presence of unwanted pollution at [the plaintiff's property] is an injury in fact capable of supporting standing for a RCRA claim."); *Ditchfield*, 881 F. Supp. 2d at 962–63 ("[T]he unauthorized physical presence of [perchloroethylene] on [the plaintiff's] property, by itself, constitutes a trespass to property and thus suffices for the purposes of standing."). Nothing here suggests a different result.

The cases just cited did not obsess over whether the contamination at issue exceeded some regulatory threshold, and there is no need for the Court to do so here. Monsanto discusses the 0.23 ppm threshold selected by the City's expert epidemiologist (Dr. Olson),[11] as well as higher thresholds set by the Toxic Substances Control Act ("TSCA"). But the TSCA thresholds do not govern liability in this case. *See* 15 U.S.C. §§ 2617(g)(1)(A) ("Nothing in this chapter . . . nor any standard, rule, [or] requirement . . . implemented pursuant to this chapter, shall be

[11] Monsanto erroneously attributes the selection of the 0.23 ppm threshold to the City's remediation expert, Kevin Coghlan. Coghlan's testimony was clear that Olson made that determination. *See* Resp. SMF ¶ 51.

construed to preempt, displace, or supplant any State or Federal common law rights . . . ."); (g)(1)(B) ("[N]othing in this chapter . . . shall preempt or preclude any cause of action for . . . property damage, or other injury based on negligence, strict liability . . .or any other legal theory of liability under any State law."); (g)(2)(A) ("Nothing in this chapter . . . nor any rules, regulations, requirements, . . . or orders issued pursuant to this chapter shall be interpreted as . . . dispositive in any civil action."); 2619(c)(3) ("Nothing in this section shall restrict any right which any person . . . may have under . . . common law . . . to seek any other relief.").

Even plaintiffs bringing PCB contamination claims under federal environmental laws are not required to show contamination above the TSCA threshold. *Liebhart v. SPX Corp.*, 917 F.3d 952, 957–61 (7th Cir. 2019). If the TSCA standards do not govern liability in *Liebhart*, they do not govern liability here, and thus cannot govern standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) ("standing hurdle" cannot be raised "higher than the necessary showing for success on the merits").

Even if there was some requirement that the City show "elevated" PCB levels, it can do so—for every single Tested Parcel. PCBs are man-made chemicals; the natural background level is zero. SMF ¶ 95. Every Tested Parcel was found to have PCB concentrations above zero. SMF ¶ 94. That distinguishes this case from those that involve naturally occurring substances, like the Monsanto authority *Tiger*. The plaintiff there complained about personal injury arising from lead exposure, but because there are "naturally occurring lead levels in the environment," the court required that the plaintiff either show elevated levels of lead in his body, or some diagnosed injury, before it would find injury-in-fact. 2025 WL 437019, at *4. Here, on the other hand, there no possibility the PCBs on the Tested Parcels appear there naturally—rather, they are probably

there because Monsanto made 700 million pounds of them less than a mile away. SMF ¶¶ 58–59. The City can seek redress for this unauthorized invasion of PCBs on its property.

**b. The City Has Standing for the 47 Previously-Owned Parcels.**

For the 47 parcels that the City has owned at some time between 1955 through 2023, Monsanto claims the City "cannot show that the alleged presence of PCBs . . . is causing it to suffer the concrete injury required to seek forward-looking equitable relief."[12] Dfts.' Mot. at 24. Monsanto again is incorrect.

The City has standing to obtain prospective relief for the formerly-owned parcels (whether in the form of cleanup costs or an abatement order). "[M]unicipalities may sue to protect their own proprietary interests that might be congruent with those of its citizens." *City of Metropolis v. Honeywell Int'l, Inc.*, No. 21-CV-860, 2022 WL 17488478, at *3 (S.D. Ill. Dec. 7, 2022) (citing *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)). "Proprietary" in this context refers not just to property interests, but things "as varied as a municipality's responsibilities, powers, and assets." *City of Sausalito*, 386 F.3d at 1197. Thus standing has been found to flow from, *e.g.*, the threat of increased traffic "affecting . . . municipal management and public safety functions." *Id.* at 1198. Municipalities may also "demonstrate organizational standing" by "act[ing] as a representative vindicating the injuries to its citizens." *Vill of Riverdale*

[12] Monsanto does not contest that the City has standing to recover retrospective damages for the claims arising from the formerly-owned parcels. The law agrees. *See Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, No. 07 C 2680, 2019 WL 4201559, at *3, *4 (N.D. Ill. Sept. 5, 2019) (under federal standing principles, which "are more liberal than what is required under Illinois law," a claim for damage to property "once accrued, does not become moot based solely upon subsequent changes in the ownership rights of the property"); *accord ESM Dev. Corp. v. Dawson*, 795 N.E.2d 397, 400 (Ill. App. Ct. 2003) (alleged diminution in property value gave plaintiff standing though they "were not the record owners of the property on the date that the suit was filed"), *abrogated in irrelevant part by Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523 (Ill. 2009).

*v. 138th St. Joint Venture*, 527 F. Supp. 2d 760, 765 (N.D. Ill. 2007) (citing *City of Milwaukee v. Saxbe*, 546 F.2d 693, 698 (1976)).

*Village of Riverdale* shows well how these principles apply in the chemical contamination context. There, the plaintiff village alleged the defendants created a public nuisance by disposing "a host of toxic materials," including PCBs, on property owned by third parties.[13] *See id.* at 761–62. It sought both injunctive relief and damages. *Id.* The court rejected the defendants' assertion there was no Article III injury, finding the village had "concrete and particularized interest" in "the redevelopment of land within its jurisdiction," and that this interest was harmed by "the release of solid wastes to air, soils, subsurface soils, [and] sediments" that "present[ ] an imminent and substantial endangerment to health or the environment." *Id.* at 764, 765. Other courts considering actions for public nuisance have reached the same conclusion. *See City of N. Chicago v. Hanovnikian*, No. 06 C 0962, 2006 WL 1519578, at *1–2 (N.D. Ill. May 30, 2006) (plaintiff city had standing to pursue injunctive relief and civil penalties for chemical contamination located on defendant's property); *City of Stamps, Ark. v. Alcoa, Inc.*, No. CIV. 05-1049, 2006 WL 2254406, at *3, *5–7 (W.D. Ark. Aug. 7, 2006) (plaintiff city had standing to pursue injunctive relief for abatement of public nuisance on state-owned property).

The City, like those municipalities, has standing to seek prospective relief. The PCB contamination in the City can be dispersed by the wind and affects the comfort and safety of area residents. SMF ¶¶ 125–26, 157, 163. This injures the City and its interest in protecting its residents and property within its territorial jurisdiction. SMF ¶¶ 134–38.

---

[13] The *Village of Riverdale* opinion does not discuss ownership of the property in detail, but the Complaint discloses that all or most of the properties at issue were owned by the defendants. *See* Ex. 56 (*Vill. of Riverdale* Compl.) ¶¶ 19–33.

**c. The City Has Standing for the Remaining 125 Parcels.**

For the same reasons just explained, the City has standing to obtain prospective relief (in the form of cleanup costs or an abatement order) for the parcels it never has owned.

**d. The City's Injury Is Fairly Traceable to Monsanto.**

Monsanto makes a meager argument that the City's loss-of-use damages are not traceable to the PCB contamination. *See* Dfts.' Mot. at 28. Traceability is about whether the plaintiff can "show[ ] that the defendant caused her injury." *Abbott*, 725 F.3d at 808. There is evidence that Monsanto caused the PCB contamination, *see* SMF ¶¶ 62–75, 87–104, and that the contamination has harmed the Tested Parcels, *see* SMF ¶¶ 144–51. That is enough for standing; the disputed facts must be resolved by the jury.[14]

## II. THE CITY'S CLAIMS ARE NOT TIME-BARRED.

Monsanto next argues that the City's claims are barred by the statute of limitations and that those limitations cannot be avoided under the *nullum tempus* doctrine. That is incorrect. *Nullum tempus* applies, and even if it does not, the jury must decide when the City's cause accrued and whether the limitations period has expired.

**a. *Nullum Tempus* Applies to the City's Action.**

Monsanto's discussion of *nullum tempus* is most notable for what it does *not* contain: a single reference to either of the Illinois Supreme Court's foundational decisions setting out how the doctrine is applied in modern times, *City of Shelbyville v. Shelbyville Restorium, Inc.*, and *Board of Education of City of Chicago v. A, C & S, Inc*. This is a glaring omission, because as Monsanto observes elsewhere, *see* Dfts.' Mot. at 40, the Court, sitting in diversity, "must apply

[14] Monsanto incorrectly suggests that the City must show the properties were susceptible to residential use throughout the damages period to obtain loss-of-use damages. Not so. The lost use calculation uses rental rate as a proxy for any use of the property at issue, which is consistent with real estate valuation standards. SMF ¶¶ 150–51.

[Illinois] law as [it] believe[s] the highest court of [Illinois] would apply it if the case were now before that tribunal." *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024). Those binding decisions considered, it becomes clear that Monsanto incorrectly treats *nullum tempus* as a question of fact and ignores that the doctrine is uniformly applied in cases touching on public health and safety—cases like this one.

#### 1. Whether *Nullum Tempus* Precludes the Application of Statutes of Limitation Is a Pure Question of Law.

Illinois decisions demonstrate that whether *nullum tempus* applies to an action is not based on evidentiary facts. Rather, it is a question of "[t]he applicability of a statute of limitations to a cause of action," which is a "legal question." *Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 587 (Ill. 2008). Illinois courts decide whether a particular statute of limitations applies to an action by considering "the nature of the plaintiff's injury" and "the nature of the liability." *Id.* (quoting *Armstrong v. Guigler*, 673 N.E.2d 290, 293, 295 (Ill. 1996)). And in much the same way, Illinois courts focus the *nullum tempus* inquiry on "the right which the plaintiff governmental unit seeks to assert," *City of Shelbyville v. Shelbyville Restorium, Inc.*, 451 N.E.2d 874, 876–77 (Ill. 1983), together with "the nature . . . of the damaged interest." *People ex rel. Dep't of Transp. v. Molter*, 478 N.E.2d 1102, 1104 (Ill. App. Ct. 1985) (citing *Shelbyville*, 451 N.E.2d at 877). When "the nature of the damaged interest . . . characterizes the [plaintiff's] action as a public right," then *nullum tempus* negates the statutes of limitation. *Molter*, 478 N.E.2d at 1105.

The Illinois Supreme Court's leading decisions on *nullum tempus* show that whether the doctrine applies is determined by the pleadings without regard to the facts adduced in discovery. *See Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 603 (Ill. 1989) (concluding on appeal from motion to dismiss that "the statute of limitations does not bar the

viable causes of action"); *Shelbyville*, 451 N.E.2d at 878 (concluding on appeal from motion to dismiss that "the interest of the city . . . is public in nature"); *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 805 N.E.2d 281, 291 (Ill. App. Ct. 2004) (concluding on appeal from motion to dismiss that "the right asserted here was a public right and . . . the doctrine of *nullum tempus* applies"). Those decisions reached conclusive determinations about *nullum tempus* based on the pleadings, even though some defendants raised factual disputes regarding the factors at issue.[15] *See A, C & S*, 546 N.E.2d at 601 (defendants "argu[ed] that the [plaintiffs'] interests do not affect the public at large because all the people of the State alike do not use the [property at issue]"); *Latronica*, 805 N.E.2d at 290 (defendant claimed public interest not affected because there was no "imminent danger of waste on the Site becoming airborne").

This makes sense, because the *nullum tempus* inquiry is one that a court, rather than a jury, is best equipped to handle. In many instances, "the fact/law distinction . . . turn[s] on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Miller v. Fenton*, 474 U.S. 104, 113–14 (1985). Only courts possess the legal understanding required to analyze the nature of a right and determine whether it is public. *Cf. Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 564–65(1990) (resolving whether action invokes legal or equitable rights); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1113–16 (Ill. 2004) (resolving meaning of "public right" in context of public nuisance claim). It is thus unsurprising that other jurisdictions expressly have held that *nullum tempus* presents a question of law. *See Portland Water Dist. v.*

[15] Similarly, the Northern District of Illinois recently declined to consider the defendant's statute of limitations arguments on summary judgment after determining at the motion to dismiss stage that *nullum tempus* applied. *See City of Chicago v. Equte LLC*, No. 21 C 518, 2022 WL 2132630, at *5 (N.D. Ill. June 14, 2022) ("The City has sufficiently *alleged* it is enforcing a public right; therefore, the statute of limitations does not bar Count II." (emphasis added)); 2023 WL 6173593, at *9 (N.D. Ill. Sept. 19, 2023) (refusing to revisit earlier finding).

*Town of Standish*, 905 A.2d 829, 833 (Me. 2006); *In re Asbestos Sch. Litig.*, 768 F. Supp. 146, 152 (E.D. Pa. 1991); *see also Nw. Ark. Conservation Auth. v. Crossland Heavy Contractors, Inc.*, 47 F.4th 705, 707 (8th Cir. 2022) (reviewing de novo district court's determination that plaintiff could not invoke *nullum tempus*). Indeed, the City can locate no case from any jurisdiction in which the *nullum tempus* issue was submitted to the finder of fact.[16]

Consequently, this Court must determine whether *nullum tempus* provides the City immunity from the statute of limitations just as the Illinois Supreme Court did in *A, C & S* and *Shelbyville*—by considering "the [C]ity's interest in bringing the lawsuit," as reflected by the allegations in the operative pleading.[17] *A, C & S*, 546 N.E.2d at 601.

### 2. The City's Action Asserts an Interest in Protecting Public Property and Health.

Illinois courts uniformly have held that an action invokes public rights—and *nullum tempus* immunity—when the allegations implicate potential harm to public health and safety. *See Shelbyville*, 451 N.E.2d at 878 (*nullum tempus* applies to action seeking reimbursement for street repairs, because "the safety of all persons . . . will depend on the workmanlike construction and maintenance of these streets"); *Asbestospray Corp.*, 616 N.E.2d at 654–55 (applies to action

[16] The lone decision the City can locate to even suggest that *nullum tempus* may depend upon evidentiary facts is *Village of Roxana, Ill. v. Shell Oil Co.*, No. 12-577, 2013 WL 4510164 (S.D. Ill. Aug. 26, 2013). There, the defendants filed a motion to dismiss and for summary judgment based on statute of limitations defenses. *See id.* at *1, *4. The court first held that summary judgment was improper on the limitations issue because there was a genuine dispute as to when any limitations period began running. *See id.* at *5. The plaintiff also asserted immunity from limitations defenses under *nullum tempus*. *Id.* at *6. After considering the factors, the court found that the plaintiff's immunity argument "appears meritorious," while noting that its denial of the defendants' motions was based on "the abundance of outstanding material facts." *Id.* Notably, the court cited no authority for its decision to defer a final ruling on the *nullum tempus* issue. The case was ultimately dismissed upon settlement, *see* Judgment (ECF No. 189), Case No. 3:12-cv-577 (S.D. Ill. Feb. 23, 2018), and there is no indication the *nullum tempus* issue was again considered.

[17] To the extent the Court finds that evidentiary facts are relevant, those also show each *nullum tempus* factor to be satisfied. *See infra* at n. 20, 22, 23; *see generally* SMF ¶¶ 122–43.

raising asbestos-related tort claims); *Molter*, 478 N.E.2d at 1104–05 (applies to action seeking reimbursement for highway repairs, because "public's claim to maintenance of the roadways" relates to "overall public safety"); *Pielet Bros. Trading v. Pollution Control Bd.*, 442 N.E.2d 1374, 1379 (Ill. App. Ct. 1982) (applies to Illinois Environmental Protection Agency's penalty action against auto shredder because agency "seeks . . . to protect the public's right to a clean environment"); *see also City of Chicago ex rel. Scachitti v. Prudential Sec., Inc.*, 772 N.E.2d 906, 915 (Ill. App. Ct. 2002) (applies to powers "essential to government," which includes power to "regulate for public welfare").

The Illinois Supreme Court's decision in *A, C & S* is instructive. In *A, C & S*, the plaintiffs were a group of school districts who brought claims for negligence, strict liability, and negligent misrepresentation against defendants involved in the supply chain for asbestos-containing materials. 546 N.E.2d at 583–84. The court construed the plaintiffs' allegations as tort claims for property damage,[18] while also recognizing that the allegations of asbestos contamination implicated "resulting health concerns." *Id.* at 601. Importantly, the Court contrasted the plaintiffs' evidentiary obligation to prove harmful health effects at trial, *see id.* ("at trial the plaintiffs will have an opportunity to establish that the levels of asbestos in the buildings can cause personal injury") with its decision to apply *nullum tempus* based on the nature of the allegations, *see id.* (plaintiffs' interests are "sufficiently 'public' " because their "complaint has alleged . . . an interest in the safety of these public buildings and in the safety of a large segment of this State's population"). Thus *A, C & S* establishes that public rights are at stake when a

[18] 546 N.E.2d at 590 ("We believe . . . it is sufficiently stated that harmful asbestos exists throughout the buildings, similar to a claim for contamination. . . . Thus, the buildings have been damaged."), 601 ("The complaints allege that as a result of the asbestos in these products, toxic fibers exist throughout the public school buildings in sufficient amounts, for the basis of a tort claim, to constitute property damage.").

governmental plaintiff asserts claims for property damage and those claims have a plausible nexus to public health and safety.

The court of appeals' decision in *Latronica* follows the same line. There, the plaintiff city brought claims (including common law public nuisance) based on allegations that the defendant dumped "construction debris and other waste" on a vacant lot owned by the city. 805 N.E.2d at 283–84. The court held that *nullum tempus* applied by reviewing the city's allegations and concluding that they showed the action to be "predicated upon a public right." *Id.* at 288. Specifically, the court followed *A, C & S* by focusing on the "*potential* health risks" flowing from the defendant's conduct. *Id.* (emphasis added). Because "the illegal dumping of waste *could* create a danger to the public health," and "[t]he presence of debris and airborne toxins *could* prove hazardous to the community," the City's action to clean up the lot "affect[ed] the interests of the public." *Id.* (emphasis added). The court rejected the defendant's factual contention that the debris on the lot was "no longer a threat" because it was already "85% to 90% cleaned-up," finding that "irrelevant" to "whether the City is afforded immunity from the statute of limitations."[19] *Id.* at 290. So *Latronica*, like *A, C & S*, confirms that actions plausibly implicating public health and safety will satisfy the first *nullum tempus* factor.

The City's claims here are no different than those in *A, C & S* and *Latronica*. The City alleges that its property is contaminated with PCBs because Monsanto emitted them from its manufacturing plant for 40-plus years. SMF ¶¶ 110, 111. The City likewise alleges that the PCBs on its property are a threat to public health and safety. *See id.* ¶¶ 111, 112. The City seeks to recover damages that would allow it to clean up the PCBs. *See id.* ¶ 121. This all is in the public interest because "[a] municipal corporation holds its property in trust for the public." *O'Fallon*

[19] The court likewise rejected the defendant's factual argument that public rights were not at issue because the city "intended to convey the property to a developer." 805 N.E.2d at 290.

*Dev. Co. v. City of O'Fallon*, 356 N.E.2d 1293, 1298 (Ill. App. Ct. 1976) (citing *Hackett v. Trs. of Sch.*, 74 N.E.2d 869, 872 (1947)); *People v. Parker*, 83 N.E. 282, 282 (Ill. 1907) ("A municipal corporation holds its property in trust for public uses . . . ."). Thus the City "alleges sufficient facts predicated upon a public right" to establish that *nullum tempus* applies.[20] *Latronica*, 805 N.E.2d at 288.

Monsanto's arguments to the contrary ignore the substance of the cases cited above in favor of cherry-picked quotations. Monsanto takes from *City of Chicago v. DoorDash, Inc.* the snippet that *nullum tempus* applies when there is a threat to the health, safety, or property of an "*entire* municipality." Dfts.' Mot. at 36 (quoting No. 21 CV 5162, 2024 WL 4252797, at *7 (N.D. Ill. Sept. 20, 2024)). Yet Monsanto omits that the Illinois cases *DoorDash* cites for that point include *Shelbyville* (property at issue was streets within a single subdivision, 451 N.E.2d at 875), *A, C & S* (property at issue was an unspecified number of school buildings, 546 N.E.2d at 588–89), and *Latronica* (property at issue was a single City-owned vacant lot, 805 N.E.2d at 283–84). Those three decisions squarely foreclose the claim that the 273 Tested Parcels (or the 100 City-owned parcels) are "not enough" property for *nullum tempus* to apply.

---

[20] The evidentiary facts also satisfy this factor. The City's experts have opined that the PCB contamination creates an increased risk of cancer and other diseases. SMF ¶¶ 122–24, 128–30. This risk is not confined to the parcels where PCBs have been found, because PCBs in dust, soil, and other particulate matter can blow from one area to another. *Id.* ¶¶ 125–26. When the EPA performed its own PCB sampling in the City—in the same area general that the City sampled—it warned that residents should reduce their exposure by doing things like keeping their windows closed on windy days and making sure that they wash their children's hands and faces often. *Id.* ¶¶ 157, 160, 163. That advice is consistent with the experience of City expert epidemiologist Dr. Olson, who studied residents of Anniston, Alabama (the other place where Monsanto made PCBs) and found that soil was "clearly" a route of PCB exposure. *Id.* ¶ 125. These risks have made the City's contaminated property less valuable. SMF ¶¶ 144–46. So just as in *A, C & S* and *Latronica*, it is in the public's interest to remove this risk once and for all so that the City's property can be used for whatever purpose the City deems most productive. SMF ¶¶ 141–42.

Similarly misguided is Monsanto's contention (again based on *DoorDash*) that the City's contingent-fee agreement with its counsel renders *nullum tempus* inapplicable. No authority supports the notion that retaining counsel on a contingent fee means that the client is "becom[ing] a partner" with or "engag[ing] in business" with its attorneys. Dfts.' Mot. at 36 (quoting *People ex rel. Town of New Trier v. Hale*, 52 N.E.2d 308, 310–11 (Ill. App. Ct. 1943)). The Illinois Rules of Professional Conduct plainly suggest otherwise,[21] and Illinois courts have rejected for over 140 years the contention that governmental use of contingent-fee agreements is improper. *See Richland Cty. v. Millard*, 9 Ill. App. 396, 400 (1881) (county's contingent fee agreement was "nothing objectionable" and suggested no "fraud or . . . sinister action by the county officials"). It would be a perverse result to hold (with no support from Illinois law) that *nullum tempus*—a doctrine designed to protect the public from "the negligence of its officers and agents," *Shelbyville*, 451 N.E.2d at 876—should be denied to a city because it cannot afford to pay attorneys' hourly rates out of pocket. The argument should be rejected.

**3. The City Is Obligated to Act.**

The next factor is the governmental plaintiff's "obligation to act on behalf of the public." *A, C & S*, 546 N.E.2d at 602. In *Latronica*, the court found this factor satisfied because municipal code language authorized the plaintiff city "to summarily abate any nuisance" and "impose[d] a duty . . . to bring about the abatement of pollution sources which pose an imminent danger to the public or which constitute a public nuisance." 805 N.E.2d at 289. That was enough to establish the city's "oblig[ation] to act on behalf of the public" for *nullum tempus* purposes, *id.*, even though the city's action included a common law claim in addition to those brought under the

---

[21] *Compare* Ill. R. Prof. Conduct 1.5(d)–(e) (allowing contingent-fee agreements except in matters of domestic relations and criminal defense) *with* Ill. R. Prof. Conduct 1.8(a) (prohibiting attorneys from "enter[ing] into a business transaction with a client" unless client is advised to seek independent legal counsel and gives informed consent).

municipal code. *See id.* at 283–84. This factor also is satisfied when the governmental plaintiff's failure to act would leave the public without a remedy. *See Vill. of Roxana*, 2013 WL 4510164, at *6 ("[I]f the municipality is not obligated to act on behalf of the public when a municipal ordinance is being violated, then no one is and the ordinance itself is useless—the Court will not operate under that assumption.").

The City has the same obligation to bring this action on the public's behalf. The City, as a municipality, "has a common law duty to maintain its property in a reasonably safe condition." *Warning v. City of Joliet*, 974 N.E.2d 954, 960 (Ill. App. Ct. 2012); *see also* 745 ILCS 10/3-102(a) ("[A] local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition."). And the City's ordinances, like those in *Latronica*, "authorize[ ] and obligate[ ]" the City to address the PCB pollution. 805 N.E.2d at 288. They provide that

- the City manager "shall have the power and be required to . . . [e]nforce all laws and ordinances of the city," SMF ¶ 113; *cf.* 805 N.E.2d at 289 ("the commissioner of the environment shall have the duty to 'supervise the execution of and implementation of all laws [and] ordinances . . . pertaining to environmental protection and control'");

- "[w]henever any nuisance shall be found . . . the officials are authorized to cause such nuisance to be summarily abated," SMF ¶ 114; *cf.* 805 N.E.2d at 288–89 ("whenever 'any nuisance shall be found . . . the commissioner of buildings or commissioner of the environment is hereby authorized . . . to cause the same to be summarily abated'"); and that

- "[t]he health department shall cause all nuisances to be abated or removed which it may deem prejudicial or obnoxious to the public health or comfort," SMF ¶ 114; *cf.* 805 N.E.2d at 289 ("the commissioner . . . is required to 'initiate proceedings to bring about the summary abatement of pollution sources which pose an imminent and serious threat to public health and welfare'").

So the City here too is "obliged to act on behalf of the public and to clean up [the] waste" at issue. 805 N.E.2d at 289. And unless the City can seek damages through this lawsuit, the public

will be without a remedy, because no private plaintiff has standing to sue for damage to City property. Thus the second prong of *nullum tempus* is satisfied.[22]

Monsanto again misses the mark. Monsanto relies on *DoorDash* to suggest that *nullum tempus* should not apply to "ordinary common-law claims." Dfts.' Mot. at 38. But that cannot be true, because Illinois courts applied *nullum tempus* to "ordinary common-law claims" in *Shelbyville*, 451 N.E.2d at 875 (three counts for "money damages" and two for equitable relief), *A, C & S*, 546 N.E.2d at 584 (negligence, strict liability, negligent misrepresentation), and *Latronica*, 805 N.E.2d at 283 (public nuisance). Monsanto also proves too much with the argument that any third party injured by the PCB pollution could simply bring claims on their own behalf. The same can be said of anyone injured by driving on the deficient streets at issue in *Shelbyville*, attending the asbestos-contaminated schools at issue in *A, C & S*, or being around the "dust, dirt, and other materials" at issue in *Latronica*, *id.* at 284. Monsanto's arguments squarely contradict Illinois Supreme Court precedent and thus fall short.

**4. The City Is Required to Expend Public Funds.**

The last factor is "the extent to which public funds must be expended." *A, C & S*, 546 N.E.2d at 602. Any suit by a governmental entity will involve "some fiscal impact," so this factor is more likely satisfied by costs that "run into the millions" rather than "small sums of money." *Id.* One court "[h]armoniz[ed] the case law," including the Supreme Court's decisions in *A, C & S* and *Shelbyville*, and concluded that "the relevant amount of public revenue being expended is that representing the potential damages to the plaintiffs." *Scachitti*, 772 N.E.2d at

[22] The evidentiary facts point in the same direction. Former City attorney Michael Wagner testified (both individually and as the City' Rule 30(b)(6) corporate representative) that City officials have the duty and responsibility to protect the health and safety of the City's occupants and visitors. SMF ¶¶ 133–35. Those obligations were memorialized in the resolution that approved the hiring of Wagner's firm as corporate counsel. *Id.* ¶ 134. The current City Manager affirms those obligations. SMF ¶ 136–38.

917. "[T]he reasons behind the expenditure of funds" also are relevant. *Champaign Cty. Forest Pres. Dist. v. King*, 683 N.E.2d 980, 984 (Ill. App. Ct. 1997). And both amounts that the plaintiff already has expended—as well as those that would be expended to address the underlying problem if suit was barred—should be considered. *See A, C & S*, 546 N.E.2d at 584 (plaintiffs filed suit "[i]n anticipation of spending 'substantial sums of money'"); *Shelbyville*, 451 N.E.2d at 875 (plaintiff "sought money damages for expenditures which the city incurred or projected it would incur").

The City here faces an immense financial obligation if it cannot recover PCB cleanup costs through this suit. Those costs, which the City seeks as damages, are well into the millions of dollars. *See* SMF ¶¶ 117–19. And the City needs to clean up the PCB pollution to protect the health and safety of its residents and make productive use of its public property. *See id.* ¶¶ 111–12. So just as in *A, C & S*, "this litigation" is the only means to avoid those costs being borne by the public. 546 N.E.2d at 602. Hence the third *nullum tempus* factor is satisfied.[23]

Monsanto asserts that the costs of prosecuting this suit cannot be considered public expenditures because the City was not required to bring it. Dfts.' Mot. 39. This contention improperly merges the second and third factor without support in the Illinois case law. *Cf. Scachitti*, 772 N.E.2d at 915 ("[D]efendants have cited no authority stating that the analysis of the third prong may be imported into the analysis of the first prong."). It also assumes Monsanto is correct about the second factor; it is not for the reasons stated above. And finally, it is wrong on the merits, because the costs of prosecution include the costs of sampling (for which the City has reimbursement obligations, SMF ¶ 140). Those costs would need to be expended to define

[23] Again, the evidentiary facts support the same conclusion. The costs of cleaning up the PCB contamination in the City to a safe level exceed $20 million. SMF ¶ 139. The City must clean up the PCBs to make the property safe for unrestricted use. *Id.* ¶¶ 123–24, 141–42.

the scope and severity of the contamination regardless of the specific means (*i.e.*, this suit or otherwise) chosen to address the contamination. So again, Monsanto's arguments fail. The Court should find that *nullum tempus* applies to the City's action.

**b. There Is a Material Dispute of Fact as to When the City Had Notice of the PCB Contamination.**

Even if the Court declines to apply *nullum tempus*, there remains a material dispute as to when the City's cause accrued. Illinois follows the discovery rule, which says that "the statute of limitations clock does not start running until the injured party knows or reasonably should have known both that she was injured and that her injury was wrongfully caused by another person." *Stark v. Johnson & Johnson*, 10 F.4th 823, 828 (7th Cir. 2021). This is "often a disputed question of fact"; only "[w]hen there is a single, clear answer to be drawn from the undisputed facts . . . may [the Court] determine the issue as a matter of law." *Id.* at 829; *see also id.* at 829–30 (reversing grant of summary judgment where district court's view of accrual date was "one reasonable view but not the only reasonable view").

"[T]he 'more obvious the injury' . . . 'the more easily a plaintiff should be able to determine its cause." *Id.* at 833 (quoting *Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116 (Ill. App. Ct. 2002)). The injury here was not obvious. Monsanto has emphasized in other briefing that PCB contamination can be detected only by "analytical testing and scientific instrumentation." ECF No. 263 at 21. This is relevant to the City's discovery of its injury, because "when 'knowing a fact depends on having technical knowledge, the incredible variance in such knowledge across American society can make the knowledge of the average person a perverse benchmark.' " *Stark*, 10 F.4th at 837 (quoting *Arroyo v. United States*, 656 F.3d 663, 677 (7th Cir. 2011) (Posner, J., concurring)). The community rumors and supposition that

Monsanto points to as evidence of accrual are not the same as actual knowledge—on behalf of the City—that another person caused harmful levels of PCB contamination on its property.[24]

Nor does the other accrual evidence Monsanto identifies establish there is but one reasonable view on this issue. The EPA's cleanup activities in Sauget excluded the City, SMF ¶ 165–67, which suggests that the City did *not* have a contamination problem. While the EPA may have sampled for PCBs within the City in 2009 and 2012, there is no evidence the City was ever told about it. *Id.* ¶¶ 155–56, 158–62. The only document about the EPA testing that facially suggests it was sent to a City official is dated September 9, 2016, *id.* ¶ 160; if that is what started the five-year clock under 735 ILCS 5/13-205, then the City's action, initiated on February 3, 2021, is timely. So Monsanto is not entitled to summary judgment on the statute of limitations.[25]

## III. THE CITY'S CLAIMS ARE VIABLE ON THE MERITS.

While Monsanto is correct that federal courts sitting in diversity "ought to be circumspect" about following state law, Dfts.' Mot. at 40 (quoting *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997)), this rule (which Monsanto ignored when analyzing *nullum tempus*)

[24] Moreover, most of the evidence regarding "community knowledge" concerns unspecified contamination in a general area of the City, not PCBs on the Tested Parcels. *See* Resp. SMF ¶¶ 27, 28. The jury should be allowed to hear the full evidence on these issues and decide whether broad concerns about contamination put City officials on notice to investigate PCBs specifically; there is no single test or analysis that can detect the presence of any chemical contaminant known to man. Monsanto also provides no authority to support that "community knowledge" must be imputed to City officials as a matter of law. "[A] municipal employee's *actual* knowledge *may* be imputed to the municipality." *Heath v. City of Naperville*, — N.E.3d —, 2024 IL App (3d) 230663, ¶ 59 (emphasis added). But Monsanto never establishes actual knowledge on the part of any City official, and the record evidence supports the opposite conclusion. *See* SMF ¶¶ 155–56, 158–62.

[25] Monsanto also makes a cursory argument regarding laches. *See* Dfts.' Mot. at 33 n.4. Laches applies only when a party "has *knowingly* slept on his rights," *PNC Bank, Nat'l Ass'n v. Kusmierz*, 193 N.E.3d 1196, 1205 (Ill. 2022) (emphasis added), so it does not apply here for the same reasons that the City's claim accrued no earlier than September 2016. *See id.* at 1207 (lack of diligence "encompasses the plaintiff's delay in bringing the action while having notice or knowledge of defendant's conduct and the opportunity to file suit").

does not aid its arguments regarding the merits of the City's claims. The City's claims for public nuisance, trespass, negligence, and abatement all are consistent with established Illinois law and thus all must proceed to trial.

**a. The City's Public Nuisance Claim Is Viable.**

Monsanto first contends the City cannot establish its public nuisance claim because it cannot show the existence of a public right or that such a public right was substantially and unreasonably interfered with. Those contentions are without merit.

We can begin with Monsanto's halfhearted attempt to distinguish *Latronica*. *See* Dfts.' Mot. at 43. Recall that *Latronica*, like this case, arose from a city's desire to clean up "illegal waste disposed of on a lot." 805 N.E.2d at 283. The court there "explained how the illegal dumping at issue impacted the 'community' collectively," Dfts.' Mot. at 43,[26] as follows:

> There is no question that the City's cleanup of the Site affects the interests of the general public. As noted by the City, "by cleaning up the Site, the City is eliminating a blight to the surrounding community, as well as potential health risks to those who live, work, or travel in the city each day." In *A, C, & S,* the supreme court held that the abatement of asbestos in public school buildings amounted to a public right because of the health concern involved. . . . Similarly, in this case, the illegal dumping of waste could create a danger to the public health. The presence of debris and airborne toxins could prove hazardous to the community. Therefore, the City's cleanup of the Site affects the interests of the public.

*Id.* at 288. The unspecified "debris and airborne toxins" at issue in *Latronica* cannot be distinguished from the PCBs at issue in this case. PCBs in soil can be dispersed through the air. SMF ¶¶ 125–26. After the EPA found PCB contamination in the City, it advised area residents to

[26] Monsanto quotes from this very portion of the *Latronica* decision (*see* Dfts.' Mot. at 43, citing 346 Ill. App. 3d at 272) yet says that *Latronica* "relied" for the quoted analysis on two other decisions (*Donaldson* and *Cecola*) that in fact are discussed well earlier in *Latronica*, for a distinct point. *See* 805 N.E.2d at 287. Monsanto again ignores *A, C & S*—the binding Illinois Supreme Court authority that *Latronica* actually relied upon—and its avoidance of *A, C & S* on both the *nullum tempus* and public nuisance fronts hardly seems coincidental.

"reduce exposure to soil contaminants" by "[k]eep[ing] windows closed on windy days . . . . to help keep dust from being blown inside." SMF ¶ 157. If there was a public nuisance in *Latronica*, there is one here too. And *Latronica* is not an outlier, but just one of many decisions where courts have found contaminated soil to create a public nuisance. *See, e.g.*, *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 727–28 (N.D. Ill. 2017) (public nuisance claim stated on allegations that waste oils "have contaminated the soil, groundwater, and bedrock on Plaintiff's property"); *Echternach v. D.H. Martin Petrol. Co.*, No. 97 C 3802, 1997 WL 627646, at *4 (N.D. Ill. Sept. 30, 1997) (claim stated on allegations that "petroleum has infiltrated the soil, sewer system, groundwater, surface water, and air"); *see also State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 379–80 (Del. 2023) ("Monsanto . . . does not contest the sufficiency of the State's pleading that the discharge of PCBs onto Delaware's lands and into its waters is an unreasonable interference with a right common to the general public and therefore is a public nuisance.").

Monsanto's argument that no public right can be interfered with because no one presently is using the parcels misses the point. The Illinois Supreme Court—writing in Monsanto's favored authority, *City of Chicago v. Beretta U.S.A. Corp.*—explained that interference with a public right occurs when "[t]he nuisance . . . prevent[s] the public from a peaceful use of their land . . . or [causes] some direct encroachment on public property." 821 N.E.2d 1099 at 1115 (Ill. 2004) (quoting 58 Am. Jur. 2d *Nuisances* § 39 (2002)). The PCB contamination here is a public nuisance for just that reason: it prevents the use of City property that is held "in trust for the public." *O'Fallon Dev. Co.*, 356 N.E.2d at 1298. The purpose of this suit is to eliminate the PCB contamination so that the property can be used. As Monsanto's own expert admits, "you remediate a site . . . to prevent ***future*** exposure." SMF ¶ 152 (emphasis added).

Monsanto's contention that there is no present use and thus no nuisance is akin to another defendant's argument that plaintiff landowners who stopped using their well—because the defendants contaminated it—suffered no injury. *See Cannata v. Forest Pres. Dist. of DuPage Cty.*, No. 06 C 2196, 2008 WL 4889102, at *3–6 (N.D. Ill. July 24, 2008). The court rejected that argument for the obvious reason that the plaintiffs should "not [be] require[d] . . . to continuously consume what they believe to be contaminated water in order to keep their case in federal court." *Id.* at *6. Monsanto's implied contention that the City must force people onto the PCB-contaminated land to have an actionable nuisance claim is just as absurd.

Moreover, the facts of *Beretta*—and the concerns that led the Illinois Supreme Court to find no public right at issue there—plainly are distinguishable. The plaintiff city in *Beretta* tried to address rampant gun crime by bringing a public nuisance claim against gun manufacturers. *See* 821 N.E.2d at 1106–09. The crime at issue was not being committed by the defendants, but by the users of their products. *See id.* The court recognized at the outset that this "threat of illegal conduct by others" was substantively different from traditional nuisance cases—like those arising from "fumes, dust, and *other sources of pollution*." *Id.* at 1114 (emphasis added). The court went on to express its "reluctant[ce] to state that there is a public right to be free from the threat that *some individual*s may use an otherwise legal product . . . in a manner that may create a risk of harm." *Id.* at 1116 (emphasis added). Thus the court did not want to create wide-ranging public nuisance liability for harm caused by third parties. That concern is not present here because there are no third parties involved in the causal chain supporting the City's claim: Monsanto vented PCBs from its plant and those PCBs were transported by wind to the City's property. SMF ¶¶ 62–67, 87–104. So *Beretta* is inapposite.

Finally, Monsanto argues that PCBs cannot be a public nuisance because they are not physically offensive. *See* Dfts.' Mot. at 44. It is far from clear that Illinois law strictly imposes such a requirement. *See City of Chicago v. Festival Theatre Corp.*, 438 N.E.2d 159, 162 (Ill. 1982) ("[P]resenting obscene performances fits within the common law concept of public nuisance."); *Vill. of Bensenville v. Botu, Inc.*, 350 N.E.2d 239, 241 (Ill. App. Ct. 1976) ("[T]he definition of a public nuisance is not confined to a physical injury to the senses."); *see also City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 826 (N.D. Ill. 2014) (underground petroleum pollutants constitute nuisance because they are "perceptible at the place to which they have migrated"). Even if such a requirement exists, it is satisfied. PCB-contaminated soil can be dispersed by wind and thus requires area residents to keep their windows closed to avoid harm. SMF ¶¶ 125–26, 157. Monsanto admits that PCBs "can cause skin conditions" and their vapors "probably do irritate the membranes of the nose and throat. SMF ¶ 131. So the City's claim for public nuisance must be decided by the jury.

**b. The City's Trespass Claim Is Viable.**

Monsanto further argues that the City's trespass claim fails because the City cannot show the intent that trespass requires, or that PCBs constitute an invasion in the way that trespass requires. Monsanto is wrong on both counts.

**1. Monsanto Knew to a Substantial Certainty that the PCBs It Intentionally Vented Would Invade the City's Land.**

"A trespass is an invasion in the exclusive possession and physical condition of land." *Texaco*, 19 F. Supp. 3d at 826 (quoting *Lyons v. State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 725 (Ill. App. Ct. 2004)). Intentional trespass occurs when the defendant "directly cast[s] an object upon the property of another," or "indirectly caus[es] the intrusion [through] an act [that] is done with knowledge that it will, to a substantial certainty, result in the entry of the foreign

matter." *Dial v. City of O'Fallon*, 411 N.E.2d 217, 220 (Ill. 1980). There need not be the specific intent to invade another's land. *See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1041 (7th Cir. 1992) ("[O]ne need not intend to take possession of the encroached-upon premises, or to deprive occupants of their right to possess those premises."); *Lyons*, 811 N.E.2d at 724 ("The defendant is liable for an intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that he is committing no wrong.").

There is more than enough evidence for the jury to find trespass here.

***Monsanto intentionally vented PCBs.*** Between 1936 and 1977, Monsanto manufactured about 700 million pounds of PCBs at its Sauget plant. SMF ¶¶ 57, 58. Throughout that entire period, Monsanto intentionally vented PCBs to reduce the concentration of PCBs in the work area and transport the PCBs elsewhere. *Id.* ¶¶ 63–65. The vents were specific places in the manufacturing process where PCB vapors were emitted into the general plant atmosphere. *Id.* ¶ 67. Because Monsanto's plant did not have a roof, the PCBs vented out of the manufacturing process were disseminated into the atmosphere by the wind. *Id.* ¶¶ 62, 66–67. According to Monsanto's own expert, five pounds is a reasonable estimate of the plant's daily atmospheric PCB emissions. *Id.* ¶ 75. So over the 41-year manufacturing period, Monsanto's plant discharged to the atmosphere roughly 75,640 pounds of PCBs.[27]

***The PCBs Monsanto vented from Krummrich invaded the Tested Parcels.*** Monsanto's plant was located on the City's southern boundary. SMF ¶ 59. The predominant winds in and around the City blow from the south (and have since at least the 1940s). *Id.* ¶¶ 91–92. Naturally, the PCB fumes and vapors discharged from the plant tended to travel with the wind in a

[27] This is calculated as 5 pounds per day multiplied by 15,128 days (measured from January 1, 1936, to August 31, 1977).

downwind direction. *Id.* ¶¶ 69, 70, 90. The PCBs discharged from the plant therefore moved north toward the Tested Parcels. *Id.* ¶¶ 91–93.

PCBs in the air will eventually settle out of the air. *Id.* ¶ 71. Hence the PCBs that Monsanto vented eventually accumulated on the City's land. The City's sampling shows that the Tested Parcels contain PCBs in amounts ranging from 0.01 to 22.6 ppm. *Id.* ¶ 94. It is undisputed that some of those PCBs are Monsanto's; none of Monsanto's experts will opine that zero percent of the PCBs found on the Tested Parcels came from Monsanto's plant. *Id.* ¶¶ 96–97, 99–104. One Monsanto expert concedes that up to 13% of the kinds of PCBs predominantly found on the Parcels "can reasonably be attributed to" the plant. *Id.* ¶ 98.

***Monsanto knew to a substantial certainty that the PCBs it vented would invade the City's land.*** Monsanto knew when it instituted its venting practice that PCBs were carried through the air and transported. SMF ¶ 68. It therefore was foreseeable to Monsanto that the PCBs it vented were going to blow north toward the Tested Parcels. *Cf. Dial*, 411 N.E.2d at 221 (intentional trespass occurs where facility is designed to "collect water . . . and discharge it upon an adjoining owner's property").

Monsanto likewise knew that PCBs released into the environment would persist there, because Monsanto knew throughout the PCB manufacturing period that PCBs are persistent and stable. SMF ¶ 79. Those properties flow from PCBs' chemical structure—which has been understood since the 1800s—and mean that PCBs are not subject to degradation under normal environmental conditions. *Id.* ¶¶ 76–77, 80–82, 84–85. Indeed, Monsanto used PCBs' persistence as a selling point, marketing them as "VIRTUALLY INDESTRUCTIBLE." *Id.* ¶¶ 83, 86. As one would expect, the same properties that make PCBs "VIRTUALLY INDESTRUCTIBLE" make them persistent in the environment. *Id.* ¶ 78.

Monsanto admits that it has no information to contradict the assumption that PCBs vented from Krummrich would have left the production area and affected the local environment. SMF ¶ 72. And the evidence shows that is precisely what happened.

### 2. The PCB Contamination Constitutes a Trespass.

Monsanto also is wrong that trespass under Illinois law requires any kind of physical invasion that is not present here. The plaintiff need not "show total deprivation of the use of its land," *Texaco*, 19 F. Supp. 3d at 826, or any specific quantum of invasion. *Crissman v. Strickland*, 357 N.E.2d 222, 224 (Ill. App. Ct. 1976) ("[A]n action for trespass to land or damage by invasion of another's property is not subject to the De minimis rule."). Rather, "[t]he projection of *any* substance upon the lands of another without right is a trespass." *Maton Bros. v. Cent. Ill. Pub. Serv. Co.*, 269 Ill. App. 99, 114–15 (1933) (emphasis added) ("ejection of gas" upon plaintiff's property constitutes trespass), *aff'd*, 191 N.E. 321 (Ill. 1934).

That chemical contaminants are a trespass under Illinois law is demonstrated conclusively by a case in which none other than Monsanto Company and its co-plaintiff received summary judgment on their own claim. In *NutraSweet Co. v. X-L Engineering Co.*,[28] the plaintiffs alleged the defendant had contaminated their property with volatile organic compounds ("VOCs") by repeatedly dumping mop-bucket water near the parties' shared property boundary. 933 F. Supp. 1409, 1412–14 (N.D. Ill. 1996). On the plaintiffs' motion for summary judgment, the court found the undisputed evidence showed that "at least a *small amount*[29] of VOCs entered [the plaintiffs'] land because of the mop-bucket-dumping." *Id.* at 1423 (emphasis added). That

[28] This decision and the Seventh Circuit's affirmance are discussed in greater depth in the City's motion for partial summary judgment on liability for trespass. *See* ECF No. 271 at 13–14.

[29] The court did not try (or deem it necessary) to quantify that "small amount," but even at the most heavily contaminated area of the plaintiffs' property, the contamination was measured in parts per billion. *See* 933 F. Supp. at 1414.

was enough to make the defendant liable for trespass. *Id.* at 1424. The Seventh Circuit affirmed on the same basis—that the defendant "caused *some* of the VOCs on [the plaintiffs'] property, not necessarily all of them," and therefore had trespassed. 227 F.3d 776, 785 (7th Cir. 2000). The PCB contamination here is no different from the VOC contamination in *NutraSweet*.

Monsanto's reliance on *City of East St. Louis v. Netflix, Inc.* is misplaced. There, the alleged trespass came not in the form of chemical contaminants but "video content" transmitted through wirelines. 630 F. Supp. 3d 1003, 1017 (S.D. Ill. 2022). The court found that not to be a trespass by relying upon other cases involving things that have "no physical presence" like radio signals, television signals, and pulses of light.[30] *Id.* at 1019. Nor does *In re Chicago Flood Litigation* support Monsanto's position. The court there did not consider any claim of trespass by chemical contaminant. *See* 680 N.E.2d 265, 277–78 (Ill. 1997) (considering whether businesses forced to evacuate due to flood, but never physically invaded by water, had viable nuisance claims). That court's description of trespass as a "crass physical invasion" is a colorful turn of phrase, not a legal standard.

Aside from *Netflix* and *Chicago Flood*, Monsanto relies only upon out-of-state precedent, and that too is unavailing. The holding in *Johnson v. Paynesville Farmers Union Co-op. Oil Co.* was motivated by the Minnesota Supreme Court's desire to maintain the longstanding distinction that Minnesota law has drawn between nuisance and trespass. *See* 817 N.W.2d 693, 702–03 (Minn. 2012). That distinction is not so ingrained in Illinois law, which recognizes that nuisance

[30] It should also be noted that at least one statement of Illinois law set forth in *Netflix* has limited applicability. The *Netflix* court cited *Geller v. Brownstone Condominium Association* for the proposition that a trespassory intrusion "has to be such as to subtract from the owner's use of the property." 630 F. Supp. 3d at 1018 (quoting 402 N.E.2d 807, 809 (Ill. App. Ct. 1980)). Yet the *Geller* court's holding was confined to the context of air space, flowing from the principal that "a property owner owns only as much air space above his property as he can practicably use." 402 N.E.2d at 809. Thus *Geller* should not be read to contradict the statements disclaiming any minimum quantum of invasion found in cases like *Texaco*, *Crissman*, and *Maton Bros.*

and trespass often "overlap." *NutraSweet*, 933 F. Supp. at 1424 (both nuisance and trespass arise from VOC contamination); *see also Texaco*, 19 F. Supp. 3d at 826 (allegations of groundwater pollution state claim for nuisance and trespass); *Statler v. Catalano*, 521 N.E.2d 565, 570 (Ill. App. Ct. 1988) (trespass and nuisance "may overlap"); *Colwell Sys., Inc. v. Henson*, 452 N.E.2d 889, 892 (Ill. App. Ct. 1983) (same).[31] The decision in *Rhodes v. E.I. du Pont de Nemours & Co.* likewise followed established West Virginia precedent holding that "chemical deposits upon [land] from fumes, gases, and dust" can be a nuisance only and not a trespass. 657 F. Supp. 2d 751, 772 (S.D. W. Va. 2009) (quoting *Bartlett v. Grasselli Chem. Co.*, 115 S.E. 451, 455 (W. Va. 1922)). But again, Illinois law points in the opposite direction: the "ejection of gas" upon land is a trespass. *Maton Bros.*, 269 Ill. App. at 115. So, the PCB contamination alleged here is a trespass, and the City's claim must proceed to trial.

**c. The City's Negligence Claim Is Viable.**

Monsanto construes the City's negligence claim as being limited to a "product-liability" theory for "negligent design and failure to warn" and asserts that it fails because this case is not about PCBs that have been placed in the stream of commerce. Dfts.' Mot. at 50. But the City's negligence claim is not so constrained: as Monsanto points out, the City's theory "is that PCBs were . . . released during [the] *manufacturing processes* and contaminated the [City's] properties." *Id.* at 51. Monsanto does not show that it is entitled to summary judgment on *that* theory (and therefore waives the argument).

[31] *Chicago Flood* is not to the contrary. There, the court discussed some distinctions between trespass and *private* nuisance in resolving whether valid claims for private nuisance had been stated. *See* 680 N.E.2d at 277–78. The court remarked that "[i]n private nuisance, the *typical* activity at issue does not result in a crass physical invasion, as in trespass," with that qualifier leaving room for exceptions to the general statement. *Id*. 278 (emphasis added). Strengthening this conclusion is that the court cited with approval *Statler* and *Colwell Systems*, two cases stating that nuisance and trespass may overlap. *See id.* at 277.

There can be no doubt that the City's Second Amended complaint articulates a claim for negligence based on PCB emissions from Monsanto's plant. The elements of a negligence claim are "a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Jones v. Chi. HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1129 (Ill. 2000). The City alleged that

- "[t]he Defendants owed a duty of reasonable care to protect East St. Louis and its public and lands against the unreasonable health and safety risks resulting from the production . . . of PCBs and PCB containing products at their Monsanto Plant," ECF No. 129 ¶ 151;

- "Monsanto knew or should have known that PCBs substantially persist in the natural environment rather than break down over time," *id.* ¶ 14;

- "Monsanto knew by the 1960's that large amounts of PCBs were escaping from its W.G. Krummrich Plant and entering the nearby environment," *id.* ¶ 50;

- "[a]s a byproduct of Monsanto's PCB manufacturing operations . . . PCBs were emitted into the atmosphere and onto East St. Louis lands," *id.* ¶ 2;

- "[t]he Defendants failed to exercise ordinary care because reasonably careful companies that knew PCBs could not be contained during normal production . . . would not continue to manufacture . . . PCBs in a way that allowed the discharge of PCBs into and onto East St. Louis lands," *id.* ¶ 154;

- "Defendants' PCBs and PCB-containing products in East St. Louis caused and continue to cause injury and damage to the physical and economic health and well-being of East St. Louis," *id.* ¶ 156.

Thus the City pled facts supporting each element of an ordinary negligence claim—which is well more than federal pleading standards require. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337–38 (7th Cir. 2024) (quoting *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017)) ("Matching facts to legal elements is the distinctive feature of code pleading, which was abrogated when the Rules of Civil Procedure introduced notice pleading. * * * It is enough to plead a plausible claim, after which 'a plaintiff receives the benefit of imagination, so long as

the hypotheses are consistent with the complaint.' "); *see also Zall v. Standard Ins. Co.*, 58 F.4th 284, 295 (7th Cir. 2023) ("[W]hen a complaint does present legal theories, those theories may later be altered or refined."); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("[N]othing in the Rules of Civil Procedure requires" that complaints be drafted "with multiple counts, each of which specifies a single statute or legal rule."). Indeed, that Monsanto clearly identified the City's negligent emissions theory in its brief shows the theory was properly pled, developed through discovery, and understood by Monsanto.

Because Monsanto makes no argument for summary judgment on the negligent emissions theory in its opening brief, it cannot do so in reply. *Tellabs Ops., Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 379 (N.D. Ill. 2012) ("Arguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are waived."). In any event, the record evidence shows that the City's claim is viable. Monsanto "had a duty not to contaminate the environment." *NutraSweet*, 933 F. Supp. at 1425 (quoting *People v. Brockman*, 574 N.E.2d 626, 634 (Ill. 1991)). Monsanto breached that duty by allowing five pounds of PCBs to escape to the atmosphere every day for over forty years. SMF ¶¶ 14, 15, 75. Despite understanding that PCBs were toxic, *id.* ¶ 60–61, and persistent in the environment, *id.* ¶¶ 74, 79, Monsanto never attempted to determine where its PCB emissions would end up or in what amounts. *Id.* ¶¶ 68, 73. The evidence shows that the prevailing winds blew the PCBs north toward the City where they were deposited on the City's property. *Id.* ¶¶ 87–104. This theory must proceed to trial.

**d. The City's Claims for Nuisance Abatement Are Viable.**

Monsanto asserts that the City cannot receive an equitable order for nuisance abatement because the non-City owners of the Tested Parcels have not been joined, and because the City Code does not authorize a civil action for abatement. Neither argument is correct.

**1. Monsanto Fails to Establish that the Court Cannot Order Abatement.**

Monsanto's contention that the non-City parcel owners must be joined as parties for the court to order abatement, *see* Dfts.' Mot. at 44–45, incorrectly relies upon Illinois law. The issue is controlled by federal law. Even when a federal court sits in diversity, its equitable powers are dictated "not by state law," but by federal common law, the federal rules, and "the traditional powers exercised by English courts of equity." *Fid. & Deposit Co. of Md. v. Edward E. Gillen Co.*, 926 F.3d 318, 326 (7th Cir. 2019) (citing *Guaranty Tr. Co. v. York*, 326 U.S. 99, 105–07 (1945)); *accord Davilla v. Enable Midstream Partners*, 913 F.3d 959, 973 (10th Cir. 2019) ("[T]he practice of borrowing state rules of decision does not apply with equal force to determining . . . equitable remedies."); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981) ("State law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision."). By failing to cite and analyze the applicable authority (Rule 19) in its opening brief, Monsanto waives the argument that federal law precludes the injunctive relief the City requests. *Tellabs Ops.*, 283 F.R.D. at 379.

To avoid any doubt, however, Rule 19 does not require joinder of the other property owners before the Court can order Monsanto to remediate their properties.

Under Rule 19(a)(1)(A), a party must be joined if "in that person's absence, the court cannot accord complete relief among the existing parties." Importantly, the term "complete relief" as used in that part of the rule "refers only to relief between the persons already parties, and not as between a party and the absent person whose joinder is sought." *Su v. Su*, 672 F. Supp. 3d 573, 588 (N.D. Ill. 2023) (quoting *Perrian v. O'Grady*, 958 F.2d 192, 196 (7th Cir. 1992)). Hence "the fact that [the relief sought] would affect non-parties does not preclude complete relief between the current parties." *Id.* at 589. Here, the City seeks an order that requiring Monsanto

(not the other property owners) to clean up the PCB contamination. Such an order provides complete relief between the City and Monsanto. So Rule 19(a)(1)(A) is not implicated.

Under Rule 19(a)(1)(B), a party must be joined if "that person claims an interest relating to the subject of the action and . . . disposing of the action in the person's absence may . . . impede the person's ability to protect the interest," or "leave an existing party subject to a substantial risk of incurring . . . inconsistent obligations because of the interest." This part of the Rule does not apply here for two reasons. First, the other property owners have the same interest as the City in having the PCB contamination on their parcels cleaned up to a safe level. *Cf. J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 653 (7th Cir. 2014) (where bank sought to enjoin arbitration against it and two of its employees, employees need not be joined because their interest "is identical to their employer's" and "will therefore be protected" even if not joined). Second, Rule 19(a)(1)(B) applies only where the absent parties actively "claim[ ] an interest relating to the subject matter of the action." *Su*, 672 F. Supp. 3d at 589–90 (collecting cases). Because Monsanto does not show that the other property owners have "come forward, intervened, or otherwise manifested some legal claim in this litigation," *id.* at 590, it cannot contend that Rule 19(a)(1)(B) applies.[32]

Finally, even if the other property owners are necessary parties under Rule 19(a), they would not need to be joined under Rule 19(b). The finding that other property owners are necessary parties implies their interests are not aligned with the City. *J.P. Morgan*, 760 F.3d at 653. This, in turn, compels they be joined as defendants for purposes of diversity jurisdiction.

---

[32] This conclusion is strengthened by the fact that St. Clair County (owner of 73 Tested Parcels) has actual notice of this lawsuit, and—while it has opined that the assignment of claims was not validly executed (which the City does not dispute)—the County has asserted no grievance with the City's request for abatement of the County-owned parcels under the common law and City Code. *See* SMF ¶¶ 41, 43, 45–47.

*See Murray v. Miss. Farm Bureau Cas. Ins. Co.*, 251 F.R.D. 361, 364–65 (W.D. Wis. 2008) (parties' alignment for jurisdictional purposes is based on their "real interests in the controlling matter"). And because some (if not all) of the other property owners are Illinois citizens, *see* SMF ¶ 41, their joinder would deprive this Court of jurisdiction. The better option, then, is to allow the case to proceed, because Rule 19(b) affords the Court latitude to shape injunctive relief that will not prejudice absent parties under the circumstances. *See* Fed. R. Civ. P. 19(b)(1)–(4). That easily could be accomplished here by framing an injunctive order such that any property owners who—for whatever peculiar reasons of their own—wish for their properties to remain PCB-contaminated may opt out from the ordered cleanup. So the City's claims for injunctive relief should not be dismissed.[33]

**2. Monsanto Fails to Establish that City Code Sections 50-79 and 62-2 Do Not Authorize Civil Relief.**

It is also incorrect that the City Code does not authorize a civil action for abatement. Monsanto is on target when it identifies Section 50-80 as "provid[ing] a specific procedure to trigger § 50-79's authorization," but omits the portions of that Section which show that its position has no merit. The portions of Section 50-80 relevant here say that

> **[1]** It shall be the duty of the duly authorized authorities to serve a written notice upon the . . . person . . . who may be the . . . cause of any such nuisance requiring such persons to abate the nuisance in such manner as shall be prescribed within a reasonable period of time . . . and such notice may be given or served by any authorized authority who may be directed or deputed to give or make such notice. **[2]** No person so notified shall neglect or refuse to comply with the requirements of such order by abating such nuisance within the time specified. **[3]** If such nuisance is not abated within the time specified in such notice, it shall be the duty of such authorized authority to proceed at once to cause such nuisance to be abated; . . . . **[4]** In either case, the expense of such abatement shall be collected

[33] If the Court disagrees, any dismissal for failure to join the other property owners must be without prejudice. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1332 (Fed. Cir. 2009); *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 319 (3d Cir. 2007).

> from the person who may have created, continued or suffered such nuisance to exist.

SMF ¶ 115 (bracketed material added). The City complied with part [1] by serving upon Monsanto the pleadings in this case, which request "the immediate and complete abatement and remediation" of the PCB contamination. Dfts.' Mot. at 53 (quoting ECF No. 129 ¶ 118(B)). Monsanto did not commence remediation and thus did not comply with part [2]. Because Monsanto did not abate the nuisance, the City maintains this proceeding for abatement, consistent with parts [3] and [4]. These are square corners, indeed.

Even if Section 50-80 does not authorize the City's abatement proceeding, then 65 ILCS 5/11-60-2 does. [34] That statute provides that "[t]he corporate authorities of each municipality may define, prevent, and abate nuisances." *See also* 65 ILCS 5/11-1-1 ("The corporate authorities of each municipality may pass and enforce all necessary police ordinances."). If the City could not enforce this right of abatement through a civil action, it would be pointless. *See Vill. of Roxana*, 2013 WL 4510164, at *6 ("[I]f the municipality is not obligated to act . . . when a municipal ordinance is being violated, then . . . the ordinance itself is useless—the Court will not operate under that assumption."). Thus Monsanto is not entitled to summary judgment on this issue.

## IV. THE PRIMARY JURISDICTION DOCTRINE SHOULD NOT BE APPLIED.

Monsanto last argues that the Court should stay this case indefinitely and refer "the City's abatement claim (Count III) and similar requests for injunctive relief" to the EPA under the primary jurisdiction doctrine. Dfts.' Mot. at 53. The Court should not do so because the City's

[34] It is of no import that the City did not expressly refer to Sections 50-80 or 11-60-2 in its pleadings, because "complaints need not identify the applicable law." *Thomas*, 120 F.4th at 1337–38 (quoting *Chapman*, 875 F.3d at 848).

claims are based on state law (to which the EPA's regulations do not apply) and because there is no indication the EPA would act promptly to address the contamination at issue.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976). The primary jurisdiction doctrine is a limited exception to that rule which allows a district court to "refer a matter extending beyond the conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (quoting *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995)). But "the doctrine is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 98 (N.D. Ill. 2013) (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)). Situations calling for the doctrine to be applied include when an ambiguous agency regulation is directly at issue, *see StarNet*, 355 F.3d at 639, or when the suit would "disrupt" a "formal administrative proceeding in progress." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (Posner, J.).

There is no reason to apply the doctrine here. The City "does not rely on federal law," but rather "state law cause[s] of action" and the City Code. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 132 (7th Cir. 1991) (doctrine does not apply to personal injury claim arising from exposure to EPA-regulated pesticides because "a garden variety personal injury suit based on the defendant's alleged negligence" is "not dependent on any EPA provisions"). Monsanto incorrectly suggests that the TSCA regulations govern the relief available to the City, *see* Dfts.' Mot at 54–55; they do

not.[35] And in any event, courts routinely decline to apply the primary jurisdiction doctrine even to claims brought under the federal environmental statutes. *See PMC*, 151 F.3d 610 at 619 (doctrine does not apply to RCRA and CERCLA claims because no formal administrative proceedings were in place); *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, No. 3:24-CV-00681, 2024 WL 4751519, at *4–6 (D. Or. Nov. 11, 2024) (doctrine does not apply to RCRA citizen suit alleging PCB contamination because "PCBs are not an unusual substance, and the claims presented in Plaintiffs' complaint do not appear to involve complex issues that would benefit from the expertise of a regulatory agency"). There is even less reason to do so here for claims brought solely under state and municipal law.

The EPA's scattered involvement with the PCB contamination in the City does not compel a different result. Some documents suggest that the EPA tested for PCBs in the south end of the City in 2009, 2012, and 2015. *See* SMF ¶¶ 155, 158, 160. The EPA's last statement on the matter—a letter dated September 9, 2016, and purportedly sent to a former City mayor—says that "EPA recommends that additional investigation be performed in this area to assess how contamination levels should be considered during future development." *Id.* ¶ 160. There is no evidence the City received the letter in 2016, *id.* ¶¶ 161–62, but the City now interprets it as putting the onus on the City to address the contamination. SMF ¶ 164. That is what the City is doing through this suit. With the EPA having put the ball in the City's court, the ball need not be returned to the EPA—particularly when it may take years to act. *Cf. PMC*, 151 F.3d 610 at 618–19 (informal state agency involvement with contaminated site did not justify applying primary jurisdiction doctrine, because "[w]riting a letter" is different from " 'commencing' or

[35] *See supra* at 44.

'prosecuting' an 'action,'" and "the interminable character of much administrative process" militates against staying case for uncertain agency response).

The situation in *Centreville Citizens for Change v. City of Cahokia Heights*, where this Court applied the primary jurisdiction doctrine, was very different from this case. There, the EPA and the defendant municipality had "entered into an Administrative Order on Consent" that required the municipality to "undertake several projects" to address the problems at issue, and the municipality was "timely implementing them." No. 21-CV-842-DWD, 2024 WL 69085, at *4 (S.D. Ill. Jan. 5, 2024). With that binding order in place, the Court saw fit to defer resolution of the plaintiffs' requests for injunctive relief so that they could be evaluated in light of the work performed under the administrative order. *See id.* at *5. Even then, the Court remained "gravely concerned with issues of diligence" and the potential for "Plaintiffs' claims . . . to languish." *Id.* at *6. Those same concerns exist here—but without anything like a consent order to suggest the EPA or Monsanto will act promptly to address the PCB contamination in the City. Hence there is no basis to apply the primary jurisdiction doctrine.

**CONCLUSION**

Monsanto's motion for summary judgment on the City's claims should be denied.

Dated: April 4, 2025

Respectfully submitted,

**THE DRISCOLL FIRM, P.C.**

By: /s/ Matthew J. Limoli
Matthew J. Limoli, #6328051
434 Fayetteville Street, Ste. 560
Raleigh, NC 27601
Phone: (919) 582-6516
matthew@thedriscollfirm.com

Paul W. Johnson, #6193774
Christopher J. Quinn, #6310758
211 N. Broadway, Suite 4050
St. Louis, MO 63102
Phone: (314) 932-3232
Fax: (314) 932-3233
paul@thedriscollfirm.com
chris@thedriscollfirm.com

**CHATHAM & BARICEVIC**
John Baricevic, #3121537
Grey Chatham, #6312518
107 W. Main Street
Belleville, IL 62220
Phone: (618) 233-2200
Fax: (618) 233-1589
john@chathamlaw.org
greyjr@chathamlaw.org

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
Melissa K. Sims, #6231297
800 S. Gay Street, Ste. 1100
Knoxville, TN 37929
Phone: (815) 878-4674
Fax: (865) 522-0049
msims@milberg.com

**THE DRISCOLL FIRM, LLC**
John J. Driscoll, #6276464
1311 Avenida Ponce de Leon, 6th Floor
San Juan, PR 00907
Phone: (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

**LEMMON LAW FIRM, LLC**
Andrew A. Lemmon, LA Bar # 18302
5301 Canal Boulevard, Suite A
New Orleans, LA 70124
Phone: (985) 783-6789
Fax: (423) 501-4244
andrew@lemmonlawfirm.com

**SMOUSE & MASON, LLC**
Roy L. Mason, #938118
Zachary E. Howerton, #151215033
233 Duke of Gloucester Street
Annapolis, MD 21401
Phone: (410) 269-6620
Fax: (410) 269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 4, 2025, the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties. The foregoing document also was served via electronic mail upon:

Philip Rice
Rice Law Offices
110 E. Lincoln Street
Belleville, Illinois 62220
price@ricelawoffices.com

/s/ Matthew J. Limoli