**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **CITY OF EAST ST. LOUIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:21-cv-232-DWD** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHARMACIA LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION IN *LIMINE* NO. 2 TO PROHIBIT MISREPRESENTATION OF EPA REGULATORY STANDARDS**

The U.S. Environmental Protection Agency (EPA) and the State of Illinois have set PCB soil cleanup levels of one part per million (1 ppm) for high-occupancy residential areas. EPA has made clear that, while these levels are health protective, they do not indicate that levels above 1 ppm endanger human health. Yet the City intends to argue at trial that the parcels at issue here require cleanup of its parcels to 0.23 ppm, relying on EPA *screening* levels instead of *cleanup* levels, thereby artificially inflating both its damages and Defendants' potential liability.

Accordingly, Defendants hereby move this Court for an order in *limine* precluding the City and its experts from misrepresenting EPA regulatory values by: (1) representing that EPA's 0.23 ppm Regional Screening Level ("RSL") is a cleanup standard when it is not; (2) arguing, contrary to what the EPA has said about its own regulatory requirements, that EPA regulatory thresholds for PCBs are levels at which the presence of PCBs on the parcels at issue would present health risks to East St. Louis residents; or (3) representing that EPA's 1 ppm cleanup level is applicable to all parcels, when some are entirely inaccessible and could not be developed for high-occupancy use even if remediated today. For reasons explained below, such representations would be false and

misleading, creating juror confusion and unfair prejudice.[1] The Court should exclude any such argument or testimony by Plaintiff's counsel and witnesses under Rule 403.

## LEGAL STANDARD

As a general principle, "relevant evidence is admissible and irrelevant evidence is not." *United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014) (citing Fed. R. Evid. 402) (citation modified). To be relevant, evidence must be both *probative*, having "any tendency to make a fact more or less probable than it would be without the evidence," and *material*, meaning that the fact is "of consequence in determining the action." *Id.* (citation omitted). But not all relevant evidence is admissible. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Even relevant evidence is properly excluded where its "probative value is substantially outweighed by a danger of unfair prejudice," *i.e.*, "it will induce the jury to decide the case on an improper basis." *Davies v. Benbenek*, 836 F.3d 887, 890 (7th Cir. 2016) (citation omitted).

## FACTUAL BACKGROUND

Plaintiff's experts intend to testify that the City's parcels should be remediated to a PCB level of no greater than 0.23 ppm. *See* Exhibit A (4/24/2024 Deposition of James Olson ("Olson Dep.")) at 57:9-23; Exhibit B (2/16/2024 Expert Report of Kevin Coghlan) at 1; Exhibit C (2/13/2024 Expert Report of David Carpenter) at 6-7. But Dr. Olson acknowledges that 0.23 ppm is a screening level, that EPA specifically warns against using it as a cleanup level, and that his use

[1] Defendants dispute that any claims in this action should be tried to a jury, as detailed in their pending Motion for Judicial Determination of Plaintiff's Demand for Jury Trial. *See* Docs. 357, 362.

of it is contrary to EPA's instructions. *See* Exhibit A (Olson Dep.) at 65:13-22 ("Q. What [EPA] states is that [ 0.23 ppm] should not be used as cleanup levels, correct? . . .THE WITNESS: It does state that. . . . Q. And just so we're clear, that is how you're proposing to use it in this case, so we're clear? A. That's correct, yes."). Mr. Coghlan, Plaintiff's remediation expert, defers to Dr. Olson's selection of 0.23 ppm despite admitting he does not remember such a screening level *ever* being used as a PCB remediation standard. Exhibit D (4/23/2024 Deposition of Kevin Coghlan ("Coghlan Dep.")) at 108:8-110:1, 156:2-15, 163:13-20.

Plaintiff's experts further intend to testify that levels above 0.23 ppm represent a health risk to East St. Louis residents, despite the EPA having never taken that position. For example, Plaintiff's expert Dr. Olson plans to testify that remediation to 0.23 ppm screening is required to prevent excess cancer risk to East St. Louis residents. Exhibit A (Olson Dep.) at 62:14-17 ("That is if the level in the soil would be greater than .23 parts per million, there would be an unwanted excess exposure to risk, specifically risk of cancer."); *see also id*. at 62:2-13 (testifying that EPA's 0.23 screening level is "a standard that's based on scientifically appropriate risk assessment methodology, the most state of the art exposure assessment quantification along with the most recent toxicological data to be protected at the level of one excess cancer in one million people, and that's the standard that was utilized in this risk assessment"). Dr. Carpenter similarly opines that levels in excess of 0.23 ppm present a hazard to human health—although he acknowledged in his deposition that the screening level is ***not*** a hazard level but only a guide for investigation, making his report's discussion of it "not totally accurate." Exhibit E (5/6/2024 Deposition of David Carpenter) at 41:25-42:24.

## ARGUMENT

### I. The Court Should Prohibit the City from Misrepresenting EPA's 0.23 ppm Screening Level as a Clean-up Level.

The Court should prevent the City and its experts from misrepresenting EPA's 0.23 ppm regional *screening* level as a clean-up or hazard level established by EPA. Plaintiff argues, and would tell the jury, that some of the properties at issue here require remediation because testing indicates a soil concentration of PCBs in excess of EPA's RSL of 0.23 ppm. *See* Doc. 330 at ¶ 139[2]; Exhibit F (2/6/2025 Deposition of Kevin Coghlan) at 26:7-10. While Plaintiff is free to advocate for any cleanup level it chooses at trial, the Court should preclude Plaintiff and its experts from incorrectly suggesting that *EPA* considers .23 ppm a cleanup level or hazard threshold.

Attributing such a view to EPA is incorrect; EPA repeatedly and expressly disclaims use of 0.23 ppm as a cleanup standard, and the City's own experts admit as much. Indeed, EPA is emphatic that "*SLs [screening levels] are not de facto cleanup standards and should not be applied as such*," that "[t]he SL's role in site 'screening' is to help identify areas, contaminants, and conditions that require further federal attention at a particular site, and that "*[c]hemical concentrations above the SL would not automatically designate a site as 'dirty' or trigger a response action*" because "*SLs are generic screening values, not de facto cleanup standards*." Exhibit G (Regional Screening Levels (RSLs) – Frequent Questions, EPA (Nov. 2024) ("RSLs").

---

[2] The City's briefs consistently evade this issue, never denying that its experts would represent screening levels as danger levels or cleanup standards. *See* Doc. 330 at ¶¶ 22, 24. Instead, the City makes a non-sequitur argument that the Toxic Substances Control Act (TSCA) does not "preempt" their claim. Preemption is not the question. Plaintiff has chosen to propose an EPA-created measure as a cleanup standard, then, when confronted with EPA statements admonishing against doing so, resorts to an irrelevant preemption argument. Plaintiff's argument is pure evasion; the City cannot misrepresent EPA's position.

EPA treats SLs as merely a starting point, after which it conducts a remedial investigation and incorporates the results of that investigation into a feasibility study, where it applies ***nine*** criteria to determine whether remedial action is necessary and appropriate. *See id.* at 5; Exhibit H (7/9/24 Expert Report of Brian Hitchens) at 39-40 ("The remedial alternatives are compared against nine criteria [threshold criteria, primary balancing criteria, and modifying criteria]"); 40 C.F.R. § 300.430(e)(9)(iii).[3] Taken alone, SLs do not establish the existence of a hazard, are "not de facto cleanup standards[,] and should not be applied as such." Exhibit G (RSLs); *see also West Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 295 (4th Cir. 2022) (quoting an EPA statement in that case that "[s]creening levels are not cleanup standard"); *Isabel v. Velsicol Chem. Corp.*, 2006 WL 1745053, at *11 (W.D. Tenn. June 20, 2006) ("The screening level does not denote a threshold for health risk, cleanup, or property devaluation. Rather, the screening level is a standard below which . . . the EPA believe[s] further investigation of a property is not warranted.") (citation modified). The Court should preclude the City and its experts from misrepresenting EPA's 0.23 ppm screening level as an EPA cleanup level.

## II. The Court Should Preclude the City and Its Experts from Suggesting That PCBs Above EPA Thresholds Increase Cancer Risk for East St. Louis Residents.

The Court also should prohibit the City and its experts from suggesting that EPA has concluded that PCBs at levels exceeding 0.23 ppm (EPA screening level) or 1 ppm (EPA residential cleanup standards) increase risks of cancer or any other health hazard for East St. Louis residents. Any such suggestion is inaccurate, misleading, and inconsistent with the appropriate use of those standards.

---

[3] Those nine criteria are: (1) "[o]verall protection of human health and the environment;" (2) compliance with applicable or relevant and appropriate requirements; (3) "[l]ong-term effectiveness and permanence;" (4) "[r]eduction of toxicity, mobility, or volume through treatment;" (5) "[s]hort-term effectiveness;" (6) "[i]mplementability;" (7) "[c]ost;" (8) "[s]tate acceptance;" and (9) "[c]ommunity acceptance."

"EPA screening levels shed[] little insight on whether a possible imminent and substantial endangerment exists because screening levels are developed solely for the purpose of setting a level at which further investigation is required; they are not a determination of actual danger." *Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, 907 F. Supp. 2d 955, 965 (E.D. Wis. 2012) (citing EPA's website). EPA screening levels are conservatively drawn and have not been subjected to the same standard of proof as is required in litigation. *See*, *e.g.*, *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1364 (S.D. Fla. 2011) (regulatory agencies apply different standards than those applicable in litigation and "may choose to err on the side of caution"). Screening levels, by definition, indicate only the need for more study. "The screening level does not denote a threshold for health risk, cleanup, or property devaluation." *Isabel*, 2006 WL 1745053, at *11. Plaintiff's intended portrayal of EPA's 0.23 ppm screening level as an indicator of cancer risk to the residents of East St. Louis is therefore false, misleading, and should be precluded.

But even ***cleanup*** standards should be rejected as a basis for testimony or argument that levels exceeding them are dangerous. This is because "a number of protective, often 'worst-case' assumptions . . . are made in estimating allowable exposures for large populations, [so] these criteria and the resulting regulatory levels . . . generally overestimate potential toxicity for nearly all individuals." *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1249 (11th Cir. 2005) (precluding expert testimony about health effects when the expert relied on regulatory standards to determine health risks specific to individuals) (citation omitted). And because "regulatory agencies are charged with protecting public health," they "reasonably employ a lower threshold of proof in promulgating their regulations than is used in tort cases." *Hostetler v. Johnson Controls, Inc.*, 2020 WL 5543081, at *2 (N.D. Ind. Sept. 16, 2020) (citation omitted). And, "faced with uncertainties (like how an effect observed in animals might translate to humans), agencies draw

conservative assumptions to ensure that the levels they adopt protect the health of the public at large." *Id.* at *3.

It is not surprising, then, that courts have consistently refused to permit plaintiffs to substitute regulatory standards for the proof of health risks required to meet common law standards. *See*, *e.g.*, *id.* at *2 ("courts routinely condemn experts' reliance on regulatory values when attempting to evaluate the risk posed to a particular individual"); *C.W. v. Textron, Inc.*, 2014 WL 1047940, at *5 (N.D. Ind. Mar. 17, 2014) (holding regulatory standards are an improper basis for expert opinion on health risks), *aff'd*, 807 F.3d 827 (7th Cir. 2015); *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d at 1365 (regulatory agencies apply different standards than those applicable in litigation); *Rider v. Sandoz Pharms. Corp*., 295 F.3d 1194, 1201 (11th Cir. 2002) (same); *Glastetter v. Novartis Pharms. Corp*., 252 F.3d 986, 991 (8th Cir. 2001) (same). For these reasons, courts roundly reject regulatory thresholds as admissible to show harm or risk of harm.

This Court should follow the numerous other federal courts to consider this issue and exclude presentation of EPA's regulatory screening or cleanup standards as evidence of a threshold for danger, because such presentation is unreliable, not probative, and thus inadmissible. The Court should prohibit the City and its experts from mischaracterizing PCB screening levels as levels that would present meaningful health risks to the residents of East St. Louis.

**III. The Court Should Prohibit the City from Falsely Claiming that All Parcels Are Indiscriminately Subject to a 1 ppm Cleanup Standard.**

Defendants believe that, if the Court permits, Plaintiff would present EPA's 1 ppm cleanup level for high occupancy parcels as the relevant cleanup level for all parcels at issue, regardless of a parcel's nature or expected use. For example, Plaintiff's experts, such as Dr. Mitchell D. Erickson, insist that "remediation of residential soils will require excavation of any soil contaminated above one part PCB per million parts soil . . . and replacement with clean soil,"

without anywhere mentioning the threshold for non-residential soils and without distinguishing between high- and low-occupancy parcels. Exhibit I (2/15/2024 Expert Report of Mitch Erickson) at 116. Yet, undisputed evidence establishes that the properties at issue here are uninhabited, many of them are entirely inaccessible, and none is characterized by the level of activity necessary to establish high occupancy. In fact, another of the City's experts, Mr. Coghlan, agrees that the parcels at issue currently meet the definition of low-occupancy property, to which EPA's 25 ppm clean-up standard applies. *See* Exhibit D (Coghlan Dep.) at 132:12–134:19. In addition, some of the at-issue parcels lack the sewer, water, and access that would allow them to become high-occupancy. The City and its experts should be prohibited from suggesting that EPA's 1 ppm cleanup standard applies to all parcels without regard for their use or occupancy level. Any such suggestion would serve only to confuse and mislead the jury and unfairly prejudice Defendants and should be excluded under Rule 403. Fed. R. Evid. 403.

**A. EPA Applies Different Cleanup Standards to Different Kinds of Properties.**

Under the federal Toxic Substances Control Act, 15 U.S.C. § 2601, *et seq*., (TSCA) and its implementing regulations, 40 C.F.R. § 761.61(a)(4), the EPA sets and administers PCB cleanup levels that vary based on the kind of material and the potential exposure to PCBs after cleanup is completed. In considering exposure potential, EPA distinguishes between high- and low-occupancy areas. *See id.* "The cleanup level for bulk PCB remediation waste in high occupancy areas is ≤1 ppm," whereas "[t]he cleanup level for bulk PCB remediation waste in low occupancy areas is ≤25 ppm." *Id.* A high-occupancy area is defined as

> any area where PCB remediation waste has been disposed of on-site and where occupancy for any individual not wearing dermal and respiratory protection for a calendar year is: 840 hours or more (an average of 16.8 hours or more per week) for non-porous surfaces and 335 hours or more (an average of 6.7 hours or more per week) for bulk PCB remediation waste. Examples could include a residence, school, day care center, sleeping quarters, a single or multiple occupancy 40 hours

> per week work station, a school class room, a cafeteria in an industrial facility, a control room, and a work station at an assembly line.

40 C.F.R. § 761.3. A low-occupancy area is one where occupancy falls below those thresholds. *See id.*

The Seventh Circuit has recognized that 40 CFR § 761.61(a)(4) "distinguishes between low and high-occupancy areas and requires that, *in high-occupancy areas*, bulk PCB remediation waste, such as soil, be cleaned up to levels of concentration at or below one ppm." *Liebhart v. SPX Corp.*, 917 F.3d 952, 960 (7th Cir. 2019) (emphasis added); *see also Liebhart v. SPX Corp.*, 998 F.3d 772, 780 (7th Cir. 2021) ("in high-occupancy areas, the EPA requires 'cleanup' only when the sample concentration exceeds 1.0 ppm"); *see also Nanouk v. United States*, 2023 WL 2524793, at *2 n.15 (D. Alaska Mar. 15, 2023) ("Acceptable levels of PCB, as established by the EPA, permit up to 25 ppm in low occupancy areas."). The language of the regulation is clear, the definitions are straightforward, and courts have no trouble distinguishing them based on the facts of the case before them. Nor do they permit the application of high-occupancy standards to objectively low-occupancy areas to impose greater cleanup burdens on defendants than the facts and law can support. *See Leather Indus. of Am., Inc. v. E.P.A.*, 40 F.3d 392, 403-05 (D.C. Cir. 1994) (vacating as "irrational" an EPA rule that treated high-potential-for-occupancy and low-potential-for-occupancy tracts alike in setting risk-based concentration caps).

**B. All of The City's Parcels Are Currently Low Occupancy and Some Lack any Reasonable Potential for High Occupancy Use.**

As Plaintiff's experts Randall Bell and Kevin Coghlan admit, all parcels at issue here are vacant, such that their use is consistent with a low occupancy designation. *See* Exhibit J (5/3/2024 Deposition of Randall Bell) at 20:22-23 ("the 273 properties today are vacant a hundred percent"); Exhibit D (Coghlan Dep.) at 132:4-133:17 ("Q. And these parcels, as they currently exist, would

qualify and be appropriately characterized as low-occupancy areas as defined by EPA, correct? A. Yes, as I currently understand how these properties are being used or not used, that's true.").

Not only are the parcels currently unoccupied—many could not be developed in their present state. Indeed, Plaintiff's corporate representative Michael Wagner testified that some of the City's parcels lack the functioning streets and sewer systems necessary to make them marketable for development, and the City has not obtained an estimate as to the cost required to provide them. Exhibit K (4/2/2024 Deposition of Michael Wagner) at 91:4-92:6. Any prospect of their marketability thus stacks conjecture upon conjecture. Without that infrastructure, there is no reasonable scenario under which those parcels could be developed for high occupancy use in their present state, even if they were remediated for PCBs. The appropriate cleanup standard for those parcels is the low-occupancy threshold of 25 ppm.

### C. The Court Should Exclude Argument or Comment Suggesting EPA's 1 ppm Cleanup Standard Applies to Low-Occupancy Parcels.

It is undisputed that, as of today and with no cleanup whatsoever, PCB levels on all of the City's parcels are below 25 ppm. Doc. 330 at ¶¶ 22, 53. And it is undisputed that at least some of the City's parcels could not be developed for residential use without significant infrastructure investment that the City has no plans to make. Defendants request that the Court prohibit the City's counsel and its experts from suggesting to the jury that EPA's 1 ppm standard applies indiscriminately to all parcels regardless of their appropriate regulatory designation. Such a position would be irreconcilable with Plaintiff's witnesses' own testimony and with the law of this Circuit, which acknowledges the EPA's distinct categories for what they are. *See Liebhart*, 917 F.3d at 960; *Liebhart*, 998 F.3d at 780.

Plaintiff should not be permitted to misrepresent the standards that apply to the low-occupancy parcels at issue and to recover abatement costs for parcels that, under the appropriate 25 ppm standard, do not require abatement.

## CONCLUSION

The Court should hold Plaintiff to correct statements of EPA's standards, prohibiting it from falsely representing a 0.23 ppm threshold as a cleanup standard, from representing that levels above either .23 ppm or 1 ppm would expose East St. Louis residents to adverse health consequences, or from suggesting that EPA's 1 ppm cleanup level for high-occupancy residential use applies to any parcel that does not qualify as high-occupancy.

Dated: February 24, 2026

Respectfully submitted,

**KING & SPALDING LLP**

Tracie J. Renfroe
Mitchell B. Bryant
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200 (telephone)
trenfroe@kslaw.com
mbbryant@kslaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Ann E. Blackwell*
Ann E. Blackwell
Darci F. Madden
211 N. Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000 (telephone)
(314) 259-2020 (fax)
liz.blackwell@bclplaw.com
darci.madden@bclplaw.com

**GOLDMAN ISMAIL TOMASELLI**

Emma Ross
200 South Wacker Drive
22nd Floor
Chicago, IL 60606
(312) 681-6000 (telephone)
eross@goldmanismail.com

**SHOOK, HARDY & BACON L.L.P.**

Abigail Fears
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
(314) 690-0200 (telephone)
afears@shb.com

**McDERMOTT WILL & SCHULTE LLP**

Anthony Upshaw
Asra A. Chatham
333 SE 2nd Ave., Ste. 4500
Miami, FL 33131
(305) 358-3500 (telephone)
aupshaw@mwe.com
achatham@mwe.com

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

Charles R. Hobbs II
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
(314) 613-2800 (telephone)
Ron.Hobbs@lathropgpm.com

*Attorney for Defendant Solutia Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 24th day of February 2026, the foregoing was filed using the Court's CM/ECF system, which will serve notice upon all counsel of record.

*/s/ Ann E. Blackwell*
Ann E. Blackwell