**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **CITY OF EAST ST. LOUIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:21-cv-232-DWD** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHARMACIA LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION *IN LIMINE* NO. 11 TO EXCLUDE ARGUMENT OR REFERENCE TO PAUL WRIGHT, IBT AND PHIL SMITH'S TESTIMONY**[1]

Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC ("Defendants") move for an order excluding evidence and argument relating to the research fraud committed by an outside laboratory, Industrial Bio-Test Laboratories, Inc. ("IBT"), and the related criminal investigation and prosecution of that third-party and certain of its employees, including Dr. Paul Wright, in the 1980s in relation to the fraud. IBT's fraud related to animal studies, including long-term rodent cancer studies, that IBT conducted for the U.S. government, and many pharmaceutical and chemical companies, including Monsanto. The fraud convictions related to products other than PCBs and none of the PCB studies IBT performed for Monsanto were invalidated. The IBT evidence is not relevant and would be misleading, highly inflammatory, and unfairly prejudicial to Defendants and result in a substantial waste of trial time. The federal district court presiding over

[1] Defendants continue to dispute that any claims in this action should be tried to a jury, as detailed in their pending Motion for Judicial Determination of Plaintiff's Demand for Jury Trial. *See* Docs. 357, 362.

the Roundup herbicide MDL proceeding excluded evidence about Dr. Wright and the IBT scandal,[2] and several state courts have excluded or limited that evidence.[3]

IBT's fraud in conducting rodent studies for numerous companies, Paul Wright's role in that fraud, and Paul Wright's history with Monsanto are all irrelevant to the City's claims in this lawsuit, which are for property damage, not health effects. The evidence is also misleading, highly inflammatory, and would be unfairly prejudicial to Monsanto and result in a substantial waste of trial time. It should therefore be excluded under Rules 402 and 403.

## LEGAL STANDARD

As a general principle, "[r]elevant evidence is admissible [and] [i]rrelevant evidence is not." *United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014) (citing Fed. R. Evid. 402). To be relevant, evidence must be both *probative*, having "any tendency to make a fact more or less probable than it would be without the evidence," and *material*, meaning that the fact is "of consequence in determining the action." *Id.* But not all relevant evidence is admissible. Even relevant evidence is properly excluded where its "probative value is substantially outweighed by a danger of unfair prejudice," *i.e.*, "it will induce the jury to decide the case on an improper basis[.]" *Davies v. Benbenek*, 836 F.3d 887, 890 (7th Cir. 2016) (citation omitted).

---

[2] *See* Ex. 1 (Pretrial Order No. 114: Order Regarding Outstanding Evidentiary Issues from PTO 81 (Doc. 2987) in *In re Roundup Prods. Liab. Litig.*, MDL No. 2741 (*Hardeman*, Case No. 16-md-02741-VC)) at ¶ 3 (allowing evidence that certain Roundup herbicide studies performed by IBT were later invalidated but excluding "evidence about why they were invalidated, about Dr. Wright, or about the broader IBT fraud scandal" under Rule 403).

[3] While some state courts have admitted at least some IBT-related evidence, those cases demonstrate the evidence wastes substantial trial time. For example, one Washington state court allowed evidence related to IBT and Dr. Wright and by the end of trial, the jury heard "IBT" referenced 526 times and heard Dr. Wright mentioned 132 times. *See* Ex. 2 (Defendant's Mot. for New Trial on the Claims of Pl. Alec Mullen-DeLand (Doc. 1014) in *Mullen-DeLand v. Pharmacia, LLC*, No. 21-2-14303-9-SEA (Wash. Super. Ct. Jan. 23, 2023) (hereinafter "*Mullen-DeLand*")) at 29.

## FACTUAL BACKGROUND

### A. IBT and its Employee, Dr. Wright

Prior to 1976, IBT was one of the largest U.S. testing laboratories performing toxicity testing and long-term animal studies for large corporations and government agencies, including the National Cancer Institute, and Monsanto.[4] In 1976, the Food and Drug Administration ("FDA") discovered discrepancies in certain toxicology tests performed by IBT related to certain pesticides and drugs.[5] Because of this, the Environmental Protection Agency ("EPA") demanded an audit of all IBT studies that had been used to support pesticide registrations.[6] The audit revealed some of IBT's studies were invalid; however, *none of the studies that Monsanto contracted IBT to conduct on PCBs were found invalid*.[7] In 1981, four IBT employees, including one—Dr. Wright—who worked for Monsanto before joining IBT and again after departing IBT, were indicted for their role in IBT's research fraud.[8] Three of the four, including Dr. Wright, were convicted of fraud. Dr. Wright's indictment and prosecution *did not concern the studies IBT performed on PCBs*; they concerned four other products – three products Monsanto did not manufacture (an insecticide, an herbicide, and an arthritis drug), as well as one product (an anti-bacterial agent) made by Monsanto. At the time of the indictment, Dr. Wright was employed by Monsanto and denied any wrongdoing, and Monsanto paid for his criminal defense. The federal indictment of Dr. Wright and IBT, and the government's evidence at trial, characterized the sponsors of the studies,

---

[4] Ex. 3 (5/25/1983 IBT Statement Memo from Dan R. Bishop, attaching fact sheet).
[5] Ex. 4 (7/1983 EPA Office of Pesticides Programs, Summary of the IBT Review Program) at 1.
[6] *Id.*
[7] *Id.* at 2.
[8] Ex. 5 (Keith Schneider, *Accused of Faking Data*, St. Louis Post-Dispatch, Mar. 30, 1983).

including Monsanto and the government agencies, as *victims* of IBT's fraud and not in any way complicit in the fraud.[9]

After his conviction, Dr. Wright was deposed in civil litigation in 1987 and was asked questions related to IBT, his conduct, and the convictions, as well as unfounded questions calculated to implicate Monsanto in his actions. Dr. Wright invoked his Fifth Amendment privilege against self-incrimination in response to all questioning regarding his participation in the Aroclor (PCB) studies conducted at IBT. Realizing the opportunity to create a misleading and prejudicial record, the plaintiff's lawyer posed 46 pages of inflammatory and factually unsupported questions aimed at implicating Monsanto in Dr. Wright's work at IBT, such as:

- "Q: Dr. Wright, while you were employed by IBT, you and the other management personnel at IBT collaborated with Monsanto to understate the toxic effects of Monsanto's Aroclor products, did you not?" Ex. 7 (6/16/1987 Deposition of Dr. Wright in *Scott v. Monsanto Co.*, No. B-84-1103-CA (E.D. Tex.) ("Wright Dep.")) at 40:22-25;

- "Q: Dr. Wright, an important part of the joint, collaborative action between Monsanto and IBT was to develop test results that could be used by Monsanto and IBT to persuade the government that Aroclor as a product was not a carcinogen; isn't that true?" *Id.* at 41:6-10;

- "Q: Dr. Wright, when both IBT and Monsanto went to representatives of the United States Government in November of 1975 and promoted their position vis-à-vis Aroclor products and PCB's, both IBT and Monsanto knew at that time that the IBT Aroclor studies were wrong or faulty; isn't that correct?" *Id.* at 44:19-24.

Through these and other unfounded questions, coupled with Dr. Wright's invocation of the privilege, the plaintiff's attorney essentially *testified*, creating an inflammatory and prejudicial record aimed at implicating Monsanto. The deposition includes no actual witness testimony about Monsanto; it is only fodder for counsel to insinuate inferences that are untrue and highly prejudicial.

---

[9] Ex. 6 (9/29/1983 Trial Transcript in *United States v. Calandra*, No. 81 CR 235 (N.D. Ill) ("*Calandra* Trial Tr.") at 17048.

### B. Monsanto Did Not Direct or Participate in the IBT Fraud

Plaintiffs in prior actions have attempted to cite the timeline of Dr. Wright's employment and the fact that Monsanto paid for his criminal defense to suggest that Monsanto directed or participated in the IBT fraud. That suggestion is false, misleading, and thus inadmissible, and has been excluded from numerous state court personal injury trials.[10] It is not only factually unsupported but foreclosed by testimony of Plaintiff's own witnesses and the historical record – including a three-year grand jury investigation that concluded there was no basis to charge Monsanto with any involvement in IBT's fraud.[11] Indeed, the IBT fraud occurred prior to 1976 when it was discovered by federal regulators, yet the undisputed evidence confirms that Monsanto did not even learn of possible fraud at IBT until a meeting it had with IBT on July 11, 1977, which

[10] *See*, *e.g.*, Ex. 8 (2/4/2021 Order in *Erickson v. Monsanto Co.*, No. 18-2-11915-4 SEA (Wash. Super. Ct., King Cnty.) at 13; Ex. 9 (Trial Transcripts in *Long v. Pharmacia LLC* (*f/k/a Bard v. Monsanto Co.*), No. 18-2-00001-7 SEA (Wash. Super. Ct., King Cnty.) (hereinafter "*Long*")) at 808-810, 1321-22; Ex. 10 (2/22/2022 Hearing Transcript in *Beutler v. Pharmacia LLC*, No. 21-2-14302-1 SEA (Wash. Super. Ct., King Cnty.)) at 109:8-115:22 (adopting *Long* ruling); Ex. 11 (5/10/2022 Omnibus MIL Order in *Soley v. Pharmacia LLC*, No. 18-2-23255-4 SEA (Wash. Super. Ct., King Cnty.) (hereinafter "*Soley*")) at 11; Ex. 12 (5/16/2023 Omnibus MIL Order in *Clinger v. Pharmacia LLC*, No. 18-2-54572-2 SEA (Wash. Super. Ct., King Cnty.) ("*Clinger* MIL Order")) at 17; Ex. 13 (10/13/2023 Trial Transcript in *Bard v. Pharmacia LLC*, No. 21-2-14305-5 (Wash. Super. Ct., King Cnty.) (hereinafter "*Bard*")) at 621:13-622:19; *see*, *e.g.*, Ex. 14 (1/24/2020 Order on Pretrial Matters in *Caballero v. Monsanto Co.*, No. MSC19-01821 (Cal. Super. Ct., Contra Costa Cnty.) at 58 (ruling "plaintiff may not mention Dr. Wright or suggest in any way that Monsanto was complicit in procuring a fraudulent study"); Ex. 15 (7/28/2022 Order Concerning the Parties' Motions *in Limine* in *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Mo. Cir. Ct., St. Louis Cnty.)) at 7 (excluding evidence or reference to IBT or any of its employees being convicted of any crime); Ex. 16 (5/17/2022 Order on Pretrial Matters in *Johnson v. Monsanto Co.*, No. 21CV10291 (Or. Cir. Ct., Jackson Cnty.)) at 3 (excluding evidence alleging that Monsanto was responsible for IBT fraud); Ex. 17 (1/23/2020 Order in *Wade v. Monsanto Co.*, No. 1722-CC00370 (Mo Cir. Ct., St. Louis City)) at 3 (excluding discussion of Paul Wright working at Monsanto).

[11] "The grand jury exists not to determine guilt or innocence, but to assess whether there is an adequate basis for bringing a criminal charge." *United States v. Yarborough*, No. 06-CR-190(A), 2007 WL 962926, at *12 (W.D.N.Y. Mar. 28, 2007).

is summarized in a contemporaneous document.[12] The record confirms that Monsanto had no role in directing the fraud:

- Plaintiff's historian Dr. Rosner has testified that he believes that Monsanto first learned of IBT's fraud in July 1977.[13]
- Plaintiff's expert Dr. DeGrandchamp has testified he cannot support a claim that Monsanto knew of the IBT fraud with respect to the Aroclor studies prior to 1980.[14]
- The contemporaneous document describing the July 11, 1977, meeting referenced by Dr. Rosner reports that, when IBT advised Monsanto of issues with the studies, Monsanto's Mr. Throdahl "asked [IBT] specifically whether 'fraud' was involved in the LTRS [long term rat studies]."[15] That inquiry would make no sense if Monsanto had orchestrated a fraud in connection with the rat studies.
- In response to IBT's disclosure at the July 1977 meeting, Monsanto undertook to audit and revalidate select studies performed by IBT to determine "whether IBT's problems were confined to the suspect department at Northbrook, Illinois" and determine "how comprehensive IBT's internal audits are."[16] These steps would have been unnecessary if Monsanto had been involved in directing the fraud.
- Immediately following the July 11, 1977 meeting, Monsanto acted "to ascertain the legal relationship between Nalco and IBT in order to determine whether or not Nalco might be held liable for IBT's conduct" because Monsanto was considering "the possibility of instituting suit against IBT (Nalco)."[17] Those considerations would make no sense if IBT had been acting at Monsanto's direction.
- Monsanto did, in fact, sue Nalco. Nalco settled the suit and never claimed that Monsanto was a co-conspirator with IBT with respect to the fraud.[18]
- The IBT fraud impacted studies it performed for many entities, not just Monsanto. From a Wall Street Journal article: "According to EPA documents, the agency has invalidated 737 of the basic laboratory safety studies involving more than 200 pesticide chemicals tested by Industrial Bio-Test Laboratories Inc., a unit of Nalco

---

[12] Ex. 18 (July 13, 1977 Withers Memo to Throdahl re IBT Audit ("Withers Memo")) at 2.
[13] Ex. 19 (Trial Transcripts in *Mullen-DeLand* ("*Mullen-Deland* Trial Tr.") at 1477:2-22 (Rosner testifying that, **during a meeting in July 1977, "Monsanto learned at that moment, that moment that fraud was involved, that these studies were fraudulent"**) (emphasis added).
[14] Ex. 20 (5/17/22 *Soley* Trial Tr.) at 2005:24-2006:10.
[15] Ex. 18 (Withers Memo) at 2.
[16] *Id.* at 3.
[17] *Id.* at 4.
[18] Ex. 21 (6/13/1994 Affidavit of Thomas M. Bistline in *Bechtold v. Monsanto Co.*, No. 922-00911 (Mo. Cir. Ct., St. Louis City)) at ¶¶ 2-3.

> Chemical Co. …. Most of the tests were done in the 1970s for 44 chemical companies ….”[19]

Plaintiff’s suggestion that Monsanto directed or was even aware of the IBT fraud when it was going on – *i.e.*, prior to July 1977 – is baseless, inflammatory, and has been excluded in many prior cases. The Court should exclude any such suggestion here. Fed. R. Evid. 104(b), 403.

Even in the personal injury context, courts have repeatedly excluded any allegation that Monsanto directed or participated in the IBT fraud because the allegation is false, lacks evidentiary foundation and presents significant risk of unfair prejudice. As a Washington state court explained in *Long*: “I know that plaintiffs have a story as to how Monsanto was putting their thumb on the scale all along, but I don’t think we have any proof that they were putting their thumb on the scale. That’s just sort of what plaintiffs are, you know, suspecting.” Ex. 23 (*Long* 8/24/2021 MIL H’rg Tr.) at 52:24-53:4. Thus, the *Long* Court excluded efforts to impute knowledge of IBT’s fraud to Monsanto. Ex. 9 (*Long* Trial Tr.) at 809:18-21 (“COURT: … And we don’t know for sure that they knew there were problems [before July 11th, 1977]”). Likewise, in *Soley*, the court prohibited the plaintiffs “from attempting to impute Dr. Wright’s knowledge obtained while at IBT or alleged participation in the alleged IBT fraud to Monsanto[, and] from implying that Monsanto participated in any fraud at IBT or that Monsanto knowingly commissioned fraudulent studies at IBT.” Ex. 11 (*Soley* MIL Order) at 11. The same was held in *Clinger* and *Bard*, finding evidence insufficient to support allegations that Pharmacia played a role in IBT’s fraud. Ex. 13 (*Bard* Trial Tr.) at 621:13-622:19 (“The evidence is that Monsanto learned of the fraud later, meeting with IBT … [T]here is still no evidence really to suggest that, while at IBT, Dr. Wright acted as an agent for Monsanto directly.”); Ex. 12 (*Clinger* MIL Order) at 17.

---

[19] Ex. 22 (Bill Richards, *EPA Turns Up Safety Questions in Pesticide Probe*, WALL ST. J., May 12, 1983).

### C. Phil Smith

Plaintiff may also seek to introduce testimony from Mr. Phil Smith, a disgruntled former IBT employee. Mr. Smith worked at IBT from 1971 to 1977, when he was asked to resign.[20] Mr. Smith, who was not a toxicologist, pathologist, certified clinical chemist or member of any professional organization,[21] received approximately $10,000 in witness fees and subsistence allowances for cooperating with government investigators, including by testifying in the criminal trial against IBT and its employees.[22] He was also granted immunity in the government's investigation.[23] In 1991—almost 15 years after Pharmacia ceased manufacturing PCBs—Mr. Smith testified for the first time that he had falsified data in IBT's PCB-related studies.[24]

Notably, Mr. Smith's 1991 testimony diverged from the testimony he offered years earlier, before a grand jury in the IBT criminal investigation, where he did not mention falsification of any PCB studies.[25] In addition, although Mr. Smith testified that he had falsified the data in IBT's PCB studies, he testified that the information on the results was still "reasonably accurate" and that the only person who was aware of the "false" data was Dr. Wright, then an IBT employee.[26]

Decades later, Mr. Smith was called to testify for plaintiffs in a civil PCB trial in Washington state court where he offered speculative testimony that Monsanto knew about the IBT fraud while it was occurring. *See* Ex. 26 (9/25/2023 Trial Transcript in *Heit v. Pharmacia LLC*, No. 18-2-55641-4-SEA (Wash. Super. Ct., King Cnty.)) at 2122:1-5. This testimony contradicted

[20] Ex. 24 (6/16/1998 Deposition of Philip Smith in *Mars Hill Missionary Baptist Church v. Monsanto Co.*, No. CV-96-243 (Ala. Cir. Ct., Calhoun Cnty.)) ("Smith Dep.") at 69:17-19.
[21] *Id.* at 135:20-137:3.
[22] *Id.* at 68:9-23.
[23] *Id.* at 158:11-14; 121:20-123:22.
[24] Ex. 25 (10/28/1991 Trial Testimony of Philip Smith in *Brown v. Monsanto Co.*, No. 862-00694 (Mo. Cir. Ct., St. Louis Cnty.)) ("Smith (*Brown*) Tr.") at 1073:6-1074:1.
[25] Ex. 24 (Smith Dep.) at 123:4-22.
[26] Ex. 25 (Smith (*Brown*) Tr.) at 1088:7-13; 1133:15-23.

Mr. Smith's prior testimony *in the same trial* that he has "no knowledge of whether Dr. Paul Wright provided any information to Monsanto about deficiencies in the Aroclor studies, whether before or after he left IBT." *Id*. at 2110:24-2111:3. Mr. Smith also offered his own speculative theory as to why federal prosecutors did not include the PCB studies among the fraudulent studies listed in the indictment. *Id*. at 2117:24-2118:10. Since the *Heit* trial, courts have precluded Mr. Smith from offering his speculation on either issue. *See* Ex. 27 (*Bard* 10/20/2023 MIL Order) at 43 (granting motion to preclude such testimony).

## ARGUMENT

### A. Any Evidence Related to IBT Fraud, Dr. Wright, and Mr. Smith Is Irrelevant to this Property Damage Case under FRE 402.

Because it concerns the actions of an independent third-party laboratory, because it involved products other than PCBs, because the animal tests at issue were for toxicity and cancer and have no bearing on the City's claims for property damage, and because it relates to studies conducted in the 1960s and 1970s and fraud that was fully exposed decades before the City claims to have known that PCBs were on any of its parcels, any evidence related to the IBT fraud has no nexus to any material fact at issue in this case.

First, the City's claims in this case are about PCBs. The IBT fraud investigation involved toxicity studies of other chemicals, not PCBs.[27] PCB studies were not at issue in the IBT indictment or criminal trial. Toxicity studies related to other products are not relevant to the issues presented. Even if the uncorroborated testimony of Mr. Smith were credited and the fraudulent toxicity testing from the late 1970s had affected the earlier PCB studies, that would not support Plaintiff's claims in this case, as Monsanto was a *victim* of the IBT fraud, not its perpetrator. In fact, IBT's parent company tacitly acknowledged that Monsanto played no role in IBT's misconduct when it entered

[27] Ex. 6 (*Calandra* Trial Tr.) at 17048, 17054.

into a settlement with Monsanto to resolve Monsanto's claims against IBT in connection with the fraud. Moreover, Monsanto had no knowledge of any purported issues with the PCB studies until after those studies were concluded and Monsanto had stopped manufacturing PCBs.[28] As a result, nothing about the IBT scandal provides a basis for resolving any issue in this case. Nor does IBT's fraud related to studies of chemicals other than PCBs pertain to any issue to be decided in this case.

Second, the IBT fraud pertains to conduct of an independent non-party. The federal indictment and evidence at trial firmly established that Defendants were victims, not perpetrators, of IBT's fraud, as the government expressly stated in its closing argument:

> Of course, [IBT] charged Monsanto $58,000 for [the study]. But Monsanto didn't know about all the commingling that occurred and they weren't told that the mortality tables were fabricated. But that is the falsification that occurred from all this.

Ex. 6 (*Calandra* Trial Tr.) at 17048. The City's anticipated use of IBT evidence in this case is to rewrite history by blaming the fraud on Monsanto, a victim of the fraud, contrary to the prosecution's position. Permitting the City to misrepresent this history and evidence to fabricate a narrative of Monsanto's participation in the IBT fraud would be false, misleading, and unfairly prejudicial to Defendants.

Nor is it relevant to any fact of consequence to this case that Monsanto paid for Dr. Wright's legal defense in his fraud case, or how much Monsanto paid—both facts that Plaintiffs in personal injury litigation have returned to repeatedly when they are allowed to do so. They do so in order to undercut what is plainly established by the related criminal investigations, which is

---

[28] IBT issued its PCB study results in November 1971. *See* Ex. 28 (*Mullen-DeLand* Slide – IBT Timeline of Events). Pharmacia did not learn that there were issues with any IBT studies until July 1977, *id.*, and Mr. Smith did not allege that the PCB studies were based on falsified data until 1991.

that Monsanto was a victim of IBT, not a participant in IBT's fraud. Monsanto's decision to pay for an executive's legal defense has no bearing on the City's property damage claims, either.

Third, animal tests for toxicity that were conducted in the 1970s—and fraud that was fully exposed by the 1980s—have no bearing on the City's claims for property damage in the subsequent decades. Their only conceivable factual relevance would be to the state of knowledge about health effects of PCBs that might devalue the City's properties. But that cannot be relevant when the City claims it did not know PCBs were on its property until 2020. By that time the IBT fraud had been fully uncovered for more than three decades. Dr. Wright had gone to jail. And, as Plaintiffs' experts frequently testify, thousands of studies had been published exploring the potential health effects of PCB exposure.

The City may seek to introduce Dr. Wright's repeated invocation of his constitutional right against self-incrimination during a 1987 deposition in order to create an unsubstantiated and improper suggestion of Monsanto's guilt. This evidence lacks probative value as to any issue of consequence in this case and is factually inaccurate. Dr. Wright's decision to invoke the Fifth Amendment was made under advice from his personal attorneys and contrary to counsel for Monsanto's strenuous *objection* urging him to testify fully and truthfully.[29] Defendants had no part in and actively opposed his choice not to testify or to correct the misstatements of fact made by the plaintiff's attorney there. The *Scott* deposition transcript therefore amounts to the testimony of an attorney who seized an opportunity to create a misleading and prejudicial record, posing

[29] "Monsanto Company objects to your taking the 5th Amendment privilege against self-incrimination during this deposition. So far as Monsanto is aware, no answer which you could give to any question relative to this case could incriminate you in any manner, whatsoever. On behalf of Monsanto, I urge you to fully and truthfully answer the questions asked of you either by [Plaintiffs' counsel] or myself." Ex. 19 (*Mullen-DeLand* Trial Tr.) at 4433:13-4434:13 (reading Dr. Wright's deposition at 18:20-19:8).

argumentative questions to a witness he knew would invoke the privilege. It would be improper and unfairly prejudicial for the jury to draw adverse inferences from Dr. Wright's choice not to answer those questions.

Similarly, any testimony given by Mr. Smith claiming that he allegedly falsified data in IBT's PCB studies is completely unrelated to the issues in this case. Mr. Smith's allegations do not address Plaintiff's claims and do not relate to any element of the alleged causes of action. Mr. Smith himself testified that no one knew about any fraud involving IBT's PCB studies except Dr. Wright until Mr. Smith testified about them in 1991. As Defendants were unaware of the alleged fraudulent nature of the PCB studies at the time of sale of the PCBs in this case, this cannot be used as a basis for punishing Defendants. Moreover, allowing such evidence would require a recognized victim in a federal criminal trial to disprove its guilt in an unrelated civil trial. The evidence should be excluded.

**B. Any Minimal Relevance Related to Evidence of Fraud Is Far Outweighed by the Unfair Prejudice to Defendants.**

Even if the Court determines that the IBT evidence has marginal relevance, it should be excluded because "its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403. Introducing the IBT evidence and using it to malign Defendants is textbook unfair prejudice, designed "to arouse the jury's emotions" and encouraging them to "consider . . . evidence for purposes other than for what it was intended." *United States v. Falco*, 727 F.2d 659, 662 (7th Cir. 1984).

Evidence of third-party fraud distracts and misleads the jury, leading them to believe that Defendants were somehow complicit in the fraud. Likewise, Dr. Wright's repeated invocation of his Fifth Amendment privilege, sometimes in response to questions calculated to impugn and

unfairly implicate Pharmacia, is unfairly prejudicial and calculated to mislead the jury. Issues related to IBT, Dr. Wright, and Mr. Smith are a sideshow meant to inflame the jury and conflate a victim of fraud with its perpetrator. If allowed, Plaintiff will make IBT a centerpiece of their case. In the *Mullen-DeLand* trial, for example, plaintiffs' counsel repeatedly, falsely suggested to the jury that Pharmacia planted Dr. Wright at IBT to falsify the PCB studies[30]—an argument entirely unsupported by the evidence – and made that suggestion a centerpiece of the trial. By the end of that trial, the jury heard "IBT" referenced 526 times and "Wright" referenced 132 times. This entire irrelevant narrative should be excluded under Rule 403.

**C. Any Reference to Paul Wright's Invocation of the Privilege Should Be Excluded.**

The Court should exclude the *Scott* deposition and any reference to Dr. Wright's invocation of the privilege. It is inadmissible and would be unfairly prejudicial, as (1) Dr. Wright is not a party here and was not an employee of any party at the time of his misconduct or invocation of the 5th Amendment, so no adverse inference can be drawn from his invocation of the privilege; (2) Monsanto had no opportunity to cross-examine him in *Scott*, so his testimony is inadmissible hearsay; and (3) the questions are rife with inflammatory, factually unsupported attorney testimony.

**1. No adverse inference can be drawn from Dr. Wright's invocation of the Fifth Amendment.**

The portions of Dr. Wright's deposition in which he asserts the privilege have no probative value here, and their potential for prejudice and confusion is immense. No adverse inference can be drawn from Dr. Wright's invocation of his privilege because he is not a party here. In civil

[30] Ex. 19 (*Mullen-DeLand* Trial Tr.) at 1444:16-1445:9; 1888:3-1901:10; 2071:14-2072:4; 2073:5-2074:8; 4384:1-4386:13; 4729:20-4731:8. Plaintiff posed questions unsupported by any evidence or good-faith basis to suggest that Pharmacia planted Dr. Wright at IBT in furtherance of the fraud. *See id.* at 4711:24-4712:2.

litigation, though an adverse inference may be permitted when a party invokes the privilege, *see Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), Illinois law does not permit a non-party's invocation to give rise to an adverse inference against anyone other than the non-party's current employer or close relation, judged by the facts of the particular case at bar.

In limited circumstances, an adverse inference may be permissible against a party based on a nonparty's invocation of the privilege. *LiButti v. United States*, 107 F.3d 110, 120–23 (2d Cir. 1997); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000). *LiButti* identified four nonexclusive factors to guide the analysis: (1) "The Nature of the Relevant Relationships;" (2) "The Degree of Control of the Party Over the Non-Party Witness;" (3) "The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation;" and (4) "The Role of the Non-Party Witness in the Litigation." 107 F.3d at 123–24. Ultimately, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 124.

Here, every one of the *LiButti* factors, and their overarching purpose, supports the exclusion of this testimony. Dr. Wright did not have the necessary relationship with Monsanto at the time of the conduct at issue or the time of his deposition, as Monsanto did not employ him at either time. Monsanto had no control over Dr. Wright during his deposition. His employment and relationship with Monsanto had ended, and he was represented by his own counsel. Indeed, Monsanto's counsel objected to Dr. Wright's invocation of the privilege during the deposition and urged him to respond substantively but could not persuade him to do so. Dr. Wright has no interest in the present litigation and his invocation of the privilege does not advance, but rather impairs, Monsanto's interest. Nor did he have any interest in the litigation in which he invoked the privilege. And Dr. Wright has no role in the current litigation, nor did he have any role in the *Scott* lawsuit.

Indeed, under near-identical circumstances, courts applying *LiButti* have refused to permit adverse inferences based on nonparties' invocations of the privilege. In *Fujisawa Pharmaceutical Co. v. Kapoor*, a court in the Northern District applying *LiButti* excluded reference to former employees of pharmaceutical company invoking the Fifth Amendment in relation to fraudulent testing data. No. 92 C 5508, 1999 WL 543166, at *9 (N.D. Ill. July 21, 1999). Other courts follow the same principles. *See*, *e.g.*, *Almodovar v. Guevara*, Nos. 18-cv-2341, 18-cv-2707, 2025 WL 71735, at *4 n.4 (N.D. Ill. Jan. 10, 2025); *Dexia Credit Loc. v. Rogan*, No. 02 C 8288, 2009 WL 10736163, at *3 (N.D. Ill. May 26, 2009) (refusing to permit adverse inference from invocation of Fifth Amendment privileges where witness's "role in the present litigation has been only as a witness"). There is nothing to distinguish those cases from the facts presented here.

**2. Dr. Wright's testimony is inadmissible hearsay.**

Dr. Wright's testimony is also inadmissible hearsay because, due to his invocation of the privilege, Monsanto did not have the opportunity to cross-examine him. Dr. Wright is deceased and thus unavailable to appear. Fed. R. Evid. 804(b)(1) only allows former testimony to be admitted "if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination." *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1186 (7th Cir. 1992) (citation omitted). But where an unavailable witness invoked the privilege, the opportunity to cross-examine him has been denied. *See In re Corrugated Container Antitrust Litig.*, 661 F.2d 1145, 1158–59 (7th Cir. 1981) ("It is undisputed that [the deponent] has, and will exercise, his Fifth Amendment privilege to refuse to answer any such questions. Defendants will not, therefore, have any real opportunity to cross-examine at the deposition."), *aff'd sub nom. Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983); *United States v. McKinney*, No. 18-3015, 2019 WL

2897504, at *2 (6th Cir. Apr. 16, 2019) (affirming district court's determination that prior testimony was not admissible under Fed. R. Evid. 804(b)(1) in part "because there was not a full opportunity to cross-examine after [the declarant] invoked the Fifth Amendment").[31]

**3. The questions asked of Dr. Wright are so prejudicially leading and loaded with unsupported insinuations as to taint the entire testimony.**

Many of the questions posed to Dr. Wright during his *Scott* deposition are inadmissible for the additional reason that they suggest facts lacking support in the record. It is improper to ask a witness inflammatory questions without having some good-faith factual support for the questions posed and without being prepared to prove the facts behind the question. *United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010) ("No attorney may ask a question if he doesn't have a good-faith basis to ask it[.]"); *Ford v. Crinder*, No. 97CIV.3031RMBJCF, 2001 WL 640807, at *5 (S.D.N.Y. June 8, 2001) ("Generally, counsel may offer a factual proposition as the predicate for a question on cross-examination *provided there is a good faith basis for believing that the proposition is true*.") (emphasis added).

In addition to their unfair prejudice under Rule 403, many questions asked lacked any factual foundation, including questions implying that Monsanto tried to forestall regulatory action, knew that Aroclor studies were falsified, or misled others about PCBs' adverse health effects.

[31] Plaintiff cannot avoid the requirements of Fed. R. Evid. 804(b)(1) by arguing that the testimony is admissible as an ancient document. *See Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, No. 81-48 MM, 1986 WL 15580, at *6 (D. Del. May 19, 1986) ("Because testimony given in a prior proceeding or case is specifically admissible as an exception to hearsay under the conditions imposed by Fed. R. Evid. 804(b)(1), the Court rejects plaintiff's attempt to force the … material into the hearsay exceptions for public records or ancient documents. Such a broad interpretation of the parameters of rules 803(8) and 803(16) would thwart the purpose of the Federal Rules of Evidence in limiting the admissibility of former testimony to only those cases where the predecessor in interest had a similar motive to develop the prior testimony."). That ruling is in line with the widely accepted rule that the specific governs the general, *i.e.*, that where a specific hearsay exception exists for the type of statement at issue, it cannot be admitted through a more general exception. *See*, *e.g.*, *Herrick v. Garvey*, 298 F.3d 1184, 1192 (10th Cir. 2002).

Indeed, if required to present any evidence to substantiate the insinuations in these questions, the City would come up empty:

- "Q: Dr. Wright, commencing in the late 1960's and early 1970's, IBT and Monsanto worked together to forestall action by the United States Government to ban or limit the manufacture, distribution, and use of PCBs, is that true?" Ex. 7 (Wright Dep.) at 43:2-6.
- "Q: Dr. Wright, while you were employed by Monsanto, you worked specifically to forestall action by the United States Government and the EPA to prohibit the discharge of PCBs into the environment?" *Id.* at 43:13-16.
- "Q: Dr. Wright, while you were employed at Monsanto, you knew that Mr. Pappageorge of Monsanto and Dr. Calandra of IBT went to representatives of the United States Government in November of 1975 and represented to them that PCB's were not a carcinogen and were otherwise a relatively safe product to handle; isn't that true?" *Id.* at 43:22-44:3.
- "Q: Dr. Wright, you knew that Monsanto and IBT went together to represent to the United States Government and presented Monsanto's position with regard to … PCBs and, in doing so, relied on IBT's reports regarding its Aroclor studies; isn't that correct?" *Id.* at 44:9-13.
- "Q: Dr. Wright, when both IBT and Monsanto went to representatives of the United States Government in November of 1975 and promoted their position vis-à-vis Aroclor products and PCB's, both IBT and Monsanto knew at that time that the IBT Aroclor studies were wrong or faulty; isn't that correct?" *Id.* at 44:19-24.
- "Q: Dr. Wright, during the entire time that you were employed by Monsanto after leaving your employment at IBT, Monsanto continued in its efforts to either understate or misstate the potential adverse health effects that could result from exposure to PCBs; isn't that correct?" *Id.* at 57:5-10.
- "Q: Dr. Wright, after you returned to your employment at Monsanto, you reported to a gentleman known as Dr. Levinskas, didn't you?" *Id.* at 57:16-18.
- "Q: Dr. Wright, after you returned to your employment at Monsanto, you knew, as a matter of fact, didn't you, that Dr. Levinskas wrote letters to IBT, specifically asking that IBT alter the conclusion of its reports on Monsanto's Aroclor products?" *Id.* at 57:24-58:3.
- "Q: Dr. Wright, after you returned to your employment at Monsanto, having previously worked at IBT, you knew that Dr. Levinskas and Dr. Calandra exchanged correspondence which resulted in the final alteration to IBT's Aroclor reports sometime in August, 1975, and the backdating of those reports to an earlier time; isn't that correct?" *Id.* at 58:9-15.

Plaintiff has no means of substantiating the insinuations behind any of this questioning. To the contrary, it intends to let the questions *themselves* be evidence of what occurred. That is improper reliance on unsworn *attorney* testimony that Monsanto cannot fairly cross-examine.

**4. If any part of Dr. Wright's testimony is admitted, the jury should hear that Monsanto objected to Dr. Wright's invocation of the privilege.**

If the *Scott* testimony is admitted, to mitigate the prejudice that will occur, the jury should at least be permitted to hear that Monsanto's attorney objected to Dr. Wright's invocation of the privilege and urged him to answer these questions. Plaintiff would lump Defendants and Dr. Wright together and assert that Dr. Wright was acting on Defendants' behalf. That Monsanto's counsel objected to his invocation of the privilege rebuts this assertion and shows that he was acting on his own behalf, against the interests of Monsanto. The inclusion of counsel's objection will mitigate against the impression Plaintiff seeks to create and is necessary under the rule of completeness. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time.").

At minimum, a limiting instruction should be read to the jury such as the following:

> Monsanto's counsel objected to Dr. Wright's invocation of the 5th Amendment to avoid answering questions posed in this deposition and requested that he respond.

Such an instruction is necessary to avoid the unfair prejudice that would result from the jury hearing the Scott plaintiff's attorney's leading questioning and Dr. Wright's invocation of the privilege without also hearing that Dr. Wright was acting against Monsanto's expressed wishes.

For the reasons given here, these questions, and others like them, are inadmissible. As they comprise so much of Dr. Wright's *Scott* deposition as to taint the entire testimony, the Court should exclude the transcript of that deposition in full.

## CONCLUSION

The Court should prohibit Plaintiff from arguing or referencing IBT, Paul Wright's fraud and conviction, Phil Smith's testimony related to IBT, and Paul Wright's testimony and his invocation of the Fifth Amendment in the *Scott* case in relation to these issues.

Dated: February 24, 2026

Respectfully submitted,

**KING & SPALDING LLP**

Tracie J. Renfroe
Mitchell B. Bryant
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200 (telephone)
trenfroe@kslaw.com
mbbryant@kslaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Ann E. Blackwell*
Ann E. Blackwell
Darci F. Madden
211 N. Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000 (telephone)
(314) 259-2020 (fax)
liz.blackwell@bclplaw.com
darci.madden@bclplaw.com

**GOLDMAN ISMAIL TOMASELLI**

Emma Ross
200 South Wacker Drive
22nd Floor
Chicago, IL 60606
(312) 681-6000 (telephone)
eross@goldmanismail.com

**SHOOK, HARDY & BACON L.L.P.**

Abigail Fears
The Plaza in Clayton
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
(314) 690-0200 (telephone)
afears@shb.com

**McDERMOTT WILL & SCHULTE LLP**

Anthony Upshaw
Asra A. Chatham
333 SE 2nd Ave., Ste. 4500
Miami, FL 33131
(305) 358-3500 (telephone)
aupshaw@mwe.com
achatham@mwe.com

*Attorneys for Defendants Monsanto Company and Pharmacia LLC*

**LATHROP GPM LLP**

Charles R. Hobbs II
The Plaza in Clayton
190 Carondelet Plaza, Suite 1400
St. Louis, MO 63105
(314) 613-2800 (telephone)
Ron.Hobbs@lathropgpm.com

*Attorney for Defendant Solutia Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 24th day of February 2026, the foregoing was filed using the Court's CM/ECF system, which will serve notice upon all counsel of record.

*/s/ Ann E. Blackwell*
Ann E. Blackwell