## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CITY OF EAST ST. LOUIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:21-cv-232-DWD** |
| ) | |
| **MONSANTO CO., PHARMACIA LLC,** ) | |
| **and SOLUTIA, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are the parties' Motions for Summary Judgment, including: Defendants' Motion for Summary Judgment on Plaintiff's Claims; Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense; the parties' Motions for Summary Judgment on Defendants' First Amended Counterclaim; and Defendant Solutia Inc.'s Motion for Partial Summary Judgment on Direct Liability.[1] Those Motions are fully briefed with the parties' Responses and Replies.[2] Also before the Court are the parties' Motions to Exclude Expert Testimony together with their Responses and Replies.[3] Finally, Defendants filed a Motion for a Judicial Determination on Plaintiff's Demand for a Jury Trial, the parties filed Motions *in Limine*, and the parties filed a Joint Motion for an Extension of Time.[4] For the reasons

---

[1](Docs. 261, 263, 268, 271, 283).

[2](Docs. 322, 324, 328, 329, 330, 345, 347, 348, 349, 351).

[3](Docs. 255, 256, 257, 258, 259, 260, 262, 264, 265, 266, 267, 269, 270, 278, 313, 314, 315, 316, 317, 318, 319, 320, 321, 323, 325, 326, 327, 337, 338, 339, 340, 341, 342, 343, 344, 346, 350).

[4](Docs. 357, 361, 362, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421).

explained below, the Court holds Defendants are entitled to summary judgment based on the statutes of limitations and repose and the *nullum tempus* doctrine. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Claims is **GRANTED, in part**, and **DENIED as moot, in part**, and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense is **DENIED**.[5] By extension of these rulings, the parties' Motions for Summary Judgment on Defendants' First Amended Counterclaim, Defendant Solutia Inc.'s Motion for Partial Summary Judgment on Direct Liability, the Motions to Exclude Expert Testimony, Defendants' Motion for a Judicial Determination on Plaintiff's Demand for a Jury Trial, the parties' Motions *in Limine*, and the Joint Motion for an Extension of Time are **DENIED as moot**. Defendants' First Amended Counterclaim is **DISMISSED without prejudice**.

## I. BACKGROUND

This case was removed from the Circuit Court of St. Clair County. (Doc. 1). Plaintiff filed a Second Amended Complaint for Damages and Abatement (Doc. 129), alleging a public nuisance (Count I), violations of the Municipal Code (§ 50-71 (Nuisance)) (Count II), abatement under the Municipal Code (§§ 50-79 and 62-2) (Count III), a continuing trespass (Count IV), a design defect (Count V), a failure to warn and instruct (Count VI), and negligence (Count VII). (Doc. 129, generally). Plaintiff's claims relate to "the contamination of vast swaths of its land with polychlorinated biphenyls…manufactured in Defendants' Monsanto Plant in adjacent Sauget, Illinois." (Doc. 129, pg. 1).[6]

---

[5]These Motions were the subject of a hearing and oral argument on January 15, 2026. (Doc. 383).
[6]The Court dismissed Count II of the Second Amended Complaint without prejudice. (Doc. 171).

Defendants filed a First Amended Counterclaim under 42 U.S.C. § 1983, stating an as-applied due process challenge to the enforcement of §§ 50-79 and 62-2 of the Municipal Code ("Abatement Ordinances"). (Doc. 179, generally).[7] Defendants seek the following relief: "[J]udgment in their favor and against Plaintiff/Counter-Defendant…to the extent authorized by law, including preliminary and permanent injunctive relief against enforcement of the Abatement Ordinances against Defendants, declaratory relief that the Abatement Ordinances are unconstitutional as applied to Defendants, and attorneys' fees pursuant to 42 U.S.C. § 1988." (Doc. 179, pgs. 13-14).[8] The Abatement Ordinances, which are the only portions of the Municipal Code still at issue, are invoked in Count III of the Second Amended Complaint for Damages and Abatement. (Doc. 129, pgs. 29-31).

## II. ANALYSIS

### A. The Parties' Motions for Summary Judgment

The Court will grant summary judgment if the movant shows there is no genuine dispute as to any material fact, such that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Assertions that a fact cannot be or is genuinely disputed must be supported by citations to the materials of record. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the assertions must be supported by a showing that the

---

[7]Defendants do not bring a facial challenge to the Abatement Ordinances. (Doc. 179, pg. 2 n. 1).
[8]Section 1988(b), in pertinent part, states the following in relation to actions or proceedings to enforce, among other statutory provisions, § 1983: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." *See* 42 U.S.C. § 1988.

materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

If the movant presents evidence to show the absence of a genuine dispute of material fact, then the burden shifts to the nonmovant to provide evidence of specific facts that create a genuine dispute of material fact. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Hudson Ins. Co. v. City of Chicago Heights*, 48 F.3d 234, 237 (7th Cir. 1995)). A genuine dispute of material fact exists if there is sufficient evidence for the nonmovant to receive a verdict. *Driveline Sys.*, 936 F.3d at 579 (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018)). Speculation, unsupported by the evidence, cannot defeat summary judgment. *Moje v. Fed. Hockey League, LLC*, 377 F. Supp. 3d 907, 920 (N.D. Ill. 2019) (citing *Sbika v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018); *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)).

When considering a motion for summary judgment, the Court will not determine credibility, weigh the evidence, or decide which inferences to draw from the facts, as those tasks are reserved for the finder of fact. *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)). Instead, based on the evidence, the Court will decide whether a genuine dispute of material fact requires a trial. *Id.* (quoting *Johnson*, 892 F.3d at 893). When doing so, the Court construes the evidence in a light most favorable to the nonmovant while avoiding the temptation of deciding one party's version of the facts is more likely true than the other party's version of the facts. *Id.* (quoting *Johnson*, 892 F.3d at 893).

It is notable, too, that these summary judgment standards apply to cross-motions for summary judgment. *See Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). The Court evaluates cross-motions for summary judgment together; however, neither may be granted unless the evidence, as a whole, shows the absence of a genuine dispute of material fact. *Id.* (quoting *Bloodworth*, 475 F.App'x at 95). As such, each party must still bear their burden of proof under the summary judgment standards. *Wilson v. Baptiste*, No. 13-cv-7845, 2016 3878125, *2 (N.D. Ill. July 18, 2016) (quoting *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008)); *see also Chicago Wine Co. v. Holcomb*, 532 F. Supp. 3d 702, 708 (S.D. Ind. 2021) ("The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial."). Courts cannot assume cross-motions for summary judgment result in no undisputed material facts, and denying one cross-motion does not require granting the other cross-motion. *Wilson*, 2016 3878125 at *2 (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

### 1. Defendants' Motion for Summary Judgment on Plaintiff's Claims and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense[9]

In their briefing, the parties raise a number of issues relating to Plaintiff's Article III standing, the statutes of limitations and repose and the *nullum tempus* doctrine, the merits, and the U.S. Environmental Protection Agency's ("EPA") primary jurisdiction.

---

[9]These Motions for Summary Judgment present overlapping arguments by the parties. For the sake of brevity, the Court addresses those arguments simultaneously whenever possible.

However, the Court concludes Plaintiff's case may be resolved pursuant to the arguments on the statutes of limitations and repose and the *nullum tempus* doctrine. As a result, the Court limits its resolution of the Motions for Summary Judgment to only those issues.[10]

Before considering those issues, though, the Court briefly discusses the history of PCBs in the City of East St. Louis and the nature of the properties at issue in this case. It is undisputed that Monsanto's Sauget Plant began producing PCBs in 1936, "after Old Monsanto acquired Swann Chemical Company in 1935 and the rights to its Aroclor patent." (Docs. 271, pgs. 7, 12; 283, pg. 12; 322, pgs. 5, 19; 330, pg. 13).[11] The parties also agree that "Old Monsanto manufactured Aroclors at the Sauget Plant…until 1977." (Docs. 271, pgs. 7, 12; 283, pg. 12; 322, pgs. 5, 19, 24-25; 330, pg. 13; 345, pg. 18). At that time, which was "two years before the EPA banned the production of most PCBs," Old Monsanto "voluntarily ceased all production." (Docs. 283, pg. 13; 322, pgs. 24-25; 330, pg. 15; 345, pg. 18). The EPA "undertook PCB cleanup actions for the Sauget Plant, as well as at two neighboring Superfund sites in the Sauget area." (Docs. 283, pg. 15; 330, pg. 17).

There are 273 properties, with alleged PCB contamination, at issue in this case. (Docs. 283, pg. 17; 330, pg. 20). The parties agree the 273 properties are currently "vacant,

---

[10]The Court notes Article III standing is usually a matter of jurisdiction that must be considered. However, here, Defendants alleged a lack of standing in their Answer to Plaintiff's Second Amended Complaint and Affirmative Defenses, and Defendants would bear the burden on the standing issue by virtue of their removal. *See City of Chicago v. DoorDash, Inc.*, 636 F. Supp. 3d 916, 921 (N.D. Ill. 2022) (citing *Bryant v. Compass Grp. USA*, 958 F.3d 617, 620 (7th Cir. 2020)); (Doc. 136, pgs. 18, 40-42). Further, the Court is "more likely to find that standing is properly listed as an affirmative defense where, as here, the case is a diversity action and Illinois law would have required defendants to include standing as an affirmative defense." *DoorDash, Inc.*, 636 F. Supp. 3d at 921 (citing *Acuity Optical Lab'ys, Inc. v. Davis Vision, Inc.*, No. 14-cv-3231, 2014 WL 5900994, *4 (C.D. Ill. Nov. 13, 2014)); *see also Greer v. Illinois Hous. Dev. Auth.*, 122 Ill. 2d 462, 494 (1988) ("In Illinois, lack of standing is an affirmative defense."). From these principles, the Court finds it is proper to rule based only on the statutes of limitations and repose and the *nullum tempus* doctrine.

[11]"Aroclors" are a trade name for a series of PCB mixtures. (Docs. 283, pg. 8; 330, pg. 7).

undeveloped lots," and there is presently no specific plan to redevelop the properties for residential or commercial use. (Docs. 283, pg. 18; 330, pgs. 20-21). Additionally, it is undisputed that Plaintiff undertook "no efforts to address PCB contamination on the 273 parcels before [filing] this suit." (Docs. 283, pg. 20; 322, pg. 27; 330, pg. 23; 345, pg. 22).

The parties agree that Plaintiff only currently owns 100 of the 273 properties, and it has never owned 126 of the 273 properties. (Docs. 271, pg. 9; 283, pgs. 17, 20; 322, pgs. 13, 25; 330, pgs. 20, 23-24, 31; 345, pg. 19; 351, pg. 14). Of the 47 properties that it once owned, Plaintiff "has not owned them since 2011 at the latest." (Docs. 283, pg. 20; 330, pg. 24). The following illustration is helpful to understand these various properties:



(Doc. 283, pg. 26).

St. Clair County, Illinois, as a trustee, currently owns 73 of the properties. (Docs. 283, pg. 23; 330, pg. 20). The other 100 properties are currently owned by private persons or non-City entities, including the East St. Louis Housing Authority, the East St. Louis School District, and the East St. Louis Township. (Docs. 283, pg. 23; 330, pg. 20).

### a. The Statutes of Limitations and Repose

On the statute of limitations, Defendants note: "There is no dispute that Monsanto stopped manufacturing PCBs in 1977 and that the last allegedly tortious act thus occurred decades ago." (Doc. 283, pg. 6). Nevertheless, Plaintiff filed this lawsuit in St. Clair

County, Illinois, on February 3, 2021, which was allegedly "four decades too late." (Doc. 283, pgs. 6, 34). As a result, Defendants argue Plaintiff's common law claims for damages (Counts I, IV, V, VI, and VII), as well as its claim under the Abatement Ordinances (Count III), are barred by the five-year statute of limitations set forth in 735 ILCS 5/13-205. (Doc. 283, pgs. 6, 33-37). Defendants also suggest the discovery rule is "no help" to Plaintiff because it "plainly knew, or at minimum should have known, of the alleged contamination of its lands well before 2016," when Plaintiff's claims must have accrued to comport with the limitations period. (Doc. 283, pg. 34). Again, Defendants note "[i]t was public knowledge that the Sauget Plant ceased manufacturing PCBs in 1977, shortly before the EPA banned the manufacture of PCBs in 1979 due to environmental concerns," and "the East St. Louis community was aware of potential contamination in the areas at issue." (Doc. 283, pgs. 34-35). On the latter point, Defendants suggest the following undisputed facts gave actual notice of the PCB contamination to Plaintiff: in 2000, the EPA worked with Defendants to clean up sites associated with the Sauget Plant; in 2006, developers chose not to pursue projects in the areas at issue due to "industrial contamination and pollutants"; in 2009 and 2012, respectively, the EPA tested and retested the areas at issue for PCB contamination; and between 2012 to 2016, the EPA "dispatched letters to two different City mayors about PCB contamination" in the areas at issue. (Doc. 283, pg. 35). For similar reasons, Defendants argue Plaintiff's strict product

liability claims (Counts V & VI) are also barred by the statute of repose, 735 ILCS 5/13-213(b), notwithstanding any application of the discovery rule. (Doc. 283, pgs. 6, 37-38).[12]

In response, Plaintiff argues genuine disputes of material fact, relating to accrual, must be answered by a jury. (Doc. 330, pgs. 5, 51, 62-63). Plaintiff states: "The community rumors and supposition that Monsanto points to as evidence of accrual are not the same as actual knowledge—on behalf of the City—that another person caused harmful levels of PCB contamination on its property." (Doc. 330, pgs. 62-63). It also states Defendants' other accrual evidence, *i.e.*, the evidence related to the EPA's cleanup activities, does not establish there is a single reasonable view on the accrual issue, as Plaintiff was excluded from the cleanup activities and it was not told about the PCB sampling in 2009 and 2012. (Doc. 330, pg. 63). Plaintiff states: "The only document about the EPA testing that facially suggests it was sent to a City official is dated September 9, 2016." (Doc. 330, pg. 63).

Now, the applicable statute of limitations provides: "[A]ctions…to recover damages for an injury done to property, real or personal…shall be commenced within 5 years next after the cause of action accrued." 735 ILCS 5/13-205. Similarly, in relation to Plaintiff's claims of product liability, the applicable statute of repose provides:

> [N]o product liability action based on any theory or doctrine shall be commenced except within the applicable limitations period and, in any event, within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier, of any product unit that is claimed to have injured or damaged the plaintiff, unless the defendant expressly has warranted or

---

[12]Defendants also suggest: "The City does not dispute that summary judgment is appropriate on its product-liability claims—its strict-liability claims are barred by the statute of repose." (Doc. 351, pg. 56).

promised the product for a longer period and the action is brought within that period.

735 ILCS 5/13-213(b).

As a matter of policy, statutes of limitations and repose "are designed 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " *Wilson v. Groze*, 800 F. Supp. 2d 949, 957 (N.D. Ill. 2011) (quoting *Order of R.R. Tels. v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)). It is for these and similar reasons that the Seventh Circuit has observed: Limitation periods "are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452-53 (7th Cir. 1990).

An accrual date is when the clock associated with statutes of limitations or repose begins to tick. *See Cada*, 920 F.2d at 450. At the time of accrual, "facts exist that authorize the bringing of a cause of action." *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 20; *see also Wilson*, 800 F. Supp. 2d at 956 ("Generally, a claim accrues when all its elements have come into existence."). However, the accrual date is not always the point in time when "the wrong that injures the plaintiff occurs"; instead, it can be when "the plaintiff discovers that he has been injured." *See Cada*, 920 F.2d at 450; *see also Antos v. Bell & Howell Co.*, 891 F. Supp. 1281, 1287 (N.D. Ill. 1995) ("Once the plaintiff discovers an injury, the statute begins to run and will run to its completion unless it is tolled."); *Wilson*, 800 F. Supp. 2d at 956 ("The discovery rule is an exception to the general application of a statute

of limitations period...and applies where there is a temporal gap between when a plaintiff suffered an injury and when he discovers that he has been injured."); 735 ILCS 5/13-213(d) (applicable statute of repose providing: "[I]f the injury complained of occurs within any of the periods provided by subsection (b) and paragraph (2) of subsection (c), the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage, but in no event shall such action be brought more than 8 years after the date on which such personal injury, death or property damage occurred."). The accrual rules that apply in the State of Illinois and in federal question cases in federal court are similar in that they "do[] not run unless the plaintiff knew or should have known about his injury" and that it was wrongfully caused. *See Ferguson v. Roberts*, 11 F.3d 696, 704-05 (7th Cir. 1993) (citing *Cada*, 920 F.2d at 450); *see also Khan*, 2012 IL 112219 at ¶ 20 ("To ameliorate the potentially harsh results of [a mechanical application of the statute of limitations], this court has adopted the 'discovery rule,' the effect of which is to postpone the start of the period of limitations until the injured party knows or reasonably should know of the injury and...that the injury was wrongfully caused."); *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 886 (C.D. Ill. 2017) (stating this rule while noting, "[w]here the discovery rule applies, the date that the limitations period begins is often a question of fact to be resolved upon summary judgment or at trial"); *Antos*, 891 F. Supp. at 1287 ("[T]he limitations period will be postponed from the date of accrual (i.e., the date of the injury) only if a *reasonable* person in the plaintiff's position would not have known that he or she had been injured.") (Emphasis in original).

11

It is not necessary for the plaintiff to know the full extent or consequences of his or her injury; instead, the limitations period runs when the plaintiff knows or should know that he or she was injured. *See Khan*, 2012 IL 112219 at ¶ 22 (quoting *Golla v. Gen. Motors Corp.,* 167 Ill.2d 353, 364 (1995)). And, importantly, when the plaintiff is a corporation or a municipality, as is true in this case, "it can only learn that it has been injured through its agents." *See Lease Resol. Corp. v. Larney*, 308 Ill. App. 3d 80, 86 (1999). For this reason, the knowledge of an agent is, generally, imputed to the corporation or municipality. *See Lease Resol. Corp.*, 308 Ill. App. 3d at 86; *see also Nat'l Prod. Workers Union Ins. Tr. v. Life Ins. Co. N. Am.*, No. 5-cv-5415, 2010 WL 1292429, *12 (N.D. Ill. March 29, 2010) ("[I]t is a well-established principle of agency law that an agent's knowledge is imputed to the principal."); *Campen v. Exec. House Hotel, Inc.,* 105 Ill. App. 3d 576, 586 (1982) ("[K]nowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority. And, once an agent's knowledge is imputed to a corporation, the imputed knowledge is not affected by changes in the corporation's personnel.") (internal citations omitted); *Heath v. City of Naperville*, 2024 IL App (3d) 230663, ¶ 59 ("[A] municipal employee's actual knowledge may be imputed to the municipality."). Further, the term "wrongfully caused" is viewed generically rather than as a term of art. *Khan*, 2012 IL 112219 at ¶ 22 (citing *Knox Coll. v. Celotex Corp.,* 88 Ill.2d 407, 416 (1981)). When these requirements are satisfied, the Supreme Court of Illinois has stated "the burden is on the injured person to inquire further as to the possible existence of a cause of action." *Id*. at ¶ 20 (citing *Witherell v. Weimer,* 85 Ill.2d 146, 156 (1981)).

Relevantly, Plaintiff filed this action in St. Clair County, Illinois, on February 3, 2021. (Docs. 283, pg. 17; 322, pg. 25; 330, pg. 20; 345, pg. 19). Therefore, under section 13-205, Plaintiff's claims must have accrued after February 3, 2016. *See* 735 ILCS 5/13-205.

On this issue, Mr. Robert Betts, who served as City Manager from 2006 to 2010, and who has again served in that capacity since June 2023, was asked what sorts of EPA involvement, interactions, or investigations he could recall from his past and present employment with the City. (Doc. 283-30, pgs. 7-8, 14). He testified: "I do know that they did some studies and some testing at one period of time…and determined that there was some high levels of [probably lead and probably PCB[]] contamination in the south end area." (Doc. 283-30, pg. 14). Mr. Betts indicated he did not know when exactly the studies and testing occurred or whether they involved lead or PCB contamination. (Doc. 283-30, pg. 14). When asked what, specifically, he remembered about the EPA involvement, Mr. Betts further indicated a belief that "there was a cleanup of some sort in Sauget some years ago but fell short of including East St. Louis." (Doc. 283-30, pg. 14). And, when asked if that was while he was working at City Hall, Mr. Betts testified: "No. It's just knowledge, firsthand knowledge being a resident of East St. Louis." (Doc. 283-30, pg. 14).

Later in his deposition, Mr. Betts was also asked about the time period before 2006, when he was employed by the Housing Authority of East St. Louis. (Doc. 283, pgs. 7, 18-20). Mr. Betts was asked whether he was aware of transactions or projects in East St. Louis that were stalled due to environmental concerns. (Doc. 283-30, pg. 19). He answered: "[T]he south end portion of town for an example, there's been numerous discussions about housing development in that area, but no developer wants to develop in a

13

contaminated area or exposing its residents to clouds of pollution." (Doc. 283-30, pg. 19). He was specifically talking about "the Monsanto area." (Doc. 283-30, pg. 19). When asked if he knew of examples of developers staying away from that area due to environmental concerns, Mr. Betts stated: "I'm thinking somewhere during the 2004 period. But, yes, we were actually considering developing homes in that area, but the contamination [from Monsanto] was a concern even way back then." (Doc. 283-30, pgs. 19-20).

Ms. Shaneal Clayborne, who has been employed by Plaintiff as the Director of Economic and Community Development since 2021, was also deposed in this matter. (Doc. 283-32, pgs. 4, 6, 9, 11-12). Ms. Clayborne was asked about "the first time that [she] heard of issues associated with PCBs in the south end." (Doc. 283-32, pg. 16). Based on her personal knowledge, as opposed to what she "heard about in [her] position," Ms. Clayborne answered as follows: "[I]t's been made very clear that there was soil contamination in the south end pertaining to Monsanto." (Doc. 283-32, pgs. 16-17).

Further, the record reflects that representatives of the EPA sent two separate letters to two different mayors of the City. The first EPA letter, which is undated, was sent to Mayor Alvin Parks by Mr. Ken Bardo, an EPA Project Manager with the Corrective Action Section. (Doc. 330-37, pg. 2). That letter advised Mayor Parks as follows:

> The United States [EPA] sampled soil at four residences along Wilford Avenue in East St. Louis on August 14 and 15. Five surface soil samples collected down to a depth of six inches were combined from the grass area in the backyards. The composite soil sample was analyzed for polychlorinated biphenyls (PCBs). The sampling was conducted based on information obtained by EPA that suggests that the far southern and western areas of East St. Louis could be impacted from historical industrial operations to the south.

14

The level of PCBs found in backyard soil at the four homes typically exceeded the EPA health screening level of 1 part per million (ppm) for residential soils recommended by EPA. The level of PCBs ranged from 0.6 to 7 parts per million. For your information, enclosed is a fact sheet from the Illinois Department of Public Health on how people can reduce exposure to contaminants in soil. Also enclosed is an EPA fact sheet that describes the sampling event. EPA will be evaluating all the sampling results in the East St. Louis area and will keep you informed of our progress.

The City of East St. Louis and CDC Development Corporation own various lots just south of Wilford Avenue, located between D Street and South 19th Street. These lots are mostly undeveloped and located in the TIF 3C Redevelopment Project Area. EPA recommends that investigation be performed in this area to assess the PCB levels in soils at these lots and how the levels may need to be addressed during future development. EPA would be glad to meet and discuss the options for these investigations and share the information we have.

I can be reached at 312-[XXX]-[XXXX]. I am also available by e-mail at [email address].

(Doc. 330-37, pg. 2).

Consistent with this first letter, in October 2012, the EPA published a document entitled: "Results Released for Homes and Former Dead Creek Area, East St. Louis Soil Sampling Project, East St. Louis, Illinois." (Doc. 330-32). It indicated that the "EPA invites you to review technical reports and plans, and other official documents related to the cleanup of the Solutia Inc. (formerly Monsanto) hazardous waste site in Sauget, IL at the information repository located at: Cahokia Public Library[,] 140 Cahokia Drive[,] Cahokia, IL." (Doc. 330-32, pg. 2). The documents could also be viewed online at specific website addresses. (Doc. 330-32, pg. 2). Mr. Bardo, who authored the first EPA letter, was listed as a point of contact. (Doc. 330-32, pg. 1). The document, in pertinent part, stated:

U.S. [EPA] Region 5 has just released the results from soil sampling of residential yards and the former Dead Creek area in East St. Louis. EPA collected these samples to find out whether PCBs carried by the wind or released from past industrial activity in the area were present in the soil. This recent work is a follow up to soil sampling conducted in November 2009 where PCBs were found to be present at some residential properties and parks in East St. Louis and Sauget. PCBs are man-made chemicals widely used in electrical equipment and hydraulic fluids. Commercial production of PCBs ended in 1977 but they have been found to accumulate and persist in the environment.

Results show that PCB contamination was found in soil at most residences sampled and at some locations at the former Dead Creek but at low levels. Levels of PCBs at 8 of 9 properties sampled were slightly above screening levels used by EPA to assess health risks to the public. Levels of PCBs at 2 of 7 Dead Creek locations were slightly above the screening levels. These levels do not indicate an acute health risk. However, in the coming months EPA will evaluate whether further sampling work is necessary and will keep the public informed.

Sample Details

On August 14 and 15, EPA sampled surface soil at 9 residences in East St. Louis. The residences sampled were chosen based on air modeling that suggested PCB contamination could be present in soil from former industrial activities near these neighborhoods. EPA also sampled 7 locations within the former Dead Creek area that extends north of the Village of Sauget into the Rush City community of East St. Louis. The northern end of the former Dead Creek historically extended into East St. Louis. It is now filled and dry. The cleanup of the portion of Dead Creek present in the villages of Sauget and Cahokia was completed in 2009.

Five soil locations to a depth of 6 inches were collected at each residence and combined into one sample. Samples were taken from the former Dead Creek at varying depths from the upper foot of soil. All the samples were then sent to an environmental laboratory and analyzed for PCBs. Dead Creek samples were also tested for metals like lead.

Exposure to PCBs at elevated levels has been shown to cause a variety of adverse health effects in people and animals. Exposure in soil would be expected to occur mainly through direct contact with skin or by incidental swallowing of dirt particles.

Sample Results

In highly industrialized areas of the United States, no soil, water or air mass is without pollutants of some sort and zero contamination is impossible to achieve. For PCBs in residential areas, EPA typically uses a health screening level of one part PCB per million parts soil (one part per million or 1 ppm). Sample results show that soil at 8 residential yards was slightly to somewhat above this screening level for PCBs. The 9 residential yards in East St. Louis contained PCBs between 0.6 and 7 ppm. Soil within the former Dead Creek area in East St. Louis contained PCBs between 0.1 and 1.9 ppm and lead was present at three locations above the EPA screening level of 400 ppm for residential areas.

Recommendations

EPA has notified property owners of the sample results….

\* \* \*

Next Steps

The level of contamination found in this sampling is not an acute health risk. However, EPA will continue to evaluate whether additional investigations or a health risk evaluation are necessary and will make sure the public stays informed as work moves along.

(Doc. 330-32, pgs. 2-3).

The second EPA letter, dated September 9, 2016, was sent to Mayor Emeka Jackson-Hicks by Mr. Jose Cisneros, the Chief of the Remediation and Re-Use Branch of Region 5 of the EPA. (Doc. 283-36, pgs. 2-3). That letter advised Mayor Jackson-Hicks:

In 2012, the United States [EPA] wrote to (then) Mayor Parks to report the results of backyard soil contamination sampling at residences along Wilford Avenue in East St. Louis. In the letter, EPA recommended that sampling continue in the area just south of Wilford Avenue, which is zoned for residential use. The 2012 sampling was a continuation of sampling begun in the in [sic] 2009 to investigate whether local historical manufacturing had contaminated residential areas. In 2015, EPA sampled additional properties in this area to determine whether local historical industrial operations could have spread contamination.

17

The sampled soil was in an area zoned for residential use near the City's western boundary adjacent to the Solutia, Inc., W.G. Krummrich facility, in Sauget, IL. Sampling occurred from April 29-30, 2015, and included the collection of 20 (composite) soil samples from mainly undeveloped properties located between the facility boundary and residential locations sampled in 2012. Please refer to the enclosed figure. The properties, which are primarily owned by the City of East St. Louis and the CDC Development Corporation, are located in the TIF 3C Redevelopment Project Area.

EPA collected the samples from the top six inches of the ground from City owned parcels and in grassy areas in City rights-of-way, and analyzed them for polychlorinated biphenyls (PCBs) in a laboratory. A number of the sample results exceeded the EPA health screening-level for residential soils of one part per million (ppm) for total PCBs. The levels of PCBs ranged from 0.2 to 17 parts per million PCB.

EPA is evaluating the samples from 2009, 2012, and 2015 to determine whether the sampled area qualifies for removal actions or whether more information is needed to make that determination. EPA recommends that additional investigation be performed in this area to assess how contamination levels should be considered during future development. For your information, enclosed is a fact sheet from the Illinois Department of Public Health on how people can reduce exposure to contaminants in soil.

(Doc. 283-36, pg. 2).

Mr. Michael Wagner testified individually and as Plaintiff's corporate representative under Federal Rule of Civil Procedure 30(b)(6). (Docs. 283-34 & 283-35, generally). He served as Plaintiff's outside legal counsel from 1999 to 2017. (Doc. 283-34, pg. 5). Mr. Wagner testified that he was never made aware of the sampling, referenced in the above-discussed letters and document, that was conducted in the City in 2009, 2012, and 2015. (Doc. 283-35, pgs. 22-23, 27). He was also unfamiliar with the October 2012 EPA document. (Doc. 283-35, pg. 27). As for the first undated EPA letter, which he testified to never seeing, Mr. Wagner agreed it would have been sent to Mayor Parks before 2015, as

Mayor Parks served from 2007 until "he was beaten by Mayor [Jackson-]Hicks in 2015-ish. '16." (Doc. 283-35, pg. 26). Although he did not know if Plaintiff ever received the October 2012 EPA document, Mr. Wagner agreed it "indicate[d] that the 2012 sampling [wa]s reflected in the [first] letter to the Mayor." (Docs. 283-34, pg. 43; 283-35, pg. 28). He also testified to being unaware of anything in the second EPA letter, dated September 9, 2016, to Mayor Jackson-Hicks. (Doc. 283-35, pg. 23). However, at relevant times, Mr. Wagner simultaneously served as outside legal counsel for the City and as counsel for the Village of Sauget in Area 1 and Area 2 Superfund proceedings. (Doc. 283-34, pg. 12). When asked if he brought his knowledge of the activities associated with PCBs and other contaminants in Sauget to the attention of Plaintiff, while serving in the dual roles, Mr. Wagner testified: "I don't believe we had specific conversations about PCBs. But I do think that everybody at city hall was aware of environmental cleanup that was happening directly to the south of city hall." (Doc. 283-34, pg. 12). Similarly, when asked if there was any question in his mind that Plaintiff's City-government knew of the environmental actions occurring to the south of the City in Cahokia and Sauget, Wagner testified: "I think that they were aware that there was a Super Fund cleanup that was underway there. As to specifics, I don't think they had any knowledge. But I think it was general knowledge in the community that that had been undertaken." (Doc. 283-34, pg. 12).

The record also contains the EPA's May 2010 Community Involvement Plan for Sauget Area 1 and Area 2 Superfund Sites, which are referenced in relation to Mr. Wagner's deposition testimony. (Doc. 283-33, generally). "The Sauget Area 1 and Area 2 Superfund sites are located in the Villages of Sauget (formerly the Village of Monsanto)

19

and Cahokia in west-central St. Clair County." (Doc. 283-33, pg. 3). Portions of the areas, which were found to contain PCBs, "extend[ed] from the W.G. Krummrich Plant at its northern end and flow[ed] south through Sauget and Cahokia." (Doc. 283-33, pgs. 3-8). In the Plan, the EPA indicated the following: "Everyone EPA spoke with said they knew there was contamination in *the area*." (Doc. 283-33, pg. 12) (Emphasis added).

On this record, the Court finds Plaintiff's claims accrued well before February 3, 2016, such that the filing of this lawsuit on February 3, 2021, was untimely. *See* 735 ILCS 5/13-205; *Cada*, 920 F.2d at 450. More specifically, the Court finds under the discovery rule that Plaintiff, through the imputed knowledge its agents, knew or reasonably should have known of its injury, and that it was wrongfully caused, years before that date. *See Ferguson*, 11 F.3d at 704-05; *Khan*, 2012 IL 112219 at ¶¶ 20, 22; *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. at 886; *Lease Resol. Corp.*, 308 Ill. App. 3d at 86; *Nat'l Prod. Workers Union Ins. Tr.*, 2010 WL 1292429 at *12; *Campen*, 105 Ill. App. 3d at 586; *Heath*, 2024 IL App (3d) 230663 at ¶ 59. When so finding, the Court stresses that Plaintiff did not have to know the full extent or consequences of the alleged injury to property. *See Khan*, 2012 IL 112219 at ¶ 22. Again, the above-discussed record demonstrates that Plaintiff, at a minimum, knew or should have known of the circumstances surrounding the alleged injury to property through its agents, such that the burden shifted to Plaintiff "to inquire further as to the possible existence of a cause of action." *Id*. at ¶ 20. For these reasons, the Court concludes Plaintiff's claims are time-barred under section 13-205.

In addition, under the applicable statute of repose, Plaintiff must have filed Counts V and VI, in any event, within "8 years after the date on which such personal injury, death

20

or property damage occurred." *See* 735 ILCS 5/13-213(b), (d). It did not do so. For that reason, the Court concludes Counts V and VI are also barred by the statute of repose.

By virtue of these conclusions, Plaintiff must rely on the *nullum tempus* doctrine to excuse it from an application of the limitation periods. As discussed below, the *nullum tempus* doctrine does not apply, so Defendants are entitled to summary judgment.

### b. The *Nullum Tempus* Doctrine

Defendants argue the *nullum tempus* doctrine cannot revive Plaintiff's time-barred claims. (Docs. 283, pgs. 38-43; 322, pg. 4). Under that doctrine, Defendants argue Plaintiff "disguises the essentially private nature of this suit through artful pleading" about public rights. (Docs. 283, pgs. 38-39; 322, pg. 36). Based on the "undisputed evidence," rather than just the pleadings, they explain: Plaintiff's claims are based on an alleged injury to particular City-owned properties rather than to the broader public health, safety, and property of the entire community; Plaintiff has no specific and mandatory legal duty to remediate the "imperceptible chemicals" on the subject properties or to request "historical loss-of-use damages" while retaining contingency-fee counsel; and Plaintiff has not expended any material funding to address the PCB contamination or presented evidence of an intent to do so in the future. (Docs. 283, pgs. 39-42; 322, pgs. 4, 33-42). Defendants emphasize that Plaintiff "produced no evidence…that PCBs spread from the soils on the properties at issue to the public at large" or that "PCBs from the parcels at issue endangered public health at all." (Doc. 322, pg. 39) (Emphasis in original omitted).

Plaintiff responds that Defendants ignore decisions, governing the modern application of the *nullum tempus* doctrine, from the Supreme Court of Illinois. (Docs. 271,

pgs. 6, 23-28; 330, pgs. 5, 51-52). Plaintiff suggests that omission was "no oversight," as the decisions "and their progeny show the doctrine is applied unfailingly to cases touching on the public's health, safety, and property." (Docs. 271, pgs. 6, 28-31; 330, pgs. 5, 51-58). Indeed, Plaintiff claims "public rights are at stake when a governmental plaintiff asserts claims for property damage and those claims have a plausible nexus to public health or safety." (Docs. 271, pg. 29; 330, pgs. 55-56; 345, pgs. 11-12). Plaintiff also rejects the argument that the threat of PCBs must affect all of East St. Louis; instead, it states affecting the 273 subject properties (or the 100 City-owned properties) gives rise to a sufficient public interest, especially where PCBs in particulate matter can blow to other areas of the City. (Docs. 271, pgs. 27, 30-31; 330, pg. 57; 345, pgs. 11-12).

Further, Plaintiff argues it was obligated to file this lawsuit on behalf of the public due to its common law duty to maintain its property in a reasonably safe condition, the fact that its Abatement Ordinances authorize and obligate it to address any and all nuisances, and the fact that other private plaintiffs would lack standing to sue for damage to City-owned property. (Docs. 271, pgs. 6, 31-32; 330, pgs. 58-60; 345, pg. 12). On the requirement to expend public funds, Plaintiff argues it "faces immense financial obligation if it cannot recover PCB cleanup costs through this suit," as it is the only way to avoid passing the costs onto the public. (Docs. 271, pg. 33; 330, pg. 61). The costs, which Plaintiff seeks as damages, "are well into the millions of dollars," and they are necessary to protect the health and safety of residents and to make productive use of public property. (Docs. 271, pgs. 6, 33; 330, pg. 61; 345, pg. 12). For these reasons, Plaintiff argues the *nullum tempus* doctrine, which it stresses presents a pure question of law for the Court

to decide based on the pleadings, immunizes it from applications of the statutes of limitations and repose. (Docs. 271, pgs. 6, 23-26; 330, pgs. 5, 51-57; 345, pgs. 8-11).

"*Nullum tempus occurrit regi,*" the phrase from which the *nullum tempus* doctrine is derived, translates to "time does not run against the King." *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 460 (1983); *City of Chicago v. Latronica Asphalt and Grading, Inc.*, 346 Ill. App. 3d 264, 269 (2004). Over 150 years ago, in 1876, the Supreme Court of Illinois described the *nullum tempus* doctrine in the following manner:

> Our understanding of the law is, that, as respects all public rights, or as respects property held for public use, upon trusts, municipal corporations are not within the operation of the Statute of Limitations, but in regard to contracts or mere private rights, the rule is different, and such corporations, like private citizens, may plead or have pleaded against them the Statute of Limitations.

*Bd. of Sup'rs of Logan Cnty. v. City of Lincoln*, 81 Ill. 156, 158 (1876) (citing *City of Alton v. Illinois Transp. Co.*, 12 Ill. 38 (1850); Dillon on Mu. Cor. 2 Vol. §§ 532 & 533); *accord Bond Cnty. Cmty. Sch. Dist. No. 2 v. Indiana Ins. Co.*, 269 Ill. App. 3d 488, 492 (1995).

In 1941, the Supreme Court of Illinois affirmed these legal principles, stating:

> It is established that unless the terms of a Statute of Limitations expressly include the State, county, municipality or other governmental agencies, the statute, so far as public rights are concerned, as distinguished from private and local rights, is inapplicable to them.

*Clare v. Bell*, 378 Ill. 128, 130-31 (1941); *accord Bond Cnty. Cmty. Sch. Dist. No. 2*, 269 Ill. App. 3d at 492; *see also Brown v. Trs. of Schools*, 224 Ill. 184, 186-87 (1906) ("The rule that statutes of limitation do not run against the state also extends to minor municipalities created by it as local governmental agencies, in respect to governmental affairs affecting the general

public. The exemption extends to counties, cities, towns, and minor municipalities in all matters respecting strictly public rights as distinguished from private and local rights.").

In this day and age, governmental entities are still immune from limitation periods when the *nullum tempus* doctrine applies. *See Shelbyville Restorium, Inc.*, 96 Ill. 2d at 460-62; *see also City of Chicago ex rel. Scachitti v. Prudential Secs., Inc.*, 332 Ill. App. 3d 353, 368-69 (2002) (rejecting the argument that, even if the *nullum tempus* doctrine can be invoked against statutes of limitation, it cannot be invoked against certain statutes of repose); *People v. Asbestospray Corp.*, 247 Ill. App. 3d 258, 261-63 (1993) (same conclusion but in the context of § 13-213(b)). That governmental immunity still serves to "embody[] a policy of protecting the public purse" and to represent a " 'judgment that the public should not suffer because of the negligence of its officers and agents' in failing to promptly assert causes of action which belong to the public." *Shelbyville Restorium, Inc.*, 96 Ill. 2d at 460-62 (quoting *State ex rel. Bd. of Univ. & Sch. Lands v. Andrus*, 671 F.2d 271, 274 (8th Cir. 1982), *rev'd on other grounds sub nom.*, *Block v. North Dakota ex rel. Bd of Univ. & Sch. Lands*, 461 U.S. 273, (1983); citing *Guar. Tr. Co. v. U.S.*, 304 U.S. 126, 132 (1938); *U.S. v. Cent. Soya, Inc.*, 697 F.2d 165, 166 (7th Cir. 1982); 34 Am. Jur., *Limitation of Actions* §§ 388 to 399 (1941)); *see also id.* at 463 ("Inasmuch as citizens who share a public right which has been violated may be unable in certain cases to bring suit on their own behalf while the government has a representative interest in the controversy, abolition of the government's immunity from limitations defenses would expose these citizens to the harsh consequences of neglect by officials over whose actions they had no control.") (internal citations omitted).

Importantly, when discussing applications of this governmental immunity in Illinois, the Supreme Court of Illinois recognized: "[T]he practice…has been to determine whether the right which the plaintiff governmental unit seeks to assert is in fact a right belonging to the general public, or whether it belongs only to the government or to some small and distinct subsection of the public at large." *Id.* at 462 (collecting cases); *accord Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 471 (1989); *Champaign Cnty. Forest Pres. Dist. v. King*, 291 Ill App. 3d 197, 202-03 (1997); *see also In re Chicago Flood Litig.*, 176 Ill. 2d 179, 191 (1997) ("If the duty or act involves the general public benefit, rather than a corporate or business undertaking for the municipality's corporate benefit, then the function is governmental whether the duty be directly imposed on the municipality or is voluntarily assumed."); *Village of DePue, Ill. v. Viacom Intern., Inc.*, 713 F. Supp. 2d 774, 781 (C.D. Ill. 2010) ("The fact that the residents of a particular municipality would benefit from the action is not alone sufficient to render it 'public' in nature."). The governmental entity is not required to assert an interest that affects "everyone in the State in order for it to qualify as a public right," but "there must be sufficient interest in the general public." *A, C & S, Inc.*, 131 Ill. 2d at 474 (collecting cases); *accord Latronica Asphalt and Grading, Inc.*, 346 Ill. App. 3d at 273-76. It is for this reason that, when determining whether a governmental entity is acting in a public or private capacity, "[t]he question of who would be benefited by the government's action and who would lose by its inaction is of paramount importance in statute-of-limitations immunity cases." *Shelbyville Restorium, Inc.*, 96 Ill. 2d at 462; *Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 200. The focus of the inquiry is "properly concentrated…on the effects of

the interest on the public." *A, C & S, Inc.*, 131 Ill. 2d at 476 (citing *Shelbyville Restorium,
Inc.*, 96 Ill. 2d at 464-65); *accord Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 200.

Moreover, as noted by the parties in this case, the governmental entity's obligation
to act on behalf of the public and the extent to which it must expend public funds are also
considerations in the inquiry. *A, C & S, Inc.*, 131 Ill. 2d at 476 (citing *Shelbyville Restorium,
Inc.*, 96 Ill. 2d at 464-65); *accord Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 200.
However, at least one Illinois court has observed: "As the question of who benefits from
the government's action is of paramount importance, it can be inferred that the[se] factors
are not equally important." *Prudential Secs., Inc.*, 332 Ill. App. 3d at 366.

The former consideration, pertaining to the obligation to act, has been viewed as
"requiring," not merely "authorizing," action by the governmental entity. *See Champaign
Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 201-02 (discussing the distinction between
authorized and required government acts identified in *Stafford v. Bowling*, 85 Ill. App. 3d
978, 982 (1980), the Downstate Forest Preserve District Act (70 ILCS 805/8b, 22), and the
Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/9–
103)); *see also Viacom Intern., Inc.*, 713 F. Supp. 2d at 783 ("In each of the Illinois cases cited
to the Court in which a governmental entity was immune from the statute of limitations,
the governmental entity had a legal obligation to undertake the action for which it sought
to recover its costs."); *People ex rel. Hartigan v. Agri-Chain Prods., Inc.*, 224 Ill. App. 3d 298,
302-03 (1991) (discussing *Stafford* and mandatory versus discretionary acts).

The latter consideration, relating to the expenditure of public funds, "must be
given a realistic application" and account for the nature of the damage, including the

26

reasons for and the source of the expended funds. *A, C & S, Inc.*, 131 Ill. 2d at 476; *Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 203. In *A, C, & S, Inc.*, for example, it was important to the Supreme Court of Illinois that it was "not dealing…with small sums of money; rather, the cost of the[] abatement projects w[ould] run into the millions" and would "be shouldered by the local school districts, appropriations from the State, Federal funds, or th[e] litigation." *Id.*; *see also Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 202 (recognizing, in both *Shelbyville Restorium, Inc.*, and *A, C, & S, Inc.*, "the court focused upon the amount of money that was needed and the burden placed on the public treasury"); *Agri-Chain Prods., Inc.*, 224 Ill. App. 3d at 303 (same).

Here, as alluded to above, the Court holds the *nullum tempus* doctrine does not apply, so Defendants are entitled to summary judgment. In doing so, the Court also holds it is not limited to a review of the pleadings when considering that question of law for the first time on summary judgment, as Plaintiff suggests; rather, the Court may properly consider the undisputed material facts. *Compare Village of Roxana, Ill. v. Shell Oil Co.*, No. 12-cv-577, 2013 WL 4510164, *6 (S.D. Ill. Aug. 26, 2013) ("So, while the Court bases its statute of limitations determination on the abundance of outstanding material facts, it does note that Roxana's sovereign immunity argument appears meritorious. Defendants' motion to dismiss/for summary judgment on the basis of the statute of limitations is denied."); *with City of Chicago v. Eque LLC*, 693 F. Supp. 3d 879, 895 (N.D. Ill. 2023) ("Defendants' *recycling of identical arguments* rejected at the motion to dismiss stage does not persuade the Court that it should reverse course.") (Emphasis added).

Further, as an initial matter, the Court again observes there are 273 "vacant, undeveloped" properties with alleged PCB contamination at issue. (Docs. 283, pgs. 17-18; 330, pgs. 20-21). Only 100 of those 273 properties are presently owned by Plaintiff, and Plaintiff has never owned 126 of the 273 properties. (Docs. 271, pg. 9; 283, pgs. 17, 20; 322, pgs. 13, 25; 330, pgs. 20, 23-24, 31; 345, pg. 19; 351, pg. 14). The 47 properties that Plaintiff once owned were sold in "2011 at the latest." (Docs. 283, pg. 20; 330, pg. 24).

Therefore, the particular properties at issue, as well as Plaintiff's claims in relation to those properties, vary greatly in terms of ownership status and requested relief. And, as to the relationship between the overarching ownership issue and the *nullum tempus* doctrine, it is difficult for the Court to discern the nature of Plaintiff's rights in the properties at differing times over the many years at issue. For example, the parties have not fully briefed the extent to which Plaintiff's claims under the *nullum tempus* doctrine could be acquired or extinguished through agreements with private or non-City entities before, during, or after the allegedly tortious conduct of Defendants. *See* (Doc. 386, pgs. 15-20, 53-54) (the Court indicating at oral argument that it was concerned with how the ownership of the properties, the timing and manner of their acquisition, and the manner in which they were held could affect the property rights at issue in the case). By extension, the extent to which Plaintiff, as a property owner, could properly place itself, through the acquisition of property and the invocation of the *nullum tempus* doctrine, in a better than other private property owners, remains equally unclear. In any event, though, such questions about acquired or foregone rights are inconsequential to the Court's present ruling. The nature of the properties and Plaintiff's claims allow for a ruling on this record.

First, as to both Plaintiff's claims for remediation costs and for loss-of-use damages, the Court holds private rather public rights are at issue in the case. Again, the case undisputedly involves 273 "vacant, undeveloped" properties for which there is currently no public right of access or use. (Docs. 283, pgs. 17-18; 330, pgs. 20-21). Indeed, as stated above, 173 of the properties are owned by private persons, non-City entities, or St. Clair County, Illinois, as opposed to Plaintiff. (Docs. 283, pg. 23; 330, pg. 20). Therefore, at a minimum, there is no risk to health from the public, *i.e.*, either residents of the City locally or residents of the State more broadly, accessing or using the properties. *See Miller v. Metro. Water Reclamation Dist. of Greater Chicago*, 374 Ill. App. 3d 188, 191 (2007) ("[T]he term 'public use'…means that the people of the state at large must have a general interest in the property at issue. It does not mean that the public necessarily must have total and unlimited access to the property, but rather that the property is for the general benefit of the people of the state."); *A, C & S, Inc.*, 131 Ill. 2d at 473-74 (finding, on review of a motion to dismiss, the plaintiff alleged an interest in the safety of public buildings and the safety of a large segment of the population, where the large segment of the population *attended* the public schools, *would attend* the public schools, and *used or would use* the public school system and public school buildings for mandatory classroom attendance and other public functions). By extension, Plaintiff has not provided evidence to support its contention that PCBs, after migrating from the subject properties to other areas, create a measurable risk to public health in this case. *See Latronica Asphalt and Grading, Inc.*, 346 Ill. App. 3d at 271-72 (finding, on review of a motion to dismiss, the defendant's alleged disposal of 2,498 cubic yards of construction debris and other waste, which could scatter to nearby

properties after becoming airborne, implicated the interests of the general public). It is at least notable, too, neither the U.S. EPA nor the Illinois EPA has required corrective action on these bases. For these reasons, the Court agrees with the following notion: "Where there's no exposure, there's no health risk." (Doc. 386, pg. 56); *see also* (Doc. 283-27, pg. 31) (Plaintiff's expert testifying, "as long as the lots are vacant and no one's exposed," "you can't have the risk"); (Doc. 283-39, pg. 16) (Plaintiff's expert testifying, generally, that "if you're not in a location, you're not likely to have excess exposure").

Similarly, the record reflects there is currently no specific plan to redevelop the properties for residential or commercial use, and Plaintiff made no efforts to address the PCB contamination before filing this lawsuit. (Docs. 283, pgs. 18, 20; 322, pg. 27; 330, pgs. 20-21, 23; 345, pg. 22). It stands to reason from these circumstances that the rights asserted in relation to the subject properties are of a private nature that belong to Plaintiff, and inure to its commercial or municipal benefit, or another small and distinct subsection of the community rather than to the general public. Put another way, the Court cannot conclude under these speculative circumstances that the general public would benefit from Plaintiff's action and lose from its inaction. To be sure, though, Plaintiff's attempt to vindicate private rights, including for property that it admittedly does not own, does not serve to "protect[] the public purse" or represent a " 'judgment that the public should not suffer because of the negligence of its officers and agents' in failing to promptly assert causes of action" belonging only to Plaintiff or to the small and distinct subsection of the community. The Court stresses that certain of Plaintiff's residents may benefit from the

30

action, pursuant to possible decision making of Plaintiff in relation to the properties at some indeterminate time in the future, but that cannot, by itself, render the action public.

Second, section 2-133 of Plaintiff's Municipal Code undisputedly provides: "The city manager…shall be responsible to the city council for the proper administration of all affairs of the city. The City manager shall have the power and be required to…[e]nforce all laws and ordinances of the city." (Docs. 271, pg. 13; 322, pgs. 21-22; 330, pg. 34; 351, pg. 21). However, section 50-79 of the Municipal Code, more specifically, does not contain the mandatory language required by the case law in this context. *See Champaign Cnty. Forest Pres. Dist.*, 291 Ill App. 3d at 201-02; *Viacom Intern., Inc.*, 713 F. Supp. 2d at 783; *Agri-Chain Prods., Inc.*, 224 Ill. App. 3d at 302-03. Section 50-79 merely provides: "Whenever any nuisance shall be found on any premises within the city, the officials *are authorized* to cause such nuisance to be summarily abated in such a manner *as may be directed*." (Docs. 271, pg. 13; 322, pg. 22; 330, pg. 34; 351, pg. 21) (Emphasis added).

Similarly, section 50-80 of the Municipal Code provides:

> It shall be the duty of the duly authorized authorities to serve a written notice upon the owner…of any lot, building or premises in or upon which any nuisance may be found or who may be the owner or cause of any such nuisance requiring such persons to abate the nuisance in such manner as shall be prescribed within a reasonable period of time…. No person so notified shall neglect or refuse to comply with the requirements of such order by abating such nuisance within the time specified. If such nuisance is not abated within the time specified in such notice, it shall be the duty of such authorized authority to proceed at once to cause such nuisance to be abated; provided, further, that whenever the owner…is unknown or cannot be found, the authorized authority shall proceed to abate such nuisance without notice. In either case, the expense of such abatement shall be collected from the person who may have created, continued or suffered such nuisance to exist.

(Docs. 330, pgs. 34-35; 351, pgs. 21-22).

This provision, admittedly, contains much stronger language than section 50-79. However, the parties agree that section 50-80 "provides [the] specific procedure to trigger § 50-79's authorization." (Doc. 283, pg. 49); *see also* (Doc. 330, pg. 77) ("Monsanto is on target when it identifies Section 50-80 as 'provid[ing] a specific procedure to trigger § 50-79's authorization' "). In other words, an exercise of discretion by "the officials" in section 50-79 must precede the mandatory actions required by section 50-80. (Docs. 271, pg. 13; 322, pg. 22; 330, pgs. 34-35; 351, pgs. 21-22). And, alternatively, the Court tends to agree with Defendants that "[n]othing in th[is] provision[] empowers the City to ask a court to order third parties to clean up [or pay damages for] imperceptible chemicals on the City's own property." (Doc. 283, pg. 49). It allows Plaintiff, with or without notice "upon the owner," to itself "proceed at once to cause such nuisance to be abated" "[i]f such nuisance is not abated within the time specified in such notice." (Docs. 330, pgs. 34-35; 351, pgs. 21-22). Thereafter, Plaintiff can "collect[]" "the expense of such abatement." (Docs. 330, pgs. 34-35; 351, pgs. 21-22). It may be true Plaintiff served the pleadings, "which request 'the immediate and complete abatement and remediation' of the PCB contamination," on Defendants, who did not subsequently abate the alleged nuisance on the subject properties. (Doc. 330, pg. 78). But Plaintiff made no efforts to address the PCB contamination before this lawsuit, *i.e.*, by "proceed[ing] at once to cause such nuisance to be abated." (Docs. 283, pg. 20; 322, pg. 27; 330, pgs. 23, 34-35; 345, pg. 22; 351, pgs. 21-22). Likewise, as to section 62-2, the "health department" no longer exists, so it cannot "cause

all nuisances" that "it *may deem* prejudicial or obnoxious to the public health or comfort" "to be abated or removed." (Docs. 271, pgs. 13-14; 322, pg. 22; 330, pg. 35; 351, pg. 22).

Third, regarding the extent to which Plaintiff must expend public funds, the Court again notes Plaintiff has no specific plan to redevelop the properties and it has made "no efforts to address PCB contamination on the 273 parcels before [filing] this suit." (Docs. 283, pgs. 18, 20; 322, pg. 27; 330, pgs. 20-21, 23; 345, pg. 22). To be sure, Plaintiff claims that is due to the high cost of remediation outside of this lawsuit. However, the Court has already held the case, which Plaintiff was not required to file under its Municipal Code, involves rights of a private or local nature. *Compare A, C & S, Inc.*, 131 Ill. 2d at 473 (noting, among other things, that "a costly program [wa]s [allegedly] underway to repair, replace and maintain the [asbestos containing materials]"); *with City of Chicago v. DoorDash, Inc.*, No. 21-cv-5162, 2024 WL 4252797, *10 (N.D. Ill. Sept. 20, 2024) (finding "there is no indication that [the plaintiff] has had to or will have to expend public funds to address the damage caused by [the defendant]'s allegedly unlawful conduct," "[t]he absence of public expenditures distinguishes th[e] case from others" where *nullum tempus* applied, and the costs of prosecuting the lawsuit were not "evidence of public expenditures since [the plaintiff] was not 'required by law to undertake' th[e] suit"); *Viacom Intern., Inc.*, 713 F. Supp. 2d at 781 ("[I]n *Shelbyville, A, C & S*, and *Latronica*, the governmental entities were required by law to undertake these expenditures and were thus entitled to recover; here, there is no obligation on the part of Plaintiff to maximize potential tax or business revenue, or to clean up pollution caused by releases from the Site. In addition, Plaintiff does not allege what costs it has been forced to incur in dealing with pollution from the

33

Site, other than to allege that it has lost potential tax and business revenues from declining property values and tourism, and that the cost of remediation 'is believed to be in the multiple millions of dollars.' As Plaintiff is not required by law to undertake the actions that these damages seek recovery for, no expenditure of public funds has been necessitated by the contamination from the Site.") (internal citation omitted).

Therefore, at this point, Plaintiff has asserted private or local rights, in its discretion, without materially expending any funds. Indeed, as discussed at other junctures in the case, it is prosecuting the case under a contingency-fee agreement.

Finally, Plaintiff's attempt to show how it intends to expend the funds from this lawsuit is also unconvincing. The "Ordinance Concerning Proceeds From Monsanto PCB Litigation," which implicates both the first and the third *nullum tempus* factors, was passed on April 10, 2025, and, in pertinent part, provides the following recitals:

> WHEREAS, the City has filed and is prosecuting the matter captioned *City of East St. Louis, Illinois v. Monsanto Company et al.*, No. 3:21-cv-232-DWD, pending in the United States District Court for the Southern District of Illinois, a lawsuit which arises from alleged polychlorinated biphenyl ("PCB") contamination within the City (the "Litigation"); and
>
> WHEREAS, the City desires to use any proceeds it may receive from the Litigation (by judgment, settlement, or otherwise), after the payment of costs and attorneys' fees (the "Litigation Proceeds"), to remediate PCB contaminated property that has been identified within the City, investigate other PCB contamination within the City, and fund projects that will further social and economic development within the City ("Qualifying Purposes"); and
>
> WHEREAS, the City desires to enter into an agreement with a person or entity who has substantial experience in state and local government and the management of municipal finances ("Oversight Partner"), pursuant to which the City and the Oversight Partner will review and approve use of

34

the Litigation Proceeds for Qualifying Purposes ("Proceeds Agreement");
and

WHEREAS, the City desires to enter into an agreement with the Oversight
Partner and a third-party escrow agent ("Escrow Agent"), pursuant to
which the City will deposit the Litigation Proceeds with the Escrow Agent,
and pursuant to which the City and the Oversight Partner will authorize
the release of the Litigation Proceeds for Qualifying Purposes per the
Proceeds Agreement ("Escrow Agreement"); and

WHEREAS, the Mayor and the City Council have determined that it is in
the best interest of the City and the public to identify potential candidates
for Oversight Partner and Escrow Agent and plan for the implementation
of a Proceeds Agreement and Escrow Agreement.

(Doc. 371-2, pg. 2) (Emphasis in and omitted from original).

The Ordinance then proceeds to set forth the process for Plaintiff to select an

oversight partner, enter a proceeds agreement, select an escrow agent, enter an escrow

agreement, and preserve any litigation proceeds. (Doc. 371-2, pgs. 2-3). However,

Defendants are generally correct that it is the nature of the right, as opposed to the plans

for recovery, that govern the analysis. *See Shelbyville Restorium, Inc.*, 96 Ill. 2d at 460-65; *A,*

*C & S, Inc.*, 131 Ill. 2d at 471, 474, 476 (1989); *Champaign Cnty. Forest Pres. Dist.*, 291 Ill App.

3d at 200, 202-03; *Latronica Asphalt and Grading, Inc.*, 346 Ill. App. 3d at 273-76;

*see also DoorDash, Inc.*, 2024 WL 4252797 at *8 ("Accepting the City's argument would

entail an expansive theory of government power whereby municipal governments could

immunize themselves from state limitations periods by enacting ordinances with only a

marginal connection to public welfare."); (Doc. 378, pgs. 1-2). Further, even if the

Ordinance could, by itself, transform what have been found to be private or local rights,

asserted in Plaintiff's discretion, into public rights requiring the expenditure of public funds, the Court believes it lacks the specificity and certainty to accomplish that tall task.

Having found the *nullum tempus* doctrine is inapplicable in this case, the Court holds Defendants are entitled to summary judgment on Plaintiff's claims. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Claims is **GRANTED, in part**, and **DENIED as moot, in part**, and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense is **DENIED**. As a final aside, though, the Court highlights its understanding of Plaintiff's predicament in this case. It is undisputed that there is some level of PCB contamination on the subject properties in the City. However, the Court could not reach the merits of Plaintiff's claims. It could only hold that those claims are barred by the applicable statutes of limitations and repose. As an extension of that holding, the Court could only conclude that the *nullum tempus* doctrine cannot excuse Plaintiff from sleeping on the private rights asserted in this action. Unable to apply that doctrine, the Court must adhere to the above-stated legal principle: Limitation periods "are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose." *Cada*, 920 F.2d at 452-53.

### 2. The Parties' Separate Motions for Summary Judgment on Defendants' First Amended Counterclaim and Defendant Solutia Inc.'s Motion for Partial Summary Judgment on Direct Liability

As discussed above, Defendants filed a First Amended Counterclaim under 42 U.S.C. § 1983, stating an as-applied due process challenge to the enforcement of the Abatement Ordinances. (Doc. 179, generally). Defendants allege, as applied to them, the

Abatement Ordinances are unconstitutionally vague. (Doc. 179, generally). For that reason, Defendants request: "[J]udgment in their favor and against Plaintiff/Counter-Defendant…to the extent authorized by law, including preliminary and permanent injunctive relief against enforcement of the Abatement Ordinances against Defendants, declaratory relief that the Abatement Ordinances are unconstitutional as applied to Defendants, and attorneys' fees pursuant to 42 U.S.C. § 1988." (Doc. 179, pgs. 13-14).

Notably, Plaintiff's case was resolved on nonconstitutional grounds. Its claim under the Abatement Ordinances was held to be time-barred, and the *nullum tempus* doctrine does not apply. Therefore, Plaintiff cannot enforce the Abatement Ordinances against Defendants, and it is not necessary for the Court to consider whether the Abatement Ordinances, as applied to Defendants, are unconstitutional. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."); *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (identifying the aforementioned principle from *Gulf Oil Co.* as "a 'fundamental rule of judicial restraint'"); *St. Augustine School v. Underly*, 78 F.4th 349, 358 (7th Cir. 2023) (recognizing "the U.S. Supreme Court's preference for constitutional avoidance, if a difficult question can be resolved either by reliance on state law or on statutory grounds," such that "[c]onstitutional adjudication must be unavoidable") (cleaned up); *U. S. ex rel. Isaac v. Franzen*, 531 F. Supp. 1086, 1092 (N.D. Ill. 1982) (noting the "general federal policy of avoiding a constitutional question when the merits of a case may be resolved on nonconstitutional grounds"). This is true even though constitutional avoidance arose from Defendants' First Amended Counterclaim rather than Plaintiff's

case. Again, in light of the specific relief requested by Defendants, which is essentially what the Court granted with the above rulings, it is unnecessary to consider the merits of the First Amended Counterclaim. On this basis alone, the parties' Motions for Summary Judgment on Defendants' First Amended Counterclaim are **DENIED as moot**. Defendants' First Amended Counterclaim is **DISMISSED without prejudice**.

Next, in light of the above rulings on Defendants' Motion for Summary Judgment on Plaintiff's Claims and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense, Defendant Solutia Inc.'s Motion for Partial Summary Judgment on Direct Liability (Doc. 261) is **DENIED as moot**.

### B. The Parties' Motions to Exclude Expert Testimony, Defendants' Motion for a Judicial Determination on Plaintiff's Demand for a Jury Trial, and the Parties' Motions *in Limine*

By virtue of the Court's rulings on Defendants' Motion for Summary Judgment on Plaintiff's Claims and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense, it is unnecessary to resolve these Motions. As such, the Motions to Exclude Expert Testimony (Docs. 255, 256, 257, 258, 259, 260, 262, 264, 265, 266, 267, 269, 270, 278), Defendants' Motion for a Judicial Determination on Plaintiff's Demand for a Jury Trial (Doc. 357), and the Motions *in Limine* (Docs. 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420) are **DENIED as moot**.

### III. CONCLUSION

For the reasons explained above, the Court holds Defendants are entitled to summary judgment based on the statutes of limitations and repose and the *nullum tempus*

doctrine. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Claims is **GRANTED, in part**, and **DENIED as moot, in part**, and Plaintiff's Motion for Partial Summary Judgment on Defendants' Liability for Trespass and First Affirmative Defense is **DENIED**. By extension, the parties' Motions for Summary Judgment on Defendants' First Amended Counterclaim, Defendant Solutia Inc.'s Motion for Partial Summary Judgment on Direct Liability, the Motions to Exclude Expert Testimony, Defendants' Motion for a Judicial Determination on Plaintiff's Demand for a Jury Trial, the parties' Motions *in Limine*, and the Joint Motion for an Extension of Time are **DENIED as moot**. Defendants' First Amended Counterclaim is **DISMISSED without prejudice**.

   **SO ORDERED.**

   Dated: February 27, 2026

              _____

              DAVID W. DUGAN
              United States District Judge